**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* KASSIE WESTMORELAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-10972-WGY |
| | ) | |
| AMGEN INC.; INTERNATIONAL | ) | |
| NEPHROLOGY NETWORK renamed | ) | |
| INTEGRATED NEPHROLOGY NETWORK, a | ) | |
| d/b/a of DIALYSIS PURCHASING ALLIANCE, | ) | |
| INC.; and ASD HEALTHCARE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF AMGEN INC.'S MOTION TO STRIKE
CERTAIN PORTIONS OF EXPERT REPORT OF RAYMOND S. HARTMAN**

Having failed during fact discovery to gather basic evidence necessary to support her

claims – items such as providers certifications and medical records – Relator seeks instead to use

the testimony of a damages expert, Raymond S. Hartman, to overcome these core failures of

proof.  Rather than interpreting or summarizing the evidentiary record, which is the proper role

of an expert witness, certain portions of Hartman's report seek to fill major gaps in the record

through the use of unsupportable assumptions and unjustifiable analytical leaps.  Because he has

been asked not just to calculate damages, but – due to Relator's lack of key evidence – to devise

novel ways of inferring much of the basic information needed to perform such calculations,

Hartman repeatedly steps well beyond the scope of any relevant expertise he may have and into

the realm of junk science.  This sort of evidentiary bootstrapping is best exemplified by two

portions of Hartman's report:

- <u>Identification of False Certifications</u> – Before he can calculate damages incurred
  by the government under Relator's express certification (kickback) theory of
  liability, Hartman needs to know when and if providers submitted the relevant

certifications to the government.  But Relator failed to gather these certifications (CMS-855 forms) for all but a few dozen providers and therefore cannot prove when – or even if – 99 % of providers ever submitted them to Medicare.  To overcome this failure of proof, Hartman relies on imagined "proxy" dates for provider certifications derived using two different methods.  One of these methods the Centers for Medicare & Medicaid Service ("CMS") itself recognized is erroneous, and the other is wholly arbitrary.

- <u>Identification of Medically Unnecessary Claims</u> – Though Relator has alleged that the Defendants caused the submission of medically unnecessary claims for Aranesp®, she made no effort to gather or analyze medical records to identify such claims.  To overcome this failure of proof, Hartman is forced to attempt this task himself.  Without the benefit of any medical expertise and using nothing but claims data and his own entirely novel and arbitrary statistical tests, Hartman purports to identify thousands of medically unnecessary claims.  Relator's own medical experts reject this analysis, however, having testified that only a person with medical training and access to patients' clinical records could possibly judge the medical necessity of Aranesp® doses.

These portions of Hartman's report rely on unsupportable assumptions and unreliable methodologies, and are an effort by Relator to overcome fundamental failures of proof through the use of unqualified and inappropriate expert testimony.  The Court should strike them and preclude Hartman from testifying on these topics.  Addressing this narrow motion at this time will be of tremendous benefit in focusing the issues for the Court and the parties on summary judgment, at the pretrial stage, and at trial.

## STATEMENT OF FACTS

## I.   HARTMAN'S RELEVANT EXPERTISE

Hartman is director, president, and 85% owner of a firm that supports his full-time work as a witness.  No client relies on Hartman's expertise outside of litigation.  *See* Hart. Tr. 12:24-14:18.  He has a Ph.D. in economics, began work as an expert witness in 1975, and has testified at deposition or trial in approximately 30 cases over the past eight years. *See* Ex. 1, Declaration of Raymond S. Hartman (hereinafter "Hart. Rep.") Att. A.1; Ex. 2, Excerpts of Deposition Transcript of Raymond S. Hartman (hereinafter "Tr.") at 11:20-12:7, 14:19-15:21.   Hartman

does not have any medical training or expertise.  Tr. at 62:10-12.  He has very limited knowledge

of Aranesp® or ESAs (the class of drugs that includes Aranesp®), and what little he knows he

learned in connection with this case.  *See* Tr. at 43:15-19 (no knowledge of how doctors

administer ESAs other than what he has learned for purposes of this case); Tr. at 108:6-9 (no

knowledge of what Aranesp® package insert recommends regarding dosing); Tr. at 257:5-15 (no

knowledge of how Aranesp® dosing practices differ by the condition being treated).

## II.     OVERVIEW OF RELEVANT PORTIONS OF HARTMAN'S OPINION

### A.     Materials Considered

Hartman's report lists the principal evidence he and his staff considered as: the Fourth

Amended Complaint, Amgen's interrogatory responses, 13 documents out of the four million

pages produced in discovery, 12 "other documents" that are routine background reports, and only

five of the 89 deposition transcripts.[1]  *See* Hart. Rep. Att. B. The principal data he relied upon to

calculate damages are CMS Medicare Part B claims records.  Hart. Rep. at 1.

