# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>*ex rel.* KASSIE WESTMORELAND, )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>AMGEN INC.; INTERNATIONAL )<br>NEPHROLOGY NETWORK renamed )<br>INTEGRATED NEPHROLOGY NETWORK, a )<br>d/b/a of DIALYSIS PURCHASING ALLIANCE, )<br>INC.; and ASD HEALTHCARE, )<br> )<br>Defendants. ) | Civil Action No. 06-10972-WGY |

## MEMORANDUM IN SUPPORT OF AMGEN INC.'S MOTION TO STRIKE CERTAIN PORTIONS OF THE EXPERT REPORT OF BRADLEY M. DENKER, M.D.

Relator has produced an expert report in this action from Dr. Bradley M. Denker, a practicing nephrologist, who purports to offer several expert opinions, the most significant of which are:

1) that Aranesp® vials contained excess overfill, which he defines to mean more overfill than necessary for a medical provider "to administer the full labeled amount,"

2) that the administration of Aranesp® overfill to patients is "neither clinically indicated nor medically necessary," and

3) that the administration of Aranesp® overfill poses "unnecessary risk" to patients. Because Dr. Denker's report is the only evidence Relator can proffer in support of these key propositions – and because Dr. Denker either lacks the relevant expertise or lacks a sufficient factual basis to opine as to any of them – granting Amgen's motion now will streamline the issues that will soon be presented to the Court at summary judgment.

In offering the first opinion, that Aranesp® vials contain excess overfill, Dr. Denker has stepped well beyond the scope of any expertise he may have.  He conceded at deposition that his opinion that Aranesp® vials contain too much overfill is based solely on his experience, on only two occasions total, administering injections of a *different* drug, Procrit®.   Based on this exceptionally limited (and irrelevant) experience with Procrit®, Dr. Denker concludes that Aranesp® has more overfill than is necessary to allow medical providers to administer the full labeled amount, which he posits is the only "medically appropriate" purpose for including overfill in a vial.  In doing so, Dr. Denker betrays his ignorance of the role the Food & Drug Administration ("FDA") plays in reviewing and approving the amount of overfill contained in drugs like Aranesp® and the manufacturing and patient safety issues the FDA considers in performing that regulatory function.

With respect to his second opinion, regarding the medical necessity of administering overfill, under questioning, Dr. Denker withdrew and qualified his opinion to the point of rendering it meaningless, as he admitted that his own personal views about the proper way to dose Aranesp® are not consistent with Aranesp®'s FDA approved label and – contrary to his report – are not supported by any published authority or guidelines.  He further conceded that it is the dose that matters for the purposes of determining medical necessity and not whether a portion of the dose included overfill.  He conceded that the use of overfill is irrelevant to the determination.   Most critically, he admitted repeatedly that it is not possible to determine whether an administered dose was clinically indicated or medically necessary without reviewing a patient's clinical records, none of which he reviewed in preparing his report.

For the same reasons, Dr. Denker's third opinion, regarding the potential harm associated with overfill administration, is unfounded and fatally contradicted by his own testimony. It is also beyond the scope of the False Claims Act and therefore irrelevant.

For the reasons set forth herein, Amgen requests that the Court strike these three portions of Dr. Denker's report and exclude him from testifying as to these subjects.

## STATEMENT OF FACTS

### I.    DR. DENKER'S BACKGROUND

Dr. Denker is a licensed physician who is board certified in Internal Medicine and Nephrology. *See* Decl. of Kirsten V. Mayer (hereinafter "Mayer Decl."), Ex. 1, Decl. of Bradley R. Denker, M.D. (hereinafter "Denker Rep.") at 1. He is an Associate Professor of Medicine at Harvard Law School and has been the Chief of Nephrology at Harvard Vanguard Associates, where he practices part-time, since 2000. *Id*; *see also* Mayer Decl., Ex. 2, Excerpts of Dep. of Bradley M. Denker (hereinafter "Tr.") at 12-13. Though Dr. Denker's report purports to opine as to topics related to both "Nephrology and Oncology practices," Dr. Denker testified that he has had "little exposure to the oncology world" – Tr. at 44 – and spoke to no oncologists in preparing his report. Tr. at 41. He testified that his practice regularly prescribes Erythropoiesis-Stimulating Agents ("ESAs" – including Aranesp® and its competitor drug Procrit®) to patients, but the vast-majority of the practice's patients (95%) self-administer the drug at home and bill their own insurers. Tr. at 30. Dr. Denker has never submitted a claim for reimbursement of an ESA or personally submitted any claims to Medicare. *Id.*

