# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* KASSIE WESTMORELAND | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-10972 - WGY |
| | ) | |
| AMGEN INC.; INTERNATIONAL | ) | |
| NEPHROLOGY NETWORK renamed | ) | |
| INTEGRATED NEPHROLOGY NETWORK, a | ) | |
| d/b/a of DIALYSIS PURCHASING ALLIANCE, | ) | |
| INC.; and ASD HEALTHCARE | ) | |
| | ) | |
| Defendants. | ) | |

## AMGEN INC.'S RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Defendant Amgen Inc. ("Amgen")

submits the following statement of material facts, which Relator cannot dispute.  Amgen relies

on deposition transcripts, deposition exhibits, and other materials, the relevant portions of which

are attached as exhibits to the Declaration of Kirsten V. Mayer, filed herewith and cited as "Ex."

## I.     Amgen followed all applicable FDA tests and procedures for setting and reporting Aranesp's® overfill level.

1.     FDA has the authority to regulate overfill and to set limits on the amount.  Ex. 1

(Deposition of FDA's Rule 30(b)(6) designee Patrick G. Swann, Ph.D.) ("FDA Dep.") 102:13-

24.

2.     FDA regulations regarding the labeling required for prescription drugs mandate

that the "determination as to strength, quality, or purity shall be made in accordance with the

tests or methods of assay set forth" in the compendium published by United States Pharmacopeia

("USP").  21 U.S.C. § 351(b); 21 C.F.R. § 201.51(g); Ex. 19 (FDA Draft "Guidance for

Industry" dated January 2003) at 14 ("The amount of overfill should be sufficient to ensure that

the finished dosage form meets appropriate pharmacopeial tests (e.g., *United States Pharmacopeia (USP) General Chapters <1> Injections, <698> Deliverable Volume, <755> Minimum Fill*)").

3.      Chapters 1 through 999 (pages 1 to 375) contain the mandatory "standards, tests, assays, and other specifications" of the USP compendia.  Ex. 12 (USP compendia dated May 1, 2008) at 3, 375; Ex. 24 (FDA Q&A on Good Manufacturing Practices, last updated Apr. 30, 2009) at 1; Ex. 14 (USP "Stimuli to the Revision Process") at 8632; Ex. 1 FDA Dep. 117:21-118:3.

4.      Drug manufacturers that fail to comply with USP tests can be liable under the Food, Drug, and Cosmetic Act ("FDCA") for selling misbranded or adulterated drugs.  21 U.S.C. § 351(b); 21 U.S.C. § 352(b); 21 C.F.R. 299.5(c); Ex. 15(USP "Frequently Asked Questions") at 1.

5.      Chapter 1 of the USP sets forth the standards, tests, and assays that determine the volume of containers, including the volume of vials for liquid injectable drugs.  Ex. 12 (USP compendia) at 36; Ex. 1 FDA Dep. 118:9-119:1.

6.      The "Injections" section of Chapter 1 of the USP compendia requires that "[e]ach container of an injection is filled with sufficient excess of the labeled 'size' or that volume which is to be withdrawn."  Ex. 12 (USP compendia) at 36.

7.      The amount of liquid in "sufficient excess" of the volume which is to be withdrawn from a container is termed "overfill."  Ex. 12 (USP compendia) at 36; Ex. 14 (USP "Stimuli to the Revision Process") at 8632; Ex. 19 (FDA Draft "Guidance for Industry" dated January 2003) at 14.

8.     USP testing standards for determining an appropriate target fill volume for a vial of liquid medicine require manufacturers to test by using a "dry syringe of a capacity not exceeding three times the volume to be measured and fitted with a 21-gauge needle not less than 2.5 cm (1 inch) in length."  Ex. 12 (USP compendia) at 36.

9.     The USP and FDA testing standards include no other requirements for the type of needle or syringe that manufacturers must use when determining an appropriate target fill volume for a vial of liquid injectable medicine.  Ex. 12 (USP compendia) at 36.

10.    FDA requires manufacturers to disclose the amount of a drug's target overfill as part of the Biologic License Application ("BLA") process.  Ex. 1 FDA Dep. 73:5-74:1; Ex. 19 (FDA "Guidance for Industry" dated June 2004) at 12; Ex. 23 (FDA "Guidance for Industry" dated May 2006) at 5; Ex. 65 (FDA "Guidance for Industry" dated Nov. 2009) at 5-6.

11.    FDA requires manufacturers to provide the scientific rationale to support the amount of a drug's target overfill disclosed as part of the BLA.  Ex. 1 FDA Dep. 73:5-74:1; 76:20-77:14, 79:16-81:19, 169:5-17; Ex. 19 (FDA Draft "Guidance for Industry" dated January 2003) at 14; Ex. 20 (FDA "Guidance for Industry" dated June 2004) at 12; Ex. 23 (FDA "Guidance for Industry" dated May 2006) at 5.

12.    No one at FDA has ever raised an issue with Amgen's use of Chapter 1 of the USP to validate an appropriate target fill volume for Aranesp®.  Ex. 1 FDA Dep. 59:5-62:25, 138:5-9.

13.    FDA testified to the accuracy and scientific integrity of the data Amgen submitted in support of its determinations that 1.168 mL +/- 0.040 mL and the increase for a limited time to 1.190 mL +/- 0.040 mL constituted a proper total target fill volume for Aranesp®.  Ex. 1, FDA Dep. 59:5-62:25, 135:20-136:1, 138:2-9, 140:20-24.

**II.      Compliance with FDA regulations guarantees that a skilled provider will be capable of withdrawing *more* than a vial's labeled amount.**

14.      The purpose of overfill is to allow for a consistent delivery of labeled product to the patient.  Ex. 1 FDA Dep. 87:7-15.

15.      A number of factors affect how much overfill should be in a vial to ensure the consistent delivery of labeled product to patients.  Ex. 1 FDA Dep. 85:2-24.

16.      The range of sophistication of who will administer the drug affects how much overfill should be in a vial.  Ex. 1 FDA Dep. 88:1-93:22.

17.      If unskilled patients may self-administer a drug, FDA would consider that a factor that could justify an increase in the drug's level of overfill.  Ex. 1 FDA Dep. 88:1-93:22; Ex. 32 (Deposition of Dr. Bradley M. Denker, M.D., of January 11, 2011) ("Denker Dep.") 30:7-12; 247:9-248:3.

18.      Aranesp® is either administered by a medical provider or self-administered by the patient.  Ex. 1 FDA Dep. 88:5-10; Ex. 32 Denker Dep. 30:11-12; 247:9-248:3.

19.      A purported medical expert retained by Relator acknowledged at deposition that it is important that the vial contain enough drug so that a patient who is self-administering the drug can withdraw the ordered amount.  Ex. 32 Denker Dep. 247:23-248:3.

20.      The specific fill process used to manufacture a drug and inherent manufacturing variability affects how much overfill should be in a vial.  Ex. 1 FDA Dep. 92:20-93:22 (noting that "natural manufacturing variability" will be based on "different fill processes that are going to have different variances").

21.      Relator admits that "the amount of 'hold up volume' or 'HUV' (as those terms are used in Paragraph 143 of [Fourth Amended Complaint] may vary depending on the type of needle a medical provider uses and the skill of the medical provider in extracting the contents of

the drug vial." Ex. 36 (Relator's Responses to Amgen's First Requests for Admission dated Sep. 17, 2010) ("Relator's Response to RFAs") at p. 5 (No. 3).

22.     "Hold up volume" refers to an amount of liquid that cannot be administered because it sticks to the vial or needle.  Relator's Fourth Amended Complaint ("FAC") [Docket No. 238] ¶¶ 143-44.

23.     Determining a target overfill amount must also take into account other variables, including the type, size and shape of container used, the manner in which the dose is delivered (i.e., vial as opposed to prefilled syringe), and the effect of the materials used on the surface tension of the liquid.  Ex. 1 FDA Dep. 93:23-94:20.

