| | |
|---|---|
| THE UNITED STATES OF AMERICA; and <br> THE STATES OF CALIFORNIA, DELAWARE, <br> FLORIDA, GEORGIA, HAWAII, ILLINOIS, <br> INDIANA, LOUISIANA, MICHIGAN, <br> NEVADA, NEW HAMPSHIRE, NEW MEXICO, <br> NEW YORK, TENNESSEE, and TEXAS; and <br> THE COMMONWEALTHS OF <br> MASSACHUSETTS and VIRGINIA; and <br> THE DISTRICT OF COLUMBIA; <br><br> ex rel. KASSIE WESTMORELAND, <br><br> Plaintiffs, <br><br> v. <br><br> AMGEN, INC.; INTERNATIONAL <br> NEPHROLOGY NETWORK; <br> AMERISOURCEBERGEN SPECIALITY GROUP; <br> ASD HEALTHCARE; <br> AMERISOURCEBERGEN CORPORATION; <br> WEDMD HEALTH CORP; MEDSCAPE, LLC; <br> WYETH PHARMACEUTICALS; AND <br> IMMUNEX CORPORATION, <br><br> Defendants. | CIVIL ACTION NO. <br> 06-10972-WGY |

### UNITED STATES' STATEMENT OF INTEREST ON INTERNATIONAL NEPHROLOGY NETWORK'S AND ASD HEALTHCARE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE PLEADINGS

Pursuant to 28 U.S.C. §§ 517 and 518(b) and the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), the United States of America respectfully submits this Statement of Interest on International Nephrology Network's and ASD Healthcare's Motion for Partial Summary Judgment on the Pleadings ("Motion").[1]

---

[1] Although the United States has not intervened in this *qui tam* action under the FCA, and is not a formal party to the case, it is the primary real party in interest. *United States ex rel. Eisenstein v. City of New York*, 129 S. Ct. 2230, 2232-37 (2009). The United States is entitled to a share of not less than 70 percent of any monies recovered through this action, 31 U.S.C. § 3730(d)(2), and has a substantial interest in the proper interpretation and application of the FCA, the government's primary tool to combat fraud. H.R. Rep. No. 99-660, at 18 (1986).

The United States submits this Statement of Interest to advise the Court of its views with regard to the following assertions that Defendants have made in their Motion: 1) that compliance with the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b), is not a condition of payment of a claim presented to Medicare, *see* Motion at 4 ("Medicare does not condition payment upon AKS compliance"); and 2) that the certification on the Medicare Provider/Supplier Enrollment Application, the CMS Form 855 (hereinafter "Application"), that requires the provider to state whether or not he or she is in compliance with the AKS, is invalid insofar as it is contrary to Medicare statutes and regulations, *see* Motion at 4 (the AKS certification is "invalid as a matter of law").

In the government's view, Defendants' first assertion is incorrect, and the second both incorrect and legally irrelevant. With regard to the first assertion, it should at this point be a settled proposition that compliance with the AKS is a condition of payment of a claim submitted to Medicare. Claims to Medicare that are the result of a kickback that violated the AKS are not the product of the physicians' unbiased judgment, and are not properly payable. This Court, and numerous others, have repeatedly so held in myriad contexts. Because compliance with the AKS is a condition of payment, Defendants' second argument, that the United States Department of Health and Human Services (HHS or the agency) lacks authority to require a certification of compliance with the AKS, is also without merit. In any event, even if the agency were held to lack such authority, it would not change the False Claims Act analysis in this case. The fact that a request for information by the government may have been improper or invalid is irrelevant where the party has actually provided a false or fraudulent response to it.

