# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* KASSIE WESTMORELAND,<br><br>Plaintiff,<br><br>v.<br><br>AMGEN INC.; INTERNATIONAL<br>NEPHROLOGY NETWORK renamed<br>INTEGRATED NEPHROLOGY NETWORK, a<br>d/b/a of DIALYSIS PURCHASING ALLIANCE,<br>INC.; and ASD HEALTHCARE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 06-10972-WGY<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## AMGEN INC.'S MEMORANDUM IN OPPOSITION
## TO RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT THAT
## AMGEN INC. ARTIFICALLY INFLATED THE AVERAGE SALES PRICE
## OF ARANESP® IN VIOLATION OF THE FALSE CLAIMS ACT

Brien O'Connor (BBO # 546767)
Kirsten V. Mayer (BBO # 641567)
William J. Dunn (BBO #666465)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Tel:  617.951.7000
Fax:  617.951.7050
Brien.o'connor@ropesgray.com
Kirsten.mayer@ropesgray.com
William.dunn@ropesgray.com

David S. Rosenbloom, pro hac vice
Douglas E. Whitney, pro hac vice
MCDERMOTT, WILL & EMERY LLP
227 West Monroe Street, Suite 4400
Chicago, IL 60606-5096
Tel:  312-372-2000
Drosenbloom@mwe.com

Michael Kendall (BBO # 544866)
MCDERMOTT, WILL & EMERY LLP
28 State Street
Boston, MA  02109-1775
Tel:  617.535.4000
Fax:  617.535.3800
mkendall@mwe.com

*Counsel to Amgen Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ......................................................................................................................... 4

I.    RELATOR'S CLAIM THAT MANUFACTURERS MUST INCLUDE
      OVERFILL IN REPORTING A DRUG'S ASP IS INCORRECT AS A
      MATTER OF LAW, AS CONFIRMED BY CMS AND OIG ......................................... 4

      A.  CMS And OIG's Testimony And Guidance Interpreting The
          ASP Statute Is Entitled To Substantial Deference By The Court ............................... 4

      B.  CMS And OIG Testimony And Guidance Confirm That Overfill Is
          Not Included Anywhere In The Calculation Or Reporting Of ASP ............................ 5

      C.  Overfill Is Not Part Of The Denominator Of The ASP Calculation
          That Determines The Number Of Units Sold .............................................................. 6

      D.  Overfill Is Not A Discount Or Otherwise Part Of The Numerator Of
          The ASP Calculation That Determines A Drug Product's Price .................................. 8

      E.  The Statutory Requirement And CMS' Interpretation That Overfill
          Not Be Included In The Calculation And Reporting Of ASP Is Reasonable .............. 9

II.   ALTERNATIVELY, RELATOR'S MOTION SHOULD BE DENIED
      BECAUSE THERE IS NO EVIDENCE THAT AMGEN INTENDED
      TO SUBMIT AN INACCURATE ARANESP® ASP ................................................... 11

III.  RELATOR'S ARGUMENTS ON LIABILITY MISREPRESENT THE
      COURT'S RULINGS IN THIS CASE AND ARE IRRELEVANT OR
      LEGALLY FLAWED ................................................................................................. 13

      A.  Relator Misrepresents This Court's Prior Ruling By Asserting
          That It Adopted Her Proposed Legal Test For ASP Inflation .................................... 13

      B.  Relator's Marketing Allegations Are Irrelevant To This Claim ................................. 14

      C.  Relator's Allegations That Aranesp's® Overfill Was "Excessive"
          Are Also Irrelevant To The Legal Issue Raised ......................................................... 15

      D.  Relator Lacks Any Basis For Contending That Amgen Had A
          Legal Obligation To Report That It Excluded Overfill From The ASP Data ............. 16

IV.   RELATOR MISSTATES THE LAW ON DAMAGES FOR PRICING CASES ............ 18

CONCLUSION ..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ab-Tech Const., Inc. v. U.S.*,
31 Fed. Cl. 429 (1994) .........................................................................................................18

*Chevron U.S.A. Inc. v. Nat. Resources Def. Council, Inc.*,
467 U.S. 837 (1984)...............................................................................................................5

*DirecTV, Inc. v. Lovejoy*,
366 F. Supp. 2d 132 (D. Me. 2005) .....................................................................................14

*Estate of Landers v. Leavitt*,
545 F.3d 98 (2d Cir. 2009)......................................................................................................5

*Hardy Wilson Memorial Hosp. v. Sebelius*,
616 F.3d 449 (5th Cir. 2010) ..................................................................................................5

*In re Marrama*,
445 F.3d 518 (1st Cir. 2006)..................................................................................................14

*In re Pharm. Indus. AWP Litig.*,
457 F. Supp. 2d 65 (D. Mass. 2006) .....................................................................................19

*LaSalle Bank Lake View v. Seguban*,
54 F.3d 387 (7th Cir. 1995) ...................................................................................................14

*Serafino v. Hasbro, Inc.*,
82 F.3d 515 (1st Cir. 1996)....................................................................................................14

*Sid Peterson Memorial Hosp. v. Thompson*,
274 F.3d 301 (5th Cir. 2001) ...................................................................................................5

*Torres Vargas v. Santiago Cummings*,
149 F.3d 29 (1st Cir. 1998).....................................................................................................11

*U.S. ex rel. Antidiscrimination Ctr. of Metro N.Y., Inc. v. Westchester County*,
No. 06-cv-2860, 2009 WL 1108517 (S.D.N.Y. Apr. 24, 2009) ............................................19

*U.S. ex rel. Longhi v. United States*,
575 F.3d 458 (5th Cir. 2009) .................................................................................................19

*U.S. ex rel. Loughren v. Unum Group*,
613 F.3d 300 (1st Cir. 2010)..................................................................................................11

*U.S. ex rel. Westmoreland v. Amgen Inc.*,
    738 F. Supp. 2d 267 (D. Mass. 2010) ...................................................................13

*U.S. v. Bornstein*,
    423 U.S. 303 (1976) ..............................................................................................19

*U.S. v. Rogan*,
    517 F.3d 449 (7th Cir. 2008) .................................................................................19

*U.S. v. Science Applications Int'l Corp.*,
    626 F.3d 1257 (D.C. Cir. 2010) .................................................................18, 19, 20

*U.S. v. Woodbury*,
    359 F.2d 370 (9th Cir. 1966) .................................................................................18

