UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE UNITED STATES OF AMERICA; *et al.* *ex rel.* KASSIE WESTMORELAND,<br><br>Plaintiff<br><br>v.<br><br>AMGEN INC., INTERNATIONAL NEPHROLOGY NETWORK, and ASD HEALTHCARE,<br><br>Defendants. | CIVIL ACTON NO.<br>06-10972-WGY |

**SUPPLEMENTAL STATEMENT OF MATERIAL FACTS IN SUPPORT OF INTERNATIONAL NEPHROLOGY NETWORK'S AND ASD HEALTHCARE'S MOTION FOR PARTIAL SUMMARY JUDGMENT[1]**

Pursuant to Local Rule 56.1, International Nephrology Network ("INN") and ASD Healthcare ("ASD") submit this supplemental statement of the material facts[2] of record as to which there is no genuine issue to be tried:

**I.   ASD's Role as a Wholesaler**

1. As a wholesaler, ASD purchases products from pharmaceutical manufacturers at the "wholesaler acquisition cost," also know as WAC. Declaration of M. McClain (Exhibit 1).

2. ASD then sells and distributes the product to customers, including pursuant to terms set forth in GPO contracts and customers' contracts with manufacturers. ASD retains the discretion to provide discounts to customers in addition to the terms set forth in the contracts between the customer and manufacturer. Declaration of M. McClain (Exhibit 1).

---

[1] The Declarations of James C. Carroll and Dale Danilewitz are attached hereto as Exhibits A and B.
[2] INN and ASD incorporate by reference all facts submitted by INN and ASD in their Rule 56.1 Statement of Undisputed Material Facts filed jointly with their Motion for Partial Summary Judgment.

3.      ASD's invoices to customers clearly disclose the discounts and the customer's obligations with respect to these discounts. The invoices' Terms and Conditions state that:

> [s]ales reflected on this invoice may include price discounts or be subject to subsequent reductions or adjustments in price, which may be reflected on other documentation. Buyer will comply with all applicable federal and state laws requiring it to report or reflect such discounts, reductions, or adjustments on cost reports or claims submitted to federal or state healthcare programs or other third party payers, retain this invoice and related pricing documentation, and make the invoice and such documentation available on request to federal or state healthcare program or other third party payer representatives.

*See, e.g.*, NAI 000552 (Exhibit 2).

4.      Pursuant to most distribution agreements between manufacturers and wholesaler/distributors, the wholesaler/distributor is *required* to provide additional discounts to customers. Declaration of M. McClain (Exhibit 1).

5.      ASD reports to manufacturers the contract price and the number of product units sold and distributed by ASD. The manufacturer then provides ASD with a "chargeback," which is the difference between the wholesaler acquisition cost and the customer's contract price. Declaration of M. McClain (Exhibit 1).

6.      In keeping with this customary business practice and industry norm, ASD operated pursuant to a Wholesaler Distribution Agreement with Amgen. Declaration of M. McClain (Exhibit 1).

7.      ASD purchases Aranesp from Amgen, and then sells Aranesp to nephrology practices based on contracts between Amgen and the practices. ASD offers, in its discretion, additional discounts to practices. Declaration of M. McClain (Exhibit 1).

8. ASD's accounting system maintained a record of various discounts provided to customers who purchased Aranesp. M. McClain Dep. (Exhibit 3) at 63:17-63:25.

9. ASD reported to Amgen the number of units sold as well as the contract price for those units. Declaration of M. McClain (Exhibit 1).

10. Amgen then paid ASD a chargeback for the difference between the customer's contract price and ASD's wholesaler acquisition cost. Declaration of M. McClain (Exhibit 1).

11. In addition to Aranesp, ASD had contracts with Amgen for the distribution of other products. *See* ABCQT-DMA-0000054433 (Exhibit 4), ABCQT-DMA-0000054466 (Exhibit 5).

12. ASD is INN's preferred, but not only wholesaler. *See* ABCQT-DMA-0000432775 (Exhibit 6) at 432789.

13. Relator's purported GPO rebuttal expert, Hal Singer, did not refute that GPOs routinely have one preferred distributor. H. Singer Dep. (Exhibit 7) at 164:21-165:4.

14. ASD had internal sales representatives who were based in the office. *See* M. McClain Dep. (Exhibit 3) at 132:24-133:9.