### B.     Threshold Assumptions and Methodology

Hartman has "not been asked to submit testimony addressing liability" and has "been

asked to assume the behavior set out in the *Complaint*."  Hart. Rep. ¶ 30.  Tracking the claims in

the Fourth Amended Complaint, his report purports to calculate the damages resulting from three

categories of false claims: 1) express certification-based (kickback) claims 2) medically

unnecessary claims, and 3) claims for unadministered product.  Hart. Rep. ¶ 41.

For all three of these categories of false claims, Hartman begins his analysis by

attempting to identify instances of overfill billing from CMS claims data.  Based on Aranesp®

---

[1] Hartman testified that, while his "staff" reviewed unspecified provider testimony, he did not personally review any deposition transcripts or witness declarations.  Hart. Tr. 28:3-17; 77:23-78:7.  He conceded that reviewing such testimony and declarations would be something he would want or need to do in rendering his opinions in this matter. Hart. Tr. 36-38, 77:23-78:22, 145:4-146:11.

having a target overfill of 16.8% during the relevant time frame and an assumption that providers never use more than two vials in combination, Hartman combs the CMS claims data – which contain roughly eight million total Aranesp® claims – for recorded doses that are 1-17% higher than a standard Aranesp® vial size or combination of two vial sizes, and he flags all such entries as possible instances of "billing the overfill."  Hart. Rep. ¶¶ 37-41.[2]

After identifying all claims that fall within these putative overfill ranges, Hartman then runs a statistical filter to determine, for each provider for each year, whether there are a sufficient number of putative overfill claims to represent "deliberate behavior" or whether the overfill claims are so few as to suggest "random administrative errors."  Hart. Rep. ¶¶ 40-41.  He considers every provider who passes this statistical filter for at least one year (a total of 2,191 providers) to be "tainted" and considers all of such providers' claims—both before and after the "tainted" year—as subject to potential "taint."  Hart. Rep. ¶¶ 40-41, 43, 46-48.  Despite his acknowledgement that the CMS claims data contain numerous apparent mistakes and clerical errors, Hartman's methodology assumes a baseline error rate of 0% for "clean" providers.  Hart. Rep. ¶ 40 & Att. D.  Accordingly, under his screen, Hartman considers a provider who submits just three claims out of a thousand that fall within his putative overfill range to be "tainted."  *See* Hart. Rep. Att. D, p. 2; *see also* Ex 3, Rebuttal Expert Report of Fiona Scott Morton, Ph.D.

---

[2] While not the subject of this motion, Hartman's methodology for attempting to identify overfill claims is flawed by its reliance on a number of unjustified assumptions.  He assumes, without considering any of the significant provider testimony to the contrary, that doses within this range do not represent instances of providers (1) re-entering single-use vials to obtain multiple doses for multiple patients, a practice Medicare allowed; (2) administering partial vials and discarding the remaining medicine without billing for it; (3) administering three vials to a single patient in a single visit; or (4) using a pharmacy hood to repackage single-dose vials into multiple doses for multiple patients.  Tr. 69:2-74:16, 77:23-80, 82-83, 207:19-208:14.  He acknowledged at deposition that if any of these activities occurred with sufficient frequency, it would impact the validity of his results, i.e., his purported ability to accurately identify overfill claims based solely on claims data.  *Id*. at 70-71, 73-74, 123:20-129:11, 137:3-138:12, 205:16-206:20, 207:14-208:14.  Amgen contests the validity of Hartman's calculations based on these and other deficiencies and reserves the right to raise these issues at a later time.

(hereinafter "Morton Rep.") ¶ 98 (describing Hartman's error screen).[3]  Hence, of the 2,191

providers Hartman classifies as tainted – who collectively were responsible for approximately

241,000 putative overfill claims, Hart. Rep. ¶41, n.74 – 54% had five or fewer putative overfill

claims within the year they were classified as "tainted" and 75% had ten or fewer.  *See* Morton

Rep. Ex. 7 (calculating impact of Hartman's results).

Hartman then assumes that all of the 2,191 providers he has identified as having

submitted overfill claims have engaged in criminal conduct.   *See* Hart. Rep. ¶ 20 ("To the extent

that certain provider groups or providers participated in billing the overfill, I have been asked to

assume that the False Claims Act and/or the Anti-Kickback Statute were violated . . . .").  He

does so despite CMS testimony – of which Hartman was not made aware – that billing for

overfill was legal during the entire relevant time period and that CMS would continue to pay

overfill claims until the effective date of its new rule, January 1, 2011:

> Q      And upon the effective date, CMS will no longer continue to pay claims that
>        contain overfill amounts; is that correct?
> A      That is correct.
> Q      Notwithstanding the fact that up until today CMS has reimbursed claims without
>        regard to whether or not they've included overfill?
> A      Correct.
>
> …
>
> Q.     During November and December of 2010, will CMS continue to apply its current
>        policy of making reimbursement decisions without regard to whether or not
>        claims contain or did not contain overfill?
> A      Yes.