II.     **OVERVIEW OF PROFFERED EXPERT OPINIONS**

A.     **Materials Considered**

In preparing his report, Dr. Denker reviewed the Fourth Amended Complaint as well as the deposition testimony of representatives of four clinical practices: Boca Nephrology, Nephrology Associates of Syracuse, Balboa Nephrology, and Dallas Nephrology Associates. Denker Rep. at 2.  Counsel also provided him with Centers for Medicare & Medicaid Services ("CMS") Medicare Part B claims data for three of those practices: Boca Nephrology, Nephrology Associates of Syracuse, and Balboa Nephrology.  *Id.*  Significantly, though his report does not say so, Dr. Denker testified that his opinions are limited to those three practices and that he has no basis to opine as to any others.  *See* Tr. at 293 ("My opinions are limited to those specific practices . . . .").  Dr. Denker's report also lists, as materials considered, a number of published articles from various medical journals relating to ESA use.  Denker Rep. Ex. D.

B.     **Dr. Denker's Opinion As To The Purpose And Excessiveness Of Aranesp Overfill**

Dr. Denker's report opines that "the only medically appropriate purpose for putting overfill in injectable medications is to ensure that the *medical provider* is able to withdraw and administer the full labeled dose of the medication to the patient."  Denker Rep. at 1-2 (emphasis added).  Dr. Denker testified, however, that 95% of the patients at his practice self-administer ESAs at home.  Tr. at 30.  Medical providers frequently play no role in such administrations.  He acknowledged that such patients are, at least initially, "less skilled" than medical providers at withdrawing and administering medicine from a vial.  Tr. at 247.  He testified that "it would not be acceptable, nor financially beneficial for a patient to be unable to be – to administer the fully prescribed dose" and agreed that it is "important that the vial contain enough drug so that a patient who is self-administering the drug can withdraw the ordered amount."  *Id.*

Dr. Denker's report further opines that Aranesp® has an excessive amount of overfill: "Based on my personal experience drawing up and administering Procrit from a single-use vial, and the fact that Procrit contains less overfill than Aranesp, I conclude there was more overfill in Aranesp than was necessary to withdraw and administer the labeled amount, to the level at which medical providers were able to withdraw and administer overfill amounts to patients."  Denker Rep. at 8.  He opines that "this additional overfill in excess of the amount needed to administer the full labeled dose has no medically appropriate purpose."  Denker Rep. at 8.

The section of the report explaining this conclusion is less than one page, double-spaced. Dr. Denker does not detail his "experience drawing up and administering Procrit."  At deposition, Dr. Denker admitted that he has never in fact administered Aranesp® to a patient and that he has only administered Procrit® on two occasions in "recent memory" – both to the same patient. Tr. at 174-79.  He admitted that his opinion that Procrit® overfill (and therefore, by inference, Aranesp® overfill) is excessive is based *solely* on his "experience with those two injections."  Tr. at 246-47.  When asked how much excess liquid there was in the vials on these two occasions, he testified "I don't know, some" and explained "it's difficult to distinguish the air volume from the substantive volume that gets extruded when you bring the syringe up to the 1 cc line."  Tr. at 178.  He testified that Aranesp and Procrit are not chemically identical.  Tr. at 93.

Dr. Denker further admitted that he was unfamiliar with the concept of "manufacturing variability" – that is the unavoidable variance in fill volume levels from vial to vial as a result of the drug manufacturing process – and did not know what degree of variability existed among vials of Aranesp® or Procrit®.  *See* Tr. at 179-80.  It is undisputed that 1.0 mL Aranesp® vials have a standard fill volume variance of 0.08 mL (+/- 0.4 mL).  *See* Mayer Decl., Ex 3, Rebuttal

Expert Report of John Geigert, Ph.D., RAC (hereinafter "Geigert Rep.") ¶¶ 154-58, 175-78 (explaining manufacturing variability of Aranesp® vials). Dr. Denker admitted that he had not taken this sort of variance into account in concluding that Aranesp® overfill was excessive. Tr. at 180.