24.     Due to the multiple drug-specific factors that may have an impact on how much overfill should be in a vial, FDA evaluates a drug's disclosed target overfill for whether it is scientifically justified.  Ex. 1 FDA Dep. 88:1-93:22, 122:25-124:4, 126:18-22.  FDA does not set a specific level of permissible overfill due to the complexity of these multiple factors.  *Id.*

25.     A level of overfill would exceed a scientifically justified range of overfill if it would cause excessive product to be delivered to a patient and cause harm or if it lacked a scientific rationale.  Ex. 1 FDA Dep. 76:20-77:14, 79:16-81:19, 106:5-24, 122:25-124:4; Ex. 19 FDA Draft "Guidance for Industry" dated January 2003) at 14; Ex. 20 (FDA "Guidance for Industry" dated June 2004) at 12; Ex. 23 (FDA "Guidance for Industry" dated May 2006) at 5.

26.     A level of overfill would fall below a scientifically justified range of overfill if it would risk vials being manufactured without enough medicine for those administering the product consistently to extract the labeled amount of medicine.   Ex. 1 FDA Dep. 76:20-77:14, 79:16-81:19, 94:21-96:18, 122:25-124:4.  FDA considers the risk of "underfill" to constitute a "fundamental quality issue" that poses risks to patients. *Id.* 95:10-95:24.

27.     FDA instructs manufacturers to have a "high degree of assurance" that their products will "consistently" meet quality standards, including overfill requirements, "from batch-to-batch and unit-to-unit."   Ex. 1 FDA Dep. 151:7-25; Ex. 22 (FDA Draft "Guidance to Industry" dated Nov. 2008) at 4-5; Ex. 16 (FDA "Guidance to Industry" dated May 1987) at 2.

28.     The target amount of overfill for a liquid medicine that may be self-administered must be high enough to provide a high degree of assurance that even a self-administering patient can consistently withdraw and administer the full labeled dose despite the numerous variables and factors that affect the fill volume of a vial and the amount that can be withdrawn and administered.  Ex. 1 FDA Dep. 85:2-24; 87:7-15; 88:1-94:20; 122:25-124:4; 151:7-25.

**III.     FDA approved Aranesp's® overfill level after "rigorous" review and evaluation.**

29.     FDA evaluates whether a drug such as Aranesp® can be marketed through the review of a BLA.  21 C.F.R. §§ 600-680.  Before FDA will approve a drug for market, it "must undergo the agency's rigorous evaluation process, which scrutinizes everything about the drug, from the design of clinical trials to the severity of side effects to the conditions under which the drug is manufactured."   Ex. 25 ("The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective" dated Oct. 28, 2010); Ex. 1 FDA Dep. 69:19-72:18.

30.     A specific component of FDA's rigorous review of a drug's BLA is to evaluate the amount of target overfill.  Ex. 1 FDA Dep. 73:5-74:1, 106:5-24.  FDA also evaluates the documentation submitted to support the proposed target overfill amount.  *Id*.  FDA has the authority to conduct independent facility inspections to verify the source documentation.  *Id*. 66:5-67:20.  FDA explained at deposition that "a relatively unique component of biologics versus [other drugs] is that there is a facility inspection that will proceed during this timeline between submission of information and a decision date. . . ."  *Id*. 66:11-15.

31.     FDA will not approve a drug's BLA if FDA has concerns about the amount of target overfill that remain unaddressed.  Ex. 1 FDA Dep. 111:5-10.

32.     FDA has taken further action, where it had concerns that a drug product included a potentially excessive amount of overfill, including imposing post-marketing commitments such as additional studies required after drug approval to provide additional data to FDA.  Ex. 1 FDA Dep. 111:5-117:13.

33.     On December 23, 1999, Amgen submitted a BLA for Aranesp® to the FDA.  Ex. 57 (Aranesp® BLA) at 1.

34.     Aranesp®'s BLA proposed a target total fill volume of 1.168 mL, with a fill variability of plus or minus 0.040 mL.  Ex. 57 (Aranesp® BLA) at Table IIB-11; Ex. 1, FDA Dep. 221:1-6.  In other words, the BLA proposed that the actual amount in a vial of Aranesp® could range 0.040 mL above or below the target level (1.128 mL to 1.208 mL) based on unavoidable and expected manufacturing variability.   Ex. 57 (Aranesp® BLA) at Table IIB-11; Ex. 1, FDA Dep. 200:15-20.

35.     Despite this target range of overfill, one Aranesp® vial measured a withdrawable volume of only 1.007 mL, only 0.007 mL of liquid above the labeled fill amount.  Ex. 57 (Aranesp® BLA) at Table IIB-31.

36.     Between 1999 and 2000, Amgen sustained a critical manufacturing failure related to the fill volume of the "conformance lot" for the product Kineret®, which also initially included 16.8% overfill based on Amgen's experience with EPOGEN®.  Ex. 37 (Deposition of Amgen Rule 30(b)(6) designee William Vega, dated Sep. 10, 2010) ("Vega Dep.") 51:22-52:7.

37.     After the failure of the Kineret® conformance lot, Amgen introduced a new formula for setting target overfill volumes that took additional variables into account.  Ex. 37

Vega Dep. 51:13-52:14.  To account for the worst case scenario of additional liquid remaining trapped in the syringe, and based on an analysis of Kineret® data, Amgen increased the target fill volume for Aranesp® to 1.19 mL.  *Id.*

38.  On March 30, 2001, Amgen reported to FDA in a pre-launch Annual Report of Changes related to Aranesp® an increase in the maximum total fill volume to 23% or 1.230 mL. Ex. 58 (Annual Report to FDA dated Mar. 30, 2001) § B.7.  Based on an expected manufacturing variability of +/- 0.040 mL, a target of 19% overfill would result in a maximum total fill volume of 1.230 mL.  *Id.*

39.  The new target fill volume of 1.19 mL +/- 0.040 mL remained within the previously reported maximum total fill volume of 1.230 mL.  Ex. 58 (Annual Report to FDA dated Mar. 30, 2001) at 2.

40.  Amgen reported to FDA the increase in target overfill for Aranesp® to 19%, or a target total fill volume of 1.190 mL.  Ex. 1 FDA Dep. 154:9-15; Ex. 59 (Annual Report to FDA dated April 19, 2002) at 2.  FDA determined that the change was "acceptable and adequately reported."  Ex. 60 (FDA Review Memorandum dated July 12, 2002) at 2; Ex. 1 FDA Dep. 160:20-163-13.

41.  Amgen manufactured a limited number of lots at this target fill volume in 2000 and 2001, before implementing a reduction back to 16.8% target overfill.  Ex. 37 Vega Dep. 177:24-178:4; 179:3-5; 232:16-24; Ex. 60 (FDA Review Memorandum dated July 12, 2002) at 2.

42.  FDA reviewed and approved Aranesp's® target overfill of 16.8% +/- 0.040 mL, first in its approval of the BLA, again in connection with a BLA supplement, and again in its Review of Amgen's Annual Report for Aranesp®.  Ex. 57 (Aranesp® BLA) at Table IIB-11; Ex.

1 FDA Dep. 140:20-141:7, 221:1-6; Ex. 60 (FDA Review Memorandum dated July 12, 2002); Ex. 61 (FDA Review Memorandum of BLA Supplement dated July 18, 2002).

43.    FDA did not raise any concerns that Aranesp's® target overfill level was excessive.  Ex. 1 FDA Dep. 149:12-151:6; 205:4-18.

44.    The original FDA reviewer of Aranesp's® BLA noted "[h]is major concern was that there not be an underfill."  Ex. 1 FDA Dep. 149:12-151:6.

45.    In 2009, Amgen reported to FDA in its Annual Report of Minor Changes that it decreased Aranesp® overfill to 14.3% on September 8, 2008.  Ex. 62 (Annual Report of Minor Changes dated Aug. 28, 2009) at 19; Ex. 1 FDA Dep. 180:4-181:1.

**IV.    Relator has no evidence that Aranesp's® overfill level was ever "excessive" by any legitimate standard.**

46.    In the USP compendia, chapters above 999 (page 375) "are information . . . they contain no standards, tests, assays, nor other mandatory specifications, with respect to any Pharmacopeial articles."  Ex. 12 (USP compendia) at 375; Ex. 1 FDA Dep. 117:21-118:3; Ex. 24 (FDA Q&A on Good Manufacturing Practices) at 1; Ex. 14 (USP "Stimuli to the Revision Process") at 8632.