I.  **CONGRESS INTENDED FOR COMPLIANCE WITH THE AKS TO BE A CONDITION OF PAYMENT.**

This Court has held on at least two occasions, including in this case, that compliance with the AKS is a condition of payment of claims submitted to Medicare. In both *United States ex rel. Hutcheson v. Blackstone Medical, Inc*. 694 F. Supp. 2d 48 (D. Mass. 2010) and *United States ex rel. Westmoreland v. Amgen, Inc*. 707 F. Supp. 2d 123 (D. Mass. 2010), the Court found that an appropriate express false certification of compliance with the AKS supports a violation of the FCA. *See Blackstone*, 694 F. Supp. 2d at 65 (physicians who expressly certified compliance with AKS, but submitted claims for services performed while accepting kickbacks, "did not comply with the Anti-Kickback Statute, and thus submitted a false claim"); *Amgen*, 738 F. Supp. 2d at 276 (Relator's 4th Amended Complaint sufficiently pled a violation of the FCA based on the allegation that one or more physicians expressly and falsely certified compliance with the AKS). Each of these holdings was based on the Court's conclusion that the AKS is a condition of payment. *See Blackstone*, 694 F. Supp. 2d at 65 ("A claim is legally false under an express certification theory when the party making the claim expressly states that it has complied with the applicable statutes or regulations, *where such compliance is a precondition of payment*") (emphasis added); *Amgen, Inc*. 707 F.Supp.2d at133 (same).

Numerous other courts have also concluded that compliance with the AKS is a condition of payment of a claim submitted to Medicare. *See, e.g., United States v. Rogan*, 517 F.3d 449, 455 (7th Cir. 2008) (affirming liability under FCA based on violations of AKS and Stark law); *United States ex rel. McNutt v. Haleyville Med. Supplies, Inc*., 423 F.3d 1256, 1260 (11th Cir. 2005) ("compliance with the [AKS] is necessary for reimbursement under the Medicare program"); *United States ex rel. Schmidt v. Zimmer, Inc*., 386 F.3d 235, 243 (3d Cir.2004)

(violation of AKS gives rise to liability under FCA); *U.S. ex rel. Lisitza v. Johnson & Johnson*, --- F.Supp.2d ----, 2011 WL 673925 (D. Mass. 2011) ("The court agrees that in the case of the AKS, compliance is not merely a condition of participation in federal health care programs, but is also material to the government's decision to pay any claim resulting from a kickback"); *United States ex rel. Pogue v. Diabetes Treatment Centers of America*, 565 F. Supp. 2d 153, 160 (D. D.C. 2008) ("Finding near unanimity in support of relator's argument that actions alleging violations of the AKS and Stark Law may proceed under the FCA, the Court rejects as meritless defendant's arguments to the contrary"); *In re Pharmaceutical Industry Average Wholesale Price Litig.*, 491 F. Supp. 2d 12, 18 (D. Mass. 2007) ("compliance with the anti-kickback statute is a prerequisite to payment in the Medicare program"); *United States v. Rogan*, 459 F. Supp. 2d 692, 714 (N.D. Ill. 2006), *aff'rm, Rogan,* 517 F.3d 449 (7th Cir. 2008), *supra* ("Compliance with the Anti-Kickback Statute is a condition of payment by the Medicare and Medicaid programs")*; United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 615 (N.D. Ill. 2003) ("Compliance with the AKS is [] central to the reimbursement plan of Medicare"); *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 32 (D. D.C. 2003) (compliance with AKS a condition of payment of a Medicare claim); *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp.2d 35, 43 (D. Mass. 2000) (violation of AKS gives rise to FCA liability).[2]

---

[2] Whether the cases speak in terms of a condition of payment, the materiality of a false statement of compliance with the AKS, or employ the theory of legal falsity in reference to the AKS violation, the underlying analytical conclusion in each case is that compliance with the AKS is a requirement of payment. This is plain in cases applying an express or implied certification theory of liability, since compliance with the AKS must be a condition of payment for either theory to apply. The same is true when the courts speak in terms of the materiality of a false statement of compliance with the AKS. Such a false statement cannot be material to the government's decision to pay the claim, i.e., it cannot potentially affect the agency's decision to pay, unless compliance with the AKS were a prerequisite to payment in the first instance.