*Visiting Nurse Ass'n of North Shore, Inc. v. Bullen*,
    93 F.3d 997 (1st Cir. 1996) .....................................................................................5

**STATUTES**

Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No.
    108-173, § 303(c), 117 Stat. 2066, 2239 (2003) (codified at 42 U.S.C. § 1395w-3a) ..............1

31 U.S.C. § 3731(d) .........................................................................................................20

42 U.S.C. § 1395w-3a .............................................................................................. passim

**OTHER AUTHORITIES**

21 C.F.R. § 201.51(g) .......................................................................................................2

42 C.F.R. § 414.800 *et seq.*.......................................................................6, 10, 15, 17

42 C.F.R. § 414.900 *et seq.*...........................................................................................15

75 Fed. Reg. 73170 (2010) ...................................................................................... passim

69 Fed. Reg. 1084-01 (2004) ..........................................................................................18

John T. Boese, *Civil False Claims and Qui Tam Actions* § 3.01[B][3][a] (4th ed. 2010)............19

## GLOSSARY

| | |
|---|---|
| Amgen SOF | Amgen Inc.'s Local Rule 56.1 Statement of Undisputed Facts in Support of its Motion for Summary Judgment (filed March 1, 2011) [Docket No. 378] |
| MSJ Ex. | Exhibits attached to the Declaration of Kirsten V. Mayer in Support of Amgen Inc.'s Motion for Partial Summary Judgment (filed March 1, 2011) [Docket No. 381] |
| Opp'n Ex. | Exhibits attached to the Declaration of William J. Dunn in Opposition to Relator's Motion for Partial Summary Judgment that Amgen Inc. Artificially Inflated the Average Sales Price of Aranesp® in Violation of the False Claims Act (filed herewith on March 22, 2010) |
| Relator's Mem. | Relator's Memorandum in Support of Her Motion for Partial Summary Judgment That Amgen Inc. Artificially Inflated the Average Sales Price of Aranesp in Violation of the False Claims Act (filed March 1, 2011) [Docket No. 388] |
| Relator SOF | Relator's Rule 56.1 Statement in Support of Her Motion for Partial Summary Judgment That Amgen Inc. Artificially Inflated the Average Sales Price of Aranesp in Violation of the False Claims Act (filed March 1, 2011) [Docket No. 389] |
| Relator App. | Relator's Appendix attached to Relator's Rule 56.1 Statement in Support of Her Motion for Partial Summary Judgment That Amgen Inc. Artificially Inflated the Average Sales Price of Aranesp in Violation of the False Claims Act (filed March 1, 2011) [Docket No. 389] |
| FAC | Relator's Fourth Amended Complaint (filed May 27, 2010) [Docket No. 238] |

## PRELIMINARY STATEMENT

The Centers for Medicare and Medicaid Services ("CMS"), which is the federal agency responsible for administering the ASP reporting requirement, has already considered and rejected precisely the argument Relator makes in her motion for summary judgment. Relator's motion turns on a question of law that both the Average Sales Price ("ASP") statute[1] and the relevant government agencies have answered explicitly and uniformly in Amgen's favor.

CMS interprets and implements the ASP statute, and Congress specifically delegated to CMS the authority to regulate the calculation and reporting of ASP. CMS has definitively rejected the notion that overfill is to be counted in ASP. In testimony, CMS acknowledged that "in connection with [the ASP] regulations [CMS] has determined that overfill amounts . . . have not been and should not be reported for ASP purposes." Opp'n Ex. 1 CMS Dep. 214:6-10.[2] CMS' rule-making in November 2010 also states that "overfill is currently not included in the calculation of payment limits under the methodology in [the ASP statute]" and that it did "not intend to change the ASP calculation methodology to include intentional overfill." MSJ Ex. 6 at 73466-73469. The Office of Inspector General ("OIG") within the Department of Health and Human Services, which is charged with overseeing CMS' administration of the ASP reporting process, agrees with CMS. OIG testified that the ASP statutory language provides no basis to require overfill to be included in ASP calculations. Opp'n Ex. 2 OIG Dep. (Tawes) 102:10-21.

CMS and OIG's positions are firmly grounded in the statutory and regulatory language governing ASP. The ASP statute requires manufacturers to calculate a fraction: the denominator

---

[1] Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 303(c), 117 Stat. 2066, 2239 (2003) (codified at 42 U.S.C. § 1395w-3a) (adding § 1847A to the Social Security Act).
[2] "MSJ Ex." refers to the exhibits attached to the Declaration of Kirsten V. Mayer in Support of Amgen Inc.'s Motion for Partial Summary Judgment [Docket No. 381]. "Opp'n Ex." refers to the exhibits attached to the Declaration of William J. Dunn that are filed along with this opposition brief.

is the number of units sold; the numerator is sales dollars net of discounts. 42 U.S.C. § 1395w-3a(c). Overfill cannot find its way into the denominator for calculating any ASP reimbursement rate because CMS mandates that those rates be calculated with reference only to the "amount of product in the vial or other container as indicated on the FDA approved label." MSJ Ex. 6 at 73466. The FDA approved label lists the minimum quantity of medicine that must be included in a container and does not reflect overfill. 21 C.F.R. § 201.51(g). Thus, for each package size of Aranesp® sold – each of which has its own National Drug Code ("NDC") identifying number – CMS requires Amgen to report how many "items" (*e.g.*, vials) are in each NDC package and the "volume per item" without reference to overfill.[3] *See* MSJ Ex. 6 at 73466. As CMS has stated, "[m]anufacturers are currently reporting ASP and sales data based on the labeled amount of the drug product." *Id.* at 73468. This CMS-mandated reporting system implements the ASP statutory requirements that reporting be done at the NDC level and that payment amounts be determined by unit "without reference to volume measures pertaining to liquids." 42 U.S.C. § 1395w-3a(b)(2)(B), (c)(1).