15. Strategic Account Managers ("SAMs") for INN worked to identify potential customers in a number of ways, including from vendors of other products in INN's portfolio and from INN SAMs' own knowledge of the nephrology practices. A. Miele Dep. (Exhibit 8) at 57:4-57:24, 200:18-200:23.

16. INN SAMs directed nephrologists to ASD internal sales force members to establish new accounts and manage the logistics of ordering portfolio products, including Aranesp. E. Gremont Dep. (Exhibit 9) at 94:15-94:23.

17. Kristen Lyons is currently the Director of Sales for ASD and has been employed by American Medical Distributors and subsequently ASD since 1997. In her capacity as Director of Sales for ASD, she is responsible for managing accounts and supporting customer needs. Declaration of K. Lyons (Exhibit 10).

18. In the summer of 2008, Ms. Lyons was Director of Sales for ASD. During this time, Ms. Lyons corresponded with Shelley Huttar, an INN SAM, regarding Ms. Huttar's discussion of potential discounts for the purchase of Aranesp through ASD available to provider Dr. Thomas. *See* Declaration of K. Lyons (Exhibit 10).

19. In her capacity as Director of Sales for ASD, Ms. Lyons did not believe that emphasizing discounts to customers was the most effective way to promote ASD's business because, in her experience, discounts were not effective means of developing customer loyalty and satisfaction because of the frequency of discount fluctuations. Declaration of K. Lyons (Exhibit 10).

20. Ms. Lyons does not agree that the level of coordination between ASD and INN raised flags within ABSG, nor did Ms. Lyons have any concerns with Ms. Huttar discussing economic issues with customers. *See* Declaration of K. Lyons (Exhibit 10).

21. From 2007 to 2010, ASD and INN shared the same accounting department and consolidated their financial reports. Declaration of M. McClain (Exhibit 1).

22. Mr. Evan Gremont of ASD did not use spreadsheets with providers. E. Gremont Dep. (Exhibit 9) at 66:25-67:11.

23. ASD's policy was not to initiate any communications with respect to overfill and to refer the practice to the manufacturer if they had questions. M. McClain Dep. (Exhibit 3) at 103:2-103:13.

## II. INN's Role as a GPO

24. GPOs are permitted to and do enter into partnerships with vendors for products and services, pursuant to which they receive administrative fees. The provision of administrative fees from vendors to GPOs is common in the industry and specifically sanctioned by the GPO Safe Harbor. H. Singer Dep. (Exhibit 7) at 111:10-111:23, 122:19-128:2.

25. Relator's GPO expert testified:

> Q. And is it also fair to say, however, that one of the other reasons why a vendor will pay an administrative fee to a GPO is for its ability to sell through the GPO to the GPO's members?
> A. Correct . . . .

H. Singer Dep. (Exhibit 7) at 125:17-125:22.

26. The administrative fee arrangement outlined in the GPO Safe Harbor creates a commonality of economic interests between a GPO and a vendor to sell more of the vendor's GPO-contracted products to the GPO's members. H. Singer Dep. (Exhibit 7) at 121:20-128:2.

27. Relator's GPO expert testified:

> Q. And the fact is that the existing compensation structure under the safe harbor provides certain incentives to GPOs, correct?
> A. Correct.

> Q.  And one of those incentives is to have their members buy more of those products that are within the GPO portfolio, correct?
> MR. HALL:  Object to the form.
> A.  That is – that is one incentive, yes.
> Q.  Because the way these fees are structured, if they do that, they will earn more money, correct?
> A.  Correct.
> Q.  So that's an economically rational thing for them to do, correct?
> A.  Correct.

H. Singer Dep. (Exhibit 7) at 121:20:122:12.

28.     It is standard industry practice of GPOs to use a portion of the GPO fees they receive from vendors to provide more favorable pricing to members.  As Relator's expert Hal Singer testified that, "depend[ing] on the GPO. . . GPOs pass through a certain portion of those fees, net of certain expenses, to their members" and agreed with the conclusion of INN's and ASD's expert Dr. Lawton Burns that "the mere fact of a pass-through is not uncommon."  H. Singer Dep. (Exhibit 7) at 135:11-136:20; 139:4-140:8.

29.     As purchasing agents for their members, GPOs discuss the economic consequences of their member practices' purchase of products.  Relator's expert Hal Singer testified that "it would be typical for a GPO to lay out the relative expenses or costs of the various options under the GPO contract."  H. Singer Dep. (Exhibit 7) at 152:1-153:16.