*See* Ex. 4 at 214:16-23, 220:19-23 (Excerpts of Deposition Testimony of CMS 30(b)(6) witness

John Warren); *see also id.* at 27-29 (explaining that the "incident to" provision of the Medicare

---

[3] Hartman testified that he was unaware of actual CMS error rates, Hart. Tr. at 159:2-162:14, and his methodology ignores published CMS reports establishing actual error rates as high as 10%.  *See* Morton Rep. ¶ 19 (citing CMS reports).

program benefits manual related to overfill issue only "tenuously"); *id.* at 209-210 (CMS never

issued any guidance suggesting that overfill was free product or "that the 'incident to' rule

precluded coverage for overfill"); *id.* at 77:10-80:15 (CMS was aware no later than early 2005

that "Medicare was paying claims to dialysis providers that included overfill amounts").[4]

Hartman was not aware of any of this CMS testimony, but, when it was described to him at his

deposition, he testified that he would consider it relevant to his analysis.  Tr. at. 42:2-43:14.

Similarly, with respect to all of the 2,191 providers Hartman identifies as having

submitted overfill claims, Hartman assumes – without any analysis or explanation – that the

Defendants caused them to submit all such claims.  Hart. Rep. ¶ 32 ("From the vantage point of

providers, the extent to which Defendants caused injury by 'marketing the overfill' is measured

by the amount of overfill billed and the number of claims for which overfill was billed.").[5]

---

[4]  This testimony from a CMS 30(b)(6) representative directly refutes key allegations in Relator's Fourth Amended Complaint upon which the Court relied in allowing Relator to proceed with her claims.  *See* Rel. Opp'n Amgen Mot. to Dism. Four. Am. Compl. [Dkt. #267] at 3-5 ("Amgen's assertion that CMS reimburses for overfill is not only contrary to the allegations of the Complaint, and therefore not a proper grounds for dismissal, but it is also unfounded. . . . Under longstanding CMS policy, overfill is not reimbursable by Medicare because it does not represent an expense incurred by the physician and therefore violates the 'incident to' provisions of the Manual.").

[5]  In making this assumption, Hartman fails to consider obvious alternative causes of providers billing for overfill, other than the Defendants' conduct.  For example, he ignores Relator's testimony that Amgen's competitor, Johnson & Johnson, marketed overfill in Procrit® (which competes directly with Aranesp®) and that this competitor's marketing could just as plausibly have caused providers to begin submitting overfill claims.  *See* Ex. 9 (Relator interrogatory response stating that Johnson & Johnson was "actively marketing Procrit overfill" and alleging that Amgen marketed overfill "in response to that marketing practice").  Similarly, it is a matter of public record that, long before Aranesp® entered the market, providers were billing for overfill in Epogen® and other dialysis drugs that Amgen did not manufacture.  *See, e.g.,* Ex. 10, 1997 OIG Report (acknowledging use and billing of overfill).  Hartman's failure to control for *any* alternative causes of provider billing behavior is grounds alone to exclude his report, as it renders it completely useless to a jury, at least absent independent evidence establishing that the Defendants' marketing conduct, as opposed to other factors, caused each of these providers to submit these putative overfill claims.  *See PharmaNetics, Inc. v. Aventis Pharmaceuticals, Inc.*, 182 Fed. Appx. 267, 270-71 (4th Cir. 2006) (affirming exclusion of a damages expert where proffered opinion was "not sufficiently tied to the facts when the evidence showed various factors caused lost sales" and therefore "the jury had no reasonable method to dissect the report and assess what acts may have caused particular losses."); *R.F.M.A.S., Inc. v. So*, No. 06-civ-13114, 2010 WL 4341331, *21 (S.D.N.Y. Oct. 12, 2010) (excluding two damages experts for whose reports merely asserted "in a conclusory fashion that they ruled out other possible causes of the decrease in plaintiff's sales" when "nothing in either expert's report indicates that they considered and controlled for the obvious possibility" that factors other than the defendant's alleged conduct could have caused sales to decline").