The FDA requires manufacturers to comply with specific tests in determining what level of overfill to include in liquid injectable drug vials and to submit the results of these tests, along with other supporting data, to the FDA as part of the drug approval process. *See* Mayer Decl., Ex. 4, Excerpts of Dep. Test. of FDA 30(b)(6) Designee Patrick Gerard Swann, ("FDA Dep.") at 66:5-67:20; 21 C.F.R. § 601.2(a); *see also* Geigert Rep. ¶¶ 64-68 (giving overview of FDA review process relating to overfill). The FDA "rigorously" reviews this data and conducts facility inspections, if necessary. FDA Dep. at 66:5-67:20; 69:19-73:20. In determining whether the target overfill level of a product is appropriate, the FDA considers, among other factors, both manufacturing variability and, if relevant, the needs of self-administering patients. FDA Dep. 88:1-93:22; Geigert Rep. ¶¶ 69-95. The FDA reviewed the testing data Amgen submitted in support of its disclosed target Aranesp® overfill and approved it. FDA Dep. 221:1-6; Geigert Rep. ¶¶ 152-187 (summarizing FDA review and approval of Aranesp® overfill level). Dr. Denker was not aware of the role the FDA plays in approving overfill levels or the standards the FDA applies in doing so. Tr. at 180-82 ("I assume somebody reviews [overfill amounts], but I wasn't aware the FDA did.").

### C. Dr. Denker's Opinion As To The Medical Necessity Of Overfill Administration

Dr. Denker's report opines that the "administration of overfill [in Aranesp® vials] is neither clinically indicated nor medically necessary." Denker Rep. at 2. The report makes clear that this opinion is not based on the review of any patient medical records. Rather, it is offered

as a categorical opinion, a claim that administration of overfill is *per se* medically unnecessary. In support of this opinion Dr. Denker makes two key factual claims.

First, and most significantly, Dr. Denker asserts in the report – repeatedly – that "all studies and guidelines for administration of Aranesp and other ESAs are based on the labeled amount [of the vial]" and, therefore, "the academic literature provides clinical guidance and insight only in circumstances where the overfill is not administered to the patient."  Denker Rep. 8-9.  Implicit in this statement, though never stated clearly in the report, is a normative belief that medical providers should generally round up or down to the nearest vial size when administering a dose.  At deposition, Dr. Denker confirmed this to be his belief.  Tr. at 211.

Second, Dr. Denker asserts that "[i]n my experience, changes in dosing of an ESA on the order of 7%, or even 19%" – amounts corresponding to possible overfill amounts – "do not produce meaningful clinical benefits."  Denker Rep. at 9.  Rather, "[c]hanges in dosing must be significantly greater, such as 25%, to have demonstrated clinical benefit."  *Id.*  Putting these two premises together, Dr. Denker concludes that "[t]here is no medical rationale for dosing Aranesp with increased amounts found in the overfill . . . ."  *Id.*

At his deposition, however, Dr. Denker backed away from both of these underlying factual claims.  He acknowledged that Aranesp's® FDA approved package insert provides a weight-based formula for dosing – 0.45 mcg per kilogram for Chronic Kidney Disease ("CKD") patients, for example – and says nothing about administering full vials.  Tr. at 220.  Dr. Denker further acknowledged that, contrary to his repeated assertion in the report, he did not know and could not determine what dosing protocols were used in any published clinical study regarding Aranesp®.  Tr. at 248-53.  He did know whether the patients in those studies were dosed in full

vial increments – as he stated in his report – or in accordance with the FDA's weight-based

formula or in some other way.  *Id.*

More significantly, he acknowledged that there is no difference between the chemical

composition of Aranesp® overfill and the remainder of the liquid in the vial; it is "all the same

drug" and will have "the exact same clinical benefit."  Tr. at 81.  He agreed, for example, that in

the case of a 220 pound CKD patient, Aranesp's FDA approved package insert would

recommend a starting dose of 45 mcg, which does not correspond to any Aranesp® vial size, but

would correspond with a 40 mcg vial with overfill. *Id.* at 239.  Thus, Dr. Denker acknowledged

that what matters for medical necessity purposes is the dose, not whether the medicine came

from the top or bottom of the vial:

> Q.   Okay, you would agree that in that circumstance [a 220 pound patient], the 45
>      microgram dose, however obtained, would be medically necessary.  Correct?
> A.   Yes.
> Q.   Even though it contained overfill?
> A.   The 45-microgram dose is independent of whether there's overfill.