47.    Chapter 1151 includes a table that details the "Recommended Excess Volume" for liquid injectable drugs that is "usually sufficient to permit withdrawal and administration of the labeled volumes."  Ex. 12 (USP compendia) at 619.

48.    For a labeled size of 1.0 mL, the "Recommended Excess Volume" in the information only table is 0.10 mL for mobile liquids.  Ex. 12 (USP compendia) at 619.

49.    In 1950, USP first published this table in the section now numbered as Chapter 1. Ex. 14 (USP "Stimuli to the Revision Process") at 8632.

50.     Including this table in a "mandatory" chapter "created continual problems in interpretation by both industry and regulatory agencies."  Ex. 14 (USP "Stimuli to the Revision Process") at 8632.  As a result, in 1997, USP deleted the table from a mandatory chapter and relocated it to its present location in Chapter 1151 (page 619), which USP and FDA consider to be "only informational."  *Id.*; Ex. 12 (USP compendia) at 375, 619; Ex. 24 (FDA Q&A on Good Manufacturing Practices) at 1.

51.     FDA responded to USP's proposal to move the table to Chapter 1151 by stating that "[w]e note that the initial proposal to relocate the Volume in Container subsection . . . was based on the concept that the Recommended Excess Volume was not mandatory and should not appear in [Chapter 1] Injections, a legally enforceable chapter.  We understand and do not object to this concept."  Ex. 13 (Letter from FDA to USP dated Nov. 7, 1997).

52.     In 1999, USP considered a recommendation to "revise [Chapter 1] by providing language establishing an upper limit" of overfill out of concerns that the phrase "'sufficient excess' does not convey the sense of an upper limit on the excess volume."  Ex. 14 (USP "Stimuli to the Revision Process") at 8632.  USP "considered establishing a limit of 110% of the labeled volume for single-administration containers of 30 mL or less," but noted that "[v]olume overfill can exceed 20% in some containers" and "decided that further information was necessary before proposing a 'cap' percent limit."  *Id.*

53.     Amgen issued a subpoena to FDA for testimony related to this case.  Ex. 4 (Letter from M. Shane, FDA, dated Mar. 2, 2010) ("FDA Letter") at 1.  On March 2, 2010, FDA sent counsel for Amgen a letter to supplement the documents and information previously provided.  *Id.*

54.     FDA provided information for fifteen applications for injectable liquid biologics that it had approved between the years 2003 and 2010.  Ex. 4 (FDA Letter) at 1-2.  FDA approved six applications for biologics that contained a percentage of overfill that equaled or exceeded 20%.  *Id.*

55.     Relator admits that "FDA has represented in the [Letter from M. Shane, FDA, dated Mar. 2, 2010] that some approved products contain overfill in excess of 16.8%."  Ex. 36 Relator's Response to RFAs at p. 5 (No. 2).

**V.     CMS reimbursed for administered overfill until January 1, 2011.**

56.     On February 10, 2010, Amgen issued a subpoena to the Centers for Medicare & Medicaid Services ("CMS") for testimony related to this case.  Ex. 5 (Letter from J. Blum, CMS, dated June 17, 2010) ("CMS Letter") at 1.

57.     The CMS Administrator delegated the authority to respond to the subpoena to Jonathan Blum, Deputy Administrator for CMS.  Ex. 5 (CMS Letter) at 1; Ex. 2 (Deposition of CMS's Rule 30(b)(6) designee John F. Warren dated Nov. 5, 2010) ("CMS Dep.") 16:12-25.  As Deputy Administrator, Mr. Blum directs operations and is the ultimate policy decision-maker for all aspects of the Medicare program.  Ex. 2 CMS Dep. 16:24-17:19.  In accordance with the regulations commonly referred to as *Touhy* regulations, Mr. Blum provided CMS' response to the subpoena on June 17, 2010.  Ex. 5 (CMS Letter) at 1.

58.     "[I]t is the FDA that oversees when, and how much, 'overfill' can properly be contained in a drug vial."  Ex. 5 (CMS Letter) at 2.  "CMS has never made any proclamations concerning what it considers to be a proper or improper amount of overfill in a vial.  Such policies, if they exist, would fall within the ambit of the FDA."  *Id.* at 2-3.

59.     On the topic of reimbursement for administered overfill, "CMS' policy is to reimburse suppliers for the total number of units administered to a Medicare beneficiary

assuming that the beneficiary's receipt of the drug is reasonable and necessary pursuant to §
1862(a)(1)(A) of the Social Security Act.  CMS does not make payment determinations based on
the absence or presence of 'overfill' in a vial."  Ex. 5 (CMS Letter) at 2-3.

60.     Through 2010, CMS never denied payment for a claim under the Medicare
reimbursement system because the claim included amounts of overfill.  Ex. 2 CMS Dep. 202:13-
18, 214:20-23.

61.     On November 29, 2010, CMS issued a new final rule that prohibits providers
from seeking reimbursement for administered units of overfill effective January 1, 2011.  Ex. 6
(Medicare Program: Payment Policies Under the Physician Fee Schedule and Other Revisions to
Part B for CY 2011: Final Rule, effective January 1, 2011) ("CMS Final Rule") at 73466.

62.     CMS continued to approve claims that included overfill during November and
December 2010.  Ex. 2 CMS Dep. 220:19-23.

63.     CMS relied upon the statutes and regulations pertaining to the reporting of a
drug's Average Sales Price ("ASP") to extend the payment rules to preclude claims seeking
payment for administered overfill.  Ex. 2 CMS Dep. 213:23-214:23; Ex. 6 (CMS Final Rule) at
73466.

64.     CMS' policy as expressed in the new final rule "is not intended to limit the use of
intentional overfill during the care of beneficiaries or in medical practice; such measures are
beyond CMS' authority.  Rather we are clarifying our ASP pricing and payment policies . . . ."
Ex. 6 (CMS Final rule) at 73467.

65.     The Medicare program provides coverage benefits for outpatient drugs that are
"furnished 'incident to' a physician's service provided that the drugs are not usually self-
administered by the patients who take them."  Ex. 7 (CMS Medicare Benefit Policy Manual,

Chap. 15) § 50.  Under this provision, the charge for the drug "must represent an expense to the physician."  *Id*. § 50.3.

66.     The "incident to" provision is a "benefit category provision" and not a payment provision.  Ex. 2 CMS Dep. 32:4-33:4; 136:11-21.  This provision requires a provider to expend some money in obtaining the drug as part of the administration of the drug in the physician's office.  *Id*.

67.     The "incident to" provision addresses situations where a patient purchases a drug on his or her own, delivers it to the physician, and the physician administers the drug.  Ex. 2 CMS Dep. 126:15-127:12.  In that situation, the physician incurs no cost at all for the purchase of the drug.  *Id*.  Under Medicare policy, the physician cannot seek reimbursement for the drug that the patient purchased.  *Id*.

68.     Interpreting the "incident to" provision to prohibit payment for claims including overfill amounts prior to the issuance of the new final rule is "tenuous at best."  Ex. 2 CMS Dep. 25:2-33:4.

69.     CMS implemented a new policy position it had never before articulated by relying on the "incident to" provision to prohibit the billing for administered overfill as of January 1, 2011.  Ex. 2 CMS Dep. 215:13-22.

70.     Prior to the issuance of the final rule, CMS believed it would be reasonable for a provider to conclude that the cost associated with a purchased product could and should be attributed to any units of overfill administered.  Ex. 2 CMS Dep. 204:11-20.

71.     Prior to the issuance of the final rule, CMS had never issued any guidance to suggest that overfill was free product or was product that did not represent an expense to a

physician.   Ex. 2 CMS Dep. 209:20-210:4; 217:18-24 (characterization of overfill as "free product" is "further application that will go into effect on January 1, 2011").

72.     Providers who testified or made statements under oath in this case to administering overfill said they believed that billing for administered overfill was entirely lawful.

- Rockland Renal.  Ex. 38 Yablon Dep. 88:4-15.

- Boca Nephrology.  Ex. 39 Stemmer Dep. 43:7-44:3, 83:12-15, 129:3-130:1.