The holdings of this Court and numerous others that compliance with the AKS is a condition of payment is consistent with the plain language of the AKS and the Medicare statute, 42 U.S.C. §§ 1395 - 1395hhh.  The AKS is a core term of federal health care programs.  It is codified, along with the Medicare statute, in the Social Security Act (SSA), 42 U.S.C. Ch. 7 (Social Security).  Indeed, when it was enacted, the AKS was codified as part of the SSA provisions governing Medicare (Title XVIII), and also separately codified in the SSA provisions governing Medicaid (Title XIX).  *See* Pub. L. No. 92-603, § 242(b), codified at 42 U.S.C. §§1395nn(b), 1396(b) (SSA §§ 1877(d) and 1909).[3]  The statute, moreover, speaks specifically about kickbacks that are intended to induce the use of goods or services for which payment may be submitted to federal healthcare programs, including Medicare.  *See* 42 U.S.C. § 1320a-7b(b).

The specific focus of the statute compels two conclusions.  First, in light of the fact that there were already well-established criminal provisions addressing bribery and kickbacks generally, Congress's primary concern in promulgating the AKS was to protect the integrity of the federal healthcare program reimbursement regime.  *See United States v. Greber*, 760 F.2d 68, 71-72 (3d Cir. 1985) (AKS was intended to address the potential for "unnecessary drain on the Medicare system" resulting from kickbacks); *United States v. Ruttenberg*, 625 F.2d 173, 177 n.9 (7th Cir. 1980) (in addition to causing higher Medicare expenditures, "kickback schemes can freeze competing suppliers from the system, mask the possibility of government price reductions, can misdirect program funds, and . . . erect strong temptations to order more drugs and supplies than needed").  Second, and relatedly, Congress simply could not have intended the

---

[3] Subsequent amendments have consolidated these provisions in another section, and, among other things, made violations punishable by up to a $25,000 fine and/or five years of imprisonment. *See* 42 U.S.C. § 1320a-7b(b).

4

very federal healthcare programs that the AKS was designed to protect from kickbacks to pay the claims that resulted from such kickbacks. *See Bidani,* 264 F. Supp. 2d at 616 (paying a claim that resulted from a violation of the AKS "would put the government in the position of funding illegal kickbacks after the fact"). Indeed, Congress's decision to outlaw the payment of kickbacks intended to induce the provision of goods and services that might result in the submission of claims to Medicare illustrates quite plainly its desire to prevent such claims from entering the Medicare payment system in the first place. It is illogical to suggest that Medicare should pay those claims that end up in the payment system notwithstanding Congress's efforts to protect the program from them.

These conclusions are rendered inescapable when the purpose of the AKS is considered within the context of the Medicare statute. From the outset, Congress determined that Medicare would rely in the first instance on the professional judgment of individual healthcare providers to determine whether a beneficiary should receive a particular item or service for which the government would ultimately pay. *See* 42 U.S.C. § 1395 ("Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided"). Physicians serve as the initial gatekeeper in the delivery of healthcare by certifying that an item or service meets the requirement that it be "reasonable and necessary for the diagnosis or treatment of illness or injury." *See* 42 U.S.C. § 1395y(a)(1)(A) (covered services are those that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve functioning of a malformed body part"); *see Mikes*, 274 F.3d at 701 (compliance with reasonable and necessary requirement a prerequisite to payment). The critical importance of this gatekeeper

role to the proper functioning of the Medicare program is underscored by the fact that Medicare makes conditional payment of millions of claims *per day* in reliance on the provider's decision that the goods or services are medically necessary.[4]

Medicare's payment regime is, thus, premised at its core on the assumption that the healthcare provider's decision to render or prescribe a service reflects his or her unbiased professional medical judgment. The payment of kickbacks intended to corrupt this judgment is antithetical to that core premise. The AKS was intended to prohibit such a result by conditioning the payment of a claim upon compliance with the AKS.