CMS and OIG also reject any interpretation of the ASP statute that would require manufacturers to include overfill in the price numerator of the ASP calculation as a type of discount or "price concession." In the November 2010 rule-making, a commentator suggested that CMS should "interpret intentional overfill as a discount." MSJ Ex. 6 at 73468. CMS rejected this suggestion and stated that "overfill is not an in-kind discount." *Id.* OIG agrees with CMS' interpretation and testified that it "never considered overfill to be a free goods contingent

---

[3] CMS requires this data because the NDC package often includes an amount of product that exceeds the amount represented by the billing and payment code used to pay for that drug. Thus, CMS must translate the ASP data at the NDC level to ASP data at the Medicare billing unit level. For example, a NDC for a single vial of Aranesp® contains 25 mcg of medicine, but the current Medicare billing unit for Aranesp® is 1 mcg. FAC ¶ 93 (attaching list of Aranesp® NDCs as Exhibit A); Amgen SOF ¶ 137; MSJ Ex. 35 (Morton Report) at 30 (¶ 76). In that case, the NDC would contain 25 billing units for the purpose of ASP reporting regardless of any overfill in the vial.

on any purchase requirement." Opp'n Ex. 2 OIG Dep. (Tawes) 75:8-18. This is consistent with the statutory provision that enumerates six discounts with defined meanings in the industry and that are consistently and reliably quantifiable. *See* 42 U.S.C § 1395w-3a(c)(3).

Though Relator's claim fails on this legal basis alone, the motion should be denied for the additional reason that Relator cannot prove the essential element of her FCA claim that Amgen knew its ASP reporting was false. Amgen's employee who is responsible for the ASP reporting stated that he believed the ASP calculation and submission to CMS to be truthful and accurate. Opp'n Ex. 37 ¶¶ 9-10. The reasonableness of this belief is confirmed by a 24-month audit of Amgen's ASP methodology and submission conducted by OIG and reported to CMS in which OIG concluded that "[o]verall, Amgen's ASP calculation methodology for Aranesp complied with federal requirements." Opp'n Ex. 39 OIG Dep. (Freda) 186:18-187:9; MSJ Ex. 28 at i.

Relator's arguments to the contrary are unavailing. First, Relator misrepresents this Court's prior ruling on the motions to dismiss to assert that all Relator must prove is that overfill has "independent value." The Court made no such ruling, and the citations upon which Relator relies merely reflect this Court's recitation of the allegations in the complaint that the Court accepted as true for evaluating the motions to dismiss. Second, Relator's contentions regarding how Amgen markets Aranesp® to doctors are irrelevant to the legal question at issue regarding what a manufacturer must report *to CMS* under the ASP statute. Third, also irrelevant to this legal issue is Relator's argument that Amgen was required to disclose "excess" amounts of overfill to CMS. Instead, CMS makes plain that no amount of overfill is relevant to the ASP methodology. Finally, Relator fails to identify any legal basis for the contention that Amgen's exclusion of overfill in the ASP calculation was an "assumption" that had to be reported to CMS, particularly since CMS shares Amgen's view that overfill is not included in ASP reporting.

3

On the basis of these legally flawed allegations, Relator asserts that she is entitled to damages for the full amount of every claim for Aranesp® submitted from January 1, 2005 to the present.  This theory is contrary to well-established law that actual damages under the FCA are calculated by subtracting the value the government received from the allegedly inflated price. Even under the flawed calculations of Relator's own damages expert, the government here received no less than 97% of the value it would have received but for the allegedly inflated ASP.

For these reasons, Relator's motion for summary judgment on Count 4 should be denied and Amgen's cross-motion for summary judgment, which is incorporated by reference, on Count 4 and the portion of Count 6 that relies on allegations of ASP inflation should be granted.

## ARGUMENT

## I.  RELATOR'S CLAIM THAT MANUFACTURERS MUST INCLUDE OVERFILL IN REPORTING A DRUG'S ASP IS INCORRECT AS A MATTER OF LAW, AS CONFIRMED BY CMS AND OIG

Relator's claim that Amgen reported an inflated ASP for Aranesp® by not accounting for overfill presents an issue of law dependent on the interpretation of the ASP statute and CMS' implementing regulations.  A plain reading of these rules along with the undisputed testimony and guidance of CMS and OIG confirm that Amgen correctly determined that overfill is not included in a manufacturer's calculation and reporting requirements for ASP.

### A.  CMS And OIG's Testimony And Guidance Interpreting The ASP Statute Is Entitled To Substantial Deference By The Court

In interpreting the ASP statute and implementing regulations, CMS' testimony and rule-making is entitled to substantial deference from the Court.  First, Congress specifically delegated to CMS the authority to define what constitutes a "unit" for purposes of the ASP denominator:

> [T]he Secretary may establish the unit for a manufacturer to report and methods for counting units as the Secretary determines appropriate . . . .

42 U.S.C. § 1395w-3a(b)(2)(B), as well as "price concessions" for the ASP numerator:

4

> [T]he Secretary may include in such price other price concessions, which may be based on the recommendations of the [OIG], that would result in a reduction of the cost to the purchaser.

*Id*. § 1395w-3a(c)(3).  Second, Congress granted CMS the authority to "implement, by program instruction or otherwise, any of the provisions of [the ASP statute]."  *Id*. § 1395w-3a(c)(5)(C). Finally, courts recognize CMS' broad rulemaking authority in the Medicare regulatory scheme given the complex and technical nature of CMS' oversight over Medicare.[4]  *See Chevron U.S.A. Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984); *Sid Peterson Memorial Hosp. v. Thompson*, 274 F.3d 301, 307-08 (5th Cir. 2001) (applying *Chevron* to uphold CMS' interpretation of Medicare statute based on express delegation of authority to issue regulations to determine methods to be used to calculate "reasonable cost").

### B.    CMS And OIG Testimony And Guidance Confirm That Overfill Is Not Included Anywhere In The Calculation Or Reporting Of ASP

CMS' testimony and rule-making confirms that the statutory and regulatory requirements governing a manufacturer's calculation and reporting of ASP do not include overfill.  At deposition, CMS testified that "what and how a manufacturer reports their ASP data" is governed by the ASP statute and implementing regulations.  Opp'n Ex. 1 CMS Dep. 214:2-5. Despite testifying that CMS knew since the 1990s that manufacturers included overfill in injectable vials and that providers were administering and billing Medicare for overfill amounts, CMS definitively rejected an interpretation of these regulations as including overfill:

> Q.  And [CMS] in connection with those [ASP] regulations has determined that overfill amounts . . . have not been and should not be reported for ASP purposes, correct?
>
> A. Correct.