30.     Relator's GPO expert further testified:

> Q.  And let's focus on the purchasing agent aspect of it.  It's fair to say in a general fashion that one thing that a purchasing agent does for those that it's acting on behalf of is talk to its members about the economic aspects of the products that they are considering purchasing; is that right?
> A.  So long as the economic aspect means which one is going to be less expensive for you.
> Q.  So, in other words, a role of a purchasing agent is to say that if you buy product X, it will cost you this much, but if you buy product Y, it will cost you that much to allow the member to compare the economics of the purchase of those two products; is that right?

> MR. HALL:  Object to form.
> THE WITNESS:  Correct.  I think that goes on.
> BY MR. SITARCHUK: Q.   And to the extent that a GPO acts as a purchasing agent for its membership, that is something that a GPO does, correct?
> MR. HALL:  Object to the form.
> THE WITNESS:  Yes.
> BY MR. SITARCHUK: Q.   And that's not uncommon, correct?
> A.   Correct."

H. Singer Dep. (Exhibit 7) at 152:1-153:5.

31.     Relator's GPO expert testified: "Q.  And so the acquisition cost per unit could be lowered by the use and billing for overfill under my scenario; is that right?  A.   I think that's fair."  H. Singer Dep. (Exhibit 7) at 73:24-76:13.

32.     Relator's GPO expert testified with respect to the report of Professor Burns (INN and ASD's GPO expert):

> Q.   Where in your report do you address Professor Burns' conclusions that it is common practice for GPOs to discuss with practices the margin associated with the use of a particular product and the impact that that can have on the profitability of the practice?
>
> MR. HALL:  Object to the form.
> A: I don't think that I would disagree with that proposition in the abstract, and I don't think that's an issue of contention between me and Professor Burns.

H. Singer Dep. (Exhibit 7) at 161:15-162:1.

33.     Relator's GPO expert Hal Singer agrees that "GPOs are a highly efficient channel for the distribution of medical devices and other products."  H. Singer Dep. (Exhibit 7) at 155:15-156:2, 160:2-160:19.

34.     INN did not perform any services for Amgen before the execution of the GPO or advisory board contracts.  V. DeStasio Dep. (Exhibit 11) at 28:13-29:1.

7

### III. <u>INN Annually Sent Administrative Fee Disclosure Letters</u>

35. INN used a third party company, Bulk Mailing and Addressing, Inc. ("BMA") to send its annual administrative fee disclosure letters to INN members for purchases in years 2003 to 2006. *See* W. Venus Dep. at 77:18-77:24 (Relator's App. at 992 (Dkt. 390-8)); ABCQT-DMA-0000697669 (Exhibit 12); ABCQT-DMA-0001111640 (Exhibit 13); ABCQT-DMA-0001111653 (Exhibit 14).

36. BMA was a vendor based out of Hanover, Maryland, in the business of mailing and distributing large volumes of direct mail pieces. Declaration of P. Ort (Exhibit 15).

37. INN would prepare the template for each annual administrative fee disclosure letter. *See* ABCQT-DMA-0000719480 and ABCQT-DMA-0000719478 (2003 administrative fee disclosure template) (Exhibits 16 and 17); ABCQT-DMA-0001111643 (2004 administrative fee disclosure template) (Exhibit 18); ABCQT-DMA-0000760018 (2005 administrative fee disclosure template) (Exhibit 19); ABCQT-DMA-0000760016 (2006 administrative fee disclosure template) (Exhibit 20); ABCQT-DMA-0000787290 and ABCQT-DMA-0000787287 (2007 administrative fee disclosure template) (Exhibits 21 and 22).

38. INN would send the "raw data around the purchases" to the outside vendor who "would then fulfill, do a mail merge and mail the actual letters out." *See* W. Venus Dep. at 77:18-77:24 (Relator's App. at 992 (Dkt. 390-8)).

39. Paul Ort served as President of BMA from 1983 to 2010. In the ordinary course of BMA's business, Mr. Ort's duties as President included performing mail merges, producing

and distributing direct mail pieces on behalf of BMA's clients, and managing client accounts. *See* Declaration of Paul W. Ort (Exhibit 15).

40. INN was a client of BMA from approximately 2003 through 2007. *See* Declaration of P. Ort (Exhibit 15).

41. Mr. Ort personally corresponded with employees of INN and arranged the distribution of letters on behalf of INN. Employees under Mr. Ort's direction performed mail merges and created various types of direct mail pieces for INN on a regular basis from 2003 to 2007. *See* Declaration of P. Ort (Exhibit 15).