### C.      Hartman's Methodology For Calculating Damages Resulting From False Certification-Based Claims

To establish the elements of a false certification-based claim, the Court has stated that Relator must show "that when the providers signed the enrollment forms, they knew that they would be accepting kickbacks from the Defendants in violation of the anti-kickback statute." *United States ex rel. Westmoreland v. Amgen Inc.*, No. 06-10972-WGY, 2010 WL 1634315, at *10 (D. Mass. Apr. 23, 2010).  In an effort to calculate damages consistent with this theory of liability, Hartman attempts to identify – from among the group of "tainted" providers – those providers who submitted at least one putative overfill claim before and at least one putative overfill claim after enrolling in Medicare's Provider Enrollment Chain and Ownership System ("PECOS").  Hart. Rep. ¶¶ 42-44.  When enrolling in PECOS, providers sign a certification on CMS form 855 that they understand that payment of a claim by Medicare is conditioned on the claim and underlying transaction complying with the federal Anti-Kickback Statute ("AKS").  As noted above, Hartman was directed by counsel to assume that all instances of overfill billing by providers are willful kickback violations.  Hart. Rep. ¶ 20.  He therefore infers that whenever a provider can be shown, through his methodology, to have submitted an overfill claim both before and after submitting a CMS-855 form, that the representation relating to AKS compliance contained in that form was knowingly false when made, and that all subsequent Aranesp® claims were false.  Based on this "post-PECOS" methodology, Hartman calculates total damages and penalties of up to $2.64 billion based on alleged false claims from 561 providers.  Hart. Rep. ¶¶ 43-44.

### 1.      Hartman's method of supplying missing certifications and dates

Because Relator failed to gather during discovery the relevant CMS-855 forms for all but handful of the providers at issue, Hartman lacks key inputs necessary to perform his analysis: the

existence of provider certifications and the date of those certifications.[6]  He has no idea when or

if most of the providers filed 855 forms and made the representation on which his AKS analysis

depends.  To compensate, he uses two methods to derive proxy dates for certifications.  First, for

a minority of providers, he uses dates taken from a spreadsheet that CMS produced.  Hart. Rep.

¶ 42.  CMS has stated, however, that the dates on this spreadsheet are <u>not</u> certification dates.  *See*

Ex. 5 (October 26, 2010 Email from Susan M. Bozinko, Office of General Counsel, CMS

Division) (noting that the dates on spreadsheet do not represent the "date the Certification

Statement is signed").  Hartman was not only unaware of this statement by CMS, but the only

justification he was able to provide for assuming the reliability of these dates was that he

mistakenly thought the Defendants had stipulated to the use of these proxy dates.  *See* Hart Tr. at

246:11-247:12.  There is no such stipulation.  Indeed, comparing the spreadsheet to the few

actual certifications gathered during discovery – at least some of which Hartman had at his

disposal at the time he prepared his report – *reveals not a single instance in which the date on the*

*spreadsheet matches the true certification date.  See* Morton Rep. at ¶¶ 168-170.  The dates are

as many as four or five years apart in some instances, with no discernable pattern.  *Id*.  When the

actual dates are used for Hartman's analysis, the damages Hartman's methodology calculates for

many providers drop from millions of dollars to zero.  *Id*. ¶ 173

　　　　With respect to providers for whom there are no dates on the CMS spreadsheet – a large

majority – Hartman simply picks an arbitrary date of October 1, 2006.  Hart. Rep. ¶ 42.  He

chooses this date based on a statement from a single CMS document that suggests that 60% of

---

[6] Hartman uses an actual date from a CMS-855 form for only one provider out of the 561 for whom he finds post-PECOS damages.  *See* Morton Rep. ¶ 170 (analyzing Hartman's results).  He acknowledged that he would have liked to have reviewed actual certification forms had they been available, but he was not aware that any were.  Hart. Tr. 249:6-252:22.

providers had enrolled in PECOS by October 2006.[7]  The accuracy of this 60% enrollment figure is questionable in light of various other pronouncements from CMS that suggest a much lower enrollment rate and the fact that only 10% of the actual certifications produced to date were signed prior to October 1, 2006.  *See* Morton Rep. at ¶¶ 171, 179.  Furthermore, even assuming 60% of providers had in fact enrolled in PECOS as of October 2006, the precise timing of their certifications is obviously critical to Hartman's analysis.  If, for example, a provider enrolled in 2003, but is not alleged to have begun billing for overfill until August 2006, Hartman's methodology would not infer that the certification was false.  But if that same provider is arbitrarily assigned a certification date of October 1, 2006, as Hartman has done, under that same analysis, his certification *is* inferred to be false.

## 2. The assumptions and inferences underlying Hartman's "post-PECOS" methodology

Whenever Hartman identifies at least one putative overfill claim before and at least one putative overfill claim after these "proxy" certification dates, he concludes that the provider submitted a false certification.   Hart. Rep. ¶¶ 41, 43.  He does so despite his own error screen which treats isolated instances of putative overfill billing as indistinguishable from random error. Hart. Rep. ¶¶ 40-41.  For example, a single putative overfill claim in a given year is treated under Hartman's methodology as "random error," and thus not sufficient evidence of "deliberate behavior," for the purposes of determining whether overfill billing occurred.  Hart. Rep. ¶¶ 40-41.  But when attempting to determine if a provider submitted a false certification, a single

---

[7] To account for the 40% of providers he assumes had not enrolled as of this date, Hartman reduces all claims after September 30, 2006, for which he attributes damages under this theory by 40%.  Hart. Rep. ¶ 42.  But he offers no support for his assumption that reducing the number of kickback-induced claims by 40% adequately compensates for having assumed that 100% of providers submitted certifications as of October 2006.

putative overfill claim is treated as sufficient.  Thus, what he chalks up to random error in one context, he treats as sufficient evidence to infer fraudulent intent in another.[8]

Hartman's methodology also takes no account of the length of time between the alleged certification date and the nearest prior and subsequent instances of putative overfill billing. Putative overfill claims submitted many months or years before or after the putative certification date are treated no differently than claims submitted at roughly the same time.