Tr. at 238-39.

Having acknowledged that it is the amount of the dose, not whether the dose includes

overfill, that is relevant for medical necessity purposes and that doses that do not correspond

with labeled vial sizes can be clinically indicated and medically necessary, Dr. Denker conceded

– repeatedly – that one cannot determine whether the administration of overfill was medically

necessary without looking at a patient's medical files and lab reports.  *See, e.g.*, Tr. at 72-74

("Medical necessity, again, being defined as a treatment course for a given condition would

again, depend on all of those factors that we just talked about [age, weight, medical history, co-

morbidities, lab data, etc.]"); Tr. at 91 (agreeing that "to judge the medical necessity of a past

ESA claim, you need to look at both the lab values and other patient characteristics to determine

whether the dosage was appropriate"); Tr. at 98 (need to look at patient's lab numbers to determine whether clinical benefit was achieved); Tr. at 157 (agreeing that one cannot "judge the medical necessity of … dosing determinations without reviewing the patient information contained in patient charts"); Tr. at 193 (agreeing that you would need to look at "both hemoglobin levels and weight" to determine if an administered doses was medically necessary); Tr. at 195 (agreeing that you cannot determine whether a dosage was clinically beneficial "without looking at the patient chart" because it "[i]t's a clinical judgment").

Having made these concessions, Dr. Denker's second key factual assertion, that ESA dosing increases on the order of 7-19% have no clinical benefit, is less significant.  Nevertheless, after being presented with evidence showing that he had upwardly adjusted the ESA dosages of his own patients by as little as 5% on some occasions, Dr. Denker acknowledged that his second key factual assertion was also inaccurate.  *See* Tr. at 95-96, 105-08.  Given the opportunity to rephrase his original statement to make it accurate, Dr. Denker offered the following: "In my experience, changes in dosing of an ESA administered subcutaneously [as opposed to intravenously] to patients with chronic kidney disease on the order of 7% do not produce meaningful clinical benefits."  Tr. at 108.  Thus, he removed the reference to "19%" and limited his opinion to a particular subclass of ESA patients.  When pressed for authority to support this newly posited distinction between patients receiving ESAs intravenously and subcutaneously, Dr. Denker could not provide one.  He admitted that the FDA makes no such distinction in its approved labeling for any ESA.  Tr. at 109, 206-08.  He admitted that he was aware of no literature or clinical studies that support such a distinction.  Tr. at 116-117, 133.  He also acknowledged that the National Kidney Foundation's Kidney Disease Outcome Quality Initiative ("KDOQI") guidelines – which he admitted to reviewing regularly, including the night before his

deposition – state that dose adjustments of as little as 10% can be clinically effective for chronic kidney disease patients.  Tr. at 118-29.  He further acknowledged that providers reasonably rely on these guidelines as a "point of reference" – Tr. at 129 – and that the KDOQI's 10% guideline was in fact based on a study involving the subcutaneous (as opposed to intravenous) administration of Aranesp®.  Tr. at 328-333.

### D.     Dr. Denker's Opinion As To The Potential Harm of Overfill Administration

Though clearly derivative of his analysis regarding the medical necessity of administering overfill, Dr. Denker also opines that "the administration of Aranesp overfill could cause harm."  Denker Rep. at 10.  In support of this opinion he offers just two additional sentences, noting that there is literature showing "potential adverse outcomes of treatment with larger amounts of ESAs, such as stroke, blood clots and possible cancer" and that administering Aranesp overfill "increases the likelihood that patients would suffer harm by receiving unnecessary Aranesp, particularly in light of the black box warning for Aranesp."  *Id.*