- Diablo Nephrology.  Ex. 67 Curzi Dep. Tr. at 47:14-24.

- Balboa Nephrology.  Ex. 40 (Deposition of Steven M. Steinberg, M.D.) ("Steinberg Dep.") 150:13-151:21.

- Bronx Westchester Medical Group. Ex. 41 (Deposition of Robert S. Laitman, M.D.) ("Laitman Dep.") 93:22-94:23, 96:13-97:7.

- California Kidney.  Ex. 42 (Deposition of Anil Vaidya, CFO) ("Vaidya Dep.") 125:2-127:19.

- Durham Nephrology.  Ex. 43 (Deposition of Charles Cooperberg, M.D.) ("Cooperberg Dep.") 84:24-88:4.

- Nephrology Associates of Westchester.  Ex. 44 (Deposition of Stephen Adler) ("Adler Dep.") 43:9-21.

- Nephrology Associates of Syracuse.  Ex. 45 (Deposition of Philip Ondocin) ("Ondocin Dep.") 49:6-9; Ex. 46 (Deposition of Dorothy L. Schneider) ("Schneider Dep.") 133:5-18; 136:25-137:7, 140:24-142:21.

- Main Street Medical.  Ex. 47 (Declaration of Rebecca Schwartz dated January 24, 2011 ("Schwartz Decl.") ¶¶ 8-10.

- Associates in Nephrology.  Ex. 48 (Declaration of Robert E. Libbey, M.D.) ("Libbey Decl.") ¶¶ 13-14.

- Metabolism Associates PC.  Ex. 49 (Declaration of Frederic O. Finkelstein, M.D.) ("Finkelstein Decl.") ¶ 14.

- Napa Valley Nephrology.  Ex. 50 (Declaration of Thomas Paukert, M.D.) ("Paukert Decl.") ¶ 15.

73.     In fact, multiple providers testified or made statements under oath that administering and billing for overfill was a common practice in nephrology and the medical industry.

- Dr. Stemmer of Boca Nephrology testified that he understood that billing for overfill was customary among providers and testified that "[e]verybody did it. It was the way it was done and all sources said that it's fine to do it." Ex. 39 Stemmer Dep. 123:4-124:8, 129:3-19.

- Dr. Curzi of Diablo Nephrology testified that he understood that it was a "standard practice" among dialysis providers to bill for administered EPOGEN® overfill and that Diablo billed for overfill in other injectables such as flu vaccines. Ex. 67 Curzi Dep. 42:20-43:24, 47:14-24, 119:24-120:18.

- Dr. Laitman of Bronx Weschester testified that submitting claims for administered ESA overfill is a well-known and accepted practice in the medical industry that was "ongoing" as of the date of his deposition. Ex. 41 Laitman Dep. 18:18-19:16.

- Dr. Vaidya of California Kidney testified that he understood it was "common practice" for providers to seek reimbursement for administered amounts of injectable medications, including amounts that exceed the labeled vial size. Ex. 42 Vaidya Dep. 128:17-24.

- Dr. Adler of Nephrology Associates of Westchester testified that he understood it to be common knowledge within the dialysis community, and known to the government, that facilities were administering and being reimbursed for administered overfill amounts. Ex. 44 Adler Dep. 49:2-19.

- Dr. Robert E. Libbey of Associates in Nephrology understood it to be a common practice among physicians to utilize any overfill in injectable drugs to deliver a prescribed dose and to seek reimbursement for the amount of drug administered. Ex. 48 Libbey Decl. ¶ 13.

- Dr. Finkelstein of Metabolism Associates PC understood that it was a common practice among physicians to utilize the overfill in injectable drugs to deliver a prescribed dose. Ex. 49 Finkelstein Decl. ¶ 13.

- Dr. Paukert of Napa Valley Nephrology understood that it was a common practice among physicians to use the overfill in injectable drugs to deliver a prescribed dose and to seek reimbursement for the amount of drug administered. Ex. 50 Paukert Decl. ¶ 14.

**VI.    CMS audited and approved claims for Medicare reimbursement that included administered units of Aranesp® overfill.**

74.    **Rockland Renal.**  Steven Yablon, M.D., founded Rockland Renal.  Ex. 38 (Deposition of Stephen V. Yablon dated Oct. 15, 2010) ("Yablon Dep.") 8:24-9:8.  There are currently four other partners in the practice: Kenneth Shapiro, M.D., Jonathan Wolf, M.D., Robert Curreri, M.D., and Arthur Kozin, M.D.  *Id*.

75.    Prior to Rockland Renal's use of Aranesp®, Dr. Yablon and other providers affiliated with the practice administered and billed Medicare for Procrit® overfill.  Ex. 38 Yablon Dep. 94:20-95:19, 96:2-97:2.

76.    Dr. Yablon submitted reimbursement claims to Medicare for overfill contained in Aranesp® vials and administered to patients.  Ex. 38 Yablon Dep. 17:4-23.

77.    Dr. Yablon testified that he believed billing for overfill was lawful and complied with CMS guidance and regulations.  Ex. 38 Yablon Dep. 88:4-15.  Dr. Yablon testified that he did not believe that CMS made reimbursement determinations based on the presence or absence of overfill.  *Id*. 86:23-90:14.

78.    In or around 2007, Rockland Renal's local Medicare carrier conducted an audit of the practice's billing and claims, which included an audit of all of Rockland Renal's claims, including Aranesp® and Procrit® claims containing overfill.  Ex. 38 Yablon Dep. 103:19-106:05.

79.    The local Medicare carrier approved all of the audited claims and reimbursed Rockland Renal for all of the claims submitted.  Ex. 38 Yablon Dep. 105:13-106:5.

80.    The local Medicare carrier determined that Rockland Renal's Aranesp® and Procrit® claims were medically necessary.  Ex. 38 Yablon Dep. 106:15-19.

81.     **Boca Nephrology.**  Boca Nephrology is a nephrology practice founded by Dr. Craig Stemmer.  Ex. 39 (Deposition of Craig Stemmer, M.D., dated Sep. 23, 2010) ("Stemmer Dep.") 12:5-20.  Dr. Stemmer is currently the medical director for a dialysis facility, and served as the medical director for other dialysis facilities in the past.  *Id*. 81:20-24, 90:4-21.

82.     Boca Nephrology began purchasing Aranesp® in late 2001.  Ex. 39 Stemmer Dep. 116:9-12.  At that time, Boca Nephrology was also using EPOGEN® and Procrit®.   *Id*.

83.     Boca Nephrology submitted claims for Medicare reimbursement for administered units of EPOGEN® and Procrit® overfill.  Ex. 39 Stemmer Dep. 118:8-120:5, 124:9-23.

84.     Dr. Stemmer began billing for overfill in the dialysis setting in the late 1990s after learning that other dialysis providers were billing for overfill.  Ex. 39 Stemmer Dep. 121:9-23, 123:15-124:17.

85.     Following Aranesp's® launch, Boca Nephrology submitted claims for Medicare reimbursement for units of administered Aranesp® overfill, and the practice continued to do so into 2010.  Ex. 39 Stemmer Dep. 30:8-11; 75:7-15; 119:8-14, 124:9-27.

86.     Dr. Stemmer testified that he believed that billing for overfill was lawful.  Ex. 39 Stemmer Dep. 129:3-130:1.  He testified that he understood that billing for overfill was customary among providers and testified that "[e]verybody did it.  It was the way it was done and all sources said that it's fine to do it. . . . "  *Id*. 129:3-19.

87.     In 2004, a Medicare fiscal intermediary, First Coast, conducted an audit of Boca Nephrology's use and billing of Aranesp®.  Ex. 39 Stemmer Dep. 140:4-141:5.  In response to the audit, Dr. Stemmer submitted billing and medical records to First Coast, including records that reflected billing for overfill, which First Coast reviewed.  *Id*. at 141:16-24, 150:6-156:13.

88.     First Coast approved the payment for each claim for Aranesp® submitted by Boca Nephrology reviewed during the audit.  Ex. 39 Stemmer Dep. 143:1-7.

89.     First Coast concluded that each Aranesp® claim submitted by Boca Nephrology was medically necessary.  Ex. 39 Stemmer Dep. 143:1-7.