Nor is this conclusion the least bit novel. Instead, it hews closely to the long-standing proposition that persons who engage in illegal transactions that undermine the integrity of the government payment process forfeit their right to payment, even where forfeiture is not a remedy expressly stated in the underlying statute. For example, in *United States v. Acme Process Equipment Company*, 385 U.S. 138, 146 (1966), defendant accepted kickbacks in violation of the Anti-Kickback Act, 41 U.S.C. §§ 51, *et seq*. (1960) (AKA), and as a result of this scheme obtained a contract to deliver rifles to the United States. *Id.* at 140. The government became aware of the scheme, and ultimately cancelled the tainted contract. *Id.* at 139. Defendant sued the government for breach. The Court of Claims found for Acme, holding that the AKA did not provide for cancellation as a remedy. *Id.* at 143. The Supreme Court reversed, stating: "The [AKA] not only 'prohibited' such payments, but clearly expressed a policy decidedly hostile to them . . . . This public policy requires that the United States be able to rid itself of a prime

---

[4] For example, in 2010 Medicare paid an estimated 3,500,000 claims per business day (*i.e.*, excluding Saturdays, Sundays, and holidays). *See* CMS Data Compendium, 2010 Edition, Table III.9 (Medicare Charge Determination Data for Physician/Supplier Claims Selected Fiscal Years 1975 - 2010), available at: https://www.cms.gov/DataCompendium/14_2010_Data_Compendium.asp#TopOfPage.

contract tainted by kickbacks." *Id.* at 142, 146. Courts have articulated the unremarkable proposition that the government ought not be obligated to award the fruits of corrupt and illegal conduct in a number of other contexts as well. *See United States v. Mississippi Valley Generating Co.* 364 U.S. 520, 565 (1961) (allowing remedy of cancellation of a contract tainted by violation of federal conflict of interest statute, where statute at issue did not provide for such a remedy, in order to "guarantee the integrity of the federal contracting process and to protect the public from the corruption which might lie undetected beneath the surface of a contract conceived in a tainted transaction"); *United States v. Medico Indus., Inc.*, 784 F.2d 840 (7th Cir. 1986) (United States was entitled to cancel contract where former government employee violated 18 U.S.C. § 207 revolving door statute); *K & R Eng'g. Co., Inc. v. United States*, 616 F.2d 469 (Ct. Cl. 1980) (contractor not entitled to receive breach of contract damages from United States where government employee had accepted kickbacks from contractor in exchange for contracts, in violation of 18 U.S.C. § 208); *Rogan*, 517 F.3d at 453 (government need not pay claims tainted by kickbacks even where services were properly rendered); *United States ex rel. Longhi v. Lithium Power Technologies*, 575 F.3d 458, 472 (5th Cir. 2008) (where defendant obtained grant by fraud, government entitled to recover entire amount paid under the grant, even where the government agreed that defendant performed the grant successfully).

Lest there were ever any doubt that Congress intended the AKS to be a condition of payment that can support an FCA violation, Congress recently amended the AKS to reaffirm that "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6402(f) (2010). This amendment is not a substantive departure from

prior law or a "penalty," as characterized by Defendants, Motion at 9, but a ratification of an overwhelming body of existing caselaw holding that compliance with the AKS is a condition of payment, and that claims submitted as a result of illegal kickbacks are false. In response to a single court decision adopting an unduly crabbed view of an FCA case predicated on a kickback violation, Congress acted swiftly to settle any perceived debate on this front. *See* 155 Cong. Rec. S10853 (daily ed. Oct. 28, 2009) (statement of Sen. Kaufman). Senator Kaufman observed that "[t]he Department of Justice has had success . . . pursuing False Claims Act matters based on underlying violations of the Anti-Kickback Statute," and that the amendment was intended to address attempts by defendants in such cases to challenge "legitimate enforcement efforts." *Id.* As Senator Kaufman later noted, the amendment "clarifies that all payments made pursuant to illegal kickbacks are false for purposes of the False Claims Act." Sen. Ted Kaufman, Press Release (Mar. 23, 2010).[5] Although Defendants argue that the Amendment has no application to conduct that preceded it, the First Circuit has observed that such a clarifying amendment should be given "'great weight in statutory construction,'" especially where, as here, Congress acted in response to a specific court decision. *Liquilux Gas Corp. v. Martin Gas Sales*, 979 F.2d 887, 890 (1st Cir. 1992) (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380-81 (1969)); *see Loving v. United States*, 517 U.S. 748, 770 (1996) ("Subsequent legislation clarifying the intent of an earlier statute is entitled to great weight in statutory construction."); *Bates v. United States*, 522 U.S. 23, 32 (1997) (rejecting argument that clarifying amendments demonstrated that prior version of statute did not cover the conduct in question).