---

[4] *Visiting Nurse Ass'n of North Shore, Inc. v. Bullen*, 93 F.3d 997, 1002 (1st Cir. 1996) ("As a federal agency charged with administering the Medicaid program . . . [CMS] plainly is entitled to *Chevron* deference in its interpretations of the Act and the implementing regulations."); *Hardy Wilson Memorial Hosp. v. Sebelius*, 616 F.3d 449, 457 (5th Cir. 2010)("[C]ourts have long recognized Congress' delegation of extremely broad regulatory authority to the agency in the Medicare . . . area."); *Estate of Landers v. Leavitt*, 545 F.3d 98, 107-08 (2d Cir. 2009) (deferring to CMS' determination of nights spent "inpatient" where not further defined by statute or regulation).

*Id.* 157:16-22, 165:7-15, 214:6-15, 228:4-229:2; Amgen SOF ¶¶ 107, 114.  This is consistent with the position CMS expressed in response to a subpoena in this case where, after noting that Subpart J of 42 C.F.R. § 414.800 *et seq.* "outline[s] the requirements for submission of a manufacturer's ASP data," CMS stated that it "does not make any payment determinations based on the absence or presence of 'overfill' in a vial."  MSJ Ex. 5 at 2.

CMS confirmed this understanding with the November 2010 rule-making.  After noting that manufacturers include overfill and that some providers administer it, CMS states that "overfill is currently not included in the calculation of payment limits under the methodology in [the ASP statute,]" and that CMS did "not intend to change the ASP calculation methodology to include intentional overfill."  MSJ Ex. 6 at 73466, 73468-73469.

Moreover, OIG agreed with CMS' interpretation of the ASP statute at deposition.  OIG requested ASP information from manufacturers as part of an audit in 2004 for CMS of the acquisition cost and reimbursement of ten drugs used for patients with End-Stage Renal Disease.  Opp'n Ex. 2 OIG Dep. (Tawes) 94:4-95:9.  OIG reviewed and applied the statutory language in the ASP statute as part of the audit.  *Id.* 97:4-98:13.  OIG knew at the time of its report that providers were administering and billing for overfill units in the drugs evaluated.  *Id.* 101:20-25. Despite this knowledge, OIG interpreted the language in the ASP statute as not requiring manufacturers to include overfill in its ASP reporting.  *Id.* 102:10-21.

### C.    Overfill Is Not Part Of The Denominator Of The ASP Calculation That Determines The Number Of Units Sold

CMS stated in regulation that "[i]n order to accurately calculate Medicare ASP payment limits under [the ASP statute]," a manufacturer must determine and report the number of units sold with reference only to "the amount of product in the vial or other container as indicated on the FDA approved label."  MSJ Ex. 6 at 73466.  CMS specifically rejected one commentator's

suggestion that "the ASP calculation methodology be changed to consider intentional overfill when defining the units . . . [for purposes of ASP]." *Id.* at 73468-73469. Instead, CMS reaffirmed that "[m]anufacturers are currently reporting ASP and sales data based on the labeled amount of the drug product" and that CMS did "not intend to change the ASP calculation methodology to include intentional overfill." *Id.*

CMS confirmed at deposition that manufacturers have never been required to include overfill in ASP reporting:

> Q. And it has been your understanding up until [November 2010] that manufacturers have, in fact, reported their ASP data based on the FDA approved label amounts, correct?
>
> A. Yes.
>
> . . .
>
> Q. CMS has never, prior to November 2nd, 2010, ever suggested that a manufacturer should include any amounts or units that exceed the label amount in conducting its price reporting. Is that correct?
>
> A. We have not.
>
> Q. In fact, CMS has never informed any manufacturer that they should price report based on the total units in a vial as opposed to the FDA approved label amounts; is that correct?
>
> A. We have not.

Opp'n Ex. 1 CMS Dep. at 228:10-229:2.

CMS' regulatory conclusion that overfill should not be included in ASP reporting is a reasonable interpretation of the provisions in the ASP statute. The ASP statute requires manufacturers to calculate ASP with respect to sales of NDC drug packages. 42 U.S.C. § 1395w-3a(c). CMS must also make payment limit calculations based on the "lowest identifiable quantity [of the drug] . . . exclusive of any diluent without reference to volume measures pertaining to liquids." 42 U.S.C. § 1395w-3a(b)(2)(B). The resulting payment amount set by CMS must be based on the billing unit of the drug, which is often a smaller amount of medicine than is sold in the NDC package. MSJ Ex. 6 at 73466. To implement the ASP statute and to determine the ASP-based payment amount, CMS requires manufacturers to submit an ASP data

form that states the "volume per item" present in each NDC package.  *Id*.; Opp'n Ex. 5.  This allows CMS to take the NDC-level data and calculate the payment amount for each billing code. MSJ Ex. 6 at 73466.  To make this workable, CMS interprets the "volume per item" to be the amount indicated on the FDA approved label, which does not include overfill.  *See id*.

### D.   Overfill Is Not A Discount Or Otherwise Part Of The Numerator Of The ASP Calculation That Determines A Drug Product's Price

CMS, both through testimony and rule-making, rejects the notion that overfill constitutes any of the six types of discounts enumerated in the ASP statute that must be deducted from net sales in the numerator of the ASP calculation.  42 U.S.C. § 1395w-3a(c)(3).  In the November 2010 rule-making, CMS cited directly to the ASP statute to state:

> We acknowledge that drugs and biologicals are supplied in various containers or kits that include accessories and diluents, as well as a variable amount of intentional overfill to ensure that the single dose is prepared and administered appropriately. [The ASP statute] requires that payment limit calculations be carried out without regard to any diluents or special packaging for the drug. **We believe these statutory provisions support our position that overfill is not an in-kind discount.**

MSJ Ex. 6 at 73468 (emphasis added) (citing 42 U.S.C. § 1395w-3a(b)(2), (b)(5)).  Though CMS recognized its authority under the ASP statute "to identify price concessions that must be included in the ASP calculation," it declined to do so with respect to overfill.  *Id*.

Moreover, this interpretation is consistent with CMS and OIG's testimony on what constitutes "free goods that are contingent on any purchase requirement."  CMS described that type of discount as "a scenario where a purchaser of a drug . . . because of their purchasing patterns, is awarded a discount or some amount of free goods in addition to what they purchase." Opp'n Ex. 1 CMS Dep. 143:19-144:1.  CMS testified that this term, though undefined, is intended to address a scenario where a provider purchases 10 vials and receives the 11th free.  *Id*. 145:14-22.  In other words, it is where an additional "unit" is received on account of a purchase.