42. Mr. Ort identified a draft annual administrative fee letter as an example of the type of direct mail piece that BMA would mail on behalf of INN on a regular basis. These direct mail pieces were delivered to the United States Post Office, who confirmed their receipt and mailing, in the regular course of BMA's business. *See* Declaration of P. Ort and Exhibit A thereto (Exhibit 15).

43. For fiscal years 2007, 2008 and 2009, Jennifer Russell, INN's Manager of Member Services, was responsible for the preparation of and sending the administrative fee disclosure letters to INN members. *See* Declaration of J. Russell (Exhibit 23).

44. For the fiscal years of 2007 and 2008, INN sent the administrative fee disclosure letters to INN members via facsimile. *See* Declaration of J. Russell (Exhibit 23); *see, e.g.*, ABCQT-DMA-0001112042 (Exhibit 24); ABCQT-DMA-000111661 (Exhibit 25). For fiscal year 2009, INN employees sent the administrate fee disclosure letters to INN members via United States Postal Service. Declaration of J. Russell (Exhibit 23).

9

45.     Patrick Corcoran, a process server with Superior Process Service, LLC, in Glen Burnie, Maryland, received a request from counsel for INN and ASD on September 19, 2010, to serve a subpoena to produce documents on the custodian of records at BMA, 1328 Charwood Rd., Suite 100, Hanover, Maryland 21076.  Declaration of P. Corcoran (Exhibit 26).

46.     The subpoena requested: (1) Any and all documents sent by [BMA] to any person or entity on behalf of INN; (2) Any and all documents relating to any documents or letters sent by [BMA] on behalf of INN; and (3) Any and all lists of recipients of letters and/or documents that were sent by You on behalf of INN.  *See* September 17, 2010 Subpoena to Produce Documents issued to Custodian of Records, BMA (Exhibit 27).

47.     Mr. Corcoran made three attempts to serve the subpoena at the location on September 20, 2010 at 11:30 AM and again at 3:05 PM, and on September 21, 2010 at 11:10 AM.  Declaration of P. Corcoran (Exhibit 26).

48.     When Mr. Corcoran attempted to serve the subpoena, there were no cars in the parking lot of that location, there did not appear to be any people inside or outside the building, and the interior rooms contained only debris.  Mr. Corcoran declared that "[t]o the best of my knowledge, it did not appear that any business was operating at that location."  Declaration of P. Corcoran (Exhibit 26).

49.     Mr. Corcoran completed the proof of service noting that he was returning the subpoena unexecuted.  *See* Proof of Service (Exhibit 28).

50. Michael Mullen was employed by AmerisourceBergen Specialty Group from 2003 to 2010. Mr. Mullen is a former employee of AmerisourceBergen Specialty Group. Declaration of M. DiCandilo (Exhibit 29).

51. On or about April 23, 2010, Mr. Mullen was terminated by ABSG for reasons unrelated to "pass-through payments," any issues in this or any other litigation or related to any specialty GPO. Declaration of M. DiCandilo (Exhibit 29).

52. Mr. Mullen has an attorney-client relationship with counsel for Relator. M. Mullen Dep. at 80:7-82:24 (Exhibit 30).

Dated: March 22, 2011                    Respectfully submitted,

/s/ Thomas J. Sullivan
Peter E. Ball
SALLY & FITCH LLP
One Beacon Street
Boston, MA 02108
peb@sally-fitch.com
(617) 830-1221

Eric W. Sitarchuk (admitted *pro hac vice*)
Meredith S. Auten (admitted *pro hac vice*)
Thomas J. Sullivan (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103
 (215) 963-5000

James M. Becker (admitted *pro hac vice*)
BUCHANAN INGERSOLL & ROONEY, PC
50 S. 16th St., Suite 3200
Philadelphia, PA  19102
james.becker@bipc.com
215-665-5366

*Counsel for Integrated Nephrology Network and ASD Healthcare*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above document was served upon the attorney of record for each other party by electronic mail on March 22, 2011.

/s/  Thomas J. Sullivan
Thomas J. Sullivan
MORGAN, LEWIS & BOCKIUS LLP
1701 Market St.
Philadelphia, PA 19103
tsullivan@morganlewis.com
(215) 963-5146