Hartman then compounds these dubious inferences by treating *all* of a provider's Aranesp® claims submitted subsequent to a putative false certification (whether or not consistent with overfill billing) as "tainted" and therefore false.  Hart. Rep. ¶ 43.  Looking at actual providers illustrates how these inferences build upon one another to generate nonsensical results. One provider, for instance, submitted a single putative overfill claim roughly two and half years prior to the certification date Hartman assigned to him and another roughly 18 months after the certification date.  *See* Morton Rep. Ex. 17B.  Under Hartman's methodology this provider's certification, along with 1,984 of his post-certification Aranesp® claims (only five of which Hartman determined were consistent with overfill billing) are inferred to be "false," resulting in roughly $22 million in damages and penalties.  *Id*.  This is not an isolated example.  Providers who submitted very few claims consistent with potential overfill billing account for a disproportionately large percentage of Hartman's "post –PECOS" damages and penalties.  *See* Morton Rep. Ex. 18B (noting that providers with putative overfill claims representing less than 1% of their total Aranesp® claims account for 37% of Hartman's total "post-PECOS" damages

---

[8] Hartman explained that he understood by performing this calculation, he was following the Court's instructions. Tr. 264:22-266:15 ("And my understanding of the judge's directions were -- are that if there is a tainted claim, period, one, doesn't have to be that it's a --meets a statistical criteria of making the provider tainted.  If there's one tainted claim before the certification under PECOS, then -- and then there are -- and then that providers becomes tainted or demonstrates tainted behavior after they have signed that PECOS certification claim -- form, that all claims after the signature of that form are -- are tainted.").

and penalties and that providers with less than 5% putative overfill claims account for 60% of the total damages).

### D.    Hartman's Methodology For Identifying Medically Unnecessary Claims

Because Relator has not collected – or had medical experts analyze – *any* medical records for *any* patients treated by *any* of the 2,191 "tainted" providers Hartman's report identifies, Hartman, who has no medical training, has been asked to develop statistical methods of identifying medically unnecessary claims based solely on his review of CMS claims data.  He has been asked to do so despite testimony from Relator's own three medical experts that it is not possible to determine the medical necessity of Aranesp® claims based solely on claims data and without access to patient charts.  *See* Ex. 6 at 36:10-37, Excerpts of Deposition Transcript of Arnold S. Relman, M.D. (one cannot "make a judgment on the necessity of a treatment without actually seeing the patient"); Ex. 7 at 157:2-9, Excerpts of Deposition Transcript of Bradley M. Denker, M.D. (one cannot "judge the medical necessity of … dosing determinations without reviewing the patient information contained in the patient charts"); Ex. 8 at 296:23-297:20, Excerpts from Deposition of Jane M. Connor, RN, CNN (to determine whether dose is "clinically indicated" you would need to look at Hemoglobin levels, weight, ethnicity, co-morbidities, responsiveness to ESAs, and iron levels).

Working under the assumption – which is never explained or supported – that "a group with standing orders to bill a fixed amount of overfill for all patients would not be administering the drug based on medical necessity," Hartman determines that a provider has a "standing order" in place if any one of the following conditions are met:  (a) the provider is a member of one of the three practices for which he finds a standing order "documented in discovery"; (b) greater than 60% of the provider's claims in a given year are putative overfill claims; or (c) at least 50%

of the provider's putative overfill claims in a given year are for two or fewer dosage amounts. Hart. Rep. ¶¶ 46-47.

Hartman does not explain why he chooses these particular numbers, nor does he cite any authority for these concepts. With respect to his 60% test, for example, Hartman does not explain why a provider who is following a "standing order" to bill overfill would bill for it only 60% of the time (as opposed to something much closer to 100%). With respect to the 50% test, Hartman does not explain how looking at only a provider's putative overfill claims, as opposed to all of a provider's Aranesp® claims, could support an inference of a standing order. Because this test fails to account for a provider's overall percentage of putative overfill claims, it infers the existence of standing orders with respect to a large number of providers who very rarely submitted claims consistent with overfill billing. In fact, providers with one, two, three, or four putative overfill claims in a given year will automatically meet this test (because 50% of four claims will necessarily fall into one or two specific amounts), thereby causing all of their subsequent putative overfill claims to be flagged as medically unnecessary. As a result, over 80% of the providers for whom Hartman infers the existence of a standing order to bill for overfill submitted fewer than ten purported overfill claims. *See* Morton Rep. Ex. 14. And there is at least one instance in which Hartman found a "standing order" based on dosages provided to just one patient. *See* Morton Rep. Appx.¶ 248.[9]