## ARGUMENT

## I.     LEGAL STANDARD

Pursuant to Federal Rule of Evidence 702, a qualified expert may testify "in the form of an opinion, or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  In discharging its gatekeeper function under the rule, this Court poses three primary questions.  First, "[i]s this junk science?" – that is, under the principles of *Daubert* and Federal Rule of Evidence 702, is this opinion the product of well-accepted and reliable principles and methods?  *Ambit Corp. v. Delta Airlines, Inc.*, 707 F. Supp. 2d. 74, 76 (D.Mass. 2010) (Young, J.).  Second, "[i]s this a junk scientist?" – that is, "does

the proffered witness have adequate qualifications to testify" and does "our society – outside the litigation process itself – turn[] to this individual to render the opinion sought to be presented to the court." *Id.* at 76-77.  Third, "[i]s this a junk opinion" – that is, does it rest on a reliable foundation and is it "relevant to the task at hand." *Id*. at 77.  As the proponent of the expert testimony at issue, it is Relator's burden to establish, by a preponderance of evidence, that the answer to each of these questions is "no."  *McGovern v. Brigham & Women's Hosp.*, 584 F. Supp. 2d 418, 422 (D. Mass. 2008) (Young, J.).

## II.   APPLICATION

### A.   Dr. Denker Is Not Qualified To Testify Regarding The "Purpose" Or "Excessiveness" Of Overfill And His Opinion On These Subjects Lacks Any Factual Foundation

#### 1.   Dr. Denker's experiential basis for concluding that Aranesp overfill is excessive is plainly insufficient

Dr. Denker states explicitly that his opinion regarding the excessiveness of Aranesp® overfill is "based on my personal experience drawing up and administering Procrit."  Denker Rep. at 8.  Remarkably, however, he testified that this experience, which he feels qualifies him to testify as an expert witness, consists of just two instances of administering Procrit® and none administering Aranesp®.  Tr. at 246.  Moreover, he could not remember how much excess liquid there was in the vial on these two occasions and noted that it was difficult to make such determinations because "it's difficult to distinguish the air volume from the substantive volume that gets extruded when you bring the syringe up to the 1 cc line."  Tr. at 178.  Thus, Dr. Denker's purported expert opinion that there is "more overfill than necessary" in Aranesp® vials is based solely on two instances of drawing up "some" indeterminate and unrecorded excess liquid from vials of a *different* product.

-11-

As a basis for offering expert testimony, this is clearly insufficient. As the Advisory Committee Note to Rule 702 states "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Ev. 702 advisory committee's note (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)); *see also United States v. Lupton*, 620 F.3d 790, 798-99 (7th Cir. 2010) (affirming exclusion of expert's testimony on real estate broker's conduct where expert "had never participated in a competitive bid transaction like the one at issue here"). Generalizing from two observations, neither of which were documented in any way, is not a reliable or recognized methodology for doing any kind of analysis. It amounts to nothing more than "I know it when I see it," even though he has seen it vary rarely. Indeed, it is worse than that because Dr. Denker was not even looking at the right drug. For this reason alone, the Court should strike Dr. Denker's opinion regarding the excessiveness of Aranesp® overfill.

> **2.      Even assuming Dr. Denker had extensive clinical experience administering Aranesp®, he would not have sufficient expertise to opine as to the purpose or excessiveness of Aranesp® overfill**

At his deposition, Dr. Denker admitted that he was unfamiliar with the concept of "manufacturing variability" – that is the variance in fill volume from vial to vial resulting from the manufacturing process – and did not know what degree of variability existed with respect to vials of Aranesp® or Procrit®. *See* Tr. at 179-80. As noted above, vials of liquid medicine have significant variance in their total fill volume. Thus, the amount of accessible overfill in two vials of Procrit® clearly says nothing meaningful about the appropriateness of the manufacturer's

target overfill level for all such vials – much less vials of a different product.  Even with a much

larger sample size, without understanding the range of variance among vials and the frequency of

outliers (significantly under- or overfilled vials), it would be very difficult to determine solely

from administering a drug whether the target overfill level for that drug was excessive.  *See*

Geigert Rep. ¶¶ 107-115 (explaining distribution of vial fill volumes due to manufacturing

variability).  Dr. Denker admitted that he had not taken this sort of variance into account in

concluding that Aranesp® overfill was excessive.  Tr. at 180.