90.     In 2007, First Coast conducted an audit of Dr. Stemmer's dialysis practice.  Ex. 39 Stemmer Dep. 132:3-14.  The audit included a review of each Aranesp® claim submitted by Dr. Stemmer between late-2007 to mid-2008, a time period when Dr. Stemmer administered and billed for overfill.  *Id*. 132:3-17.  First Coast approved each payment reviewed during the audit. *Id*. 132:18-19, 135:2-7.

91.     **Diablo Nephrology.**  Diablo Nephrology ("Diablo") is a nephrology practice led by Dr. Mario Curzi, the President of the clinic.  Ex. 67 (Deposition of Mario Curzi, M.D., dated Oct. 6, 2010) ("Curzi Dep.") 11:4-12:1.  Nine physicians are currently affiliated with Diablo.  *Id*. 91:16-18.  In the early 1990s, Diablo had ownership interests in three dialysis facilities.  *Id*. 93:6-21.  Since that time, Dr. Curzi served as a medical director for other dialysis facilities.  *Id*. 93:22-94:15.

92.     Diablo submitted claims to Medicare for reimbursement of administered units of Aranesp® overfill.  Ex. 67 Curzi Dep. 32:9-34:3.

93.     Dr. Curzi testified that he believed that the submission of claims to CMS for the reimbursement of administered overfill comported with the law.  Ex. 67 Curzi Dep. 47:14-24.

94.     Dr. Curzi testified that he understood that it was a "standard practice" among dialysis providers to bill for administered EPOGEN® overfill and that Diablo billed for overfill in other injectables such as flu vaccines.  Ex. 67 Curzi Dep. 42:20-43:24, 47:14-24, 119:24-120:18.  He further testified that Diablo administered and billed for administered Procrit®

overfill even before the launch of Aranesp®. *Id.* 116:13-117:3. He testified that he believed that when Diablo purchased a vial of Aranesp®, it paid for the full contents of the vial and could utilize the full contents of the vial. *Id.* 47:14-24, 64:13-65:3.

95.     In 2007, a CMS contractor conducted an audit of Diablo's Procrit® claims, including those that included overfill submitted to CMS during the 2003 time period. Ex. 67 Curzi Dep. 128:18-141:9. The CMS contractor approved each payment reviewed during the audit. *Id.* 134:10-135:11, 137:5-10, 138:24-139:8, 140:16-22. Dr. Curzi understood that approval to be "an indirect confirmation" that his billing practices were correct. *Id.* 141:3-9.

**VII.   CMS and OIG knew that providers billed Medicare for overfill, yet prior to 2010 did not take any regulatory or enforcement action.**

96.     The mission of the Office of Inspector General ("OIG") is "to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs." Ex. 27 (OIG Report "Medicare Reimbursement for Existing End-Stage Renal Disease Drugs" dated May 2004) ("OIG 2004 Report"); Ex. 3 (Deposition of OIG's Rule 30(b)(6) designee Nicole Freda dated Nov. 2, 2010) ("OIG Dep.") 36:11-20. OIG performs this mission "through a nationwide network of audits, investigations, and inspections. . . ." Ex. 27 (OIG 2004 Report).

97.     OIG's duties include investigating and reporting on improper practices and publishing guidance on practices that may constitute kickbacks. FAC ¶¶ 34-35; Ex. 18 (OIG Advisory Opinion No. 00-10 dated Dec. 15, 2000) ("OIG Advisory Opinion No. 00-10") at 7.

98.     CMS informs providers that submitting claims for reimbursement not in accordance with CMS policies could subject them to scrutiny and follow-up action by OIG. Ex. 6 (CMS Final Rule) at 73466.

99.     OIG issued guidance on December 15, 2000, regarding compliance with the Anti-Kickback Statute related to services offered by drug manufacturers to providers for "free assistance" with respect to reimbursement information about the manufacturers' products.  Ex. 18 (OIG Advisory Opinion No. 00-10) at 7.

100.    OIG informed drug manufacturers and providers that "[s]ince these services have no independent value to providers apart from the products, they are properly considered part of the products purchased and their cost is already included in the products' price.  Ex. 18 (OIG Advisory Opinion No. 00-10) at 7.  OIG concluded that "these services have no substantial independent value and do not implicate the Federal anti-kickback statute."  *Id.*

101.    In November 1997, OIG published a report to CMS titled "Review of EPOGEN® Reimbursement."  Ex. 26 (OIG Report "Review of EPOGEN Reimbursement" dated Nov. 1997) ("OIG 1997 Report"); FAC ¶ 355.  The report detailed OIG's findings and recommendations regarding a study of Medicare's reimbursement for EPOGEN®.  Ex. 26 (OIG 1997 Report) at 1.

102.    As part of this study, OIG obtained an understanding of the internal control structure relative to the processing of claims for EPOGEN® reimbursement, reviewed applicable Medicare laws and regulations, reviewed claims data for EPOGEN® paid to 771 hospital-based dialysis facilities and 2,023 free-standing dialysis facilities, obtained invoices from 105 randomly selected End-Stage Renal Disease ("ESRD") facilities, and estimated the number of EPOGEN® units billed to Medicare.  Ex. 26 (OIG 1997 Report) at 3-4; FAC ¶ 356.

103.    OIG reported that it learned during the audit that Amgen included 25% overfill in each vial of EPOGEN®.  Ex. 26 (OIG 1997 Report) at 7; FAC ¶¶ 355, 358-59.

104.    OIG reported that "there are indications that some free-standing dialysis facilities were able to use a portion of [the EPOGEN® overfill]."  Ex. 26 (OIG 1997 Report) at 8.  OIG

concluded that the "use of this additional EPO would materially affect each provider's cost." *Id*.; FAC ¶ 356.

105.    OIG recommended in the report that CMS reduce the Medicare per unit reimbursement rate for EPOGEN®. Ex. 26 (OIG 1997 Report) at 5; FAC ¶ 356.

106.    No representative from CMS responded to the report to suggest that billing for overfill was not permitted. Ex. 3 OIG Dep. 99:24-100:13.

107.    Based on the 1997 OIG report, CMS had notice that manufacturers included overfill in vials of injectable drugs and that dialysis providers were billing Medicare for overfill units. Ex. 2 CMS Dep. 162:1-163:22; Ex. 26 (OIG 1997 Report) at 5, 7-8.

108.    In May 2004, OIG published a report to CMS titled "Medicare Reimbursement for Existing End-Stage Renal Disease Drugs." Ex. 27 (OIG 2004 Report); FAC ¶ 9. The report detailed OIG's findings and recommendations regarding the difference between the Medicare reimbursement amount for selected separately billed ESRD drugs and the acquisition cost of these drugs. Ex. 27 (OIG 2004 Report) at ii-v.

109.    As part of this audit, OIG collected acquisition cost data from the four largest dialysis providers and from a sample of facilities not owned or managed by those providers for ten drugs, including EPOGEN®. Ex. 27 (OIG 2004 Report) at ii. OIG also collected ASP data for those ten drugs from drug manufacturers, including Amgen. *Id*. at ii-iii.

110.    OIG noted in its findings that "[t]hree providers reported that they are able to lower actual acquisition costs through the utilization of overfill for [EPOGEN®]." Ex. 27 (OIG 2004 Report) at 8. One provider reported that "[t]he overfill ranges from 7 to 14 percent based on type of vials." *Id*. at 9. In addition, one provider "reported a similar overfill percentage for Paricalcitol." *Id*.

111.    The OIG audit team would review claims data related to EPOGEN® reimbursement to prepare such a report.  Ex. 3 OIG Dep. 127:15-19.

112.    OIG is not aware of any law or regulation that the audit team uncovered that suggested it was improper to bill for overfill.  Ex. 3 OIG Dep. 130:10-16.

113.    OIG decided not to include overfill in the acquisition cost data because "the amount of overfill varies, and because facilities may have different practices regarding the utilization of overfill."  Ex. 27 (OIG 2004 Report) at 9.

114.    The 2004 OIG report put CMS on notice once again that Medicare was paying claims to dialysis providers that included overfill amounts.  Ex. 2 CMS Dep. 77:10-15, 80:10-15; 162:2-163:21, 164:21-165:15.