Defendants point to the absence of specific words in the AKS expressly stating that

---

[5] *See http://kaufman.senate.gov/press/press_releases/release/?id=4804ae96-5cc7-4f0a-ad89-a32a0de32670.*

compliance with the AKS is condition of payment (which Defendants define as "payment-condition phrases"). *See, e.g,* Motion at 6 ("Had Congress intended to condition Medicare payment on AKS compliance, it would have said so expressly"). Defendants' reliance on a magic words test is contrary to basic principles of statutory construction, which require in addition to a review of the relevant clauses, a comprehensive review of the statute, the legislative scheme of which it may be a part, and the underlying policy that the legislative scheme is meant to effectuate. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988) ("Statutory construction . . . is a holistic endeavor"); *Kokoszka v. Belford*, 417 U.S. 642, 650 (1974) (same). Put another way, whether the AKS uses Defendants' magic "payment-condition phrases" is merely the beginning, rather than the end, of the statutory analysis.

In fact, Courts have rejected time and again Defendants' argument that absent the use of specific, key phrases in a statute, the government is obligated to pay claims that result from conduct that violated it. Instead, consistent with basic canons of statutory construction, to determine whether a statutory provision is properly considered a condition of payment, courts have also looked to the statute's context, the relationship of the statute to the overall legislative scheme, and the underlying policy objectives that the statute was intended to achieve. For example, in *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166 (9th Cir. 2006), the Ninth Circuit rejected defendant's argument that there could be no false claim where defendant had violated a certain statutory condition of participation. *Id.* at 1176. Relying on the "statutes, regulations, and contracts implementing the Title IV and Higher Education Act requirements for funding[,]" the court held that a provision described as a "condition of

9

*participation*" also could be, and in fact was, a condition of *payment*. *Id.* at 1175-1176. Numerous other cases similarly so hold. *See United States ex rel. Main v. Oakland City University*, 426 F.3d 914, 916 (7th Cir. 2005) (compliance with incentive compensation ban was a condition of payment even though it was labeled as a condition of participation); *United States v. Science Applications Intern. Corp.*, 626 F.3d 1257, 1269-1270 (D.C. Cir. 2010) (compliance with conflict of interest provisions were conditions of payment despite lack of identification as such); *see also, Mississippi Valley Generating Co.*, 364 U.S. at 565 (allowing non-enforcement of a contract even though such remedy was not expressly identified in statute); *United States v. Acme Process Equipment Company*, 385 U.S. at 146 (recision viable remedy even where unstated in statute).

Defendants also observe that certain provisions of the Medicare statute expressly prohibit payment in certain circumstances. Defendants thus submit that because the AKS does not contain the identical phrasing, Congress could not have meant for compliance with the AKS to be a condition of payment. *See* Motion at 6-7. Defendants point, for example, to language used in certain provisions of the statute (sections 1395f and 1395m) that say that "no payment shall be made" in certain circumstances as support for this proposition. Defendants also point to the Stark Law, which prohibits, among other things, the submission of claims by physicians engaged in prohibited financial relationships, and the payment of those claims. *See* 42 U.S.C. § 1395nn(a),(g). As noted, however, courts have rejected the view that the absence of particular language is dispositive of whether the statute in question is a condition of payment. Moreover, unlike the statutes cited by Defendants, the AKS is a criminal statute, and Congress could reasonably have concluded that there was no need for it to specify the obvious: that payment is

not authorized for claims resulting from such illegal conduct.