OIG went even further than CMS at deposition. OIG testified that "free goods contingent on any purchase requirement" means "free product that you would get if you buy a certain amount of other product." Opp'n Ex. 2 OIG Dep. (Tawes) 72:6-9. OIG acknowledged that providers "informed [OIG] that they were utilizing and billing for overfill" as part of an audit regarding actual acquisition cost. *Id*. 75:8-10. Yet, OIG testified:

> Q. And you never instructed them to include overfill in the average acquisition cost; correct?
>
> A. No.
>
> Q. And you never considered overfill to be a free goods contingent on any purchase requirement; correct?
>
> A. No.

*Id*. 75:11-18; 102:1-21. Thus, even applying a broad definition of what constitutes contingent free goods under the ASP statute, OIG never understood that definition to apply to overfill.

### E.     The Statutory Requirement And CMS' Interpretation That Overfill Not Be Included In The Calculation And Reporting Of ASP Is Reasonable

Underlying the conclusion that overfill is not part of ASP is a pragmatic rationale related to how ASP must be reported and translated by CMS into payment determinations. As CMS stated, there is "a practical reason for declining to consider overfill to be a discount for purposes of the ASP calculation – namely, operational feasibility." MSJ Ex. 6 at 73468. CMS acknowledged at deposition that it would essentially be impossible to conduct price reporting based on how many units of medicine were administered as opposed to defining a "unit" by the FDA labeled amount. Opp'n Ex. 1 CMS Dep. 229:3-8. This is due to 1) the demands in ASP reporting to use exact and consistent quantities of drug products; 2) the variable nature of overfill amounts; and 3) the different practices and skill levels for extracting and administering overfill.

CMS states that accurate and stable price reporting requires that "manufacturer sales data, ASP calculations, and ASP payment limits use ***exact*** quantities of drug that are represented by

*exact* monetary values."  MSJ Ex. 6 at 73468 (emphasis added).  As discussed, CMS must translate ASP data reported at the NDC level into the CMS billing unit level.  42 U.S.C. § 1395w-3a(c)(1)(B); 42 C.F.R. § 414.804(a)(1); Opp'n Ex. 3 at 3.  These calculations require the data submitted by manufacturers to be easily and consistently quantifiable and fixed.  MSJ Ex. 6 at 73466, 73468.  Not including overfill in the ASP methodology is reasonable because, as CMS states, "attempting to account for a variable amount of overfill could result in price instability or inaccuracy."  *Id*. at 73468.

In contrast, CMS recognizes that "[t]he amount of overfill in vials varies from drug to drug and often is not easily or consistently quantifiable because actual fill amounts may also vary slightly due to the manufacturing process."  *Id*.  Manufacturers must include sufficient overfill to address the unavoidable manufacturing variability in fill volumes.  Amgen SOF ¶¶ 2-26.

Furthermore, the skill of those administering a liquid injectable drug like Aranesp® may range from the self-administering patient to the highly skilled medical provider, which will affect the amount of medicine that can be administered from a vial.  *Id*. ¶¶ 14-19.  Some providers do not utilize overfill.  Indeed, Relator's own damages expert contends that only 3% of all Aranesp® claims are consistent with billing for overfill.  MSJ Ex. 29 ¶ 37, n.74; MSJ Ex. 6 at 73467 (billing for overfill "does not occur routinely").  Thus, attempting to determine how much product was sold by including overfill would require provider-level information.

As a result, the amount of overfill available and actually administered may vary significantly. Opp'n Ex. 2 OIG Dep. (Tawes) 114:4-12 (respondents to an audit reported a "substantial range" in overfill amounts).  By way of example, the ASP statute required OIG to publish a report in 2004 for CMS regarding the actual acquisition costs of existing end-stage renal disease drugs.  MSJ Ex. 27.  OIG sent surveys to large and small dialysis organizations

regarding their acquisition costs.  Opp'n Ex. 2 OIG Dep. (Tawes) 42:12-24.  In response to these surveys, one provider that was using EPOGEN® vials informed OIG that it could extract 13.8% overfill, while another (also using EPOGEN® vials) reported that it could extract only 6%-8%. *Id*. 80:10-81:6, 87:18-88:12.  As OIG testified, the providers' "practices varied in the amount [of overfill] that they captured." *Id*. 115:16-20.   To accurately include this information in calculating providers' actual acquisition cost, OIG testified that it would require "individualized data from pretty much each administration as to how much overfill had been captured," which would require information from the individual providers themselves. *Id*. 115:16-116:20.

## II.   ALTERNATIVELY, RELATOR'S MOTION SHOULD BE DENIED BECAUSE THERE IS NO EVIDENCE THAT AMGEN INTENDED TO SUBMIT AN INACCURATE ARANESP® ASP

Relator's allegations that Amgen violated the FCA by submitting quarterly reports to CMS with inflated ASP data for Aranesp® require proof that Amgen knew at the time of those submissions that overfill constituted a price concession for ASP purposes. *See U.S. ex rel. Loughren v. Unum Group*, 613 F.3d 300, 312 (1st Cir. 2010) ("To be found liable under the FCA, an individual must act 'knowingly' in submitting a false claim.")  Though Relator's claim fails on the legal question addressed above, Relator's motion is deficient for the additional reason that the record evidence establishes that Amgen reasonably believed – as confirmed by government audits – that its ASP data submissions complied with all statutory and regulatory requirements. *See Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35 (1st Cir. 1998) ("The party who has the burden of proof on a dispositive issue cannot attain summary judgment unless the evidence that he provides on that issue is conclusive.")

Amgen reasonably believed its ASP reporting to be accurate when not including overfill. Mr. Fred Manak, Amgen's Executive Director responsible for ASP price reporting and Amgen's Rule 30(b)(6) designee for pricing policy, declared under oath that "I believed at the time of

11

submission, and believe now, that all ASP reports for Aranesp® have been accurate when they did not treat overfill as an adjustment to ASP reporting items. . . . I believe Amgen's quarterly submissions to CMS for Aranesp® properly did not take overfill into account when calculating and reporting ASP and in submitting ASP-related data."[5]  Opp'n Ex. 37 ¶¶ 9-10; *see also* Opp'n Ex. 11 Manak Dep. 16:9-25, 42:18-20, 148:2-5 (no Medicare pricing rate ever included overfill).