Application of these tests leads to various other absurd results. For example, there are patients for whom this methodology finds that a higher dose was medically appropriate, but a subsequent titration to a lower dose resulted in a dose that was medically unnecessary. *See*

---

[9] Inferring "standing orders" in situations in which providers or practices did not uniformly bill for overfill is not consistent with Relator's allegations regarding standing orders in the Fourth Amended Complaint. *See* Fourth. Am. Compl. ¶¶ 435-436 (describing the administration of "overfill units *across the board*, to *every* patient in the practice or group of patients, because of standing orders or other protocols") (emphasis added).

Morton Ex. 13A (noting that, with respect to the same patient, doses of 100 mcg and 150 mcg are treated as medically necessary, but subsequent doses of 75 mcg are not).  Similarly, there are patients for whom the same dose delivered at different times and/or by different providers is inferred to be medically necessary in some instances but medically unnecessary in others.  *See* Morton Exs. 12A & 12B.

When pressed at his deposition about his ability to draw conclusions regarding medical necessity solely from this sort of statistical analysis of claims data, Hartman seemed to acknowledge that these tests cannot do what his report claims that they can:

> Q.   You've made a finding of medical necessity.  You have no idea what's the blood test to determine medical necessity, correct?
> . . . .
> **A.   I haven't made a finding of medical necessity.  I've made -- I've made some -- I've taken some patterns of billing that make me question whether medical necessity is entering into a -- the billing patterns of a provider.  But I can't -- the particular tests are going to identify patient specific attributes that will require -- that will indicate the extent to which Aranesp is -- or any ESA is required.**
> . . . .
> Q.   So if the dosage appears to be individualized to the patient going up and down, that would indicate to you medical necessity.  But if the dosage was just standard across patients, it's not?
> . . . .
> A.   Medical necessity would take into account the medical necessity of a patient, each patient being different.
> Q.   And you think you're qualified to judge that; is that correct?
> . . . .
> **A.   I think -- I'm not qualified to judge it, a doctor would judge it. I'm -- it's -- I'm -- I'm qualified enough to look at dosaging practices to see if there -- if I'm seeing a sufficiently diverse prescription amount or dosage amount that it would seem to suggest a pattern that they're taking into account individuality.**
> Q.   And what clinical authority do you have to decide what is diverse and not diverse?
> . . . .
> A.   I -- I have put in place measures of percentages of amounts billed at particular levels or that would -- that would demonstrate that what is being prescribed either diverges from FDA standards of medical necessity, or is

sufficiently the same as not to take into account any kind of the variation that one would expect to see in a patient population.

**Q.   What clinical authority do you have to base this assumption on? Has any doctor told you this?  Any medical literature you're relying on --**

. . . .

**Q.   -- or is it just your own interpretation of the label?**

. . . .

**A.   It's my interpretation of dosing drugs and -- and what I -- what I've seen in the analysis of many drugs over the last 15 years as an economist.**

Tr. at 63:18-67:4 (emphasis added).

<u>**ARGUMENT**</u>

## I.   LEGAL STANDARD

Pursuant to Fed. R. of Evid. 702, a qualified expert may testify "in the form of an opinion, or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  In discharging its gatekeeper function under the rule, this Court poses three primary questions.  First, "[i]s this junk science?" – that is, under the principles of *Daubert* and Federal Rule of Evidence 702, is this opinion the product of well-accepted and reliable principles and methods?  *Ambit Corp. v. Delta Airlines, Inc.,* 707 F. Supp. 2d. 74, 76 (D.Mass. 2010) (Young, J.).  Second, "[i]s this a junk scientist?" – that is, "does the proffered witness have adequate qualifications to testify" and does "our society – outside of the litigation process – turn[] to this individual to render the opinion sought to be presented to the court."  *Id.* at 76-77.  Third, "[i]s this a junk opinion" – that is, does it rest on a reliable foundation and is it "relevant to the task at hand."  *Id.*  As the proponent of the expert testimony at issue, it is Relator's burden to establish, by a preponderance of evidence, that the answer to each of these questions is "no."  *McGovern v. Brigham & Women's Hosp.*, 584 F. Supp. 2d 418, 422 (D.Mass. 2008) (Young, J.).