Similarly, in parroting Relator's invented standard[1] that overfill is excessive if vials are

filled "to the level at which medical providers [are] able withdraw and administer overfill

amounts to patients," – Denker Rep. at 8 – Dr. Denker manages to overlook a key aspect of his

*own* clinical practice, in which he testified that 95% of his patients self-administer ESAs at

home.  Tr. at 30.  Indeed, he readily volunteered that "it would not be acceptable" if these "less

skilled" individuals were unable to extract and administer the full labeled amount of the vial.  Tr.

at 247.  Therefore, Dr. Denker acknowledged that his report's stated conclusion regarding the

"purpose" of overfill is false, that there is in fact a "medically appropriate purpose" for overfill

other than permitting a skilled medical provider to administer the full labeled dose, namely,

permitting an unskilled patient to do so as well.

His failure to consider these factors – manufacturing variability and the needs of self-

administering patients – is not surprising given his admitted lack of any knowledge whatsoever

of the drug manufacturing process or the relevant FDA rules, standards, or review process

relating to the amount of overfill in liquid injectable drugs vials.  Tr. at 61, 63 180-82.  He would

---

[1] *See* Fourth Amend. Compl. ¶ 144 (alleging that level of overfill in vials must be set so that "little to no overfill can be extracted from the vial").

not have known, for instance, that the FDA looks closely at both of these factors when reviewing and approving the target overfill level for drugs such as Aranesp®. *See* FDA Dep. at 88:1-93:22.

These oversights only underscore just how far Dr. Denker's report strays from his relevant knowledge and expertise. There are, in fact, people at the FDA whose job it is to make these sorts of determinations, people who regularly review complicated applications and supporting documents by drug manufacturers and perform site inspections to validate the appropriateness of fill volume levels in drug vials. *See* FDA Dep. at 66:5-67:20, 70:10-7:15 ("[O]ur review of the manufacturing process will be rigorous, will include all components of its manufacture, all the way from the vialing of material to the delivery of the product to the patient"); 21 C.F.R. § 601.20 (a)-(c) (conditions for drug approval). Dr. Denker is not one of these people. It is simply not credible to suggest that "our society – outside the litigation process" would turn to someone with Dr. Denker's background to render an opinion as to either the "purpose" or the "excessiveness" of the overfill level in Aranesp® vials. *See, e.g., United States ex rel Joes v. Brigham & Women's Hosp.*, 07-11481-WGY, 2010, U.S. Dist. LEXIS 119486, *29-30 (D. Mass. Nov. 10, 2010) (Young, J.) (excluding testimony of professor of radiology because, despite her medical expertise, she was not qualified to testify regarding the National Institutes of Health application review process). Because Dr. Denker does not have the relevant knowledge or expertise to opine as to the "purpose" or "excessiveness" of Aranesp® overfill – and because he has admitted that his own conclusion is inaccurate – the Court should strike this portion of Dr. Denker's report and exclude him from testifying on this subject.

B.       **Dr. Denker's Opinion Regarding The Medical Necessity Of Administering Aranesp® Overfill Is, By His Own Admission, Incorrect And Unsupported**

1.       **Dr. Denker's opinion that the administration of overfill is *per se* medically unnecessary lacks foundation and is fatally undermined by his own testimony**

Dr. Denker opines in his report that the administration of overfill is *per se* medically unnecessary.  Denker Rep. at 2 (the "administration of overfill [from vials of Aranesp®] is neither clinically indicated nor medically necessary.").

As Dr. Denker readily acknowledges, however, overfill is not chemically different than the rest of the medicine in the vial.  Indeed, it is not even conceptually different.  A vial does not contain some medicine that is overfill and some that is not; it just contains a single homogenous volume of liquid.  Further, Dr. Denker acknowledges that when it comes to dosing Aranesp, there is nothing magical about the face labeled volume of the vial.  The FDA recommended dose of Aranesp bears no relationship to vial size, but rather is an individualized formula that produces a different value depending on a patient's weight.  Thus, as Dr. Denker concedes, whether a dose conforms to a standard vial size says nothing about whether or not it was medically necessary.  Nor does the source of the medicine used to administer that dose.  And because the proper dose for any given patient is a function of that patient's individual characteristics – primarily weight, hemoglobin level, and prior responsiveness to the medicine – Dr. Denker acknowledges, repeatedly, that it is impossible to determine whether a dose is medically necessary without looking a patient's medical charts and lab results, something he did not do in preparing his report.  *See* Tr. at 244 (observing that "there are a host of variables that go into deciding on a dose" and it is "an art, not a science").