115.    On March 15, 2004, DaVita Inc., a leading provider of kidney care, notified OIG in connection with a facility audit that it "is able to capture a portion of EPOGEN overfill."  Ex. 3 OIG Dep. 143:1-147:9.  No one on the OIG audit team suggested that they thought the billing for overfill was not in accordance with Medicare guidelines.  *Id.*  OIG did not even include a reference to this practice in its final audit report.  *Id.*

116.    On March 15, 2004, Fresenius Medical Care, a large provider of kidney dialysis services, notified OIG in connection with a facility audit that it utilized a percentage of overfill.  Ex. 3 OIG Dep. 149:20-152:2.  Fresenius Medical Care specifically noted in its letter to OIG that its "profit margin on EPO administration is partly derived from overfill utilization."  Ex. 66 (Deposition of OIG's Rule 30(b)(6) designee David E. Tawes dated Oct. 26, 2010) 78:9-79:19.  OIG understood that utilization of overfill to enhance profit meant billing the government for units of overfill.  *Id.*  OIG's final report on the audit of Fresenius did not reference the provider's use or billing of overfill.  Ex. 3 OIG Dep. 149:20-152:2.

117.   **Main Street Medical.**   Main Street Medical ("Main Street") is a medical facility located in Dunedin, Florida.  Ex. 47 (Schwartz Decl.) ¶ 1.  Three nephrologists currently practice at Main Street.  *Id.* ¶ 1.  Rebecca Schwartz has held the position of facility administrator for Main Street since 2007.  *Id.*

118.   Main Street began purchasing Aranesp® shortly after it was introduced to the market.  Ex. 47 (Schwartz Decl.) ¶ 5.

119.   In 2007, Ms. Schwartz became aware that Main Street was administering overfill from vials of Aranesp®.  Ex. 47 (Schwartz Decl.) ¶ 8.

120.   In order to determine how Main Street should properly bill for the administered overfill from vials of Aranesp®, Ms. Schwartz contacted CMS by telephone and asked a "CMS representative whether it was appropriate to bill for overfill."  Ex. 47 (Schwartz Decl.) ¶ 8.

121.   The CMS representative informed Ms. Schwartz that it is appropriate to bill for the amount of medicine administered so long as it is medically necessary.  Ex. 47 (Schwartz Decl.) ¶ 8.

122.   The information CMS provided Ms. Schwartz regarding the ability to bill for administered and necessary overfill was the same position CMS expressed in this case in response to an Amgen subpoena.  Ex. 5 (CMS Letter) at 2-3 ("CMS' policy is to reimburse suppliers for the total number of units administered to a Medicare beneficiary assuming that the beneficiary's receipt of the drug is reasonable and necessary. . . .")

## VIII.   Relator obtained signed certification statements for only 11 of the 561 providers asserted to have submitted false certifications.

123.   Since 2001, CMS required medical providers to use one of several different types of forms to enroll in Medicare.  Ex. 35 (Rebuttal Expert Report of Fiona Scott Morton, Ph.D, dated Feb. 2, 2011) ("Morton Report") at 25 (¶¶ 67-68); FAC ¶ 71.

124.    The current versions of the CMS-855 forms include a certification that providers must sign that references the federal, criminal AKS.  FAC ¶ 71.

125.    In 2003, CMS launched a new enrollment data system known as the Provider Enrollment Chain & Ownership System ("PECOS").  Ex. 35 (Morton Report) at 27 (¶ 70); FAC ¶ 371.

126.    Relator alleged that CMS set a deadline of January 3, 2011 for providers to enroll in PECOS.  FAC ¶ 374.

127.    On November 24, 2010, CMS announced that any mandatory deadline had been delayed "indefinitely."   Ex. 9 (CMS Notice "Important Update on PECOS & Ordering / Referring" released Nov. 24, 2010) ("CMS PECOS Notice"); Ex. 10 (InsideHealthPolicy.com "CMS Again Delays Mandatory Internet-Based 'PECOS' Enrollment" dated November 24, 2010) ("IHP PECOS Notice").  CMS informed providers that "we want to reiterate that CMS has not announced any date (January 3 or otherwise)" regarding when automatic denials would occur.  Ex. 9 (CMS PECOS Notice).

128.    Relator's purported damages expert, Raymond Hartman, asserted that 2,191 providers, identified by Medicare ID number, purposely submitted overfill claims for Aranesp® to Medicare for reimbursement and were thus "tainted."  Ex. 29 (Declaration of Raymond S. Hartman dated Dec. 14, 2010) ("Hartman Report") at 18 (¶¶ 40-41).

129.    Mr. Hartman then assigned a certification date for each of the 2,191 providers. Ex. 29 (Hartman Report) at 18 (¶¶ 40-44); Ex. 35 (Morton Report) at 76-77 (¶¶ 167-172).

130.    Mr. Hartman assigned a date from an actual, signed certification form for only one provider.  Ex. 29 (Hartman Report) at 18-19 (¶¶ 40-44); Ex. 35 (Morton Report) at 77-78 (¶ 170).

131.    For the other providers, Mr. Hartman relied on dates in two spreadsheets provided by CMS (the "CMS Spreadsheets").  Ex. 29 (Hartman Report) at 19 (¶ 42).  If the CMS Spreadsheets did not have a date for a provider or a group of which the provider was a member, Mr. Hartman assumed the certification date was October 1, 2006.  *Id.*  Mr. Hartman assumed an October 1, 2006 certification date for 398 of the 561 providers that he alleged submitted false certifications.  Ex. 35 (Morton Report) at 77 (¶ 169 n.236).

132.    On October 19, 2010, counsel for Relator, Marc A. Wallenstein, sent an e-mail to Susan M. Bozinko, an attorney with the CMS Division of the U.S. Department of Health & Human Services to inquire about the dates related to enrollment contained in the CMS Spreadsheets.  Ex. 11 (E-mail exchange between Marc A. Wallenstein, Esq., Counsel for Relator, and Susan M. Bozinko, Esq. of CMS dated October 25-26, 2010) ("Bozinko Emails").  Mr. Wallenstein wrote, "I'd like to confirm that the 'enrollment create date' does in fact correspond to the date on which a medical provider enrolled in PECOS (and submitted the two-page written certification statement)."  *Id.*  On October 25, 2010, Ms. Bozinko responded, "No" and explained that no date in the CMS Spreadsheets corresponds with the actual signature date of the certification statement.  *Id.*

133.    Mr. Hartman used the certification date he assigned to each provider to evaluate whether the provider had submitted a purported overfill claim both before and after that specific date.  Ex. 29 (Hartman Report) at 19 (¶¶ 42-43).

134.    Mr. Hartman asserted based on this methodology that 561 of the 2,191 "tainted" providers submitted false certifications to Medicare.  Ex. 29 (Hartman Report) at 19 (¶¶ 42-43); Ex. 35 (Morton Report) at 72 (¶ 159), 77 (¶ 169).

135.    Relator obtained, through the date of Mr. Hartman's deposition, actual, signed certification statements for only 11 of the 561 providers whom Relator asserts to have submitted false certifications to Medicare.  Ex. 35 (Morton Report) at 76-79 (¶¶ 169-174) and Exhibit 19 of Morton's Report (noting the 11 providers who are included in Mr. Hartman's "Post-PECOS Calculations" for whom actual certifications were obtained).

136.    None of the dates of actual certifications produced correspond with the dates Mr. Hartman assigned from the CMS Spreadsheets or the assumed date of October 1, 2006.  Ex. 35 (Morton Report) at 76-78 (¶¶ 167-170) and Exhibit 19 of Morton's Report (comparing actual certification dates with the "CMS Spreadsheets Match Signature Date" and the "Certification Date Inferred by Hartman Methodology").

## IX.    The medical necessity of a dose of Aranesp® depends on patient-specific clinical factors.

137.    To accommodate different clinical uses, Amgen manufactures Aranesp® in vials and prefilled syringes with the following volumes of medicine per vial or syringe: 25, 40, 60, 100, 150, 200, 300, or 500 mcg.  FAC ¶¶ 113-14.  With the exception of the 150 mcg vials, the labeled volume of total liquid Aranesp® vials, regardless of the concentration of medicine, is 1.0 mL.  *Id*. ¶ 115.