Finally, Defendants reference to mandatory and permissive exclusion, 42 U.S.C. § 1320a-7(a) and (b), due to AKS violations is also unpersuasive  Motion at 6-7.  Exclusion is an administrative remedy the purpose of which is to bar persons or entities from any participation in the Medicare program.  The non-payment provision cited by Defendants relating to excluded entities stands for the unremarkable proposition that no claims submitted by an excluded party will be paid.  42 U.S.C. § 1395y(e)(1)(A).  Contrary to Defendants' suggestion, it does not follow that by placing limits on exclusion, which would preclude Medicare from paying *any* claims submitted by an excluded provider, that Congress intended that Medicare pay *every* claim submitted by a non-excluded provider.  Rather, the more logical conclusion from this provision is that by permitting HHS to exclude an entity all together from the program for AKS violations, Congress surely also intended for the agency to exercise the less extraordinary step of not paying the specific claims resulting from such conduct.

## II.     HHS HAS AUTHORITY TO REQUEST A CERTIFICATION OF COMPLIANCE WITH THE AKS.

As this Court has stated, a claim can be factually false, or legally false under either an implied or express certification theory.[6]  *Amgen, Inc.*, 738 F. Supp. 2d at 272-273.  This Court has held repeatedly in this case that an express certification of compliance with the AKS gives

---

[6] Adopting the Second Circuit's reasoning in *Mikes*, this Court has held in this case that because the AKS does not expressly state that compliance with it is a prerequisite to payment, application of the implied false certification theory of liability is not appropriate in the context of the AKS.  *See Amgen*, 707 F.Supp. 2d. at 133.  The government here restates its view that this aspect of *Mikes* was wrongly decided.  *See, e.g.*, *Science Applications Intern. Corp.*, 626 F.3d at 1270 (refusing to cabin implied certification theory to limitation articulated in *Mikes*).

rise to liability under the FCA.[7]  The Court has further held that with respect to the Relator's 4th Amended Complaint, the Relator properly pled allegations that one or more providers made knowing express false certifications of compliance with the AKS on their respective Medicare Enrollment Applications that gave rise to liability under the FCA.

Notwithstanding the Court's straightforward holding in this regard, Defendants now argue that CMS lacked authority to require providers to provide information regarding their compliance with the AKS, that the Enrollment Application is legally infirm, and therefore that it cannot provide a basis for falsity under the FCA.  To the extent that Defendants contend that the agency acted improperly in identifying compliance with the AKS as a condition of payment, Defendants are wrong because, as set forth above, the AKS itself establishes that compliance is a condition of payment.  To the extent that Defendants contend that the agency acted improperly or lacked authority to request a certification of compliance with the AKS in the Enrollment Application, ample authority exists for the agency to do so.

### A. The Process for Adopting the Enrollment Application Was Procedurally Valid.

Although Defendants purport to see a "heavy cloud" over the agency's enactment of the Enrollment Application and the AKS certification contained within it, *see* Motion at 14, Defendants concede, as they clearly must, that 1) Congress delegated authority to HHS to

---

[7] The certification at issue here was contained in the Enrollment Application.  The Court concluded that this certification could be false under the FCA only if the signatory knew it to be untrue at the time he or she signed the Application itself.  In the government's view, this temporal criterion is not applicable under the circumstances of this case as the certification is ongoing and applies to each claim at the time the claim is presented for payment.  *See, e.g.*, 42 CFR § 424.500 ("Providers and suppliers must meet *and maintain* . . . enrollment requirements to bill either the Medicare program or its beneficiaries for Medicare covered services or supplies") (emphasis added); *Backman v. Polaroid Corp.*, 910 F.2d 10, 17 (1st Cir. 1990) (there is a general duty to update statements if they "have forward intent and connotation upon which the parties may be expected to rely" and circumstances change and call for further disclosure).

prescribe regulations governing the Medicare program, *see* 42 U.S.C. § 1395hh; 2) HHS properly enacted such regulations, including enrollment requirements, pursuant to the notice and comment procedures set forth in the Administrative Procedure Act (APA), 5 U.S.C. § 1002, *see* 42 C.F.R. 424.510; and 3) the HHS Enrollment Application form, and the AKS certification contained within it, were properly put into use pursuant to the requirements of the Paperwork Reduction Act (PRA), 44 U.S.C. § 3501 *et seq.*, which included publishing the Application for public comments and submitting it to the Office of Management and Budget (OMB) for approval. *See* Motion at 12, 14, and 16 (noting that CMS submitted the revised Application to OMB "[p]ursuant to the PRA" and that OMB thereafter approved it).