Moreover, OIG confirmed the reasonableness of Amgen's belief through an extensive audit that approved the ASP calculation for Aranesp®.  As part of the change to ASP, OIG conducted a two-year long audit to "determine whether Amgen's ASP calculation methodology for Aranesp [in 2005] complied with Federal requirements and guidelines."  MSJ Ex. 28 at i.  To accomplish this objective, OIG reviewed all applicable federal laws and CMS guidance and interviewed CMS officials about the federal requirements and guidance governing ASP submissions.  *Id.* at 2; Opp'n Ex. 39 OIG Dep. (Freda) 176:23-180:22, 182:3-23.  Both OIG and CMS knew at this time that manufacturers included overfill and that some providers were administering and billing Medicare for overfill amounts.  Amgen SOF ¶¶ 96-116.  OIG began the audit by requiring "Amgen officials and people that were very familiar with the ASP process to describe, literally walk [OIG] through. . . . in detail with the calculation, how [Amgen] performed their calculation."  Opp'n Ex. 39 OIG Dep. (Freda) 172:18-174:14.  OIG also requested and received documents containing Amgen's written methodology and assumptions

---

[5] Relator relies on four documents – all from 2004 or earlier – to argue that that Amgen "secretly calculated the ASP" to include overfill.  Relator's Mem. at 12; Relator SOF at 16 n.93.  One document is a spreadsheet dated November 24, 2003 that includes an overfill calculation for EPOGEN® as one of the "Key Assumptions" for 2005. *See* Relator App. 454.  Mr. Manak explained, however, that this represented a hypothesis regarding what CMS' forthcoming ASP methodology might include, but that CMS never included overfill in its actual ASP methodology. Opp'n Ex. 11 Manak Dep. 146:2-148:12.  With regard to a presentation titled "2005 EPOGEN® Contract Options" that referenced overfill, Mr. Timothy Hayes explained that when this spreadsheet was created "we were not sure how CMS was going to, or Congress, was going to come up with regulations around defining what average selling price" would be and were thus trying to determine what the reimbursement rate would be if CMS "developed a methodology that included or excluded overfill in how they calculated ASP."  Opp'n Ex. 23 Hayes Dep. 16:11-17. Furthermore, Mr. Manak testified as Amgen's 30(b)(6) designee that no payment rate ever included overfill.  Opp'n Ex. 11 Manak Dep. 148:2-5.

and the underlying data for the ASP calculation.  *Id*. 175:20-176:22.  OIG testified that Amgen provided all information that OIG deemed relevant for the audit, and at deposition could not identify any relevant information that Amgen allegedly withheld.  *Id*. 218:19-219:15.  At the end of the two-year audit, OIG concluded, "Overall, Amgen's ASP calculation methodology for Aranesp complied with federal requirements."[6]  *Id*. 186:18-187:9; MSJ Ex. 28 at i.

## III.   RELATOR'S ARGUMENTS ON LIABILITY MISREPRESENT THE COURT'S RULINGS IN THIS CASE AND ARE IRRELEVANT OR LEGALLY FLAWED

### A.   Relator Misrepresents This Court's Prior Ruling By Asserting That It Adopted Her Proposed Legal Test For ASP Inflation

Relator argues (at 1, 10) that the "Court ruled" in denying the motions to dismiss that if overfill has "independent value" then "Amgen was required to deduct it as a 'price concession' in formulating its reported ASP."  This argument shamelessly misrepresents the Court's opinion.  *See U.S. ex rel. Westmoreland v. Amgen Inc.*, 738 F. Supp. 2d 267, 279-80 (D. Mass. 2010).  The Court never adopted Relator's proposed test.  *Id*.  Instead, the Court accepted the allegations in the Complaint as true for purposes of the motion to dismiss and drew "all reasonable inferences in favor of Relator."  *Id*. at 280.  As the Court noted, "[t]he Complaint alleges that excess overfill is a 'free good' that should have been deducted from the total Aranesp sales."  *Id*. at 279.  The Court denied the motions to dismiss solely by crediting those allegations for that specific procedural posture.  *See id*. at 279-80.  But those allegations are neither substantiated nor material to the question of statutory and regulatory interpretation that CMS itself has answered in Amgen's favor.  *See* pp. 5-11, *supra*.

---

[6] OIG noted a few minor calculation errors in Amgen's Aranesp® ASP, none of which related to overfill.  Opp'n Ex. 39 OIG Dep. (Freda) 186:21-187:13.

## B.      Relator's Marketing Allegations Are Irrelevant To This Claim

Relator argues (at 5, 10) that based on the plain language of the ASP statute, all she must show is that Amgen knew that overfill could affect providers' acquisition costs to render it a discount for purposes of ASP reporting.  Relator then alleges that the Defendants marketed the economic value that providers could obtain by billing Medicare for overfill.  These allegations are beside the point.

By moving to an ASP-based methodology, Congress and CMS sought to define by statute and implement through regulations precisely what manufacturers must report regarding the pricing of their drug products.  *See* Opp'n Ex. 3 at 2-3.  This includes statutorily defined discounts that are terms of art in the industry so that pricing determinations would not depend on the discretion or perspective of a manufacturer.  *See id*.  The conduct of Amgen's field-level sales and marketing representatives, none of whom held any position related to ASP reporting or Amgen's pricing policy, is simply not relevant to the legal question of whether Congress or CMS includes overfill in the ASP reporting requirements.[7]

---

[7] As part of her marketing allegations, Relator argues that she is entitled to adverse inferences from five former Amgen employees.  Relator's Mem. at 2-3, 10, 12-13.  However, Relator has shown neither prejudice nor a substantial need for the specific adverse inferences.  *See Serafino v. Hasbro, Inc.*, 82 F.3d 515, 518 (1st Cir. 1996) ("[T]he Fifth Amendment Privilege should be upheld unless [the civil litigants] have substantial need for particular information and there is no other less burdensome effective means of obtaining it.").  First, none of these former employees had any role in price reporting.  Second, Relator deposed 24 *current* Amgen employees in their individual capacity, including Amgen's current Chief Executive Officer Mr. Kevin Sharer, 13 *current* employees as Rule 30(b)(6) designees, and received over 5 million pages of documents in discovery.  Not one *current* employee deposed asserted his or her Fifth Amendment privilege.  Moreover, of the 15 *former* Amgen employees deposed, 10 testified without asserting the privilege.  Relator cannot explain why these 47 depositions were not sufficient.  In addition, Relator fails to offer independent evidence to support the desired adverse inferences.  *See DirecTV, Inc. v. Lovejoy*, 366 F. Supp. 2d 132, 139 (D. Me. 2005) (no adverse inference where movant "forced the constitutional issue, rather than produce either probative evidence within its possession, custody or control, or an explanation as to why that evidence is unavailable."); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391-92 (7th Cir. 1995) ("[A] judgment may not be based directly, automatically, or solely on Fifth Amendment silence.").  Further, an adverse inference is inappropriate in support of a motion for summary judgment for which the movant bears the burden of proof.  *See In re Marrama*, 445 F.3d 518, 522-23 (1st Cir. 2006) ("[W]e have expressed doubt as to whether a court can draw [an adverse inference] at the summary judgment stage, where all reasonable inferences must be drawn for the non-movant.")