-14-

II.     **APPLICATION**

A.      **The Court Should Strike The Portion Of Hartman's Report Purporting To Identify And Calculate Damages With Respect To False Certification-Based Claims**

1.      **Without PECOS certifications, Hartman's methodology cannot possibly identify false certifications**

In allowing Relator to proceed with her certification based claims, the Court observed that "before conducting full discovery, [Relator] would likely not have access to provider enrollment forms submitted by third party providers." *United States ex rel. Westmoreland v. Amgen*, 2010 WL 3622033, *5 (D. Mass. Sept. 20, 2010). The Court's clear implication was that Relator would need to gather such forms to ultimately prove her claims. But Relator has not done so.

Instead, Relator asked her damages expert to supply the missing facts that only those enrollment forms can provide: the identities of providers who signed and submitted the forms and the dates on which they did so. But, as set forth above, the data and assumptions Hartman used to infer these identities and dates (the CMS spreadsheet and comment that 60% of providers had enrolled in PECOS by October 2006) are unreliable and arbitrary. Therefore, the Court should strike Hartman's resulting damages calculation with respect to Relator's false certification based claims. *See Casas Office Machs. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 681 (1st Cir. 1994) ("A district court may exclude expert testimony where it finds that the testimony has no foundation or rests on obviously incorrect or speculative evidence."); *see also Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1474 (1st Cir. 1996) ("[A]n expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation.").

-15-

### 2.   Even assuming accurate dates, Hartman's false certification methodology is unreliable and inadequate to the task at hand

Even assuming Hartman had actual certification dates to work with, his methodology consists of stacking a series of untenable inferences on top of one another.  First, his method of inferring the existence of a false certification, which is based on nothing more than the presence of a single putative overfill claim before and after the certification in question, assumes that he can accurately distinguish an overfill claim from other perfectly plausible possibilities, such as the use of a partial vial (*see* p. 4 fn. 2, *supra*) or clerical error.  Indeed, this methodology *disregards* Hartman's own error screen, which treats isolated putative overfill claims as indistinguishable from random error.

Second, because this methodology assumes that every instance of overfill billing indicates acceptance of a kickback, it goes much further than the scope of Relator's claims.  Even Relator has not alleged that *all* cases of overfill billing represent kickbacks, but only those resulting from Defendants' alleged marketing conduct ("[T]he gravamen of the Relator's complaint is that Defendants actively marketed excess overfill . . . .").  Relator's Opp'n Amgen Mot. Dism. Four. Am. Compl. at 11. [Dkt. 267].  Moreover, the assumption that every instance of overfill billing represents acceptance of a kickback is inconsistent with CMS's testimony that it was, at all relevant times, legal to bill for overfill.  *See* p. 5-6, *supra*.

Third, Hartman's methodology attributes no significance whatsoever to the often very substantial length of time between the alleged certification date and either the prior or subsequent instances of putative overfill billing.  Logically, for prior or subsequent conduct to provide any insight at all into a provider's knowledge or intent at the time he signed or submitted a certification, the conduct would have to occur immediately before or after the certification was

signed.  Conduct that occurs months or years later (or months or years before) sheds no light on what a provider knew or was thinking when he signed the certification.

Finally, Hartman's methodology compounds all of these dubious inferences by concluding that *any* Aranesp® claim submitted after a putative false certification – whether or not consistent with overfill billing – is "false" and should count towards damages and penalties, thereby causing providers who – even according to his model – submitted only a handful of putative overfill claims to account for millions of dollars in purported damages.

Where, as here, "there is simply too great an analytical gap between the data and the opinion proffered" the opinion should be excluded.  *McGovern*, 584 F. Supp. 2d at 426 (Young, J.) (excluding medical expert testimony where witness's conclusions were not sufficiently "connected to existing data about the risk of stroke").

**B.    The Court Should Strike The Portion of Hartman's Report Purporting To Identify And Calculate Damages Related To Medically Unnecessary Claims**

**1.    Hartman is not a person to whom our society would turn, outside of the litigation process, to render judgment as to the medical necessity of Aranesp® dosing**

As with the certification-based claims, in permitting Relator to proceed with her medical necessity claims, the Court observed that it would "be almost impossible *at this stage* for relator to access the medical records of each clinic and specify wherein the dosage claimed was medically unnecessary . . . ."  *Westmoreland*, 2010 WL 3622033, *7 (emphasis added).  Again, the clear implication was that, in order to ultimately prove her claims, Relator would need, at minimum, to go out and examine the relevant medical records.  Relator has not done so.

Instead, she has asked her damages expert, a person with no medical background and almost no knowledge of how Aranesp® is dosed, to come up with a way of divining whether Aranesp® claims were medically necessary based solely on CMS claims data.  At deposition,

Hartman seemed to acknowledge that he was uncomfortable with this task and that it was not really his place to make such determinations.  *See* Hart Tr. 62:10-67:11 ("I haven't made a finding of medical necessity.  I've made – I've made some – I've taken some patterns of billing that make me question whether medical necessity is entering into a – the billing patterns of a provider.  But I can't – the particular tests are going to identify patient specific attributes that will require – that will indicate the extent to which Aranesp® is – or any ESA is required.").  Yet his report purports to identify specific medically unnecessary claims and calculate damages resulting from them, something Relator's own medical experts have testified cannot be done without medical training and access to patients' medical charts.