That alone is sufficient grounds to exclude Dr. Denker's testimony on this subject, for it demonstrates conclusively that his stated opinion rests on an inadequate foundation.  *See Casas*

*Office Machines Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668 (1st Cir. 1994) ("A district court

may exclude expert testimony where it finds that the testimony has no foundation or rests on

obviously incorrect assumptions or speculative evidence.").

> **2.    Dr. Denker's watered-down, post-testimony opinion is not relevant and would only confuse a jury**

After taking into account his own withdrawn statements and qualifications, and being

exceedingly generous to Dr. Denker, what is left of his opinion on this subject is nothing more

than the unremarkable claim that it is possible to treat patients successfully without

administering overfill, and, therefore, use of overfill is not "necessary."

> Q      …   The label directs you to administer 45 micrograms of Aranesp, correct?
> A      The package insert recommends 45 micrograms per kilogram.
> Q.     And is it your testimony that administering the recommended amount, the amount that is recommended in the package insert is medically unnecessary?
> …
> A.     No.  But it depends how you get to the 45 micrograms.
> Q.     But you've testified that the clinical impact would be exactly the same, whether you use the 40-microgram vial and overfill, a 60-microgram vial or a hundred-microgram vial.  Correct?
> A.     The clinical impact of 45 micrograms would be the same from those different scenarios.
> Q.     Okay.  And so if you administer the amount of the drug that is recommended by the label, how is it that it could be medically unnecessary?
> A.     Well, maybe *I'm confusing medical necessity with the practical aspects of the real world*.  So in my opinion, it is not un – it is no more necessary to administer the 45 than to administer the 40 in this scenario.  And, therefore, one does not have to deal with the overfill and can stay focused on the labeled amount.

Tr. at 241-42 (emphasis added); *see also* Tr. at 283-84 (testifying that "the use of the overfill

amount isn't necessary" because it would not "have a significant demonstrable difference in the

response from administering just the face labeled amount"); Tr. at 243 ("you would get the same

response with 40 as 45 … [s]o why bother with the overfill…?").  Dr. Denker is clearly using the

terms "necessity" and "necessary" in a way that is very different than how those terms are used

in the FCA context.  *See United States ex rel. Bailey v. Ector County Hosp.*, 386 F.Supp.2d 759,

765-66 (W.D. Tex. 2004) (to establish that services were not medically necessary in FCA context requires proof that services "were so deficient as to be worthless").  A service can be "medically indicated and necessary" in the FCA context even though there are other equally effective courses of treatment available.  *See United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004) (expressions of opinion or scientific judgments regarding medical necessity about which reasonable minds could differ cannot be false under FCA).  Dr. Denker's standard would prove far too much.  Indeed, by this standard, Dr. Denker's own use of Procrit® to treat his patients is not "medically necessary" because those same patients could have been successfully treated with Aranesp®, which Dr. Denker acknowledges is just as effective.  *See* Tr. at 23 ("I think ESAs are equivalent.").

What Dr. Denker couches in terms of "medical necessity" is really nothing more than a personal normative belief – for which he can cite no literature, clinical evidence, or other authority in support – that, when administering an ESA, providers should generally round up or down to the nearest vial size rather than administer overfill.  *See* Tr. at 245-256.  Dr. Denker concedes, however, that a provider need not follow an "optimal clinical strategy" to provide medically necessary services – Tr. at 126 – and that "there is more than one way to achieve a target hemoglobin or specific clinical outcome, and that no one way may be better or worse than the other." Tr. at 127.  Dr. Denker's opinion, therefore, has nothing to do with medical necessity in the FCA sense – which he concedes cannot be determined without looking at patient records and outcomes – but simply represents a statement of what he considers to be a best practice.

Moreover, even Dr. Denker admits that this belief about rounding to the nearest vial size is driven not by any medical considerations, but by his understanding – undoubtedly influenced by reading Relator's complaint – regarding the appropriateness of billing for overfill:

Q.      You would recognize, would you not, that each of those 45 micrograms of
        Aranesp will have the same clinical effect on the blood as the others?

A.      Correct.

Q.      Okay.  And you would also recognize that the first hypothetical, utilizing only a
        40-microgram vial, will be cheapest to Medicare.  Correct?