138.    A dose of Aranesp® may come from the full volume of a vial, a combination of two or more vials, or the administration of less than the full amount of a vial.  For example, a provider could administer 160 mcg of Aranesp® by utilizing both a 100 mcg vial and a 60 mcg vial.  Ex. 51 (Declaration of Yunus T. Nomanbhoy, M.D.) ("Nomanbhoy Decl.") ¶¶ 10-11; Ex. 52 (Declaration of Michael W. Harms) ("Harms Decl.") ¶¶ 12-13; Ex. 53 (Declaration of Jeffrey Paonessa, M.D.) ("Paonessa Decl.") ¶ 12; Ex. 32 Denker Dep. 202:22-205:23.

139.    Relator admits "that it is physically possible for Medical Providers to administer more than one vial of Aranesp to a patient during a single visit by that patient." Ex. 36 (Relator's Response to RFAs) p. 6 (No 5).

140.    Relator admits "that it is physically possible for a Medical Provider to administer only part of the contents of a single vial of Aranesp to a patient during a single visit by that patient." Ex. 36 (Relator's Response to RFAs) p. 6 (No. 6).

141.    Aranesp's® FDA-approved label directs providers to dose Aranesp® based on a calculation that includes an individual patient's weight and condition.  FAC ¶ 92; Ex. 56 (Aranesp® Label dated Nov. 19, 2008) at 18; Ex. 32 Denker Dep. 204:13-205:23.

142.    Relator's purported medical expert, Dr. Bradley Denker, agreed that Aranesp's® label recommends a starting dose of 45 mcg for a 220 pound patient with chronic kidney disease and that such a dose would be medically necessary regardless of whether it came from overfill. Ex. 32 Denker Dep. 238:23-239:5.  A 45 mcg dose of Aranesp® is not equivalent to any labeled volume of Aranesp® sold, but can correspond to a 40 mcg vial with overfill.  FAC ¶¶ 113-14.

143.    The Aranesp® label does not direct providers to administer the full vial, nor does it direct providers to round the dose to the nearest vial size.  Ex. 56 (Aranesp® Label dated Nov. 19, 2008); Ex. 32 Denker Dep. 220:12-22.

144.    There is no one correct dose of Aranesp® for any single patient.  Ex. 38 Yablon Dep. 85:12-86:22; Ex. 40 Steinberg Dep. 100:5-101:5; Ex. 44 Adler Dep. 58:4-20; Ex. 45 Ondocin Dep. 47:3-48:6.

145.    There is a range of medically necessary dosages of Aranesp® for a given patient depending on patient-specific parameters such as how a patient's hematocrit responds to the

medication.  Ex. 38 Yablon Dep. 85:12-86:22; Ex. 40 Steinberg Dep. 100:5-101:5; Ex. 44 Adler

Dep. 58:4-20; Ex. 45 Ondocin Dep. 47:3-48:6.

146.     The purported clinical experts Relator retained testified that it is not possible to

determine whether a dose of Aranesp® was or was not medically necessary without examining

patient-specific clinical factors.  Ex. 33 (Deposition of Arnold S. Relman, M.D dated Jan. 11,

2011) at 36:10-38:6; Ex. 32 Denker Dep. 157:2-9; Ex. 34 (Deposition of Jane M. Connor, RN,

CNN dated January 13, 2011) at 296:23-297:20; Ex. 68 (Deposition of Robb S. Friedman, M.D.

dated February 18, 2011) at 171:18-173:24.

147.     Relator's purported medical expert Dr. Denker agreed that one cannot "judge the

medical necessity of . . . dosing determinations without reviewing the patient information

contained in patient charts" and that you would need to look at "both hemoglobin levels and

weight" to determine whether a dose was medically necessary.  Ex. 32 Denker Dep. 157:2-9,

193:16-195:5.

148.     Dr. Denker testified that there are a host of variables that go into deciding on a

dose;" it is "an art, not a science."  Ex. 32 Denker Dep. at 98:6-16, 157:2-9, 195:2-5, 238:18-

240:11, 242:5-244:14.

149.     Providers must submit a CMS-1500 claim form to Medicare to receive

reimbursement for services rendered to patients.  FAC, Ex. K; Ex. 35 (Morton Report) at 29-31

(¶¶ 74-77).

150.     A medical provider identifies the administration of Aranesp® by using a set of "J-

codes" as specified by the Healthcare Common Procedure Coding System ("HCPCS").  Ex. 35

(Morton Report) at 30 (¶ 76).  CMS instructs providers to round to the next highest unit based on

the dosing specified by the appropriate J-code.  *Id*.; Ex. 8 (Medicare Claim Processing Manual

Ch. 17) § 10.   From January 1, 2003 to December 31, 2005, each unit for the J-code for Aranesp® was the equivalent of five micrograms of medicine.  Ex. 35 (Morton Report) at 30 (¶ 76).  Beginning on January 1, 2006, each unit J-code for Aranesp® was the equivalent of one microgram of medicine.  *Id*.

151.    The CMS-1500 form includes a certification statement that requires the physician or supplier to "certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction."  FAC, Ex. K.

**X.    Relator cannot identify any medical records to support her allegations that administrations of Aranesp® were not medically necessary.**

152.    Mr. Hartman, a purported damages expert retained by Relator, purports to calculate medically unnecessary claims for Aranesp® by relying solely on claims data.   Ex. 29 (Hartman Report) at 20-21 (¶¶ 46-47); Ex. 30 (Deposition of Raymond S. Hartman dated January 24, 2011) ("Hartman Dep.") 288:12-292:7.  Mr. Hartman did not review any clinical records in connection with this case, nor did he rely upon any medical expert who had done so.  Ex. 29 (Hartman Report) Attachment B (Attachment B lists all documents upon which Mr. Hartman relied); Ex. 30 (Hartman Dep.) 22:9-13.

153.    Dr. Denker, a purported medical expert retained by Relator, purports to determine medically unnecessary claims for Aranesp® by assuming that the only medically necessary dose is a dose that matches a labeled fill volume for a vial—i.e., 25, 40, 60, 100, 150, 200, 300, or 500 mcg.  Ex. 31 (Denker Report) at 8-10; Ex. 32 Denker Dep. 157:2-9, 193:16-195:5.

154.    Neither Mr. Hartman nor Dr. Denker has made a determination of lack of medical necessity based upon reviewing "patient information contained in patient charts," such as "hemoglobin levels and weight" to determine whether particular doses of Aranesp® were

medically necessary.   Ex. 31 (Denker Report) at 8-10; Ex. 32 Denker Dep. 157:2-9, 193:16-195:5; Ex. 29 (Hartman Report) at 20-21 (¶¶ 46-47).

155.   Each provider who has testified or made a statement under oath in this case to administering overfill said that he or she believed that all doses of Aranesp® that their practice administered were medically necessary.

- Rockland Renal.  Ex. 38 Yablon Dep. 90:19-24, 91:5-10.

- Boca Nephrology.  Ex. 39 Stemmer Dep. 169:6-9.

- Diablo Nephrology.  Ex. 67 Curzi Dep. 49:6-19.

- Balboa Nephrology.  Ex. 40 Steinberg Dep. 119:15-121:7.

- Bronx Westchester Medical Group. Ex. 41 Laitman Dep. 84:17-85:3.

- California Kidney.  Ex. 42 Vaidya Dep. 127:16-128:3.

- Durham Nephrology.  Ex. 43 Cooperberg Dep. 88:9-12, 88:19-89:3.

- Nephrology Associates of Westchester.  Ex. 44 Adler Dep. 46:21-47:3, 47:8-14.

- Nephrology Associates of Syracuse.  Ex. 45 Ondocin Dep. 51:4-9; Ex. 46 Schneider Dep.137:9-140:8.

- Main Street Medical.  Ex. 47 Schwartz Decl. ¶¶ 9, 10.

- Associates in Nephrology.  Ex. 48 Libbey Decl. ¶¶ 6, 8.

- Metabolism Associates PC.  Ex. 49 Finkelstein Decl. ¶¶ 6, 8.

- Napa Valley Nephrology.  Ex. 50 Paukert Decl. ¶ 6, 8.