  **B.** **HHS Has the Substantive Authority to Adopt the Enrollment Application, including the Certification Request.**

 Given the fact that the Enrollment Application and the attendant certification was undoubtedly implemented through appropriate and procedurally proper agency action under the PRA, Defendants attack the adoption of the certification as falling outside of the authority of the agency entirely. That clearly is not the case as the Social Security Act and the HHS regulations implementing it, all authorize the agency's action.

 At the outset, HHS was authorized to collect the information requested on the Enrollment Application by the delegations to the agency in the Social Security Act in 42 U.S.C. §§ 1320a-3(a)(1), 1320a-7, 1395f, 1395g, 1395(l)(e) 1395u(h), 1395u(r), and 1395w-4 (2001). Likewise, the Enrollment Application, including the certification contained within it, fall squarely within HHS's regulatory authority. HHS regulations, codified in 2006, could not be any more explicit about this. For example, the regulations provide that "Providers and suppliers must submit enrollment information on the applicable enrollment application," 42 C.F.R. §

424.510(a), and that the "Enrollment application means a CMS-approved paper enrollment application or an electronic Medicare enrollment process approved by OMB." 42 C.F.R. § 424.502. The regulations further provide that providers and suppliers must meet enrollment requirements, including the submission of a signed Enrollment Application. 42 C.F.R. § 424.510(d). A signature on the Enrollment Application "attests that the information submitted is accurate and that the provider or supplier is aware of, and abides by, *all applicable statutes*, regulations, and program instructions." 42 C.F.R. § 424.510(d)(3). The AKS, a statute that by its own terms only applies to transactions that could affect federal healthcare programs, including Medicare, falls within the scope of the phrase "all applicable statutes" contained in section (d)(3) of this regulation.

Defendants contend that a different provision, 42 C.F.R. § 424.516(a), limits HHS to requiring compliance with the Medicare statute alone. But this provision on its face requires a provider to certify that it meets, and continues to meet, not simply the requirements of Title XVIII of the Act, but "applicable Medicare regulations." Those "applicable Medicare regulations" necessarily include the requirement in 42 C.F.R. § 424.510(d)(3), discussed above, which is the broad attestation by a provider relating to "*all* applicable statutes." Moreover, this provision was adopted after the Enrollment Application containing the AKS certification had already been approved by OMB and in use for over five years, and thus it is not logical to guess, as Defendants have, that the agency intended for this provision to conflict with its existing practice of seeking such a certification in its Enrollment Application.

Defendants' further observe that this provision broadly refers to "all applicable statutes" and does not compel an enrollee specifically to subscribe to the AKS certification undercuts its

14

arguments here. HHS's authority to require certification of compliance with all applicable statutes surely contains within it the ability to emphasize and highlight certain core requirements. Defendants appear to be complaining that the reference to the AKS in the Enrollment Application lacks legal sanction because it is *too* specific and *too* clear. This argument must collapse under the weight of its own irony.

Defendants' assertion that the Application is an "agency interpretation" of the AKS that is "unworthy of any deference" is misplaced. Motion at 10-11. As discussed, Congress has with the AKS and the SSA spoken directly on the issue whether compliance with the AKS is a condition of payment of a claim submitted to Medicare, and those statutes establish that it is, as a matter of law. As a consequence, the Court need only give effect to this intent, as it has to date. *See Rogan*, 517 F.3d at 449 (agency need not testify that it will comply with the law). Thus, the question of "deference" is simply irrelevant. Nevertheless, if the Court does decide that the Application contains some elements of an "agency interpretation," the AKS certification plainly reflects Medicare's long-held understanding that compliance with the AKS is a condition of payment as a matter of law. *See United States ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.*, 238 F.Supp.2d 258, 264 (D. D.C. 2002) (2001 version of Medicare Enrollment Application containing AKS certification was relevant to show that Medicare considered compliance with AKS and Stark Law to be a condition of payment even prior to 2001).