Similarly irrelevant is whether overfill constitutes an "economic inducement" due to CMS' policy of reimbursing providers for overfill administered to patients and whether Amgen allegedly discussed this "inducement" with customers. *See* Relator's Mem. at 10. These allegations are little more than a criticism of CMS' Medicare payment policy based on ASP (in Subpart K of the ASP regulations), not allegations that challenge Amgen's compliance with the separately regulated ASP *reporting* requirements (Subpart J). *See* 42 C.F.R. § 414.800 *et seq.* (Subpart J); 42 C.F.R. § 414.900 *et seq.* (Subpart K). For example, Relator continues to misrepresent the November 2010 rule-making that changed CMS' *payment* policy under Subpart K to prohibit billing for overfill as of January 1, 2011, as evidence of Amgen's liability. Relator's Mem. at 17. Despite CMS rejecting Relator's theory out of hand, Relator continues to assert that CMS had a "longstanding Medicare policy" that prohibited billing for overfill.[8]  *Id.*; Opp'n Ex. 1 CMS Dep. 214:6-216:12 (testifying that CMS had never before interpreted the "incident to" provision to prohibit billing for overfill and that CMS would continue to reimburse for claims that contain overfill until January 1, 2011). But this change to CMS' *payment* policy to preclude future claims containing overfill while not changing "the *ASP calculation methodology* to include intentional overfill" demonstrates that ASP-based payment policies affecting reimbursement to providers are irrelevant to evaluating a claim for the improper submission of a manufacturer's ASP data. MSJ Ex. 6 at 73468-73469 (emphasis added).

## C.   Relator's Allegations That Aranesp's® Overfill Was "Excessive" Are Also Irrelevant To The Legal Issue Raised

Relator argues that even if overfill is not generally part of the ASP calculation, Amgen had the legal obligation to report Aranesp's® overfill because the fact that some medical

---

[8] Relator presents her argument by combining two separate paragraphs in the November 2010 rule-making to give the Court the false impression that the "longstanding Medicare policy" (discussed in the first paragraph) applies to the new prohibition against billing for overfill (the following paragraph). *See* MSJ Ex. 6 at 73466. Relator does so despite CMS' testimony specifically rejecting this interpretation. Opp'n Ex. 1 CMS Dep. 214:6-216:12.

providers were administering and billing for it allegedly proved it was "excessive."  But CMS and OIG explicitly rejected the contention that overfill in any amount was relevant to a manufacturer's statutory and regulatory ASP reporting obligations.  *See* pp. 5-11, *supra*.

Furthermore, CMS confirmed that the amount of overfill included in a vial is governed by FDA rules and is beyond CMS' regulatory authority.  Opp'n Ex. 1 CMS Dep. at 149:6-18 (testifying that "the FDA has rules about the inclusion of overfill" and acknowledging that "the rules are beyond the scope of CMS's authority").  Relator ignores CMS' repeated statements that "it is the FDA that oversees when, and how much, 'overfill' can properly be contained in a drug vial."  MSJ Ex. 5 at 2; MSJ Ex. 6 at 73467 (CMS does not "allow, prohibit, or otherwise regulate the amount of overfill" because it does not "have the authority to regulate the manufacturing of drugs or biologicals").  This is consistent with the statutory requirement that manufacturers must calculate and report ASP at the FDA-defined NDC level.  42 U.S.C. § 1395w-3a(b)-(c).

Finally, CMS rejects Relator's contention that providers' use of overfill demonstrates "excess."  In the November 2010 rule-making, CMS repeatedly acknowledged that some providers utilize overfill and that "most providers and suppliers use overfill in clinically appropriate circumstances."  MSJ Ex. 6 at 73467.  CMS stated that its "policy is not intended to limit the use of intentional overfill during the care of beneficiaries or in medical practice."  *Id*. Thus, CMS knows of providers' utilization of overfill and still requires manufacturers to report ASP data based only on the "labeled amount of the drug product."  *Id*. at 73468.

### D.    Relator Lacks Any Basis For Contending That Amgen Had A Legal Obligation To Report That It Excluded Overfill From The ASP Data

Relator also argues (at 13-14) that Amgen submitted knowingly false quarterly ASP reports for Aranesp® by failing to notify CMS that "it was purposefully excluding overfill from its reported ASPs" despite "requirements to disclose to CMS *all* assumptions underlying its ASP

computations."  As a threshold issue, Amgen did not make an "assumption" by not including overfill in its ASP calculation.  Rather, Amgen followed the prescribed statutory and regulatory methodology regarding what constitutes a "unit" for reporting purposes.  *See* 42 U.S.C. § 1395w-3a(c); 42 C.F.R. § 414.804; MSJ Ex. 6 at 73466.

Moreover, Relator simply invents the so-called "requirement" for manufacturers to submit "*all* assumptions" underlying the ASP calculation.  No such requirement exists in the ASP statute or regulations governing the submission of manufacturer's ASP data.  Instead, Relator mischaracterizes three sources as purported authority.

First, Relator cites a study conducted by OIG titled "Average Sales Prices: Manufacturer Reporting and CMS Oversight."  Relator's Mem. at 14 n.15.  This report undermines rather than supports Relator's assertion by stating that "[m]anufacturers are under no obligation to report to CMS the underlying data that form their ASP submissions.  CMS receives only the ASP, the NDC, the number of units, and some product information.  Manufacturers are not required to provide any data on total sales, price concessions, or type of customer."  Opp'n Ex. 4 at 13.