In short, society would never turn to someone of Hartman's background and expertise to make the sort of medical determinations his report purports to make. *See Morin v. E. Me. Med. Ctr.*, CV-09-258-BW, 2010 U.S. Dist. LEXIS 76292, *14-15 (D. Me. 2010) (excluding nurse from testifying as expert witness "about the correctness of [medical] diagnoses, since such testimony is outside her expertise.").[10]

### 2.    Hartman's methodology for identifying medically unnecessary claims is wholly arbitrary and produces absurd results.

Hartman's "methodology" for identifying medically unnecessary claims is the very definition of junk science:  rather than being well-accepted and reliable, it is novel and wholly arbitrary and, when applied, leads to absurd results.  Regardless of whether his two tests – 60% of all claims being "overfill claims" or 50% of all "overfill claims" being in one or two amounts – are intended to identify "standing orders to bill a fixed amount of overfill," Hart. Rep. ¶ 46, as

---

[10] Similarly, Hartman is not someone "our society" would turn to "outside of the litigation process" to audit Medicare claims for medical necessity.  *See United States ex rel Jones v. v. Brigham & Women's Hosp.*, Civ. A. No. 07-11481-WGY, 2010 U.S. Dist. LEXIS 119486, 29-30 (D. Mass. 2010) (excluding professor of radiology from testifying about National Institutes of Health application review process due to lack of relevant experience).  Indeed, Medicare has in fact audited a number of the providers identified in Hartman's report.  *See* Morton Rep. ¶ 155.

he says in his report, or merely intended to identify "suspicious patterns" of billing behavior, as he acknowledged at deposition – Tr. at 152:13-153:25 – they are simply not adequate to the task at hand. He points to no authority for either threshold – they are tests that he, an economist with no experience with ESA dosing, simply pulls out of thin air. Nor does he have any authority – other than his own stamp of approval – for the proposition that doses administered in accordance with such a "standing order" are medically unnecessary.

As set forth above, Hartman's arbitrary tests lead, predictably, to bizarre results, such as the same dose of medicine administered to the same patient being treated as medically unnecessary in some instances and medically necessary in others. These sorts of tests, which purport to identify "suspicious patterns" based on statistical analysis of billing data, have been found to be insufficient in the FCA context even for *pleading* purposes. *See, e.g., United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 65-66 (D. D.C. 2007) (dismissing FCA medical necessity claims under Rule 9(b) that were based largely on statistical inference, noting that "[w]elding different inferences together cannot substitute for direct proof, of which relator presents none"). Yet Relator and Hartman seek to offer this sort of analysis at trial. As with Hartman's certification analysis, "there is simply too great an analytical gap between the data and the opinion proffered." *McGovern*, 584 F. Supp. 2d at 426 (quoting *General Electric v. Joiner*, 522 U.S. 136, 146 (1997)). The Court should therefore strike the portion of Hartman's opinion purporting to identify and calculate damages with respect to medically unnecessary claims.

## CONCLUSION

For the foregoing reasons, Amgen respectfully requests that the Court strike the portions of Hartman's report relating to his purported identification of false certifications and medically

unnecessary claims, as well as his resulting damages calculations and exclude him from testifying on these topics.

DATED:  February 18, 2011                    Respectfully submitted,

                                             /s/ Kirsten V. Mayer
                                             Brien O'Connor (BBO # 546767)
                                             Kirsten V. Mayer (BBO # 641567)
                                             ROPES & GRAY LLP
                                             Prudential Tower
                                             800 Boylston Street
                                             Boston, MA  02199-3600
                                             Tel:  617.951.7000
                                             Fax:  617.951.7050
                                             brien.o'connor@ropesgray.com

                                             David S. Rosenbloom, *pro hac vice*
                                             Douglas E. Whitney, *pro hac vice*
                                             MCDERMOTT, WILL & EMERY LLP
                                             227 West Monroe Street, Suite 4400
                                             Chicago, IL 60606-5096
                                             Tel:  312-372-2000
                                             Drosenbloom@mwe.com

                                             Michael Kendall (BBO # 544866)
                                             Daniel A. Curto (BBO # 639883)
                                             MCDERMOTT, WILL & EMERY LLP
                                             28 State Street
                                             Boston, MA  02109-1775
                                             Tel:  617.535.4000
                                             Fax:  617.535.3800
                                             mkendall@mwe.com

                                             *Counsel to Amgen Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and a copy will be sent by electronic mail to those indicated as non registered participants on February 18, 2011.

<u>/s/ Kirsten V. Mayer</u>
Kirsten V. Mayer