A.      Correct.

Q.      And you recognize that the first hypothetical, using the 40-microgram vial and 5
        micrograms of overfill will be cheapest to the patient, correct?

A.      Correct.

Q.      So we get the same clinical outcome at a lower cost.  What is wrong with that, Dr.
        Denker?

A.      *So what's wrong with it is that the provider billing for the overfill for which they
        did not pay*.

….

Q.      But you're not objecting, based on the clinical impact, because in the scenario we
        just discussed, the clinical impact is the same, correct?

…

A.      I'm not objecting to giving any given patient 45 micrograms per kilogram.  *What
        I'm objecting to is the way you get there*.

Tr. at 233-34 (emphasis added).

Such an opinion quite simply has nothing to do with medical necessity in the FCA

context and would undoubtedly confuse a jury given its misuse of terms with legal significance.

*See, e.g.*, *United States v. Ahrendt*, 560 F.3d 69, 76 (1st Cir. 2009) (affirming exclusion of expert

report on issue that was irrelevant and would only serve to confuse a jury); *Sosna v. Binnington*,

321 F.3d 742, 745 (8th Cir. 2003) (same).  The portion of Dr. Denker's report purporting to

opine as to the medical necessity of administering Aranesp® overfill is, therefore, simply not

"adequate to the task at hand," and Dr. Denker should be excluded from testifying as to this

subject.  *See McGovern*, 584 F. Supp. 2d at 424.

C.      **Dr. Denker's Opinion That The Use Of Overfill Is Harmful To Patients
        Lacks Foundation And Is Irrelevant**

Dr. Denker further opines in his report that the "administration of Aranesp overfill creates

unnecessary risk of harm to patients without corresponding benefit."  Denker Rep. at 10.

This conclusion is clearly derivative of Dr. Denker's prior conclusion that administration of overfill is *per se* medically unnecessary and should therefore be excluded for all the reasons set forth above.  As he concedes, for the purposes of determining clinical benefit or harm, it is the dose that matters, not whether the dose includes overfill.  Tr. at 238-39.  Whether a particular dose of Aranesp was derived through harvesting overfill or through other means has absolutely no bearing on whether it was clinically beneficial or harmful to the patient.  *Id.*

Furthermore, the question of whether a given dose is harmful – as opposed to merely not "medically indicated and necessary" – is beyond the scope of the FCA and thus is not an appropriate topic of expert testimony.  It is simply not relevant to the task at hand, and therefore would only serve to confuse and prejudice a jury.  *See Martinez v. Hongyi Cui*, 608 F.3d 54, 63 (1st Cir. 2010) (affirming exclusion of expert testimony on issues collateral to those at trial); *United States v. Maxwell*, 254 F.3d 21, 25-26 (1st Cir. 2001) (same).  Dr. Denker's testimony on this subject should therefore be excluded.

## CONCLUSION

For the reasons set forth above, Amgen respectfully requests that the Court strike the portions of Dr. Denker's purported expert report related to 1) the "purpose" and "excessiveness" of Aranesp® overfill, 2) the medical necessity of administering overfill to patients, and 3) the risk of harm associated with administering overfill.  Amgen further requests that Dr. Denker be excluded from testifying as an expert witness with respect to these subjects.


DATED:  February 22, 2011                    Respectfully submitted,


                                              /s/ Kirsten V. Mayer
                                             Brien O'Connor (BBO # 546767)
                                             Kirsten V. Mayer (BBO # 641567)

ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Tel:  617.951.7000
Fax:  617.951.7050
brien.o'connor@ropesgray.com

David S. Rosenbloom, *pro hac vice*
Douglas E. Whitney, *pro hac vice*
MCDERMOTT, WILL & EMERY LLP
227 West Monroe Street, Suite 4400
Chicago, IL 60606-5096
Tel:  312-372-2000
Drosenbloom@mwe.com

Michael Kendall (BBO # 544866)
Daniel A. Curto (BBO # 639883)
MCDERMOTT, WILL & EMERY LLP
28 State Street
Boston, MA  02109-1775
Tel:  617.535.4000
Fax:  617.535.3800
mkendall@mwe.com

*Counsel to Amgen Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and a copy will be sent by electronic mail to those indicated as non registered participants on February 22, 2011.

/s/ Kirsten V. Mayer
Kirsten V. Mayer