- Nephrology Specialists.  Ex. 54 (Declaration of Bruce A. Silverman, M.D.) ("Silverman Decl.") ¶¶ 6, 8.

- Lincoln Nephrology and Hypertension.  Ex. 55 (Declaration of Leslie Spry, M.D.) (Spry Decl.") ¶ 8.

**XII.**   **The government does not require manufacturers to account for overfill in calculating a drug's Average Sales Price.**

156.   CMS publishes its policies and regulations governing the calculation and reporting of a drug's Average Sales Price ("ASP") at 42 C.F.R. § 414 *et seq.*  Ex. 5 (CMS Letter) at 2; FAC ¶ 55.

157.   CMS requires the drug manufacturer to submit "the manufacturer's sales to all purchasers in the United States" for the particular National Drug Code ("NDC") assigned by CMS and "the total number of units sold by the manufacturer in that quarter." 42 C.F.R. § 414.804(a)(1); FAC ¶¶ 55-56.

158.   The data submitted by a manufacturer includes the "volume per item" sold, which CMS defines as "[t]he amount in one item."  Ex. 6 (CMS Final Rule) at 73466.

159.   CMS stated in its new final rule that "we proposed to update our regulations at 42 CFR part 414 Subpart K to clearly state that Medicare ASP payment limits are based on the amount of product in the vial or container as reflected on the FDA-approved label . . . . [and] to clearly state that payment for amounts of free product, or product in excess of the amount reflected on the FDA-approved label, will not be made under Medicare."  Ex. 6 (CMS Final Rule) at 73466-67.

160.   CMS directs manufacturers that "[i]n order to accurately calculate Medicare ASP payment limits . . . we interpret 'the amount in one item' to be the amount of product in the vial or other container as indicated on the FDA approved label."  Ex. 6 (CMS Final Rule) at 73466.

161.   CMS regulations require a manufacturer to deduct certain defined "price concessions" from the calculation of a drug's ASP.  42 C.F.R. § 414.804(a)(2); FAC ¶ 55.

162.   CMS, "in connection with [the ASP] regulations [,] had determined that overfill . . . should not be reported for ASP purposes."  Ex. 2 CMS Dep. 214:6-10.

163.    CMS never suggested that a manufacturer should include any amounts or units of medicine that exceeded the labeled amount in conducting the manufacturer's price reporting for ASP.   Ex. 2 CMS Dep. 228:18-229:8.

164.    The rationale for CMS' position that "overfill is not an in-kind discount" subject to the statutory definition of a "price concession" is "operational feasibility."  Ex. 6 (CMS Final Rule) at 73468.  CMS' position acknowledges that "[t]he amount of overfill in vials varies from drug to drug and often is not easily or consistently quantifiable because actual fill amounts may also vary slightly due to the manufacturing process.  In contrast, manufacturer sales data, ASP calculations, and ASP payment limits use exact quantities of drug that are represented by exact monetary values . . . .  We do not have access to information that would permit us to account for overfill in the ASP calculation.  Further, we are concerned that attempting to account for a variable amount of overfill could result in price instability or inaccuracy."  *Id.*; Ex. 2 CMS Dep. 229:3-8.

165.    As part of the ASP calculation, CMS requires drug manufacturers to submit information regarding the "manufacturer's sales to all purchasers . . . ."  42 C.F.R. § 414.804(a)(1).

166.    CMS regulations do not require manufacturers to include administrative fees paid to Group Purchasing Organizations ("GPOs") in the calculation of ASP because they are not "purchasers" under the regulations.  Ex. 3 OIG Dep. 196:10-23; 198:23-199:2; Ex. 28 (OIG Report "Audit of Amgen USA, Inc.'s Second Quarter 2005 Average Sales Price Calculation for Aranesp" dated July 2007) ("OIG 2007 ASP Audit") Appendix C at 3 ("Administrative fees paid to Group Purchasing Organizations ("GPOs") on purchases by their non-owned members were not included in the calculation of ASP because the GPO itself is not a purchaser . . . .")

167.     Manufacturers include the methodology and assumptions underlying the ASP calculation as part of the ASP submission to CMS.  Ex. 2 CMS Dep. 231:15-234:3.

168.     Amgen's methodology and assumptions submitted to CMS noted that it excluded administrative fees paid to GPOs.  Ex. 3 OIG Dep. 162:22-163:18; Ex. 2 CMS Dep. 248:11-18; Ex. 28 (OIG 2007 ASP Audit) at 5, Appendix C at 3.

169.     Amgen specifically informed CMS that "[a]dministrative fees paid to group purchasing organizations were not included in the calculation of ASP."  Ex. 2 CMS Dep. 236:4-10.

170.     Amgen's submission made clear to CMS and OIG its position regarding the treatment of GPO administrative fees.  Ex. 2 CMS Dep. 236:4-19.

171.     Amgen made reasonable assumptions and submitted the rationale for those assumptions in providing ASP data for Aranesp® to CMS.  Ex. 2 CMS Dep. 253:21-254:19.

172.     CMS confirmed the reasonableness of Amgen's assumptions.  Ex. 2 CMS Dep. 253:21-254:19.

173.     On July 23, 2007, OIG released its results of a two-year study of Aranesp®'s ASP calculations for the second quarter of 2005 titled "Audit of Amgen USA, Inc.'s Second Quarter 2005 Average Sales Price Calculation for Aranesp®."  Ex. 28 (OIG 2007 ASP Audit).

174.     The objective of OIG's audit was to "determine whether Amgen's ASP calculation methodology for Aranesp complied with Federal requirements and guidance."  Ex. 28 (OIG 2007 ASP Audit) at i.

175.     To conduct the audit, OIG reviewed all applicable Federal laws and regulations and CMS guidance, Amgen's policies and procedures for ASP filing, interviewed Amgen representatives to understand the methodology and assumptions used to calculate the ASP,

interviewed CMS officials about the Federal requirements and guidance governing ASP submission and any concerns with Amgen's ASP, evaluated Amgen's written methodologies and assumptions, and verified various calculations.  Ex. 28 (OIG 2007 ASP Audit) at 2-3.

176.   CMS and OIG testified that Amgen made clear that it did not treat administrative fees paid to GPOs as "price concessions" and did not include those fees in the calculation of ASP.  Ex. 2 CMS Dep. 248:11-18; Ex. 3 OIG Dep. 188:18-189:1, 191:24-192:5, 194:4-9.

177.   Amgen was fully transparent with OIG and CMS regarding its treatment of GPO administrative fees.  Ex. 2 CMS Dep. 248:15-18.

178.   Amgen's exclusion of GPO administrative fees from the calculation of ASP was consistent and continues to be consistent with all existing CMS guidance.  Ex. 2 CMS Dep. 251:3-19.

179.   As part of the audit, OIG had discussions with CMS on the specific issue of how to address GPO administrative fees.  Ex. 3 OIG Dep. 162:22-163:18.  Amgen provided the audit team with a GPO contract to support its documentation regarding administrative fees.  *Id*. 178:22-179:6.  The audit team did not contest Amgen's treatment of the GPO administrative fees.  *Id*. 162:22-163:18; 187:10-13.

180.   OIG concluded that "Overall, Amgen's ASP calculation methodology for Aranesp complied with federal requirements and guidance."  Ex. 28 (OIG 2007 ASP Audit) at i; Ex. 3 OIG Dep. 168:5-13; 186:18-187:9.

181.   OIG also concluded that "Amgen's methodology does not treat [administrative fees paid to GPOs] as price concessions in the ASP methodology.  We believe Amgen's exclusion of administrative fees paid to GPOs is appropriate and in accordance with established CMS criteria and guidance."  Ex. 28 (OIG 2007 ASP Audit) Appendix C at 3.

182.    OIG raised no concerns regarding Amgen's treatment of overfill.  Ex. 28 (OIG 2007 ASP Audit) at i; Ex. 3 OIG Dep. 186:18-187:9.

### CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to

the registered participants as identified on the Notice of Electronic Filing (NEF), and a copy will

be sent by electronic mail to those indicated as non-registered participants on March 1, 2011.

/s/ Kirsten V. Mayer_
Kirsten V. Mayer