  **C.**  **The Provision of False Information Is Actionable, Even If the Request for Information Was Legally Deficient.**

As a final matter, even if the agency was not permitted to request a certification of compliance with the AKS (and given that compliance with the AKS is a condition of payment of the claims to Medicare, it is impossible to see how that could be the case), it is well settled that

the legal infirmity of a governmental request for information is no defense to a person's affirmative provision of false information in response to that request. For example, in *Bryson v. United States,* 396 U.S. 64 (1969), defendant was convicted under 18 U.S.C. § 1001 for fraudulently certifying to the National Labor Relations Board (NLRB) that he was not a member of the Communist party, where such certification was a prerequisite to participation in NLRB proceedings. *Bryson*, 396 U.S. at 65-66. Defendant argued that since the NLRB had no legal authority to demand that certification, his conviction should be set aside. *Id.* at 67. The Supreme Court refused, concluding that the question of whether the NLRB had authority to require the certification was irrelevant to the fact of the defendant's provision to the NLRB of a false one. *Id.* at 67-68. As the Court stated, "[I]t cannot be thought that as a general principle of our law a citizen has a privilege to answer fraudulently a question that the Government should not have asked. Our legal system provides methods for challenging the Government's right to ask questions – lying is not one of them. *A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood*." *Id.* at 90 (emphasis added). So it is in this case. Were Defendants of the mind that Medicare had no authority to inquire as to their compliance with the AKS, they could have not answered and challenged the propriety of the request. They did not take this course. Instead, as alleged in Relator's 4th Amended Complaint, they just went ahead and lied to the government about their noncompliance.

In this case, it is the fact of the express false certifications that is relevant. What one does with this fact in the context of the FCA is, of course, an independent question, but Medicare's basis for asking the question in the first place is simply not a factor in that legal analysis. *See*

*Dennis v. United States*, 384 U.S. 855, 866 (1966) ("When one undertakes to cheat the Government or to mislead its officers . . . by false statements, he has no standing to assert that the operations of the Government in which the effort to cheat or mislead is made are without constitutional sanction"); *United States v. Weiss*, 914 F.2d 1514, 1522 (2nd Cir. 1990) (a person charged with filing false statements to Medicare on HFCA 1500 claim form may not interpose a defense that government had no authority to demand the information fraudulently supplied); *United States v. Calhoon*, 97 F.3d 518, 529 (11th Cir.1996) ("while a provider may submit claims for costs that it knows to be presumptively non-reimbursable, it must do so openly and honestly, describing them accurately while challenging the presumption and seeking reimbursement"); *Cedars-Sinai Medical Center v. Shalala*, 125 F.3d 765, 769 (9th Cir. 1997) ("If the Hospitals did indeed knowingly submit false claims in order to receive payment for devices not covered under the 1986 rule, the invalidity of the rule will be no defense").

### III. CONCLUSION

At bottom, this Motion is merely another request that the Court reject its prior holdings that compliance with the AKS is a condition of payment of claims submitted to Medicare. Defendants provide no basis in their Motion for such a reassessment. In the government's view, the Court should reject Defendants' request.

Respectfully submitted,

TONY WEST
Assistant Attorney General

CARMEN MILAGROS ORTIZ
United States Attorney

By:   /s/ Shannon Kelley
SHANNON KELLEY
Shannon.Kelley2@usdoj.gov
Assistant U.S. Attorney
Moakley U.S. Courthouse
One Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3632

JOYCE R. BRANDA
PATRICIA R. DAVIS
JOHN HENEBERY
JESSICA S. CHAMPA
ANDREW SKOWRONEK
Attorneys, Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, D.C. 20044
(202) 353-2680

Attorneys for the United States

Dated: March 18, 2011

## **CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to all registered participants as identified on the Notice of Electronic Filing (NEF), by filing this document through the ECF system on March 18, 2011.

> /s/ Shannon T. Kelley
> Assistant U.S. Attorney
> BOSTON U.S. ATTORNEY'S OFFICE
> 1 Courthouse Way, Suite 9200
> Boston, MA 02210
> Phone: (617)748-3632