Second, Relator relies on a final CMS rule from January 7, 2004, that states: "The manufacturer should submit a description of the methodology used to estimate these costs."  Relator's Mem. at 9 n.11.  Relator omits, however, that this applies only when a manufacturer must address a "lag in the availability of this information [on price concessions] applicable to the quarter."  69 Fed. Reg. 1084-01 (2004).  Where such a lag occurs, "the manufacturer should apply a methodology based on the most recent 12-month period available to estimate costs attributable to these price concessions."  *Id*.  It is assumptions related to specific lagged reporting methodologies – and not "*all* assumptions" – that CMS requests be provided with the ASP data.

17

Finally, Relator cites a response from CMS on its website to the question, "Can manufacturers make assumptions with respect to a particular aspect of the ASP calculation in the absence of specific guidance in the Social Security Act or Federal regulations?"  Relator's Mem. at 9 n.11 (website printout attached at Opp'n Ex. 40).  CMS responds that in the absence of guidance, manufacturers "may make reasonable assumptions" and they "should be submitted along with the ASP data . . . ."  Opp'n Ex. 40 at 1.  This subregulatory guidance does not require "all" assumptions to be submitted, but only ones made without the benefit of statutory or regulatory guidance.  *See id.*  Here, the ASP statute and regulations are clear – as confirmed by CMS and OIG – that overfill is not included in the ASP calculation.

## IV.    RELATOR MISSTATES THE LAW ON DAMAGES FOR PRICING CASES

Relator urges the Court (at 19-20) to apply a theory of actual damages that is not supported by the FCA or the case law and which would render Amgen "liable for the full amount paid by the government" on every single claim for Aranesp® submitted to Medicare from January 2005 to March 2009.  FCA actual damages are compensatory, not punitive, and so Relator bears the burden of proof to demonstrate the amount that would place "the government in the same position as it would have been if the defendant's claims had not been false."  *U.S. v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1278 (D.C. Cir. 2010).  Where the government received a tangible benefit despite the false claims, the value of goods received is subtracted from the value of goods promised.  *Id.*; *Ab-Tech Const.*, *Inc. v. U.S.*, 31 Fed. Cl. 429, 434-35 (1994).  Actual damages are limited to any excess payment.  *Science Applications*, 626 F.3d at 1278; *U.S. v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966).

In pricing cases where an inflated AWP was alleged, both the parties and the courts have recognized and applied the principle that actual damages constitute the difference between the allegedly inflated price and the price the drug should have been absent fraud.  *See, e.g.*, *In re*

*Pharm. Indus. AWP Litig.*, 457 F. Supp. 2d 65, 74 (D. Mass. 2006) (Florida alleged its damages to be the "amount it actually paid in reimbursements minus the amount it should have paid had the AWP and WAC figures not been inflated"); Opp'n Ex. 41 at 20-21 (*Comm. v. BMS Co.*, No. 212-md-2004, jury instruction) (Pa. Commw. Ct. Sept. 9, 2010) ("The Plaintiff Agencies are entitled to be fairly and adequately compensated in an amount measured by the difference between the value they paid in reimbursements for BMS drugs and the actual, real or intrinsic value of what their beneficiaries received in BMS drugs from 1991 through 2008."); Opp'n Ex. 42 at 142 (*Mass. v. Schering-Plough Corp.*, No. 03-11865, jury instruction) (D. Mass. Sept. 28, 2010) ("The measure of [] damages is the amount that it paid out by reason of the false claims or statements over and above what it would have paid if the claims or statements were not false.")

The cases Relator cites in support of her proposition are unavailing. Relator relies primarily on *U.S. v. Rogan*, 517 F.3d 449 (7th Cir. 2008), which has been criticized by the authoritative treatise on the FCA and more recent circuit case law. *See* John T. Boese, *Civil False Claims and Qui Tam Actions* § 3.01[B][3][a] (4th ed. 2010) (describing *Rogan* as employing "an extremely harsh valuation of FCA damages"); *Science Applications*, 626 F.3d at 1279 (distinguishing *Rogan*). Critically, *Rogan* neither cites nor does its holding comport with the leading Supreme Court decision on this exact issue. *See U.S. v. Bornstein*, 423 U.S. 303, 316 n.13 (1976) ("The Government's actual damages are equal to the difference between the market value of the tubes it received and retained and the market value that the tubes would have had if they had been of the specified quality.") Similarly, in both *U.S. ex rel. Longhi v. United States*, 575 F.3d 458, 473 (5th Cir. 2009), and *U.S. ex rel. Antidiscrimination Ctr. of Metro N.Y., Inc. v. Westchester County*, No. 06-cv-2860, 2009 WL 1108517, at *3 (S.D.N.Y. Apr. 24, 2009), the allegations involved a third-party receiving a benefit which it would not have otherwise received

if the program was properly administered.  Here, the government received the exact value for which payment was made.

Furthermore, as it is Relator's burden to prove actual damages suffered by the government and as she concedes in this motion that such a task is "impossible to calculate," this suggests an independent ground to deny Relator's claim and to allow Amgen's cross-claim on the ASP inflation theory.  *See* Relator's Mem. at 19; 31 U.S.C. § 3731(d) ("[T]he United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence"); *Science Applications*, 626 F.3d at 1280 ("The government, however, bears the burden of proving damages . . . .").

## **CONCLUSION**

For these reasons, Relator's motion for summary judgment on Count 4 should be denied and Amgen's cross-motion for summary judgment on Count 4 and the portion of Count 6 that relies on allegations of ASP inflation should be granted.

DATED:  March 22, 2011

Respectfully submitted,

 /s/ Kirsten V. Mayer
Brien O'Connor (BBO # 546767)
Kirsten V. Mayer (BBO # 641567)
William J. Dunn (BBO #666465)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Tel:  617.951.7000
Fax:  617.951.7050
brien.o'connor@ropesgray.com

David S. Rosenbloom, *pro hac vice*
Douglas E. Whitney, *pro hac vice*
MCDERMOTT, WILL & EMERY LLP
227 West Monroe Street, Suite 4400
Chicago, IL 60606-5096
Tel:  312-372-2000

Drosenbloom@mwe.com

Michael Kendall (BBO # 544866)
Daniel A. Curto (BBO # 639883)
MCDERMOTT, WILL & EMERY LLP
28 State Street
Boston, MA  02109-1775
Tel:  617.535.4000
Fax:  617.535.3800
mkendall@mwe.com

*Counsel to Amgen Inc.*

### CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to

the registered participants as identified on the Notice of Electronic Filing (NEF), and a copy will

be sent by electronic mail to those indicated as non registered participants on March 22, 2011.

/s/ Kirsten V. Mayer
Kirsten V. Mayer