**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THE UNITED STATES OF AMERICA<br>*ex rel.* KASSIE WESTMORELAND, et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>AMGEN INC., et al.,<br><br>                Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No.<br>    06-10972-WGY |

## RELATOR'S RESPONSE TO INN'S AND ASD'S RULE 56.1 STATEMENT

Pursuant to Local Rule 56.1, Relator Kassie Westmoreland ("Relator") submits this statement of the material facts of record as to which there exists a genuine issue to be tried in opposition to International Nephrology Network's ("INN") and ASD Healthcare's ("ASD") Motion for Partial Summary Judgment and Defendants' associated Statement of Material Facts ("INN SOF").[1]

Relator incorporates her Statement of Undisputed Facts in Support of Her Motion for Partial Summary Judgment as to INN and ASD's Ninth Affirmative Defense.

**INN SOF 1**

INN is a group purchasing organization ("GPO") specializing in the support of community-based nephrology practices. See INN Website, https://www.inn-online.com/ (Exhibit 1); ABCQT-DMA-0000427107 (Exhibit 2) at 42709.

**Response to SOF 1**

Disputed.  While INN purports to be a legitimate group purchasing organization ("GPO")

---

[1] INN and ASD include several section headings in their statement of material facts.  As these headings are not part of any paragraph, no response to them is required.  To the extent that a response is required, Relator disputes the facts contained in those headings.

specializing in the support of community-based nephrology practices, it does not in fact constitute a legitimate GPO, for all the reasons set forth in Relator's Memorandum in Support of Her Motion for Partial Summary Judgment as to INN & ASD Healthcare's Ninth Affirmative Defense (Dkt 386) (Mar. 1, 2011) ("Relator's S.J. Mem.") and Rule 56.1 Statement in Support of Her Motion for Partial Summary Judgment as to INN & ASD Healthcare's Ninth Affirmative Defense (Dkt 390) (Mar. 1, 2011) ("Relator's R. 56.1 Stmt.").

**INN SOF 2**

ASD is a distributor of specialty pharmaceutical products, and is a specialty

pharmaceutical partner for many of the largest GPOs in the country.  *See* ASD Website,

https://www.asdhealthcare.com/display.aspx?cid=AboutUs.cms (Exhibit 3).

**Response to SOF 2**

Partially disputed.  Relator does not dispute that ASD is a distributor of specialty pharmaceutical products.  Relator disputes that the cited authority—ASD's own website—does not establish the truth of the proposition for which it is cited.  Relator states that while ASD may currently be a partner for more than one GPO, it formerly had an exclusive partnership with INN. *See* Relator's Response to INN SOF 67, *infra*.  INN's 30(b)(6) representative testified that when INN entered into the GPO contract, INN considered Amgen to be its exclusive partner.[2]  Thus, INN was bound to purchase from ASD, and INN considered Amgen its exclusive partner from the outset.  For purposes of the sale of Aranesp, the ASD-INN-Amgen relationship continued at all relevant times, *see* Relator's R. 56.1 Stmt. 17-87, and INN's revenues were almost all from the sale of Aranesp.[3]

**INN SOF 3**

Amgen Inc. ("Amgen") is a therapeutics company in the biotechnology industry that,

among other things, develops products to treat kidney disease.  *See* Amgen Website,

http://www.amgen.com (Exhibit 4).

**Response to SOF 3**

Not disputed.

---

[2] *See* Deposition of William Venus 98:3-13 (Nov. 19, 2010) ("Venus (INN 30(b)(6)) Tr.") (App. at 998) *see also* ABCQT-DMA-0000596447 (App. at 567) (referring to INN as ASD's "lifeline"); Deposition of Gary Inglese Tr. 130:4-6; 131:16-132:8 (Sept. 22, 2010 & Mar. 9, 2010) ("Inglese Tr.") (App. at 885); ABCQT-DMA-0000430768 (App. at 23).

[3] *See* Deposition of Anthony Corrao 129:12-18 (Sept. 23, 2010) ("Corrao Tr.") (a "very high percentage" of INN's revenue was attributable to Aranesp) (Resp. App. at 479); Inglese Tr. 82:21-24 ("vast majority" of INN's revenue came from Amgen) (Resp. App. at 531).

**INN SOF 4**

Relator is Kassie Westmoreland, a former Amgen employee, who first filed this matter in 2006.  *See* Docket No. 1; Docket No. 238 at ¶ 24.

**Response to SOF 4**

Not disputed.

**INN SOF 5**

On September 1, 2009, the United States filed a Notice of the United States That It Is Not Intervening At This Time.  *See* Docket No. 71.

**Response to SOF 5**

Not disputed.  The United States has filed Statements of Interest and sought to participate in oral argument in the related appeal by the states following their dismissal by this Court.[4]

**INN SOF 6**

AmerisourceBergen Corporation and AmerisourceBergen Specialty Group, named defendants in the Third Amended Complaint, were dismissed as parties to this action.  *See* Docket Nos. 212 and 213.

**Response to SOF 6**

Disputed in part.  AmerisourceBergen Corporation and AmerisourceBergen Specialty Group were dismissed without prejudice to a motion to reinstate them as Defendants at any later time in this action or related appeals.[5]

**INN SOF 7**

Relator is proceeding on her Fourth Amended Complaint.  *See* Docket No. 238.[3]

[3] Relator, on behalf of the government, brings seven counts against the Defendants. However, Relator's counsel has stated as follows, "[a]s the Complaint makes clear, this case is about how INN conspired with Amgen to market overfill in vials of Aranesp." February 10, 2011 Letter from S. Strikis to T. Sullivan (Exhibit 7).

_____

[4] *See* United States Statement of Interest on INN's & ASD Healthcare's Motion for Partial Summary Judgment on the Pleadings (Dkt 421) (Mar. 18, 2011).

[5] *See* Westmoreland v. Amgen Inc., 707 F. Supp. 2d 123 (D. Mass. 2010).

**Response to SOF 7**

Not disputed in part.  Relator does not dispute that she, with the Court's permission, is currently proceeding on her Fourth Amended Complaint in this action.  Disputed in part that Relator's allegations are limited to or by the statements set forth in footnote 3 of INN SOF 7.  Relator's Fourth Amended Complaint sets forth the grounds for this action, which are not limited to INN's conspiracy with Amgen to market Aranesp overfill.  Relator's counsel, when making the foregoing statement, was responding to a question from INN's counsel concerning the scope and nature of the testimony of expert Hal J. Singer, who is responding to INN GPO expert R. Lawton Burns.  It is no surprise therefore that Relator's counsel referenced the conspiracy between INN and Amgen to market overfill in such a letter, but the letter does not limit Relator's claims solely to that conspiracy.

**INN SOF 8**

On December 1, 2009, Relator submitted Plaintiffs' Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1).  *See* Relator's Initial Disclosures (Exhibit 5).

**Response to SOF 8**

Not disputed.

**INN SOF 9**

On July 23, 2010, Relator submitted supplemental disclosures pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iii) regarding computation of damages.  The disclosures state "[f]urther calculations for damages resulting from other kickbacks . . . will be supplemented at a later time in accordance with Rule 26."  *See* Relator's Supplemental Disclosures (Exhibit 6).

**Response to SOF 9**

Not disputed.

**INN SOF 10**

The United States Government Accountability Office ("GAO") recently recognized that healthcare providers, including those who participate in Medicare and Medicaid, face continuing pressure to address rising healthcare costs.  U.S. Government Accountability Office (GAO), Group Purchasing Organizations, Services Provided to Customers and Initiatives Regarding Their Business Practices, GAO-10-738, (Aug. 2010) ("GAO Report") (Exhibit 8) at 1.

**Response to SOF 10**

Disputed.  The GAO Report discusses concerns voiced by Congress over anticompetitive business practices, such as contracting with only one vendor, and linking price discounts to purchases.[6]  It is undisputed that INN engaged in precisely these practices, by giving additional discounts to INN members who purchased Aranesp through ASD, and by maintaining an exclusive and strategic partnership with Amgen.[7]

**INN SOF 11**

Providers have responded to these cost pressures is by utilizing GPOs.  GAO Report

(Exhibit 8) at 1.

**Response to SOF 11**

Disputed.  *See* Relator's Response to INN SOF 10.  The purpose of the GAO Report was to assess the impact of codes of conduct on the size of administrative fees charged by GPOs, not to specify which behavior is common in general for GPOs, and the report assessed only seven sample GPOs.[8]  With respect to INN's defense of this case, its own GPO expert, R. Lawton Burns, has not considered the GPO code of conduct in rendering his opinion about INN's operations.[9]  There is no evidence in the record that INN, in fact, adhered to a GPO code of conduct.[10]  Healthcare providers have responded to rising healthcare costs in a variety of ways, including but not limited to, the use of legitimate GPOs.[11]

**INN SOF 12**

A GPO is an economic entity, a fundamental purpose of which is to offer financial

benefits to its members through group purchasing.  Expert Report of L. Burns (Exhibit 9) at 11-

12.

**Response to SOF 12**

Disputed.  Relator objects that the unsworn declaration of INN's expert is not admissible

---

[6] *See* INN Exh. 8 at 2 (GAO Report).

[7] *See* Venus (INN 30(b)(6)) Tr. 72:9-17, 98:7-13 (App. at 991, 998); Deposition of Mike Mullen 30:7-33:22 (Oct. 10, 2010) ("Mullen Tr.") (App. at 944); Inglese Tr. 283:19-24 (App. at 892); Mullen Exh. 6 (App. at 297).

[8] *See* INN Exh. 8 at 3 & n.8 (GAO Report).

[9] *See* Deposition of Lawton Burns 39:3-8 (Jan. 19, 2011) (Resp. App. at 468).

[10] *See id*. at 38:13-39:8 (Resp. App. at 468).

[11] INN Exh. 8 at 1 (GAO Report).

evidence and insufficient standing alone to support any proposition.[12]  Relator disputes that the concept of "economic entity" has any particular meaning that can be discerned.

Even assuming that the purpose of a GPO includes offering financial benefits to its members, INN acted inconsistently with this purpose and instead primarily delivered economic value to co-Defendants Amgen and ASD, and the INN/ASD parent corporations Amerisource Bergen Specialty Group ("ABSG") and AmerisourceBergen Corporation, not the INN members. *See* Relator's R. 56.1 Stmt. 50-58, 78.  Mike Mullen, former Chief Financial Officer and Chief Operating Officer ("COO") of ABSG, testified that that pairing a GPO with a distributor was the AmerisourceBergen business model, and that the business model was the same across many of these ABSG subsidiaries.[13] One of the subsidiaries with the same model[14] as INN and ASD operated at a 900% profit, showing revenue of $100 million generated by services that cost only $10 to $20 million, which raised a red flag for Mullen as COO.[15]  Had INN been an independent GPO rather than merely a marketing arm for Amgen and a revenue-generator for ABSG, it would have had greater opportunity to obtain better discounts for its members.  *See* Relator's R. 56.1 Stmt. ¶ 16.

Moreover, any financial benefits must be lawfully provided to GPO members.  A GPO that engages in unlawful conduct is, according to INN's own expert, not acting in a manner "consistent with what GPOs do."[16]

## INN SOF 13

GPOs are recognized by the federal government as entities authorized to act as a

purchasing agent for a group of individuals or entities who are furnishing services for which

payment may be made in whole or in part under Medicare, Medicaid or other Federal healthcare

programs.  42 C.F.R. § 1001.952(j).

## Response to SOF 13

Disputed as an incomplete definition under federal regulations.  A GPO is an entity that is both authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services for which payment may be made in whole or in part under Medicare, Medicaid or other Federal healthcare programs and which in fact does act as a legitimate agent, working on behalf of such individuals or entities to reduce their purchasing costs through

---

[12] *See* Mem. in Support at __.

[13] *See* Mullen Tr. 30:7-35:17 (App. at 944-945); Mullen Exh. 6 (App. at 297).

[14] *See* Mullen Tr. 34:18-35:10 (App. at 945).

[15] *See id.* at 70:2-71:14 (Resp. App. at 567-577).

[16] Burns Tr. 46:14-21 (App. at 848).

legitimate means.[17]

## INN SOF 14

There is a Safe Harbor for GPOs under the Anti-Kickback Statute. 42 C.F.R.

§ 1001.952(j).

### Response to SOF 14

Not disputed that that there is a statutory exception to the Medicare and Medicaid Patient Protection Act of 1987, as amended, 42 U.S.C. §1320a-7b (Anti-Kickback Statute "AKS"), 42 U.S.C. § 1320a-7(b)(3)(C), for legitimate GPOs, and that the Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS") has promulgated regulations to implement this exception pursuant to statutory authority.[18]

## INN SOF 15

GPOs are common in the healthcare industry and there are over 600 GPOs in the United

States.  GAO Report (Exhibit 8) at 4.

### Response to SOF 15

Disputed.

To the extent the GAO Report may be considered admissible evidence, Relator states that it discusses concerns voiced by Congress over anticompetitive business practices, such as contracting with only one vendor, and linking price discounts to purchases.[19]  It is undisputed that INN engaged in precisely these practices, by giving additional discounts to INN members who purchased Aranesp through ASD, and by maintaining an exclusive and strategic partnership with Amgen.[20]

Not disputed in part that legitimate GPOs exist in the healthcare industry.  Relator objects that the term "common" expresses an opinion.  Not disputed in part that there are over 600 entities claiming to be legitimate GPOs in the United States.   Disputed in part that entities functioning—like INN—primarily as sales force for pharmaceutical companies and/or which promote a pharmaceutical company's products at least in part by extolling the economic benefits of kickbacks provided by the company, are legitimate GPOs or are common in the healthcare industry.  *See* Relator's S.J. Mem. and Relator's R. 56.1 Stmt.

---

[17] *See* 42 C.F.R. § 1001.952(j).

[18] *See id.*

[19] *See* INN Exh. 8 at 2 (GAO Report).

[20] *See* Venus (INN 30(b)(6)) Tr. 72:9-17, 98:7-13 (App. at 991, 998); Mullen Tr. 30:7-33:22 (App. at 944); Inglese Tr. 283:19-24 (App. at 892); Mullen Exh. 6 (App. at 297).

**INN SOF 16**

A GPO's primary, but not exclusive, function is to enter into purchasing arrangements with vendors that its physician and/or hospital members can access if they so choose.  *See* Report of L. Burns (Exhibit 9) at 11.

**Response to SOF 16**

Disputed.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[21]

Relator objects that the GAO Report relied upon by the INN expert, at 11, n.12, is not admissible evidence that may be considered for purposes of summary judgment.  To the extent the GAO Report may be considered, Relator states that it discusses concerns voiced by Congress over anticompetitive business practices, such as contracting with only one vendor, and linking price discounts to purchases.[22]  It is undisputed that INN engaged in precisely these practices, by giving additional discounts to INN members who purchased Aranesp through ASD, and by maintaining an exclusive and strategic partnership with Amgen.[23]

**INN SOF 17**

GPOs aggregate the purchasing power of their member medical providers, and allow them to access various benefits that GPOs provide.  Expert Report of L. Burns (Exhibit 9) at 11. Economic benefits are both the purpose of a GPO and the value of a GPO to its members. *See* Expert Report of L. Burns (Exhibit 9) at 16.

**Response to SOF 17**

Disputed.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[24]

---

[21] *See* Mem. in Support at __.

[22] *See* INN Exh. 8 at 2 (GAO Report).

[23] *See* Venus (INN 30(b)(6)) Tr. 72:9-17, 98:7-13 (App. at 991, 998); Mullen Tr. 30:7-33:22 (App. at 944); Inglese Tr. 283:19-24 (App. at 892); Mullen Exh. 6 (App. at 297).

[24] *See* Mem. in Support at __.

**INN SOF 18**

Delivering economic value to members is the fundamental reason GPOs exist.  Expert

Report of L. Burns (Exhibit 9) at 16.

**Response to SOF 18**

Disputed.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence
and insufficient standing alone to support any proposition.[25]

**INN SOF 19**

GPOs in the healthcare industry operate as pooling alliances that bring together providers

in a manner that allows them access to the many benefits that GPOs provide. Expert Report of L.

Burns (Exhibit 9) at 11.

**Response to SOF 19**

Disputed.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence
and insufficient standing alone to support any proposition.[26]

Disputed that GPOs may operate as pooling alliances to allow provider access to
illegitimate benefits such as kickbacks.

**INN SOF 20**

These benefits can include more favorable pricing on drugs, equipment, supplies and

services and the opportunity to receive educational or other services provided by the GPO. *See*

Expert Report of L. Burns (Exhibit 9) at 11.

**Response to SOF 20**

Disputed.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence

---

[25] *See* Mem. in Support at __.

[26] *See* Mem. in Support at __.

and insufficient standing alone to support any proposition.[27]

Disputed that the benefits a legitimate GPO may offer include the opportunity to receive educational or other services provided by the GPO. A legitimate GPO may offer educational and other services only where such services are legitimately designed to educate its members and are not designed to market particular pharmaceutical products or obtain confidential practice and patient information on behalf of a pharmaceutical company to assist them in promoting their products.

**INN SOF 21**

From the perspective of its members, the primary purpose for joining a GPO is to take

advantage of the economic benefits a GPO offers to its members. Expert Report of L. Burns

(Exhibit 9) at 16.

**Response to SOF 21**

Disputed.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[28]

**INN SOF 22**

GPOs can promote the economic advantages of a product in their portfolio to their

members. Expert Report of L. Burns (Exhibit 9) at 12.

**Response to SOF 22**

Disputed.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[29]

GPOs may not promote kickbacks offered by a pharmaceutical company.

---

[27] *See* Mem. in Support at __.

[28] *See* Mem. in Support at __.

[29] *See* Mem. in Support at __.

**INN SOF 23**

One of the functions of a GPO is to discuss with its physician membership the economics

of their practices. *See* Report of L. Burns (Exhibit 9) at 16.

**Response to SOF 23**

Disputed.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[30]

Relator objects that the GAO Report is not admissible evidence that may be considered for purposes of summary judgment.  To the extent the GAO Report may be considered, Relator states that it discusses concerns voiced by Congress over anticompetitive business practices, such as contracting with only one vendor, and linking price discounts to purchases.[31]  It is undisputed that INN engaged in precisely these practices, by giving additional discounts to INN members who purchased Aranesp through ASD, and by maintaining an exclusive and strategic partnership with Amgen.[32]

**INN SOF 24**

One of the ways in which GPOs compete with one another is to emphasize the economic

benefits of products in their contract portfolio as compared to those of their competitors. Expert

Report of L. Burns (Exhibit 9) at 12.

**Response to SOF 24**

Disputed.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[33]

Disputed legitimate GPOs may discuss the economic benefits of kickbacks provided by a pharmaceutical company.

---

[30] *See* Mem. in Support at __.

[31] *See* INN Exh. 8 at 2 (GAO Report).

[32] *See* Venus (INN 30(b)(6)) Tr. 72:9-17, 98:7-13 (App. at 991, 998); Mullen Tr. 30:7-33:22 (App. at 944); Inglese Tr. 283:19-24 (App. at 892); Mullen Exh. 6 (App. at 297).

[33] *See* Mem. in Support at __.

**INN SOF 25**

It is common for a GPO to discuss the economic benefits of the products in its portfolio

with members, including the relative margins associated with the use of the GPO's products as

compared to those of its competitors. Expert Report of L. Burns (Exhibit 9) at 16; E. Goldman

Deposition (Exhibit 10) at 92:17-93:17.

**Response to SOF 25**

Disputed.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence
and insufficient standing alone to support any proposition.[34]

The testimony of Dr. Edward Goldman cited by INN says nothing about how common it
is for GPOs to discuss economic benefits with their members.  In any event, a GPO may not
account for or discuss the economic benefits of kickbacks provided by a pharmaceutical
company.

**INN SOF 26**

GPO agreements commonly include the negotiation of an administrative fee to be paid by

the vendor to the GPO calculated as a percentage of the vendor's sales through the GPO. Expert

Report of L. Burns (Exhibit 9) at 13; GAO Report (Exhibit 8) at 6.

**Response to SOF 26**

Disputed.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence
and insufficient standing alone to support any proposition.[35]

To the extent the GAO Report may be considered admissible evidence, Relator states that
it discusses concerns voiced by Congress over anticompetitive business practices, such as
contracting with only one vendor, and linking price discounts to purchases.[36]  It is undisputed
that INN engaged in precisely these practices, by giving additional discounts to INN members
who purchased Aranesp through ASD, and by maintaining an exclusive and strategic partnership

---

[34] *See* Mem. in Support at __.

[35] *See* Mem. in Support at __.

[36] *See* INN Exh. 8 at 2 (GAO Report).

with Amgen.[37]

The cited GAO Report states: "GPOs may also negotiate contracts where there is no contract administrative fee paid by the vendor."[38]   The purpose of the GAO Report was to assess the impact of codes of conduct on the size of administrative fees charged by GPOs behavior, not to specify which behavior is common or acceptable in general for GPOs, and the report assessed only seven sample GPOs.[39]

## INN SOF 27

It is common for these administrative fees in GPO contracts to range from 2%-3%, but

may be higher or lower than these percentages. *See* Expert Report of L. Burns (Exhibit 9) at 13.

### Response to SOF 27

Disputed.  Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[40]

Legitimate GPOs are limited to a maximum 3% administrative fees except in particular circumstances requiring additional disclosure.[41]

## INN SOF 28

GPOs use these administrative fees to fund their operations, provide value-added services

to members and as their source of profit. Expert Report of L. Burns (Exhibit 9) at 13; GAO

Report (Exhibit 8) at 6.

### Response to SOF 28

Not disputed that GPOs use administrative fees to fund their legitimate operating expenses.  Otherwise disputed.  Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[42]

To the extent the GAO Report may be considered admissible evidence, Relator states that it discusses concerns voiced by Congress over anticompetitive business practices, such as

---

[37] *See* Venus (INN 30(b)(6)) Tr. 72:9-17, 98:7-13 (App. at 991, 998); Mullen Tr. 30:7-33:22 (App. at 944); Inglese Tr. 283:19-24 (App. at 892); Mullen Exh. 6 (App. at 297).

[38] INN Exh. 8 at 2 (GAO Report).

[39] *See id.*

[40] *See* Mem. in Support at __.

[41] *See* 42 C.F.R. § 1001.952(j).

[42] *See* Mem. in Support at __.

contracting with only one vendor, and linking price discounts to purchases.[43] It is undisputed that INN engaged in precisely these practices, by giving additional discounts to INN members who purchased Aranesp through ASD, and by maintaining an exclusive and strategic partnership with Amgen.[44]

Relator objects that the cited portion of the GAO Report says nothing about profit, and certainly nothing about rolling profits from the GPO up to a parent company in the pharmaceutical supply industry, as happened here.[45] Indeed, the outsized profits (on the order of 900%) of the ABSG subsidiaries shows that they do not use administrative fees merely in a legitimate fashion to fund their operations and provide member benefits. They are instead merely a cash machine for ABSG. *See* Relator's Response to INN SOF 12, *supra*; Relator's R. 56.1 Stmt. 7-16.

**INN SOF 29**

The GAO Report stated that the GPO fee from the vendor "is designed, in part, to cover a GPO's operating expenses and serves as its main source of revenue. The amount of contract administrative fees is based on a percentage of the purchase price for a product obtained through GPO contracts. When negotiated, the contract administrative fee is paid each time a GPO's customer purchases a product through a GPO contract. In addition to using these contract administrative fees to cover operating expenses, such as providing services to their customers, GPOs may distribute a portion of contract administrative fees to customers or use them to finance other ventures such as investing in other companies." GAO Report (Exhibit 8) at 6; Expert Report of L. Burns (Exhibit 9) at 19, fn. 29.

**Response to SOF 29**

Not disputed in part that the GAO Report contained the quoted language. Otherwise disputed.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[46]

---

[43] *See* INN Exh. 8 at 2 (GAO Report).

[44] *See* Venus (INN 30(b)(6)) Tr. 72:9-17, 98:7-13 (App. at 991, 998); Mullen Tr. 30:7-33:22 (App. at 944); Inglese Tr. 283:19-24 (App. at 892); Mullen Exh. 6 (App. at 297).

[45] *See* Mullen Tr. 7:15-8:24, 11:3-14:25 (App. at 939, 940-41).

[46] *See* Mem. in Support at __.

To the extent the GAO Report may be considered admissible evidence, Relator states that it discusses concerns voiced by Congress over anticompetitive business practices, such as contracting with only one vendor, and linking price discounts to purchases.[47]  It is undisputed that INN engaged in precisely these practices, by giving additional discounts to INN members who purchased Aranesp through ASD, and by maintaining an exclusive and strategic partnership with Amgen.[48]

Relator objects that the cited authority does not establish the truth of the proposition cited.  The purpose of the GAO Report was to assess the impact of codes of conduct on the size of administrative fees charged by GPOs, not to issue an advisory opinion authorizing any particular type of GPO conduct, and in any event the report assessed only seven sample GPOs.[49]  In no way does the foregoing statement in the GPO Report authorize the conduct of INN and ASD, including the funding of discounts to INN members via a pass-through payment to an alter ego wholesaler owned by the same corporate parent, such that the entire operation involved a wild allocation of one giant cesspool of money with no pattern and no documentation.  *See* Relator's R. 56.1 Stmt. 17-57, 99. Indeed, the premise underlying the GAO report is that large administrative fees—and correspondingly large pass-through discounts—are problematic.

**INN SOF 30**

The GAO Report found that six large hospital-based GPOs distributed about 53 percent of their total revenues to members based on the latter's purchasing volume or the percentage of GPO fees generated through the latter's purchases. *See* GAO Report (Exhibit 8) at 12; Expert Report of L. Burns (Exhibit 9) at 19.

**Response to SOF 30**

Not disputed, in part that the GAO Report states that the GPOs that the GAO reviewed reported that they distributed 53% of their total revenues based on "a number of factors" including but not limited to purchasing volume or the percentage of contract administrative fees produced through customer purchases. Disputed that the GAO Report endorses INN's conduct. *See* Relator's Response to INN SOF 29, *supra*.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[50]

To the extent the GAO Report may be considered admissible evidence, Relator states that

---

[47] *See* INN Exh. 8 at 2 (GAO Report).

[48] *See* Venus (INN 30(b)(6)) Tr. 72:9-17, 98:7-13 (App. at 991, 998); Mullen Tr. 30:7-33:22 (App. at 944); Inglese Tr. 283:19-24 (App. at 892); Mullen Exh. 6 (App. at 297).

[49] *See* INN Exh. 8 at 2 (GAO Report).

[50] *See* Mem. in Support at __.

it discusses concerns voiced by Congress over anticompetitive business practices, such as contracting with only one vendor, and linking price discounts to purchases.[51]  It is undisputed that INN engaged in precisely these practices, by giving additional discounts to INN members who purchased Aranesp through ASD, and by maintaining an exclusive and strategic partnership with Amgen.[52]

**INN SOF 31**

The Office of Inspector General for the Department of Health and Human Services

("HHS OIG") issued a report entitled "Review of Revenue From Vendors at Three Group

Purchasing Organizations and Their Members" which addressed the amount and use of GPO fees

received by GPOs from vendors. Office of Inspector General for the Department of Health and

Human Services Report, Review of Revenue From Vendors at Three Group  Purchasing

Organizations and Their Members, A-05-03-00074 (January 2005) ("OIG January 2005 GPO

Report") (Exhibit 11); Expert Report of L. Burns (Exhibit 9) at 20.

**Response to SOF 31**

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[53]

Not disputed in part that the Office of Inspector General for the Department of Health and Human Services ("HHS OIG") issued a report entitled "Review of Revenue From Vendors at Three Group Purchasing Organizations and Their Members" A-05-03-00074 (Jan. 2005) ("HHS OIG Report").  Disputed in part that this report addressed the amount and use of GPO fees received by GPOs from vendors in any manner that set or interpreted legal guidelines for the use of administrative fees by GPOs.  In no way does the foregoing statement in the OIG Report authorize the conduct of INN and ASD, including the funding of discounts to INN members via a pass-through payment to an alter ego wholesaler owned by the same corporate parent, such that the entire operation involved a wild allocation of one giant cesspool of money with no pattern and no documentation.  *See* Relator's GPO SOF 17-57, 99.

The HHS OIG Report explicitly states that the Department of Health and Human Services "does not directly 'regulate' GPOs."[54]  It is therefore explicitly beyond the scope of the

---

[51] *See* INN Exh. 8 at 2.

[52] *See* Venus (INN 30(b)(6)) Tr. 72:9-17, 98:7-13 (App. at 991, 998); Mullen Tr. 30:7-33:22 (App. at 944); Inglese Tr. 283:19-24 (App. at 892); Mullen Exh. 6 (App. at 297).

[53] *See* Mem. in Support at __.

[54] INN Ex. 11 at i (HHS OIG Report).

report to assess what GPOs may do with their administrative fee revenue.  The Report makes clear that its purpose is to provide descriptive, factual information about three large GPOs to hospitals, in order to help the hospitals properly comply with Medicare regulations that "provide guidance on the reporting of rebates that hospitals receive from vendors."[55]  The cover memorandum to the Report makes clear that one of the central recommendations of the Report is to encourage CMS to "provide specific guidance [to hospitals] on the proper Medicare cost report treatment.  Nowhere does the Report purport to authorize or not authorize any particular conduct or behavior by GPOs."

INN's purported expert on GPOs, Lawton Burns, testified that GPOs do not engage in illegal conduct, and that an entity engaging in illegal conduct would not be behaving "consistent with what GPOs do."[56]  To the extent that INN engaged in the same improper pass-through scheme, and marketed overfill to medical providers (which is illegal),[57] INN did not act consistent with what GPOs do.  INN and Amgen also marketed monthly dosing to medical providers, which is an off-label indication, and is also illegal.[58]

**INN SOF 32**

The OIG January 2005 GPO Report found that the three GPOs "collected administrative

fee revenue of $1.8 billion for the period reviewed. Of this amount, $1.3 billion, or 72 cents of

every dollar collected, represented net revenue in excess of operating costs."  OIG January 2005

GPO Report (Exhibit 11); Expert Report of L. Burns (Exhibit 9) at 2.

**Response to SOF 32**

Relator objects that the foregoing citation to the HHS OIG Report lacks a pinpoint citation and should therefore be disregarded.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence

---

[55] *Id.*

[56] Burns Tr. 46:14-21 (App. at 848).

[57] *See* Relator's Memorandum of Law in Opposition to Amgen's Motion for Summary Judgment at Part I.C .

[58] Venus Exh. 11 at 695 (encouraging "less frequent dosing" including "100-150 mcgs/ month"); Deposition of  Angela Miele 66:10-18 (Aug. 27, 2010) ("Miele Tr.") (Resp. App. at 558); Inglese Tr. 357:16-22 (Resp. App. at 527.1); Deposition of  Louis Deppe 47:7-53:18 (Aug. 25, 2010) (Resp. App. at 485); Deposition of Tiffany Gaetano 56:5-60:19 (referencing Gaetano Exh. 5) (Oct. 21, 2010) (Resp. App. at 498-502); Deposition of Susan Seberg (Balboa Nephrology (30(b)(6)) 46:14-47:1 (Nov. 17, 2010) ("Seberg (Balboa (30(b)(6)) Tr.") (Resp. App. at 634-635); Deposition of Claes Hornstrand 105:1-25 (Oct. 14, 2010) (Resp. App. at 509); Deposition of  Jeremy Jaggi 163:5-164:13, 185:20-186:2 (Sept. 16, 2010) (Resp. App. at 535-536, 537-538).

and insufficient standing alone to support any proposition.[59]

**INN SOF 33**

GPOs often pass through a portion of their administrative fee to members in the form of additional product discounts or rebates to their members. "In exchange for administrative services and the ability to sell through a GPO to its members, vendors pay administrative fees to GPOs."  Thus, the administrative fee by definition produces a commonality of economic interest between a GPO and a vendor to sell more of the vendor's GPO-contracted products to the GPO's members.  Office of Inspector General for the Department of Health and Human Services Report, Review of Revenue From Vendors at Three Group Purchasing Organizations and Their Members, A-05-04-00073 (May 2005) ("OIG May 2005 GPO Report") (Exhibit 12); OIG January 2005 GPO Report (Exhibit 11).

**Response to SOF 33**

Relator objects that the foregoing "fact" is attorney argument, specifically, the conclusion that "Thus, the administrative fee by definition produces a commonality of economic interest between a GPO and a vendor . . . ."  Not disputed in part that the May 2005 OIG Report contains the quoted language.  Otherwise disputed.  The May 2005 Report is simply an extension of the January 2005 Report ("HHS OIG Report") based on an audit of three other GPOs and suffers from the same issues.  *See* Relator's Responses to INN SOF 31-32, *supra.*  The conclusion of the May 2005 report is similarly directed at how hospitals should fill out certain Medicare cost reports.[60]  It does not endorse or opine about what GPOs should or should not do with their administrative fees, and merely relays descriptive information about what three GPOs reported to OIG that they did, in fact, do.

**INN SOF 34**

The OIG January 2005 GPO Report also found that the GPOs retained $415 million of the $1.3 billion in net revenue to provide reserves and venture capital for new business lines. They distributed the remaining $898 million to members. *See* OIG January 2005 GPO Report (Exhibit 11); Expert Report of L. Burns (Exhibit 9) at 20.

---

[59] *See* Mem. in Support at __.

**Response to SOF 34**

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[61]

Relator objects that this paragraph fails to include a pinpoint citation to the OIG Report and should therefore be disregarded.

Disputed to the extent that INN relies on this paragraph to support its operations as legitimate.  *See* Relator's Responses to INN SOF 31-33, *supra*.

**INN SOF 35**

The OIG January 2005 GPO Report determined that: "Administrative fees paid by vendors to GPOs comprised the vast majority of revenue received by the three GPOs [the HHS OIG] reviewed. All three GPOs generated revenue from vendors' administrative fees in excess of related operating costs." OIG January 2005 GPO Report (Exhibit 11); Expert Report of L. Burns (Exhibit 9) at 20.

**Response to SOF 35**

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[62]

Relator objects that this paragraph fails to include a pinpoint citation to the OIG Report and should therefore be disregarded.

Disputed to the extent that INN relies on this paragraph to support its operations as legitimate.  *See* Relator's Responses to INN SOF 31-34, *supra*.

**INN SOF 36**

The OIG May 2005 GPO Report found that "[t]he three additional GPOs reviewed – which were among the largest in the United States – collected administrative fees revenue of $513 million during our audit period. Of this amount, $275 million represented net revenue in excess of operating costs.  The GPOs retained $58 million of the $275 million in net revenue to

---

[60] INN Exh. 12 at 6 (OIG May 2005 GPO Report).

[61] *See* Mem. in Support at __.

provide reserves and venture capital for new business lines. They distributed the remaining $217 million to members." OIG May 2005 GPO Report (Exhibit 12); Expert Report of L. Burns (Exhibit 9) at 20-21.

**Response to SOF 36**

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[63]

Relator objects that this paragraph fails to include a pinpoint citation to the OIG Report and should therefore be disregarded.  Disputed to the extent that INN relies on this paragraph to support its operations as legitimate.  *See* Relator's Responses to INN SOF 31-35, *supra*.

**INN SOF 37**

GPOs may have exclusive contracts with a single vendor, have a non-exclusive but nonetheless sole source contract with a single vendor for a particular drug within a therapeutic class, or contract with multiple sources for multiple drugs within a single therapeutic class.

Expert Report of L. Burns (Exhibit 9) at 21; *see also* GAO Report (Exhibit 8) at 5.

**Response to SOF 37**

Disputed.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[64]

To the extent the GAO Report may be considered admissible evidence, Relator states that it discusses concerns voiced by Congress over anticompetitive business practices, such as contracting with only one vendor, and linking price discounts to purchases.[65]  It is undisputed that INN engaged in precisely these practices, by giving additional discounts to INN members who purchased Aranesp through ASD, and by maintaining an exclusive and strategic partnership with Amgen.[66]

---

[62] *See* Mem. in Support at __.

[63] *See* Mem. in Support at __.

[64] *See* Mem. in Support at __.

[65] *See* INN Exh. 8 at 2 (GAO Report).

[66] *See* Venus (INN 30(b)(6)) Tr. 72:9-17, 98:7-13 (App. at 991, 998); Mullen Tr. 30:7-33:22 (App. at 944); Inglese Tr. 283:19-24 (App. at 892); Mullen Exh. 6 (App. at 297).

The cited authority does not support the proposition for which it is cited.  As described above, the GAO Report is merely presenting descriptive information about what the six sample GPOs in fact did, in order to assess the impact of codes of conduct on the size of administrative fees charged by GPOs, not to endorse or authorize exclusive or sole-source contracts between a GPO and a vendor.  *See* Relator's Response to INN SOF 29, GAO Report at 2-3 (purposes of Report).

## INN SOF 38

It is common for a GPO to work with a preferred distributor or wholesaler. Expert Report of L. Burns (Exhibit 9) at 25.

## Response to SOF 38

Disputed.

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[67]

Even the authorities cited elsewhere by INN, such as the GAO Report, rely on a small sample of GPOs (in the GAO Report's case, six hospital-based GPOs).  There is no basis set forth in INN SOF 38 to conclude that it is "common" for a GPO to work with a preferred distributor or wholesaler.

## INN SOF 39

Raj Mantena, an entrepreneur, formed INN. *See* R. Mantena Deposition (Exhibit 13) at 17:15-17:19.

## Response to SOF 39

Not disputed.

## INN SOF 40

In the early 1990s, Mr. Mantena started a specialty pharmacy company called NutriChem to supply injectable drugs to patients at home. He sold this company to PhyMatrix, a physician practice management company that acquired oncology practices. *See* R. Mantena Deposition (Exhibit 13) at 38:13-39:3,175:24-176:17, 176:21-177:24.

---

[67] *See* Mem. in Support at __.

**Response to SOF 40**

Not disputed.

**INN SOF 41**

The physician practice management model was designed to offer better pricing on

products and supplies to practices and to help practices enhance practice efficiencies. *See* R.

Mantena Deposition (Exhibit 13) at 177:25-178:20.  PhyMatrix eventually divested its assets and

sold the specialty pharmacy back to Mr. Mantena, who then sold it to Express Scripts. *See* R.

Mantena Deposition (Exhibit 13) at 179:13-180:20.

**Response to SOF 41**

Not disputed in part, disputed that INN's business model, to the extent it is derived from
the "physician practice management model," is not designed to offer better pricing to practices or
to enhance practice efficiencies, but is instead designed to offer discounts sufficient to convert
the provider to using Aranesp, increase market share for Amgen, and generate cashflow for
ABSG in the form of profit.  *See* Relator's Responses to INN SOF 12, 28.

**INN SOF 42**

Building on his experience with the physician practice management company model, Mr.

Mantena went on to create several GPOs that acted as authorized agents to negotiate contracts on

behalf of physician practices. *See* R. Mantena Deposition (Exhibit 13) at 182:7- 182:9, 185:3-

185:7, 187:21-187:23.

**Response to SOF 42**

 Disputed in part.  The cited deposition testimony does not reference multiple GPOs and
instead only refers to ION.  Relator disputes that the GPOs created by Mr. Mantena constituted
legitimate GPOs and that the physician practice management company model is appropriate for a
legitimate GPO.  *See* Relator's Responses to INN SOF 12, 28, 41 *supra.*

**INN SOF 43**

Mr. Mantena formed his first GPO, International Oncology Network ("ION"), which had

a large number of oncology drugs in its portfolio. *See* R. Mantena Deposition (Exhibit 13) at

22:11-22:14, 20:11-20:24.

**Response to SOF 43**

Not disputed in part that Mr. Mantena formed a purported GPO named the International Oncology Network ("ION") and that ION had a large number of oncology drugs in its portfolio. Disputed in part that ION was a legitimate GPO.  Mike Mullen, former Chief Financial Officer and Chief Operating Officer ("COO") of ABSG, testified that that pairing a GPO with a distributor was an AmerisourceBergen business model, and that the business model was the same across many subsidiaries.[68]  Mr. Mullen did not think that the administrative fee earned by ION was bona fide or at fair market value.[69]  This is in part because ION operated at a 900% profit, showing revenue of $100 million generated by services that cost only $10 to $20 million, which raised a red flag for Mr. Mullen as COO.[70]  Despite Mr. Mullen's then-recent promotion to COO of ABSG, and an invitation from AmerisourceBergen CEO David Yost to join the ABC Executive Management Committee, Mr. Mullen was summarily terminated by ABSG within two weeks of raising these concerns and other business issues of ABSG to Mr. Yost.[71]  *See also* Relator's S.J. Mem. and Relator's R. 56.1 Stmt.

## INN SOF 44

With the experience of ION, Mr. Mantena turned to the creation of a network of specialty

GPOs. *See* R. Mantena Deposition (Exhibit 13) at 20:11-20:24.

**Response to SOF 44**

Not disputed in part that Mr. Mantena relied on his experiences with ION in creating additional purported GPOs.  Disputed in part that the GPOs created by Mr. Mantena were legitimate.

## INN SOF 45

Compared to oncology, other specialties involved the use of a limited number of drugs.

*See* R. Mantena Deposition (Exhibit 13) at 20:11-20:24.

**Response to SOF 45**

Not disputed as to Nephrology.

---

[68] *See* Mullen Tr. 30:7-35:17 (Resp. App. at 944-945); Mullen Exh. 6 (App. at 297).

[69] *See* Mullen Tr. at 28:6-21 (App. at 943).

[70] *See id.* at 70:2-71:14 (Resp. App. at 576-577).

[71] *See id.* at 17:17-18:2 (App. at 941-942), 44:2-25 (App. at 946), 53:2-25 (App. at 947), 61:2-64:24 (App. at 948-949), 132:14-18 (App. at 952).

**INN SOF 46**

After successfully launching the oncology GPO, Mr. Mantena legally formed additional

GPOs to accommodate various specialty practices, including rheumatology, gastroenterology,

urology, nephrology, allergy, cardiology, dermatology, neurology, orthopedics, pediatrics, and

radiation. *See* R. Mantena Deposition (Exhibit 13) at 198:9-199:18.

**Response to SOF 46**

Relator objects that whether the additional GPOs were "legally formed" is a legal opinion
and not a statement of fact.  Not disputed in part that after Mr. Mantena launched ION he formed
additional purported GPOs in various specialties.  Disputed in part that the GPOs created by
Mr. Mantena were legitimate or legal.

**INN SOF 47**

Mr. Mantena consulted with Ober Kaler, a national law firm specializing in health care

law, when he formed the specialty GPOs. *See* R. Mantena Deposition (Exhibit 13) at 183:22-

184:9.

**Response to SOF 47**

Relator objects that it is impossible to admit or dispute the foregoing paragraph without
production to Relator of attorney-client communications between Ober Kaler and Mr. Mantena,
in order to assess the veracity of the foregoing paragraph.  As no such materials have been
produced, this statement is disputed.  Further disputed that Ober Kaler specializes in health law,
as its website first lists its primary focus as regulatory, transactional, and litigation services for
financial firms.[72]  Disputed as to the quality of Ober Kaler's consulting services to Mr. Mantena.
Disputed to the extent that this consultation suggests the GPOs were legitimate, or that the fact of
consultation qualifies as any form of defense to this action.  Disputed that Mr. Mantena
consulted with Ober Kaler regarding INN.

**INN SOF 48**

Ober Kaler served as external counsel for the specialty networks and advised Mr.

Mantena on the agreements entered into by INN and the other specialty GPOs that Mr. Mantena

formed. *See* R. Mantena Deposition (Exhibit 13) at 44:12-44:20, 123:5-123:15.

---

[72] *See* www.oberkaler.com.

**Response to SOF 48**

Disputed to the extent that this consultation suggests the GPOs were legitimate, or that the fact of consultation qualifies as any form of defense.  Disputed that Mr. Mantena consulted with Ober Kaler regarding INN.  Relator objects to the term "external counsel" and disputes the foregoing statement to the extent that it suggests Ober Kaler issued any form of legal opinion endorsing the legitimacy of the Mantena GPO business model or any of the specialty GPOs, including INN.  *See also*  Relator's Response to INN SOF 47.

**INN SOF 49**

Included among the network of GPOs was INN, International Nephrology Network,

whose certificate of formation was filed on October 17, 2001. *See* ABCQT-DMA0001032011

(Exhibit 14).

**Response to SOF 49**

Not disputed with clarification that INN did not start business upon formation.

**INN SOF 50**

The other specialty networks formed by Mantena included:

(a) The International Rheumatology Network, whose certificate of formation was filed on December 2, 1999. *See* ABCQT-DMA-0001032021 (Exhibit 15).

(b) The International Dermatology Network, whose certificate of formation was filed on June 20, 2001. *See* ABCQT-DMA-0001032005 (Exhibit 16).

(c) The International Gastroenterology Network, whose certificate of formation was filed on June 20, 2001. *See* ABCQT-DMA-0001032008 (Exhibit 17).

(d) The International Neurology Network, whose certificate of formation was filed on June 20, 2001. *See* ABCQT-DMA-0001032033 (Exhibit 18).

(e) The International Orthopedic Network, whose certificate of formation was filed on August 20, 2001. *See* ABCQT-DMA-0001032036 (Exhibit 19).

(f) International Allergy Network, whose certificate of formation was filed on October 17, 2001. *See* ABCQT-DMA-0001032027 (Exhibit 20).

(g) International Pediatric Network, whose certificate of formation was filed on October 17, 2001. *See* ABCQT-DMA-0001032039 (Exhibit 21).

(h) International Radiation Network, whose certificate of formation was filed on October 17, 2001. *See* ABCQT-DMA-0001032042 (Exhibit 22).

(i) The International Urology Network, whose certificate of formation was filed on October 17, 2001. *See* ABCQT-DMA-0001032024 (Exhibit 23).

(j) The International Cardiology Network, whose certificate of formation was filed on February 12, 2002. *See* ABCQT-DMA-0001032030 (Exhibit 24).

**Response to SOF 50**

Not disputed with clarification that the date of formation of these entities was not necessarily the day they started business.

**INN SOF 51**

Mr. Mantena completed the sale of ION to AmerisourceBergen Corporation in 2001. *See* R. Mantena Deposition (Exhibit 13) at 20:25-21:5.

**Response to SOF 51**

Not disputed.

**INN SOF 52**

The specialty network of GPOs, including INN, was ultimately acquired by AmerisourceBergen Corporation in 2004.  *See* R. Mantena Deposition (Exhibit 13) at 23:21-24:16, 171:8-171:10.

**Response to SOF 52**

Not disputed as to the date of acquisition, disputed that INN or any of the other GPOs were legitimate GPOs.  *See* Relator's Responses to INN SOF 12, 43, 90, 111, including specifically the quoted testimony of Mr. Mullen.

**INN SOF 53**

INN focused on serving community-based nephrologists.  *See* R. Mantena Deposition (Exhibit 13) at 20:4-20:10; ABCQT-DMA-0000427107 (Exhibit 2).

**Response to SOF 53**

Disputed.  INN's focus was not to serve nephrologists.  Rather, INN's focus, as described by Anthony Corrao, Chief Executive Officer of IPN, INN's parent company, and President and General Manager of IPN d/b/a INN, was "growing and defending Aranesp market share."[73]  Indeed, there is no dispute that INN and ASD functioned as one to sell Aranesp for Amgen.  *See* Relator GPO SOF 50, 52, 53, 54, 56, 57, 58 and accompanying cited documents.  *See also* Relator's Response to INN SOF 12, 28.

---

[73] ABCQT-DMA-0000430768 (App. at 23).

**INN SOF 54**

For anemic patients whose kidneys do not create sufficient erythropoietin, nephrologists often prescribe erythropoietin-stimulating agents, or "ESAs " to treat the anemia associated with chronic kidney disease ("CKD"). *See* C. Stemmer Deposition (Boca Nephrology P.A. 30(b)(6)) (Exhibit 25) at 96:21-97:18, 100:16-100:19; C. Cooperberg Deposition (Durham Nephrology Associates, P.A. 30(b)(6)) (Exhibit 26) at 67:23-68:18.

**Response to SOF 54**

Not disputed.

**INN SOF 55**

Amgen submitted an application to the FDA for Aranesp with a target overfill of 16.8% in December 1999.  *See* P. Swann Deposition (FDA 30(b)(6)) (Exhibit 27) at 221:1-221:6.

**Response to SOF 55**

Disputed.  Amgen submitted a biologic license application to the FDA that contained a target overfill of 16.8%.  The cited testimony nowhere states the date of the biologic license application.  Relator notes the FDA approval of the BLA contains no reference to the overfill amount.[74]

**INN SOF 56**

In 2001, the FDA approved Amgen's application for Aranesp (darbepoietin alfa) for the treatment of anemia associated with chronic renal failure, including patients receiving dialysis as well as patients not on dialysis. The indication for Aranesp use was expanded in 2002 to include treatment of anemia caused by chemotherapy in patients with some types of cancer. *See* FDA Testimony before the Subcommittee on Health, House Committee on Ways and Means, Erythropoeiesis- Stimulating Agents, Statement of John K. Jenkins, M.D., Director of the Office of New Drugs, Center for Drug Evaluation and Research, June 26, 2007,

---

[74] *See* AMGEN-BST0000856116-149 (Resp. App. at 131-164).

http://www.fda.gov/NewsEvents/Testimony/ucm1 10908.htm, accessed February 27, 2011

(Exhibit 28).

**Response to SOF 56**

Disputed in part.  Not disputed to the extent that the FDA approved Amgen's BLA application for Aranesp in 2001 and that the BLA was thereafter expanded it in 2002, disputed to the extent that this approval applies in any way to authorize the administration or billing of overfill.  To the extent that INN and ASD's brief appears to rely on any approval of the BLA as an approval of the administration or billing of overfill, Relator disputes that assertion as not supported by this SOF or the FDA.  The FDA Rule 30(b)(6) witness, Patrick G. Swann, confirmed two central components of Relator's claims.  First, the FDA takes the position that the purpose of overfill is to "allow for a consistent delivery of the labeled material."[75]  Second, the FDA takes the position that only the labeled amount of an injectable drug should be administered to patients.  Mr. Swann confirmed that "the agency would be concerned if excessive amounts were being delivered to the patient such that the patient was receiving doses in excess of the labeled amount."[76]

With respect to approval of the target amount of overfill contained in a drug's BLA, Mr. Swann testified that the FDA is concerned with ensuring that sufficient drug product exists in the vial to withdraw the labeled amount and also that there is not so much drug product in the vial that HCPs or patients would tend to inadvertently overdose themselves.[77]  The FDA's approval of Aranesp's BLA is not an endorsement of the overfill amount and does not authorize the inclusion of more overfill than necessary to withdraw the labeled amount.[78]

**INN SOF 57**

Since Aranesp's approval, vials of Aranesp have included overfill. *See* P. Swann

Deposition (FDA 30(b)(6)) (Exhibit 27) at 140:20-141:7, 221:1-221:6.

**Response to SOF 57**

Not disputed that vials of Aranesp have included overfill since Aranesp's launch. Disputed to the extent that none of the cited testimony establishes that Aranesp had overfill since Aranesp's approval.

---

[75] Deposition of Patrick Swann 87:9 (Nov. 3, 2010) ("Swann Tr.") (Resp. App. at 658).

[76] *Id.* at 105:11-13 (Resp. App. at 660).

[77] *Id.* at 95:7-9, 172 (Resp. App. at 658, 662).

[78] *Id.* at 95:7-9, 127 (Resp. App. at 658, 661).

**INN SOF 58**

There are a small number of drugs that can administered by nephrologists in their offices.

*See* A. Corrao Deposition (Exhibit 29) at 207:2-207:14.

**Response to SOF 58**

Disputed in part.  Not disputed that the deponent made a statement that there were limited options for drugs to be administered under circumstances when he began employment but the testimony does not directly support this specific statement..  this statement.

**INN SOF 59**

Prior to the approval of Aranesp, Procrit (epoetin alfa) was the only pre-dialysis ESA

sold in the United States. *See* M. Narachi Deposition (Exhibit 30) at 212:16-213:5.

**Response to SOF 59**

Disputed to the extent that "pre-dialysis ESA" has not been defined herein.  Relator does not dispute that prior to the approval of Aranesp, Procrit was the only ESA approved by the FDA and sold in the United States for use in a non-dialysis setting, such as by a nephrologist to treat Chronic Kidney Disease.

**INN SOF 60**

In 2002, a year after Mr. Mantena officially formed INN, he approached Amgen, the

manufacturer of Aranesp, about the possibility of entering into a GPO contract with INN. *See* R.

Mantena Deposition (Exhibit 13) at 215:10-215:16.

**Response to SOF 60**

Not disputed in part, disputed to the extent that INN was not a legitimate GPO.

**INN SOF 61**

Scott Carmer, Amgen's Marketing Director for Aranesp in Chronic Kidney Disease,

rejected Mr. Mantena's proposal for a partnership between Amgen and INN. *See* S.Carmer

Deposition (Exhibit 31) 109:20-110:4; R. Mantena Deposition (Exhibit 13) at 215:17- 216:13.

**Response to SOF 61**

Not disputed.

**INN SOF 62**

After Amgen rejected Mr. Mantena's proposal to partner with INN, Mr. Mantena

presented the same concept to Ortho Biotech, Inc. ("Ortho Biotech"), the company who markets

Procrit.  *See* R. Mantena Deposition (Exhibit 13) at 216:14-216:25.

**Response to SOF 62**

Not disputed that Mr. Mantena testified that he had presented the GPO concept to Ortho
Biotech.

**INN SOF 63**

Ortho Biotech informed Mr. Mantena that they were not interested in the proposal

because they believed he was already contracting with Amgen for ESAs in the oncology

specialty.  *See* R. Mantena Deposition (Exhibit 13) at 216:25-217:8.

**Response to SOF 63**

Not disputed that Mr. Mantena testified that Ortho Biotech were not interested in the
proposal for the reason stated.

**INN SOF 64**

Mr. Mantena continued to pursue contracts with both Amgen and Ortho Biotech,

believing that INN would be successful because community nephrologists would embrace the

idea of using ESA drugs in the office setting, which would delay dialysis and improve patient

care. *See* R. Mantena Deposition (Exhibit 13) at 218:3-219:15; S. Carmer Deposition (Exhibit

31) at 110:16-110:25.

**Response to SOF 64**

Not disputed that Mantena believed that INN would be successful because community
nephrologists would embrace the idea of using ESA drugs in the office setting.  Disputed that
Mantena continued to pursue contracts with Ortho Biotech.  None of the cited testimony shows
that Mantena continued to pursue contracts with Ortho Biotech.

**INN SOF 65**

In September 2003, Amgen and INN entered into a GPO contract for Aranesp. *See* ABCQT-DMA-0000432651 (Exhibit 32).

**Response to SOF 65**

Not disputed.

**INN SOF 66**

When INN and Amgen executed the GPO agreement in September 2003, INN already had 180 members signed to its membership agreement. *See* ABCQT-DMA-0000677159 (Exhibit 33).

**Response to SOF 66**

Not disputed in part, disputed to the extent that INN was not a legitimate GPO.

**INN SOF 67**

The GPO contract was not exclusive and did not prevent INN from also negotiating with Ortho Biotech or any other company or pharmaceutical manufacturer. *See* ABCQT-DMA-0000432651 (Exhibit 32).

**Response to SOF 67**

Disputed.  INN's 30(b)(6) representative testified that when INN entered into the GPO contract, INN considered Amgen to be its exclusive partner.[79]  While the GPO agreement does not contain any provision requiring or rejecting exclusivity, the termination clause allows Amgen to terminate the GPO Agreement at any time without cause.[80]  INN sold Aranesp for Amgen in order to increase Amgen's market share.  *See* Relator GPO SOF 73, 50-58.  At one point, the administrative fee payments that INN received from Amgen were actually *based* on Aranesp market share.  *See* Relator GPO SOF 21.  And it was INN's goal to sell Aranesp for Amgen.  *See* Relator's Response to INN SOF 93.  INN offered "unique" discounts to large medical providers on which Amgen placed especially high value.[81] The GPO arrangement between Amgen and INN, while formally saying nothing about exclusivity, effectively prohibited INN from

---

[79] *See* Venus (INN 30(b)(6)) Tr. 98:3-13 (App. at 998).

[80] ABCQT-DMA-0000432651 at 654 (Amgen-INN GPO Agreement ¶ 12) (Resp. App. at 727).

[81] *See* DNA Exh. 2, ABCQT-DMA-0000600373 (Resp. App. at 183); RELATOR-KW-0004971 (Resp. App. at 723).

contracting with Amgen's competitor Ortho Biotech, even if Amgen had approached Ortho before entering into the GPO agreement with Amgen.

## INN SOF 68

The GPO agreement provided that INN would receive an administrative fee from Amgen

in the amount of 3% of Aranesp sales to INN members. *See* ABCQT-DMA-0000432651

(Exhibit 32) at 2653.

## Response to SOF 68

Not disputed in part and disputed in part. INN received an administrative fee from Amgen based on Aranesp sales, which was fixed at 3% of such sales, except between April 1, 2004 to August 14, 2004 when the fee was fixed at 1% of sales plus 2% earned through growth of INN member's purchases of Aranesp, as measured by how much the market share captured for Aranesp increased (as compared to the competitor drug, Procrit).[82] INN's Rule 30(b)(6) witness testified that during the period when the administrative fee was lowered to 1%, plus up to 2% earned, the administrative fee was not "allocated" to any particular INN member, even though it was no longer automatically measured as 3% of all Aranesp sales.[83]

## INN SOF 69

INN entered into written agreements with members that disclosed the 3% administrative

fee. The membership agreement read, "One program offered to Members by INN is a group

purchasing function that has been negotiated with vendors of a variety of goods and services. In

that regard, the parties acknowledge that vendors from whom goods or services are purchased by

Members may pay to INN an administrative fee, the percentage of which will vary but will be no

more that [sic] Three percent (3%) of the value of the purchases, unless Members receive

advance notice of such fees. If the Member is an entity that is a health care provider of services,

INN shall disclose in writing to the entity, at least annually, the fee amount received from each

---

[82] *See* Venus (INN 30(b)(6)) Tr. 78:16-21 (App. at 993); Venus Exh. 4 at ABCQT-DMA-0000521214-0000521216 (App. at 90-92); Deposition of Joseph Sodano (Amgen 30(b)(6)) 8:8-22 (Oct. 20, 2010) (App. at 977); Sodano Exh. 2 at AMGEN-BST0000018003-0000018005 (App. at 188-190).

[83] *See* Venus (INN 30(b)(6)) Tr. 78:18-79:8 (App. at 993).

vendor with respect to purchases made by [or] on behalf of the entity." *See* 42 C.F.R. §

1001.952(j); ABCQT-DMA-0000466198 (Exhibit 34).

**Response to SOF 69**

 Not disputed that the cited membership agreement, signed by Anupa Khastgir in
Oklahoma City, contains the cited text.

**INN SOF 70**

 INN notified its members annually of "the amount received from each vendor with

respect to purchases made by or on behalf of the [member]." 42 C.F.R. § 1001.952(j); W. Venus

Deposition (INN 30(b)(6)) (Exhibit 35) at 76:24-78:3; ABCQT-DMA-0000465949 (Exhibit 36).

**Response to SOF 70**

 Disputed.  Relator incorporates the undisputed facts regarding the deficiencies (and
failure)  in INN's annual notification from Relator's R. 56.1 Stmt.  *See* GPO SOF 93-101.

**INN SOF 71**

 ASD was INN's preferred wholesaler. *See* D. Smitley Deposition (Exhibit 37) 207:3-

207:18.

**Response to SOF 71**

 Not disputed that ASD was INN's preferred wholesaler, but disputed to the extent that
this statement implies that ASD and INN's are distinct entities who did not act together to market
and sell Aranesp for Amgen.  *See* Relator's R. 56.1 Stmt. 60-87.  For example, when asked
whether INN and ASD sold the same drugs in terms of revenue, Evan Gremont, who worked at
both INN and ASD, testified that "ASD was the preferred wholesaler for INN, but, you know, in
looking at that, they were very similar."[84]

**INN SOF 72**

 However, INN members could and did choose other wholesalers instead of ASD. See

AMGEN-BST0000947197 (Exhibit 38).

**Response to SOF 72**

 Disputed.  While a handful of INN members chose wholesalers other than ASD, the vast

---

[84] Deposition of Evan Gremont 33:12-19 (Oct. 18. 2010) ("Gremont Tr.") (Resp. App. at 506).

majority of Aranesp purchases by INN members were through ASD healthcare.[85]  This is
because INN gave its members discounts that they could receive only if they purchased Aranesp
through ASD.[86]  In order to receive these discounts, INN members signed declaration forms that
required the purchase of Aranesp through ASD.[87]  Moreover, INN's GPO agreement with
Amgen required INN to identify any additional wholesalers added by INN other than ASD
Healthcare.[88]

## INN SOF 73

INN passed onto ASD one third of the 3% administrative fee it received from Amgen "to

reimburse ASD for certain pricing discounts that ASD provides to INN's members and certain

distribution services performed related to the GPO agreement." *See* ABCQT-DMA0001043507

(Exhibit 39), ABCQT-DMA-0000432992 (Exhibit 40), ABCQT-DMA-0001043508 (Exhibit 41)

## Response to SOF 73

Not disputed that the cited document contains the quoted language, and that the 1% pass-
through from INN to ASD was then passed through from ASD to INN members in the form of a
discount.  Disputed that the actual purpose of the pass-through was to reimburse ASD for
distribution services.  The pass-through was so vital to ASD's operations that when Amgen
reduced the administrative fee that it paid to INN from 3% to 1% plus a success fee in 2004,
ASD stated that it could no longer afford to offer discounted pricing to INN members if the pass-
through ceased.  *See* Relator's R. 56.1 Stmt. 79-81.

## INN SOF 74

INN's use of a portion of the GPO fees it received from vendors to provide more

favorable pricing to members was consistent with standard industry practice of GPOs. *See* Expert

Report of L. Burns (Exhibit 9) at 8; *see also* OIG January 2005 GPO Report (Exhibit 11); OIG

May 2005 GPO Report (Exhibit 12).

## Response to SOF 74

Disputed.  Relator objects that the unsworn declaration of INN's expert is not admissible

---

[85] *See* Venus (INN 30(b)(6)) Tr. 171:22-172:2 (App. at 999).

[86] ABCQT-DMA-0000431312 (App. at 542); ABCQT-DMA-0000432651 at 0000432660 (App. at 553);
Inglese Tr. 131:18-132:8 (App. at 885).

[87] ABCQT-DMA-0000431312 (App. at 542); ABCQT-DMA-0000432651 at 0000432660 (App. at 553).

[88] ABCQT-DMA-0000432651 at 0000432652 (Amgen-INN GPO Agreement ¶ 4) (App. at 545).

evidence and insufficient standing alone to support any proposition.[89]

      With respect to the HHS OIG (January 2005) Report contains no endorsement or approval of the practice of providing more favorable pricing to members through pass-through of GPO fees.  The Report explicitly states that the Department of Health and Human Services "does not directly 'regulate' GPOs."[90]  It is therefore explicitly beyond the scope of the report whether GPOs may provide more favorable pricing to their members through the pass-through of administrative fees.  The Report makes clear that its purpose is to provide descriptive, factual information about three large GPOs to hospitals, in order to help the hospitals properly comply with Medicare regulations that "provide guidance on the reporting of rebates that hospitals receive from vendors."[91]  The cover letter to the report makes clear that one of the central recommendations of the report is to encourage CMS to "provide specific guidance [to hospitals] on the proper Medicare cost report treatment of net revenue distributions received from GPOs."[92]  The May 2005 Report is simply an extension of the January 2005 Report based on an audit of three other GPOs and suffers from the same issues.  The conclusion of the May 2005 report is similarly directed at how hospitals should fill out certain Medicare cost reports.[93]  It does not endorse or opine about whether a GPO may pass through payments to its members.

      INN's behavior was not "consistent with standard industry practice."  To the contrary, the relationship between Amgen, INN, and ASD, and specifically INN's behavior, was anything but standard.  As described in Relator's R. 56.1 Stmt., incorporated herein by reference, the exact structure of the Mantena GPOs was imprecise, with INN at times being described as a "doing business as" of other entities and other times appearing to have separate corporate structures.[94]  *See* Relator's R. 56.1 Stmt. 1-16.  INN and ASD acted as one to sell Aranesp for Amgen. *See id.* 50-78.  The fact that the same corporate parent owns both the purported GPO and the purported wholesaler raised red flags even for Amgen, which contemporaneously accused its competitor, Ortho Biotech ("Ortho") of engaging in the very same wholesaler pass-through scheme.  Amgen accused Ortho of being "responsible for the passing on of discounts or other incentives through the specialty wholesaler, Priority," much as Amgen passed discounts through INN to ASD Healthcare and ultimately to health care providers.[95]  Amgen also accused Ortho of "blatantly promoting the economics of Procrit over Aranesp," which Amgen itself has done in this case.[96]  Amgen characterized the pass-through scheme (and the marketing of economics) as "inappropriate marketing tactics" that are "not healthy for the industry as a whole" and that

---

[89] *See* Mem. in Support at __.

[90] INN Exh. 11 at i (HHS OIG Report).

[91] *Id.*

[92] *Id.* at ii.

[93] *Id.* at 6.

[94] *See* Venus (INN 30(b)(6)) Tr. 8:6-10:15 (App. at 984-985); Deposition of Mitchell McClain (ASD 30(b)(6)) 43:7-13 ("McClain (ASD 30(b)(6)) Tr.") (App. at 919); Corrao Tr. 216:17-25 (App. at 866); Corrao Exh. 11 (App. at 13); Deposition of Craig Stemmer 58:17-59:1 (Sept. 23, 2010) ("Stemmer Tr.") (App. at 981).

[95] AMGEN-BST0004899911 (App. at 299); AMGEN-BST0004882640 (App. at 302).

[96] AMGEN-BST0004899911 (App. at 299).

Amgen was "amazed that Ortho would sanction" such conduct, particularly in light of "the current legal environment."[97]

INN's purported expert on GPOs, Lawton Burns, testified that GPOs do not engage in illegal conduct, and that an entity engaging in illegal conduct would not be behaving "consistent with what GPOs do."[98]  Because INN engaged in the same improper pass-through scheme, and marketed overfill to medical providers (which is illegal), INN did not act consistent with what GPOs do.[99]  *See* Relator's Response to INN SOF 91, *infra*.

## INN SOF 75

INN entered into similar agreements with ASD with respect to other products in INN's GPO portfolio. ASD and INN entered into a Memorandum of Understanding where INN agreed to pay ASD 1% of the administrative fee it received from American Regent pursuant to the terms of the American Regent GPO agreement for Venofer, a product used to treat iron deficiency anemia. *See* ABCQT-DMA-0001043509 (Exhibit 42). ASD and INN also entered into a Memorandum of Understanding where INN agreed to pay ASD 0.5% of the administrative fee it received from Watson Pharmaceutical pursuant to the terms of the Watson Pharmaceutical GPO agreement for Ferrlecit, another product used to treat iron deficiency anemia. *See* ABCQTDMA-0000432701 (Exhibit 43).

## Response to SOF 75

Relator objects that whether the agreements were similar is opinion testimony or attorney argument.  Disputed that the amount of the pass-through to ASD was 1% of the administrative fee rather, it was one-third.  Not disputed in part, but disputed to the extent that neither exhibit identifies the product to which the agreement applies.

## INN SOF 76

In December 2006, INN and Amgen entered into a new GPO Agreement that included the following: "No Admin Fees paid by Amgen to Purchasing Group for services rendered

---

[97] AMGEN-BST0004899911 (App. at 299); AMGEN-BST0004882640 (App. at 302).

[98] Burns Tr. 46:14-21 (App. at 848).

[99] *See* Relator's Memorandum of Law in Opposition to Amgen's Motion for Summary Judgment at Part I.C .

hereunder shall be distributed, directly or indirectly, in whole or in part, to any member of, or

other client or customer of, Purchasing Group." *See* ABCQT-DMA-0000434333 (Exhibit 44) at

434337.

**Response to SOF 76**

Not disputed in part, disputed to the extent that INN is not a legitimate GPO.

**INN SOF 77**

This amendment memorialized the fact that after September 30, 2006, INN no longer paid

ASD a percentage of Aranesp sales to INN members. *See* M. McClain Deposition (ASD

30(b)(6)) (Exhibit 45) at 20:19-20:21.

**Response to SOF 77**

Relator objects that whether an amendment memorializes something is a legal opinion.
Otherwise disputed.  INN's 30(b)(6) representative testified that precisely the opposite is the
case.  He testified that the "contractual" change caused by the amendment described in ¶ 76
above did not change how INN and ASD actually operated because ASD remained able to offer
additional discounts to particular INN members due to the common ownership of INN and
ASD.[100]  According to INN's own 30(b)(6) witness, the pass-through of Amgen administrative
fees *remained in place* as a matter of economic reality, because the "economics are the same"
before and after the amendment.[101]  ASD's 30(b)(6) also confirmed that, even after the pass-
through stopped, ASD continued to provide extra discounts to particular INN members,[102] even
though ASD had previously claimed that it could not do so if the pass-through ceased.[103]

**INN SOF 78**

Beginning in 2003, INN offered Aranesp as one of the products in its GPO portfolio. *See*

ABCQT-DMA-0000432651 (Exhibit 32).

---

[100] *See* Venus (INN 30(b)(6)) Tr. 88:23-89:2 (App. at 995).

[101] *Id.* at 89:3-21 (App. at 995); *see id.* at 83:20-89:21 (App. at 994-995).

[102] *See* McClain (ASD 30(b)(6)) Tr. 82:17-19 (App. at 925).

[103] *See* Venus (INN 30(b)(6)) Tr. 87:23-88:16 (App. at 995); Venus Exh. 4 (Resp. App. __); Inglese Tr.
216:7-217:21 (App. at 887); 225:8-14 (App. at 888); Inglese Exh. 11 at RELATOR-KW-0004580-
0004584 (App. at 661-665).

**Response to SOF 78**

Not disputed that INN offered Aranesp, but disputed that Aranesp was merely one of the products in its GPO portfolio.  The cited document contains no reference to any drug other than Aranesp.  A "very high percentage" of INN's revenue was attributable to Aranesp.[104]  The "vast majority" of INN's sales were related to Aranesp.[105]  Amgen's Aranesp was by far the largest component of INN's portfolio, and the administrative fee from Amgen "absolutely" represents the "majority" of total administrative fee revenue received by INN.[106]  And Admin fees are the way that INN made money, because they funded INN's operations, profits, overhead, and total business operations.[107]

**INN SOF 79**

Early in its existence, INN's portfolio included Amgen's Aranesp, American Regent's

Venofer and Watson's Ferrlecit and Infed, as well as GE Lunar's DEXA scanning and

ultrasound equipment, and CRI software. *See* ABCQT-DMA-0000076956 (Exhibit 46);

ABCQT-DMA-0000518467 (Exhibit 47); ABCQT-DMA-0000669053 (Exhibit 48).

**Response to SOF 79**

Relator objects that "early" in an opinion not a fact.  Otherwise not disputed with explanation that Amgen's Aranesp was by far the largest component of INN's portfolio, and the administrative fee from Amgen "absolutely" represents the "majority" of total administrative fee revenue received by INN.[108]

**INN SOF 80**

In December 2008, INN entered into a GPO agreement with Ortho Biotech for Procrit.

*See* ABCQT-DMA-0000435607 (Exhibit 49).

**Response to SOF 80**

Not disputed in part, disputed to the extent that INN was not a legitimate GPO.

---

[104] Corrao Tr. 129:12-18 (Resp. App. at 479).

[105] Inglese Tr. 82:21-24 (Resp. App. at 531).

[106] *See* Venus (INN 30(b)(6)) Tr. 215:17-20 (App. at 1005).

[107] *See* Corrao Tr. 219:6-220:16 (Resp. App. at 480-481).

[108] *See* Venus (INN 30(b)(6)) Tr. 215:17-20 (App. at 1005).

**INN SOF 81**

By the end of 2008, INN's portfolio had expanded to include Ortho Biotech's Procrit, as well as arrangements with a number of other pharmaceutical companies, including Baxter Anesthesia and Critical CR, Fougera Co., GlaxoSmithKline, JHP Pharmaceuticals, Monarch/King Pharmaceuticals, Merck, and Cura Pharmaceuticals. *See* Expert Report of L. Burns (Exhibit 9) at 38; ABCQT-DMA-0000094445 (Exhibit 50).

**Response to SOF 81**

Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[109]

Moreover, the documents cited by Burns in his report contain no reference to Critical CR, Fougera Co., JHP Pharmaceuticals, Monarch/King Pharmaceuticals, Merck, or Cura Pharmaceuticals.

**INN SOF 82**

INN also offered other services through La-Z-Boy Inc. furniture, MEI diagnostic equipment, Medline medical supplies, Melnor copiers, Nephrology Clinical Solutions educational services, and the Renal Physicians Association. *See* Expert Report of L. Burns (Exhibit 9) at 38; ABCQT-DMA-0000594663 (Exhibit 51).

**Response to SOF 82**

Disputed.  Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[110]

The other cited document (which is also the only document upon which Burns himself relies in his Report) contains no reference to Medline medical services, Melnor copies, Nephrology Clinical Solutions educational services, or the Renal Physicians Association.

---

[109] *See* Mem. in Support at __.

[110] *See* Mem. in Support at __.

**INN SOF 83**

One of INN's functions as a GPO was to discuss with its physician membership the

economics of their practices and to help maximize the economics of physicians' practices within

their membership. *See* A. Miele Deposition (Exhibit 52) at 193:3-193:8, 194:21-195:3.

**Response to SOF 83**

Not disputed to the extent that INN discussed with physicians the economics of their
practices, and that such discussion was one of INN's functions.  Disputed to the extent that this
behavior was one of INN's functions as a GPO.  INN was not a legitimate GPO, and any
discussions about overfill, including as source of profit through Medicare reimbursement, were
not properly the function of a GPO.

An employee of a medical distributor company called AMD contemporaneously
criticized INN (specifically Shelly Huttar) for pitching Aranesp to a medical provider based on
economics.  She wrote, "I don't understand why $ is being discussed in the Nephrology office
practice when INN is a service and GPO company."[111]  She added that such topics "should be
sent to the ASD inside sales team," recognizing the blurred lines between INN and ASD.[112]
Huttar ultimately forwarded the message to Evan Gremont of ASD.[113]

**INN SOF 84**

Like other GPOs, INN discussed with its provider members the economics of the

purchasing decisions they made. INN did so in the form of financial spreadsheets that illustrated

the product cost and reimbursement implications of their choice of one product over another.

*See* Expert Report of L. Burns (Exhibit 9) at 49; ABCQT-DMA-0000520946 (Exhibit 53).

**Response to SOF 84**

Not disputed to the extent that INN discussed economics with its members and used
financial spreadsheets to illustrate the cost and reimbursement of Aranesp as compared to other
products, such as Procrit.  Disputed to the extent that INN's conduct was similar to other GPOs,
including because INN marketed Aranesp based on the overfill that it contained.  Relator objects
that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing
alone to support any proposition.[114]

---

[111] ABCQT-DMA-0000603399 (Resp. App. at 68).

[112] *Id.*

[113] *Id.*

[114] *See* Mem. in Support at __.

Further disputed to the extent that paragraph 84 suggests that the spreadsheets or discussions of economics did not involve overfill. The financial spreadsheets used by INN included overfill. Steve Reichenbach, who was a regional director at INN, testified that a "number" of INN employees had overfill spreadsheets,[115] that there were "a bunch floating around," and that he "assumed" everyone at INN had one.[116] For example, INN SAM Dan Smitley made a presentation to a medical provider that contained an overfill calculator spreadsheet in the middle of the page.[117] The spreadsheets used by INN SAMs showed providers the profit they could make by billing Medicare for overfill.[118] Reviewing practice "economics" or "profitability" *is synonymous with* overfill marketing, because overfill was either included in the spreadsheets themselves, which are also known as "ARACALC," or was discussed along with them.[119] INN created a "Nephrology Backgrounder"[120] that explained how to market Aranesp based on overfill, and which included the following information:[121]

> Both Aranesp & Procrit Multi-use vials have a certain amount of overfill. Since Amgen makes both products however, it is logical that they would give an advantage to Aranesp. If you calculate it out, an office can get an extra dose for every 10 vials of Procrit but it only takes 7 vials to get the extra dose with Aranesp. Ex. in the 100mcg vial of Arenesp there is 116 mcg. You could also give the full 116 mcg (instead of 100mcg) bill and be reimbursed for the entire 116mcg.

Moreover, Anthony Corrao confirmed that INN SAMs discussed "seeking reimbursement for overfill in vials of Aranesp with a provider."[122] Amgen told Corrao how much overfill was in

---

[115] Deposition of Shelley Huttar, Exh. 2 at ABCQT-DMA-0000082157 (Oct. 12, 2010) ("Huttar Tr.") (App. at 483); Huttar Exh. 3 at ABCQT-DMA-0000430551 (App. at 502); Huttar Exh. 4 at ABCQT-DMA-0000427043 (Resp. App. at 241); Huttar Exh. 26 at ABCQT-DMA-0000097352 (Resp. App. at 203); Huttar Exh. 27 at ABCQT-DMA-0000430159 (Resp. App. at 288); Gremont Exh. 15 at ABCQT-DMA-0000097352 (Resp. App. at 203); McClain Exh. 15 at ABCQT-DMA-0000604758 (App. at 541); Venus Exh. 3 at ABCQT-DMA-0000521116 (Resp. App. at 303); Venus Exh. 10 at ABCQT-DMA-0000427051 (Resp. App. at 249).

[116] Deposition of Steven Reichenbach 156:9-13, 157:16-21 (Sept. 20, 2010) ("Reichenbach Tr.") (Resp. App. at 617-618).

[117] ABCQT-DMA-0000428049-082 (Resp. App. at 16-49).

[118] *See* Huttar Exh. 4 at ABCQT-DMA-0000427043-044 (Resp. App. at 241-242).

[119] Declaration of John Sowersby ¶ 10 (Nov. 26, 2010) ("Sowersby Decl.") (describing how "Aranesp was shown to be more profitable than Procrit, particularly when the Aranesp overfill was included in the calculation which was also discussed in addition to the spreadsheet") (App. at 253); ABCQT-DMA-0000091678 (John Sowersby referring to ARACALC) (Resp. App. at 7).

[120] *See* ABCQT-DMA-0000427667 (Resp. App. at 12).

[121] INN's Rule 30(b)(6) witness stated that INN sales representatives used sales "cheat sheets," that he reviewed this document in preparation for his deposition, and that he would call the document an INN sales "cheat sheet." Venus (INN 30(b)(6)) Tr. 112:8-25 (Resp. App. at 677A). The metadata provided with the "Nephrology Backgrounder" indicates that it was found in INN sales representative Shelley Huttar's files, that the file was dated May 1, 2006 and came from another sales representative in the INN group, Karen Byrnes-Rojas, supporting the inference that it was circulated among and used by INN employees.

[122] Corrao Tr. 107:6-11 (Resp. App. at 475).

Aranesp vials.[123]

## INN SOF 85

INN had a team of Strategic Account Managers ("SAMs") who would call on

nephrologists and medical providers not only to recruit them for INN membership, but also to

explain the full portfolio of services that were offered. *See* W. Venus Deposition (INN 30(b)(6))

(Exhibit 35) at 35:19-36:2.

## Response to SOF 85

Not disputed to the extent that INN SAMs would call on nephrologists and medical
providers to recruit them for INN membershop.  Disputed to the extent that Paragraph 85 tends
to show that INN SAMs explained INN's full portfolio.  To the contrary, INN SAMs' primary
goal was to market Aranesp for Amgen,[124] and specifically to "convert providers that were using
Procrit to use Aranesp," according to INN Executive Vice President of Sales and Marketing, IPN
President, and former Amgen employee, Anthony Corrao.[125]  Steve Reichenbach, a former SAM
and regional director at INN, testified that INN's "goal" was "to increase the sales of
Aranesp."[126]

## INN SOF 86

Specifically, INN SAMs believed they were operating under a "safe harbor" that allowed

them to discuss economics with medical providers. A. Miele Deposition (Exhibit 52) at 23:15-

24:8, 192:22-195:6; S. Reichenbach Deposition (Exhibit 54) at 33:17-34:10; S. Huttar

Deposition (Exhibit 55) at 60:8-60:11.

## Response to SOF 86

---

[123] *See id.* at 109:4-11 (Resp. App. at 476).

[124] Venus (INN 30(b)(6)) Tr. 174:25-175:9 (App. at 1000), 175:17-176:2 (App. at 1000); *see* Inglese Tr.
130:4-6 (App. at 885), 204:4-7 (App. at 886); Deposition of Christopher Coates 198:23-25 (Aug. 24,
2010) (App. at 860); Deposition of Joe Campagnuolo 95:4-96:4 (Oct. 4, 2010) (App. at 855); Deposition
of Matt Skelton 203:2-22 (Sept. 14, 2010) (App. at 971); Deposition of Steve Reichenbach 176:4-10
(Sept. 20, 2010) (App. at 969); Corrao Tr. 69:25-70:13 (App. at 862-863); Deposition of Dan Smitley
123:8-15 (Sept. 28, 2010) (App. at 974); Gremont Tr. 57:5-58:3 (App. at 872-873).

[125] *See* Corrao Tr. 69:25-70:13 (App. at 862-863).

[126] Reichenbach Tr. 176:4-15, 41:3-7 (Resp. App. at 599, 621).

Disputed.  INN SAMs knew that encouraging medical providers to bill for overfill was unlawful or improper, and not merely against company policy.  *See* Relator's Responses to INN SOF 87-91, *infra*.  And their conduct did not fool medical providers, one of whom put it bluntly: when asked "Do you think there would be anything wrong with billing for overfill?" she answered "It's illegal."[127]

INN employees knew that discussions of economics, including overfill, were unlawful or improper.  Anthony Corrao testified that for companies like Amgen, "I believe it's illegal for companies to talk about the spread."[128]

Relator incorporates by reference her Responses to INN SOF 87-91, which all address similar issues.

## INN SOF 87

Gary Inglese, Director of Sales and Marketing, testified that he understood the term "safe harbor" to reference the ability of a GPO to discuss economics with its physician membership.

G. Inglese Deposition (Exhibit 56) at 17:9-17:11; 70:8-72:2.

### Response to SOF 87

Relator incorporates her Response to INN SOF 91, specifically the documents and testimony showing that Gary Inglese understood that marketing overfill to medial providers was unlawful.  Relator further incorporates her Responses to INN SOF 85-90.

## INN SOF 88

INN SAM Angela Miele testified that her understanding was that INN fell under a safe harbor that allowed it to discuss ways that its practice members could maximize economic value.

A. Miele Deposition (Exhibit 52) at 192:22-195:6.

### Response to SOF 88

Disputed.  Drawing adverse inferences in Relator's favor, and viewed as a whole, the deposition testimony and documentary evidence creates a genuine issue of fact as to whether Angela Miele understood that marketing overfill was unlawful.

Like a number of others, Miele worked first at Amgen before joining INN.[129]  She called

---

[127] Deposition of Stephanie Skinner 36:24-37:4 (Oct. 19, 2010) (Resp. App. at 638-639).

[128] Corrao Tr. 91:4-5 (Resp. App. at 473).

[129] *See* Huttar Tr. 9:1-21 (Resp. App. at 511).

Anthony Corrao, who had left Amgen to join INN, and he brought her to INN.[130]   Corrao was the individual who told Miele that INN operated in a "safe harbor."[131]   Because Miele understood that Amgen sales reps could not talk about profit margins with medical providers so, by pre-arrangement, Amgen sales reps would leave the room when she addressed this topic.[132]   This practice was "typical."[133]   However, overfill was "controversial," and she was told by both Amgen and INN that she could not discuss overfill, despite the safe harbor.[134]   This never caused confusion with the Amgen sales reps, however, because Miele would tell them beforehand what she was going to discuss.[135]   This arrangement worked with every Amgen rep that Miele ever worked with, including Joe Campagnuolo, Brian Bagdan, and Adrienne Markisz.[136]   The purpose of this arrangement was that Miele "did not want to be seen as an Amgen sales representative."[137]

Miele demonstrated knowledge that it was wrong to discuss overfill with medical providers when she testified that INN only discussed overfill to say that it should not be used.[138] This is in stark contrast to the declaration of John Sowersby, who Miele said she worked with at INN and acknowledged was her "counterpart" at INN.[139]   Sowersby agreed he worked with Meile and that he was his "counterpart" and stated that marketing Aranesp based on overfill was a "routine sales practice."[140]   Miele and others at INN were instructed by Gary Inglese "Do not leave a calculator / comparison spreadsheet with any client."[141]   But if INN were actually operating in a safe harbor, there should be no problem with doing so.  Despite Miele's understanding that Amgen and INN could not talk about overfill,[142] she instructed Amgen rep Adrienne Markisz to discuss overfill with a medical provider.[143]   When asked about this statement, Miele denied speaking to physicians about overfill, then appeared to backtrack by stammering that what she wrote was "just a blanket statement" and said "I don't—I don't

---

[130] *See* Miele Tr. 14: 14-15:2 (Resp. App. at 544-545).

[131] *Id.* at 15-23 (Resp. App. at 545, 545.1-545.8).

[132] *See id.* at 24:24-25:8 (Resp. App. at 546-547).

[133] *Id.* at 62:12-22 (Resp. App. at 555).

[134] *Id.* at 30:14-31:3, 31:17-25 (Resp. App. at 548-549).

[135] *See id.* at 66:2-9 (referring to Amgen PSR Mike Ricciardi) (Resp. App. at 558).

[136] *See id.* at 68:12-16 (Resp. App. at 559).

[137] *Id.* at 69:19-70:14 (Resp. App. at 560-561).

[138] *See id.* at 33:11 (Resp. App. at 550).

[139] *Id.* at 47:3-19 (Resp. App. at 554).

[140] Sowersby Decl. ¶¶ 4, 8 (App. at 252-253).

[141] Miele Exh. 19 (Resp. App. at 339).

[142] *See* Miele Tr. 30:14-31:3, 31:17-25 (Resp. App. at 548-549).

[143] *See* Miele Exh. 25 ("Then you can speak to the fact that Ara has 16% overfill afterwards.") (Resp. App. at 358).

know."[144]

Miele's knowledge that it is unlawful to discuss overfill is further evidenced by an email message attaching a financial spreadsheet for the medical practice of Dr. Yablon in which she writes "DO NOT DISTRIBUTE.  REALLY!!  It could cost you your job."[145]  If INN were actually operating in a safe harbor and Amgen were not, then there is no reason for INN to share the financial spreadsheet information with Amgen.   When Amgen sales rep Joe Campagnuolo asked Miele for a financial spreadsheet, she responded "Unfortunately, we cannot leave spreadsheets behind, especially at the critical time before they sign on with INN and are on the precipice of switching over.  Although as INN we have broader parameters we can operate in, we still have to be concerned about OIG for Amgen's sake."[146]  This demonstrates both an understanding of the safe harbor and a willingness to exceed it, drawing all inferences in Relator's favor.  Inglese also circulated a comparison calculator that contained overfill information to others at INN, including Miele.[147]  The message itself shows a cognizance that there is something wrong with talking about overfill and a sensitivity to discussing it.[148]

Relator incorporates by reference her Responses to INN SOF 86-91, which all address similar issues.

## INN SOF 89

INN SAM Steve Reichenbach testified that his understanding was that INN operated

under a safe harbor that allowed it to discuss products from a business standpoint. S.

Reichenbach Deposition (Exhibit 54) at 33:17-34:5.

## Response to SOF 89

Disputed.  Drawing adverse inferences in Relator's favor, and viewed as a whole, the deposition testimony and documentary evidence creates a genuine issue of fact as to whether Steve Reichenbach, who was a district and then a regional manager for INN, understood that marketing overfill was unlawful.

---

[144] Miele Tr. 154:4-7 (Resp. App. at 571).

[145] Miele Exh. 15 at ABCQT-DMA-0000087399 (Resp. App. at 326).  The addition of the word "really" contraindicates the more common admonition "do not distribute," suggesting that such an instruction is understood to be ignored.

[146] Miele Exh. 20 (Resp. App. at 340).

[147] *See* Miele Exh. 23 ("Also, the OF tab speaks of overfill.  This is for your edification.") (Resp. App. at 341).

[148] *See id.* ("I am cautioning everyone not to be too free with this in front of Amgen reps.").

Reichenbach spent most of his time selling Aranesp.[149]  Like Miele, Reichenbach understood that Amgen representatives could not talk about economics and profitability with medical providers.[150]  So, by pre-arrangement, Amgen sales representativess would leave the room when INN SAMs addressed this topic.  Reichenbach testified that Amgen sales representatives would leave the room "[a] hundred percent of the time" when INN SAMs discussed the economics of Aranesp versus Procrit on joint sales calls with Amgen, which Reichenbach described as a "collaborative effort."[151]  This is false, however, as some Amgen representatives remained present in the room when INN SAMs talked about such topics.[152]  Relator's R. 56.1 Stmt. 70 n.77.  Reichenbach testified that INN had an "informal policy" against proactively talking to medical providers about overfill, and that the policy probably came from Gary Inglese.[153]

Reichenbach violated this policy.  Reichenbach demonstrated an understanding that billing Medicare for overfill is wrong when he "made it clear" to Nephrology Associates of Chattanooga that he was "not endorsing the billing of overfill" when he discussed overfill with them.[154]  Reichenbach testified that he discussed the "impact" of overfill "from a financial standpoint," meaning "billing Medicare for overfill," and that "they can use overfill and bill Medicare for it."[155]  While he later testified that he was "not aware" whether there was anything wrong with billing Medicare for overfill, his prior testimony, drawing all inferences in Relator's favor, creates a genuine issue of fact.[156]

Reichenbach further testified that a "number" of INN employees had overfill spreadsheets, that there were "a bunch floating around," and that he "assumed" everyone at INN had one.[157]  When asked why INN employees had overfill spreadsheets if INN had a policy against discussing overfill, he responded that it was necessary to "do an effective job" and for "gaining a knowledge base."[158]

While a legitimate GPO may discuss financials with its members to serve their interest, it

---

[149] *See* Reichenbach Tr. 27:9-29:7 (Resp. App. at 593-595).

[150] *See id.* at 43:7-13 (Resp. App. at 601).

[151] *Id.* at 41:18-42:5, 189:5-6 (Resp. App. at 599-600, 622).

[152] *See* Huttar Tr. 55:24-56:24 (Inglese and Huttar in room on visit to Balboa) (Resp. App. at 515-516); Deppe Tr. 155:2-13 ("for a short period of time during this time frame, [leaving the room] was the standard operating procedure") (Resp. App. at 492); Smitley Tr. 120:4-121:8 (present while INN representative gathered information and made preliminary presentation) (Resp. App. at 642-643).

[153] *See* Reichenbach Tr. 50:22-51:18 (Resp. App. at 606-607).

[154] *Id.* at 49:1-50:12 (Resp. App. at 605-606).

[155] Reichenbach Tr. 48:23-49:9, 57:14-58:2 (Resp. App. at 604-605, 609-610); *see* Reichenbach Exh. 1 (email from Reichenbach to others at INN describing meeting at Nephrology Associates of Chattanooga in which he writes "reviewed use of overfill") (Resp. App. at 384).

[156] Reichenbach Tr. 50:16-20 (Resp. App. at 606).

[157] *Id.* at 156:9-13, 157:16-21 (Resp. App. at 617-618).

[158] *Id.* at 154:-25 (Resp. App. at 615).

may not discuss illegal financial arrangements.  Moreover, INN acted as a marketing arm for Amgen, actively attempting to "convert" accounts from Procrit to Aranesp by persuading them that Aranesp would be more profitable, all in an effort to accomplish INN's "goal" which Reichenbach testified was "to increase the sales of Aranesp, because, as a company, a businessperson, we wanted to have revenue that we could survive in."[159]

Relator incorporates by reference her Responses to INN SOF 86-91, which all address similar issues.

**INN SOF 90**

Such discussions are part of a fundamental purpose of GPOs to deliver economic value to their members. Expert Report of L. Burns (Exhibit 9) at 49.

**Response to SOF 90**

Disputed.  Relator objects that the unsworn declaration of INN's expert is not admissible evidence and insufficient standing alone to support any proposition.[160]

Even assuming that the fundamental purpose of a GPO includes discussions about how to maximize economic value for the provider, INN acted inconsistently with this purpose and instead delivered economic value to Amgen and its parent AmerisourceBergen Corporation over its member providers.  See Relator's R. 56.1 Stmt. 50, 50-58, 78.  Mike Mullen, former Chief Financial Officer and Chief Operating Officer ("COO") of ABSG, testified that that pairing a GPO with a distributor was an AberisourceBergen business model, and that the business model was the same across many of these ABSG subsidiaries.[161] One of the subsidiaries with the same model[162] as INN and ASD operated at a 900% profit, showing revenue of $100 million generated by services that cost only $10 to $20 million, which raised a red flag for Mullen as COO.[163] Despite Mr. Mullen's then-recent promotion to COO of AmerisourceBergen Specialty Group, and an invitation from AmerisourceBergen CEO David Yost to join the ABC Executive Management Committee, Mr. Mullen was summarily terminated by ABSG within two weeks of raising these concerns and other business issues of ABSG to Mr. Yost.[164]

Had INN been an independent GPO rather than merely a marketing arm for Amgen and a revenue-generator for ABSG, it would have had greater opportunity to obtain better discounts for its members.

---

[159] Id. at 176:4-15, 41:3-7 (Resp. App. at 599, 621).

[160] See Mem. in Support at __.

[161] See Mullen Tr. 30:7-35:17 (App. at 944-45); Mullen Exh. 6 (App. at 297).

[162] See Mullen Tr. 34:18-35:10 (App. at 945).

[163] See id. at 70:2-71:14 (Resp. App. 576-577).

[164] See id. at 17:17-18:2 (App. at 941-942), 44:2-25 (App. at 946), 53:2-25 (App. at 947), 61:2-64:24 (App. at 948-949), 132:14-18 (App. at 952).

Relator incorporates by reference her Responses to INN SOF ¶¶ 86-91, which all address similar issues.

## INN SOF 91

There is no evidence that INN SAMs believed that they were acting illegally. *See, e.g.,* A. Miele Deposition (Exhibit 52) at 231:9-231:13; D. Smitley Deposition (Exhibit 37) at 195:7-196:5.

## Response to SOF 91

Disputed. Anthony Corrao, the President and CEO of IPN and former INN Executive Vice President of Sales and Marketing, testified that he (and therefore INN) knew the practice of pooling overfill was improper.[165]

Gary Inglese, Director of Sales and Marketing at INN, unequivocally established that he knew marketing overfill was wrong when he criticized Ortho's Procrit representatives for marketing Procrit overfill to Renal Associates of Grand Rapids in an email message to Karie Hilley, the billing specialist at that practice. Inglese wrote that "advocating overfill is tenuous, and I believe, is very shaky ground."[166] In the same breath, he implicitly advocated Aranesp's larger overfill by pointing out that Procrit overfill "has been reduced to 11%."[167]

Inglese further demonstrated knowledge that discussing overfill with medical providers was unlawful when he wrote in an email message to Shelly Huttar, Angela Miele, Dan Smitley, Steve Reichenbach, and Anthony Corrao, (all INN employees) as follows:

> Two ortho reps (a district manager and a regional manager) both independently affirmed the impact we (INN) are making on the community. One also indicated that they are to not speak of the overfill issue with clients. This is in response to being careful with any OIG issues. At this point, most customers understand OF. Again, I urge each of you to be very careful with this issue. We do not have a multi-dose product.[168]

Inglese's reference to "OIG issues" and his "urging" of the other INN employees to be "very careful with this issue" is evidence that Inglese and the others copied on the message knew that marketing overfill to medical providers was illegal. The statement that "[w]e do not have a multi-dose product" makes clear that Inglese understood that there is a difference between marketing Aranesp overfill, because it is contained in single-dose vials, and marketing Procrit

---

[165] *See* Corrao Tr. 109:16-23 ("Q: Would it have been improper to pool the overfill in vials of Aranesp to get an extra dose? … A: With regards to your terminology of pooling, as I mentioned in my earlier testimony, pooling was reported in the literature to be an unsafe practice.") (Resp. App. at 476).

[166] ABCQT-DMA-0000945695 (Resp. App. at 78).

[167] *Id.*

[168] ABCQT-DMA-0000084044 (Resp. App. at 2).

overfill, which is contained in multi-dose vials.  Inglese demonstrated a similar sensitivity to overfill in other correspondence when he circulated an overfill spreadsheet to others at INN and wrote "Note the updated comparison calculator.  I am cautioning everyone not to be too free with this in front of Amgen reps. . . . [T]he OF tab speaks of overfill.  This is for your edification."[169]

INN's 30(b)(6) representative confirmed that INN had the same understanding as Gary Inglese, that INN employees should be "careful" when sharing the financial spreadsheet calculators with Amgen.[170]

Indeed, INN's 30(b)(6) representative testified that INN SAM Shelly Huttar was reprimanded for "speak[ing] to the benefits of overfill" to a medical provider and instructed not to do so, because she was "not following the INN policy."[171]  Ms. Huttar also encouraged a medical provider to bill for overfill in an email message.  Ms. Huttar instructed a medical provider:  "The order has to be written for the amount that you give the patient and that you bill. So, since a 100mcg has 116mcgs, the order would be written for 116mcg . . . ."[172]  INN's 30(b)(6) representative testified that if INN had been aware of this email message, "corrective action" would have been taken.[173]

The INN Rule 30(b)(6) representative testified that INN SAM Shelley Huttar had created a spreadsheet that calculated the economic benefit to providers once overfill was taken into account.   In a sales meeting in New Orleans, in which Ms. Huttar was presenting this spreadsheet to other SAMs, INN's West Coast Director, Steve Reichenbach, "immediately stood up and stopped Shelley from presenting" because INN should "not account for overfill in [its] analysis."[174]

John Sowersby stated that Amgen employees would leave the room on joint sales calls when INN employees discussed overfill and profitability, but that this "was just for appearances sake" because INN employees would talk with Amgen employees before and after the sales calls, and also that some Amgen sales representatives such as Kelly Carter would remain in the room.[175]  This, when viewed in light of Amgen and INN's policies against discussing overfill, demonstrates awareness among INN SAMs that there was something wrong with Amgen and INN's collective overfill marketing scheme.

---

[169] *See* Inglese Exh. 4 at ABCQT-DMA-0000521102 (App. at 451) ("Note the updated comparison calculator.  I am cautioning everyone not to be too free with this in front of Amgen reps.  Not that there are any secrets, but because of their restrictions on using anything like this with their customers.  They are sensitive to using this data, as they cannot discuss margins or ROI on products. We are in a safe harbor with this.").  A spreadsheet with overfill is attached to the email message.  *Id.* at 0000521116 (App. at 465).

[170] *See* Venus (INN 30(b)(6)) Tr. 188:2-190:10 (Resp. App. at 704-705).

[171] *Id.* at 156:22-157:10 (Resp. App. at 699-700).

[172] ABCQT-DMA-0000096480 (App. at 247).

[173] *See* Venus (INN 30(b)(6)) Tr. 156:16-21; *id.* at 152:23-156:21 (Resp. App. at 695-699).

[174] *See id.* at 125:9-141:21 (Resp. App. at 678-694).

[175] Sowersby Decl. ¶¶ 13, 16 (App. 253-254).

Amgen's internal documents corroborate that Amgen and INN engaged in an "orchestrated approach" by which the Amgen rep "left the room when they got down to brass tacks" including "economic" discussions, including through direction from Claes Hornstrand that Shelly Huttar at INN talk about "brass tax" at Idaho Nephrology and that "we need to make sure Amgen people are not in the room (it needs to be orchestrated)."[176]

Gary Inglese certainly had learned that overfill was an illegal kickback when he was copied on two email messages from Amgen sales representative Julie Preston for which Ms. Preston was ultimately fired from Amgen.[177]  In one of the messages, which Preston sent to a number of others at Amgen, she writes that "Gary confirmed that Balboa is purchasing the 1ml 20,000 vial, which means they can get 11.1% overfill."[178]  This shows that Gary Inglese was passing information about Balboa Nephrology's purchasing habits to Amgen, and specifically about the overfill that Balboa was utilizing.  Attached to the two messages was one of the economics spreadsheets that calculated the profitability of Aranesp versus Procrit for Balboa Nephrology.[179]  Inglese testified that he knew that Preston was terminated because of "a discussion about overfill."[180]  Inglese must have learned at that point that overfill was a kickback.

INN employees used personal email addresses rather than work email addresses to communicate with Amgen,[181] and to circulate practice assessment spreadsheets.[182]  Indeed, INN employees provided their personal email addresses to Amgen employees to enable Amgen to communicate with them openly about accounts.  For example, Amgen sales rep Nicole Wilson sent an email to Amgen District Manager Louis Deppe, copying Steve Reichenbach at his msn.com email account, summarizing her customer visits with medical providers.  A jury could infer from this that INN employees knew their conduct was unlawful and were trying to hide it.

While INN's policy about overfill "wasn't precise," and each INN employee was "to use [their] own judgment" about what to discuss and not to discuss,[183] INN nevertheless had a policy against proactively discussing overfill with a medical provider.[184]

---

[176] AMGEN-BST0000208908 (Resp. App. at 126).

[177] Deposition of Julie Preston Exh. 10 (Oct. 6, 2010) ("Preston Tr.") (AMGEN-BST0000192714 at AMGEN-BST0000192715-36) (Resp. App. at 101-123); Preston Tr. 94:10-96:10 (Resp. App. at 586-588).

[178] Preston Exh. 10 (AMGEN-BST0000192714 at AMGEN-BST0000192715) (Resp. App. at ###).

[179] *Id.*; Preston Tr. 94:10-96:10 (Resp. App. at 586-588).

[180] Inglese Tr. 240:3-6 (Resp. App. at 532).

[181] AMGEN-BST0002628761 (email message from Angela Miele's aol.com account to Paul Koza at Amgen discussing meeting with medical provider) (Resp. App. 176); *see also* AMGEN-BST0000936769 (Resp. App. 165).

[182] ABCQT-DMA-0000617550 (Steve Reichenbach emailing others at INN a profitability spreadsheet comparing Aranesp to Procrit from his msn.com email account) (Resp. App. at 72).

[183] Huttar Tr. 63:9-18 (Resp. App. at 518).

[184] *See* Inglese Tr. 54:2-7 (Resp. App. at 530); Huttar Tr. 63:9-18 (Resp. App. at 517); Reichenbach Tr.

INN employees broke INN's own policy and proactively marketed overfill.[185]  *See* Relator's R. 56.1 Stmt. 62, 63.

INN was aware that Amgen could not discuss profit[186] or overfill[187] with medical providers.  This alone shows cognizance that there is some issue with doing so.

INN worked in concert with Amgen sales reps to circumvent Amgen's prohibition against discussing overfill or profit from Aranesp.  This evidences knowledge that the joint conduct of INN and Amgen was wrongful.  INN employees prearranged with Amgen sales representatives that the Amgen representative would leave the room when the INN rep discussed economics or overfill during joint sales calls.[188]  That INN knowingly conspired with Amgen to break the law is evidenced by the fact that it was the INN SAMs who actually instructed Amgen PSRs to leave the room.[189]  Indeed, Angela Miele testified that she asked "every Amgen rep I

---

46:18-47:9; Corrao 158:20-159:8 (discussing Corrao Exh. 6 at ABCQT-DMA-0000521239 (Resp. App. at 776), an INN powerpoint presentation slide listing "Overfill" as one of several "Practice concerns," and testifying that INN PSRs "would give [medical providers] the amount of overfill that was in the respective vial in question." (Resp. App. at 428)) (Resp. App. 602-603).

[185] *See* Huttar Tr. 31:3-11 ("Q: And was it a regular practice of yours to discuss overfill with your customers? A: If they asked me. Q: What—what about if they didn't ask you, was there ever an occasion where you brought it up to them? A: I'm sure there was.") (Resp. App. at 513); Huttar Tr. 130:18-24 ("Q: So you, in violation of the INN rule, proactively marketed overfill to Dr. Huo? A: I explained about overfill. Q: You brought it up, though? A: I did. I did.") (Resp. App. at 523); Sowersby Decl. ¶¶ 8-9 (the proactive marketing of overfill was a "routine sales practice" at INN) (App. at 253); ABCQT-DMA-0000084193 (showing Huttar telling a provider that "Overfill is Only in the Aranesp vials, of course, that's why you need zero dead space syringes") (Resp. App. at 3); ABCQT-DMA-0000429336 (Huttar telling a provider that Aranesp overfill "gives a large cushion for confidence" and indicating that INN provided the practice with an economics calculator) (Resp. App. at 54); ABCQT-DMA-0000096480 (Huttar instructing a provider on how to deliver and bill for overfill in Aranesp vials) (App. at 247).

[186] *See* Corrao Tr. 118:6-12 ("Q: Am I correct that INN SAMs could discuss the profit to be made from Aranesp with providers? A: Yes. Q: And is it my—am I correct that Amgen PSRs could not discuss that with providers? … A: Correct.") (Resp. App. at 478).

[187] *See id.* at 117:16-24 ("Q: Do you know if Amgen PSRs could discuss overfill of Aranesp with providers? … A: It's my understanding that the Amgen direction was consistent with us. They do not bring it up proactively, as I mentioned earlier. If they asked about it, they could answer the question. If they had a clinical question regarding it, that had to be answered by Amgen medical education.") (Resp. App. at 477), 260:19-25 ("Q: Sure. Is it fair to say that after that point in time, July 2003, that you had no firsthand knowledge of Amgen's policy on its sales reps discussing overfill with customers? A: I was—I was under the assumption the direction was to not bring up overfill to the practice.") (Resp. App. at 482).

[188] *See* Miele Tr. 24:9-22 ("Q: Did you—did you do joint calls with Amgen reps? A: Yes. Q: And—and how would you handle talking about those matters that the Amgen rep couldn't talk about if they were present? A: They were not discussed in front of an Amgen rep. Q: Okay. So the Amgen rep would leave the room? A: Correct. Q: How would they know to leave the room? A: I would tell them.") (Resp. App. at 546); Reichenbach Tr. 38:8-42:20 (Amgen sales reps would leave the room "a hundred percent" of the time) (Resp. App. at 596-600).

[189] *See* Miele Tr. 64:25-65:9 ("Q: Would you say, please leave the room? A: Yes. Q: Would you tell them what you were going to discuss? A. I would tell them I was going to discuss things that they could not be privy to.") (Resp. App. at 556-557).

ever worked with" to leave the room.[190]  Miele further testified that overfill was "controversial," and she was told by both Amgen and INN that she could not discuss overfill, despite the safe harbor.[191]  INN PSR Shelly Huttar described a joint sales call she made with Amgen PSR Stephanie Matta at Idaho Nephrology.  The joint call was pre-arranged at the request of Jeremy Jaggi of Amgen, who told Huttar that the practice had been a "difficult account for years."  Huttar wrote that she showed two doctors an INN Excel sheet comparing the profitability of Aranesp and Procrit, and that after this "financial presentation," they agreed to switch to Aranesp.[192]

INN SAMs equivocated when asked about INN's policy about overfill.  Shelly Huttar initially testified that Inglese told her not to talk about overfill, but simultaneously testified "However, you know it was brought up frequent[ly]."[193]  She later testified that there was nothing that Inglese told her she could not talk about with respect to overfill.[194]

Inglese testified that he prepared reports that were sent to individuals at Amgen about the activities that Inglese and his SAMS undertook, including sharing the economics spreadsheets, and other documents.[195]

INN demonstrated hesitancy surrounding the sharing of spreadsheets including overfill.  With respect to a calculator that included overfill, Shelly Huttar testified that she did not get a calculator until 90 days into her tenure at INN, even though INN was "supposed to send it to" her, and she "kept waiting for it" and "did not get that for months," during which time she "complained about not having the tools [she] needed."[196]

INN SAMs were trained not to leave the calculators behind.[197]  But she believed that she could hand-write the information for the doctor, and she believes she did so.[198]  She then testified that medical providers were supposed to write down the information from the spreadsheet.[199]  She then testified that she would use the computer, pull up the calculator, and tell the medical

---

[190] *Id*. 68:12-16 (Resp. App. 559); *see also id*. 130:11-20 (discussing Miele Exh. 21 at ABCQT-DMA-0000087143 (Resp. App. at 776)) (App. at 520) (Resp. App. 559).

[191] *See id*. 30:14-31:3; 31:17-25 (Resp. App. at 548-549).

[192] AMGEN-BST0000208879-880 (Resp. App. at 124-125).

[193] Huttar Tr. at 52:8-13 (Resp. App. at 514).

[194] *See id*. 61:7-11 ("Q. The only question I want you to answer is whether Mr Inglese told you that there was – was there anything he told you you could not talk about with respect to overfill?   A. No.") (Resp. App. at 517).

[195] *See* Inglese Tr. 152:8-153:3 (Resp. App. at 531.1-531.2).

[196] Huttar Tr. 71:8-17 (Resp. App. at 519).

[197] *See id*. at 75:1-6 (Resp. App. at 520).

[198] *See id*. at 75:22-23 (Resp. App. at 520).

[199] *See id*. at 76:7-8 (Resp. App. at 521).

providers that they could write down the information.[200]  But Huttar would not write it out herself, because she did not want to "put it in my handwriting."[201]

All the foregoing facts evidence INN's knowledge that it was acting unlawfully when marketing the profitability of Aranesp over Procrit, including overfill.

INN's knowledge of wrongfulness is further evidenced by the fact that INN eventually implemented a policy against joint sales calls with Amgen employees and also barred communications between Amgen and INN employees in late 2008.[202]

Relator incorporates by reference her Responses to INN SOF 86-91, which all address similar issues.

Amgen and INN conspired with each other to promote Aranesp based on the overfill that it contained.  An Amgen sales representative tape recorded a conversation between himself and his manager in 2005, to "protect himself" because he "believed that Amgen was engaging in questionable marketing practices."[203]  The sales rep knew beforehand that the conversation would include his annual or midyear performance review.[204]  The conversation took place within one day of a meeting with Dallas Nephrology Associates, a large account in the area, and before the conversation shifted to the performance review, the district manager discussed INN's role in that meeting.[205]  The sales rep asked the Amgen district manager, "so what was INN supposed to do?" with respect to Dallas Nephrology.[206]  The Amgen district manager responded, "They were really gonna go in and talk about you know overfill and margin, and talk about Aranesp."[207]  INN was "supposed to" have discussed overfill and margin with Dallas Nephrology, and the district manager was frustrated that INN "never got past 'hey here are our services.'"[208]

Amgen's National Sales Director, Deponent No. 1, invoked the Fifth Amendment and declined to answer any questions regarding whether INN and Amgen had the goal of encouraging providers to purchase as much Aranesp as possible, whether INN discussed economics and reimbursement with medical providers because Amgen could not do so directly, and whether INN was a de facto marketing arm for Amgen.[209]  Amgen's Manager of Marketing

---

[200] *See id.* at 76:10-25 (Resp. App. at 521).

[201] *Id.* at 77:15-17 (Resp. App. at 522).

[202] *See* Venus (INN 30(b)(6)) Tr. 185:9-186:7, 187:5-187:25, 197:19-198:8 (Resp. App. at 701-703, 707-708); Coates Tr. 104:24-105:24 (Resp. App. at 470-471); Papineau Tr. 214:17-215:5; 220:17-221:12 (Resp. App. at 580-583).

[203] Dickerson Decl. ¶¶ 1-3 (Resp. App. at 720).

[204] *See id.* ¶ 4 (Resp. App. at 720).

[205] *See id.* ¶¶ 7-8 (Resp. App. at 721).

[206] *See id.* ¶ 9 (Resp. App. at 721).

[207] *Id.* ¶ 10 (Resp. App. at 721).

[208] *Id.* ¶¶ 10-11 (Resp. App. at 721).

[209] *See* Deponent No. 1 Tr. 30:6-32:4 (Resp. App. at 444-446).

similarly invoked the Fifth Amendment when asked whether Amgen and INN conspired to market Aranesp in violation of the anti-kickback statute,[210] whether INN was not a true GPO, whether Amgen and INN entered into an agreement expressly to increase Aranesp sales,[211] and whether having INN assess the financial impact of Aranesp overfill on the economics of a physician's practice was something that Amgen asked INN to do.[212]

The former Office Manager of a nephrology practice in New York, Deponent No. 6, also invoked the Fifth Amendment and declined to answer questions whether INN representatives conducted joint sales calls at her practice with Amgen representatives, and whether INN representatives marketed Aranesp to her based on overfill, including specifically the money that her practice could make through reimbursement for overfill.[213] She declined to answer whether the INN sales pitch caused her practice to bill for overfill.[214] She declined to answer whether INN and Amgen instructed her to administer the overfill and bill it to Medicare even if the patient only needed the labeled amount.[215] And she refused to answer whether she had billed Medicare for overfill.[216]

## INN SOF 92

INN members were permitted under their agreements to purchase products other than

those offered by INN. In fact, many INN members also purchased Procrit from Ortho Biotech.

*See, e.g.,* S. Mangi Deposition (South Texas Kidney Specialists P.A. 30(b)(6)) (Exhibit 57) at

14:16-15:21; R. Laitman Deposition (Exhibit 58) at 15:5-15:16.

## Response to SOF 92

Relator objects that what INN members were permitted to do under their agreements is a legal conclusion that requires construction of the agreements.  Not disputed that INN members could purchase products other than those offered by INN.  Otherwise disputed.  INN gave its members discounts that they could receive only if they purchased Aranesp through ASD.[217]  In order to receive these discounts, INN members signed declaration forms that required the

---

[210] *See* Deponent No. 3 Tr. 49:7-14 (Resp. App. at 455).

[211] *See id.* at 62:16-65:1 (Resp. App. at 456-458).

[212] *See id.* at 78:9-17 (Resp. App. at 460).

[213] *See* Deponent No. 6 Tr. 31:7-32:5 (Resp. App. at 462-463).

[214] *See id.* at 32:7-12 (Resp. App. at 463).

[215] *See id.* at 34:22-35:5 (Resp. App. at 464-465).

[216] *See id.* 9:22-10:2 (Resp. App. at 461.1-461.2).

[217] ABCQT-DMA-0000431312 (App. at 542); ABCQT-DMA-0000432651 at 0000432660 (App. at 553); Inglese Tr. 131:18-132:8 (App. at 885).

purchase of Aranesp through ASD.[218]  Further, Relator objects that the two providers cited above are insufficient evidence to support the proposition that "many" INN Members purchased Procrit.

## INN SOF 93

INN's Gary Inglese testified that when calculations showed that the economics of Procrit were more favorable than the economics of Aranesp, he would "encourage [providers] to go with the product that made the most clinical sense, and if Procrit had the advantage economical[ly] and they were okay with that, I certainly encouraged them to do that." *See* G. Inglese Deposition (Exhibit 56) at 455:19-456:15; *see also* D. Smitley Deposition (Exhibit 37) at 195:2-195:18.

## Response to SOF 93

Disputed that any INN SAM, including Inglese and Dan Smitley, ever did, in fact, encourage providers to use Procrit.  Inglese instructed other INN employees to "not even quote any pricing for the competitor's product.  Let them call ASD.  We are in the business of promoting our GPO products."[219]  In the same message, Inglese relayed that ASD "agreed to hold all future discounts to no more than 2% on the competitor's product [Procrit]" because "INN does not make any commission or admin fees on the competitor's product."[220]

Gary Inglese testified that Amgen was INN's "strategic partner."[221]  Inglese testified that the "vast majority" of INN's revenue came from Amgen.[222]  Inglese worked with Amgen reps in "targeting [Renal Hypertension Specialists] to switch to Aranesp."[223]  INN's function was to sell Aranesp and promote Aranesp market share for Amgen.[224]  *See* Relator's R. 56.1 Stmt. 50-58, 73.

Disputed whether INN employees ever encouraged medical providers to use Procrit. INN did not even receive an administrative fee from the manufacturer of Procrit (Ortho Biotech) until recently, and well *after* Amgen instituted a prohibition on Amgen and INN representatives engaging in joint activity.  Amgen's knowledge that its use of INN as a marketing arm was illegal is further evidenced by the fact that INN eventually implemented a policy against joint sales calls with Amgen employees and also barred communications between Amgen and INN

---

[218] ABCQT-DMA-0000431312 (App. at 542); ABCQT-DMA-0000432651 at 0000432660 (App. at 553).

[219] ABCQT-DMA-0000082038 (Resp. App. at 1).

[220] *Id.*

[221] Inglese Tr. 283:19-24 (App. at 892); *see* Inglese Exh. 18 (Resp. App. at 306).

[222] Inglese Tr. 82:21-24 (Resp. App. at 531).

[223] AMGEN-BST0000175625 (Resp. App. at 100).

[224] ABCQT-DMA-0000430768 (App. at 23).

employees in late 2008.[225]

**INN SOF 94**

Procrit sales representatives discussed and promoted the amount of overfill included in

Procrit vials to INN members. *See* A. Corrao Deposition (Exhibit 29) at 102:5-102:8.

**Response to SOF 94**

Relator objects that the statements of Procrit sales representatives are hearsay.  Otherwise
disputed, as the cited testimony neither refers to vials nor to INN members.

**INN SOF 95**

It was common industry knowledge that overfill was being used by physicians. *See* C.

Stemmer Deposition (Boca Nephrology P.A. 30(b)(6)) (Exhibit 25) at 23:19-24:4; D. Powell

Deposition (Mid-Atlantic Nephrology Associates 30(b)(6)) (Exhibit 59) at 44:3-44:7.

**Response to SOF 95**

Disputed; Dr. Stemmer testified that overfill was "uniformly used," which is false, as
only 3-4% of Medicare claims for Aranesp are overfill claims.[226]

**INN SOF 96**

The HHS OIG issued a report entitled "Review of Epogen Reimbursement," which was a

review to determine whether Medicare's reimbursement for Epogen should be reduced to reflect

market prices.  Office of Inspector General for the Department of Health and Human Services

Report, Review of Epogen Reimbursement, A-01-97-00509 (November 24, 1997) ("OIG

November 1997 Epogen Report") (Exhibit 60).

**Response to SOF 96**

Relator objects that the foregoing paragraph fails to use a pinpoint citation and should
therefore be disregarded.  Disputed to the extent that Epogen is a multi-dose product, not a single-

---

[225] *See* Venus (INN 30(b)(6)) Tr. 185:9-186:7, 187:5-187:25, 197:19-198:8 (Resp. App. at 701-703, 707-
708); Coates Tr. 104:24-105:24 (Resp. App. at 470-471); Papineau Tr. 214:17-215:5; 220:17-221:12
(Resp. App. at 580-583).

[226] Stemmer Tr. 24:1 (Resp. App. at 656).

dose product like Aranesp.  Disputed because the foregoing provides no support for the proposition for which INN cites it, namely, that the Government was aware of overfill billing long before INN came into existence.[227]  The foregoing paragraph says nothing about overfill billing and contains no pincite.  Relator incorporates her response to ¶ 97.

**INN SOF 97**

The OIG November 1997 Epogen Report stated that the HHS OIG "found that Amgen,

the manufacturer of EPO, include[d] an additional 25 percent of EPO in each vial sold. As such,

if a facility purchase[d] one 10,000 unit vial of EPO they actually receive[d] 12,500 units. . .

[T]here are indications that some free-standing dialysis facilities in [the] sample were able to use,

on average, one half of the overfill which would materially affect each provider's cost." OIG

November 1997 Epogen Report (Exhibit 60).

**Response to SOF 97**

Relator objects that the foregoing paragraph fails to use a pinpoint citation and should therefore be disregarded.  Disputed to the extent that Epogen is a multi-dose product, not a single-dose product like Aranesp.  Disputed to the extent that the foregoing applies to Dialysis, not Chronic Kidney Disease, which is the illness treated by nephrologists and upon which damages in this lawsuit are based.

The 1997 OIG Report in no way authorizes or endorses the billing of overfill.  The report provides no support for the proposition for which it is cited, namely, that the government was aware that billing for overfill lowers acquisition cost (and impliedly that the government somehow therefore endorsed billing for overfill).  John Warren, the CMS 30(b)(6) representative, confirmed that it has always been unlawful to bill for overfill.[228]  Warren testified that inaction by CMS with respect to overfill would not constitute any acquiescence by the government that billing for overfill was permissible.[229]

**INN SOF 98**

The HHS OIG also published a report entitled "Medicare Reimbursement for Existing

End-Stage Renal Disease Drugs," which was a study to determine the difference between the

---

[227] INN Brief at 8.

[228] Deposition of John Warren 37, 39, 259-62 (Nov. 5, 2010) ("Warren (CMS 30(b)(6)) Tr.") (Resp. App. at 711, 714-717).

[229] *See id*. at 265:1-12 (Resp. App. at 718).

Medicare payment amount for separately billable end-stage renal disease drugs and the

acquisition costs of these drugs for facilities. Office of Inspector General for the Department of

Health and Human Services Report, <u>Medicare Reimbursement for Existing End-Stage Renal</u>

<u>Disease Drugs,</u> OEI-03-04-00120 (May 2004) ("OIG May 2004 ESRD Drugs Report") (Exhibit

61).

**Response to SOF 98**

Disputed.  Relator incorporates her response to ¶ 99 by reference.

**INN SOF 99**

The OIG May 2004 ESRD Drugs Report stated that "providers reported that they are able

to lower actual acquisition costs through the utilization of overfill for EPO." OIG May 2004

ESRD Drugs Report at 8 (Exhibit 61).

**Response to SOF 99**

Disputed to the extent that Epogen is a multi-dose product, not a single-dose product like
Aranesp.  The 2004 Report was prepared by the Office of Evaluation and Inspections (OEI),
which is a subdivision within the Office of Inspector General at DHHS.  The author of the 2004
HHS-OIG Report, David Tawes, was deposed in this matter.[230]  INN fails to cite any of his
deposition testimony.

The 2004 OEI Report in no way authorizes or endorses the use or billing of overfill.
David Tawes confirmed that CMS—not OEI—is responsible for determining whether overfill is
a free good that providers cannot bill to Medicare.[231]  Mr. Tawes confirmed that CMS—not
OEI—is responsible for determining what properly should be included or not included in the
ASP calculation of a drug.[232]  Neither of those topics were any part of the OEI Report.[233]  Both
topics were outside the scope of the report and outside the scope of OEI's responsibilities.[234]
Overfill was outside the scope of the report, because enforcement is not part of OEI's

---

[230] *See* Deposition of David Tawes 40:4-15 (Oct. 26, 2010) ("Tawes (OIG 30(b)(6)) Tr.") (Resp. App. at
665).

[231] *See id*. at 130:4-12 (Resp. App. at 667).

[232] *See id*. at 129:14-25 (Resp. App. at 667).

[233] *See id*. at 130:21-25 (Resp. App. at 667).

[234] *See id*. at 131 (Resp. App. at 668).

responsibility, and Mr. Tawes was merely performing a cost analysis function at OEI.[235]

**INN SOF 100**

INN members raised questions with INN SAMs regarding the amount of overfill in

Aranesp vials. *See* A. Miele Deposition (Exhibit 52) at 30:14-30:20.

**Response to SOF 100**

Disputed.  INN SAMs routinely raised overfill with medical providers proactively.[236]

**INN SOF 101**

Amgen, through Relator Kassie Westmoreland, provided information to INN SAMs

regarding the amount of overfill in Aranesp vials. *See* ABCQT-DMA-0000064492 (Exhibit 62).

**Response to SOF 101**

Not disputed that Kassie Westmoreland sent the single cited email message to INN
employees, which contained overfill information.  Otherwise disputed, including on the ground
that Amgen provided information regarding the amount of overfill in Aranesp vials in many ways
to many individuals and medical practices.

**INN SOF 102**

Gary Inglese developed a policy that INN SAMs should not proactively raise overfill with

providers, but could answer questions and provide clarification regarding how much overfill was

in the vials. *See* G. Inglese Deposition (Exhibit 56) at 464:20-467:3.

**Response to SOF 102**

Not disputed in part that INN SAMs had a policy not to proactively raise overfill with
providers, with the explanation that INN SAMs routinely violated this policy and proactively
raised overfill with medical providers.[237]  Disputed to the extent that the policy limited INN

---

[235] *See id*. at 132 (Resp. App. at 669).

[236] *See* Sowersby Decl. ¶¶ 8-9 (the proactive marketing of overfill was a "routine sales practice" at INN)
(App. at 253); Huttar Tr. 130:18-24 ("Q: So you, in violation of the INN rule, proactively marketed
overfill to Dr. Huo? A: I explained about overfill. Q: You brought it up, though? A: I did. I did.") (Resp.
App. at 523).

[237] *See* Sowersby Decl. ¶¶ 8-9 (the proactive marketing of overfill was a "routine sales practice" at INN)
(App. at 253); Huttar Tr. 130:18-24 ("Q: So you, in violation of the INN rule, proactively marketed
overfill to Dr. Huo? A: I explained about overfill. Q: You brought it up, though? A: I did. I did.") (Resp.
App. at 523).

SAMs to providing clarification regarding how much overfill was in the vials.  The policy was a sham.  INN SAMs were permitted to (and did in fact) discuss overfill far more broadly than merely by providing clarification as to the amount of overfill.  *Gary Inglese himself* admitted at his deposition that, if asked by a provider, he would advise them how to withdraw the entire amount of Aranesp (including overfill) out of a vial using a low dead space syringe.[238]  That goes far beyond merely informing the provider as to the amount of overfill in the vial.  Indeed, Inglese's testimony cited by INN in the foregoing paragraph states that INN SAMs could talk about overfill "more in response," not *only* in response.[239]

INN's 30(b)(6) testified that Gary Inglese was the source of the policy, but that the policy allowed INN SAMs to answer questions by medical providers, without reference to such limitation.[240]  Moreover, the policy was "informal"[241] and not "precise."[242]

## INN SOF 103

Gary Inglese testified that it was his policy that the SAMs should not talk about overfill proactively because, "it was a concept that just didn't even feel like something that we should be talking about because it seems to me it's a clinical decision. When it comes down to how much of a medication a physician should give, to me speaking about giving more than what's in the vial is no different than giving what's less. It's a clinical decision and physicians have to make that decision." *See* G. Inglese Deposition (Exhibit 56) at 465:23-467:3; *see also* W. Venus Deposition (INN 30(b)(6)) (Exhibit 35) at 39:10-39:19.

## Response to SOF 103

Not disputed that Gary Inglese so testified.  Disputed that this was the basis for INN's policy against discussing overfill.  When asked why the policy regarding overfill was established, INN's 30(b)(6) witness testified that "we can speak to overfill, but we're there to talk to the pricing, the contracts, and the product and portfolio," and that doing anything else was "not part of what we do."[243]  Venus, on behalf of INN, in no way stated that the basis of the policy had anything to do with not wanting to infringe on medical judgment.

---

[238] *See* Inglese Tr. 329:17-330:12 (Resp. App. at 526).

[239] *Id*. at 465:4-5 (App. at 896).

[240] *See* Venus (INN 30(b)(6)) Tr. 34:13-22 (Resp. App. at 676); Gaetano Tr. 50:22-52:19 (Resp. App. at 495-497); Miele Tr. 211:7-12 (Resp. App. at 573); Smitley Tr. 183:9-11 (Resp. App. at 644).

[241] Reichenbach Tr. 51:20-52:18 (Resp. App. at 607-608).

[242] Huttar Tr. 63:9-18 (Resp. App. at 518).

[243] Venus (INN 30(b)(6)) Tr. 39:10-19 (Resp. App. at 677).

**INN SOF 104**

No provider has testified that ASD ever discussed overfill with their practice.  *See, e.g.,*

M. Stanford Deposition (Renal Associates of Baton Rouge, L.L.C. 30(b)(6)) (Exhibit 63) at 27:5-

27:9; R. Velez Deposition (Dallas Nephrology Associates 30(b)(6)) (Exhibit 64) at 190:19-

190:23; S. Mangi Deposition (South Texas Kidney Specialists P.A. 30(b)(6)) (Exhibit 57) at 52:7-

52:13

**Response to SOF 104**

Not disputed in part that no medical provider in this lawsuit has overtly testified at a
deposition that ASD discussed overfill with their practice, disputed to the extent that the
documentary and deposition evidence establishes that ASD along with INN and Amgen did in
fact proactively promote Aranesp overfill to medical providers.

Relator disputes that the cited evidence supports the proposition cited.  Based on the
question he was asked, Dr. Salil Mangi was speaking for himself only, not on behalf his entire
practice.  And Dr. Ruben Velez is the head of a large medical practice consisting of 34
shareholder doctors and 74 additional doctors, plus additional staff.[244]  It is unsurprising that
medical doctors such as Dr. Velez and Dr. Mangi had never spoke with a representative of a drug
wholesaler, as that function would have been handled by someone else.

ASD successfully marketed the overfill in Aranesp vials to Karie Hilley at Renal
Associates of Grand Rapids.  Heath Dugan of ASD wrote to Ms. Hilley:  "As far as literature on
overfill and dosing protocol . . . let me discuss this with Gary [Inglese] and Evan [Gremont], and
we will come up with something for you."[245]  Karie Hilley subsequently responded that "it was
decided yesterday that we are going with Arnaesp single dose vials (in order to maximize overfill
. . . .)."[246]  Drawing all inferences in Relator's favor, this message shows that ASD successfully
pitched overfill to Ms. Hilley, which caused her to select vials rather than pre-filled syringes (or
Procrit).[247]

INN and ASD acted in a coordinated fashion to convert medical providers to Aranesp.
ASD directed INN employees to send cost comparison spreadsheets to medical providers.  Evan
Gremont of ASD informed Harold Wodinsky of IPN that Gina at Renal Hypertension Physicians
"needs a cost comparison on Procrit v. Aranesp" because "if it is that much better she'll start
switching everybody over to Aranesp," and he asked that Mr. Wodinsky "email her the template"

---

[244] Deposition of Ruben Velez 12:19-13:19 (Sept. 16, 2010) ("DNA Tr.") (Resp. App. at 672-673).

[245] ABCQT-DMA-0000945718 (Resp. App. at 83).

[246] *Id.*

[247] *Id.*

and closed the email by ordering him to "[c]all her."[248]

Overfill was part of ASD's "official" strategy.  Shelly Huttar of INN sent Evan Gremont of ASD and Robert Kelly of INN a practice analyzer calculator that included overfill.[249]  Evan Gremont later asked Robert Kelly to "please send me your latest version of the practice calculator" because "we'll probably be using it as part of the 'official' strategy for combating what's happening in the market."[250]  Evan Gremont of ASD wrote to Dan Smitley of INN that "[t]he idea is for us to pre-fill syringes (make money on the overfill)."[251]  And an "ASD Overall Business Summary" bearing the names Neil Herson and Evan Gremont listed "[o]verfill would be profitability opportunity" under the heading "Proposed Opportunities."[252]

Angela Miele sent Evan Gremont of ASD an "Ara vs Procrit" cost calculator and admonished him to "not leave a copy behind if you show it to a customer."[253]

Evan Gremont of ASD advised Gary Inglese and Dan Smitley of INN that "I have an account in Mississippi which I would love to have Dan visit" because "Dr. Lee is skeptical of Aranesp making them money."[254]  Sowersby stated in his declaration that it was "routine sales practice" at INN to market Aranesp based on overfill.[255]  Complying with Gremont's instructions, Inglese sent the provider an "Aracalc" profit calculator, and subsequently told Gremont and Sowersby that the provider had switched to Aranesp because the "numbers and ROI coincided with what I suggested they would see based on the 'Aracalc.'"[256]

Heath Dugan of ASD was aware that Amgen representatives were marketing overfill to medical providers.  He wrote in an appointment / call log that, in response to overfill marketing by Ortho Biotech, Amgen sales rep Jason West "countered by telling [South Palm Beach Nephrology] that they could get overfill from the Aranesp SDV's as well."[257]

ASD was aware that promoting overfill use was "a BIG no-no," according to ASD Healthcare's Heath Dugan.[258]  This did not stop Evan Gremont of ASD from advising Dugan to "mention" overfill if he ever got "a call from a practice that has been quoted very cheap prices

---

[248] ABCQT-DMA-0000650275 (Resp. App. at 76).

[249] Gremont Exh. 15 at ABCQT-DMA-0000097333, 0000097352 (Resp. App. at 203).

[250] McClain Exh. 15 at ABCQT-DMA-0000604740, 0000604758 (Resp. App. at 307, 325).

[251] ABCQT-DMA-0000638433 (Resp. App. at 74).

[252] ABCQT-DMA-0001055614 at 0001055617 (Resp. App. at 97).

[253] ABCQT-DMA-0000520843 (Resp. App. at 62).

[254] ABCQT-DMA-0000093224 (Resp. App. at 10).

[255] Sowersby Decl. ¶ 8 (App. at 253).

[256] ABCQT-DMA-0000093224 (Resp. App. at 10).

[257] ABCQT-DMA-0000953116 (Resp. App. at 92).

[258] ABCQT-DMA-0000600344 (Resp. App. at 66).

from" a competitor.[259]

ASD's 30(b)(6) representative testified that in preparation for the deposition, he reviewed call notes that referenced Heath Duggan discussing overfill with a medical practice.[260]

Debbie Ekas, a buyer for ASD Healthcare, provided information about Aranesp overfill to a medical provider. She asked an Amgen customer support line how to respond to a question from a customer about overfill, and then personally forwarded the information about overfill that she received from Amgen to the customer.[261]

Evan Gremont of ASD would update INN SAM Angela Miele on target accounts, and would follow up with the accounts afterwards.[262] ASD sought to "bring value to Amgen" by converting medical providers who were "prepared to go full throttle with anything that will make [them] more money."[263]

Julie Preston testified that Evan Gremont sent her information about Balboa Nephrology.[264] Balboa testified that they utilized and billed for Aranesp overfill.[265]

INN SAMs copied Evan Gremont on email messages about overfill. For example, Steve Reichenbach copied Gremont on an email message in which he wrote that he "[r]eviewed the use of overfill" with a medical provider.[266]

Heath Dugan was aware that medical providers were purchasing Aranesp in order to utilize the overfill. He wrote in an appointment / call log that an employee of Dr. Laitman's at Bronx Westchester called him to ask "what needed to be done to swap the syringes for the vials (they use the vials for the overfill)."[267]

ASD was aware of and sensitive to the unlawful conspiracy between Amgen, INN, and ASD. Evan Gremont at ASD wrote to Angela Miele at INN it was "extremely important" that ASD be "extremely discreet" with Amgen concerning providing Amgen with information about

---

[259] Id.

[260] See McClain Tr. 105:2-7 (Resp. App. at 541).

[261] AMGEN-BST0002951938 (Resp. App. at 178).

[262] See Miele Tr. 37:7-22, 39:24-40:8 (Resp. App. at 551-553).

[263] ABCQT-DMA-0000596621 (Resp. App. at 65).

[264] Preston Tr. 119:18-120:4 (Resp. App. at 589-590).

[265] Deposition of Steven Steinberg (Balboa 30(b)(6)). 24:11-15, 27:18-28:2, 32:23-33:17 (concerning Exhibit 3, BNEPH 00128 (Resp. App. at 776)), 34:15 (concerning Exhibit 4, BNEPH -129 (Resp. App. at 776)) (Oct. 21, 2010) (Resp. App. at 648-652); Seberg (Balboa (30(b)(6)) Tr. 9:22-25, 23:6-18, 25:2-26:1 (Resp. App. at 630-633).

[266] ABCQT-DMA-0000594714 (Resp. App. at 63).

[267] ABCQT-DMA-0000952982 (Resp. App. at 89); see also id. at 0000952983 ("VIALS ONLY!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!! per Dr. Laitman NO EXCEPTIONS EVER!!!") (Resp. App. at 90).

"their competition's sales, from me, the wholesaler, i.e. the spreadsheet."[268]

**INN SOF 105**

No provider has testified that ASD ever promoted the billing of Aranesp overfill that was

not medically necessary or actually administered. *See, e.g.,* S. Yablon Deposition (Rockland

Renal Associates 30(b)(6)) (Exhibit 65) at 118:4-118:16; S. Skinner Deposition (Central Illinois

Kidney and Dialysis Associates 30(b)(6)) (Exhibit 66) 30:6-30:9, 31:2-31:5; M. Curzi Deposition

(Diablo Nephrology Medical Group, Inc. 30(b)(6)) (Exhibit 67)148:14-148:20.

**Response to SOF 105**

Disputed.  If INN / ASD are part of the conspiracy to promote the billing of overfill, then
it necessarily promoted the billing of Aranesp overfill that was not medically necessary or
actually administered, because the promotion of Aranesp overfill promoted using more drug
product than was medically necessary.  For example, medical providers switched from not
billing overfill to billing overfill after purchasing Aranesp.[269]  With respect to amounts not
actually administered, if INN / ASD were part of the overfill conspiracy, then they were part of
the conspiracy to encourage providers to bill for amounts not actually administered, because it is
not possible to administer the volume of overfill marketed to providers by Amgen.

**INN SOF 106**

There were a limited number of occasions in which providers mentioned overfill to ASD,

but ASD never promoted or encouraged the use, administration, or billing of overfill. *See* M.

McClain Deposition (ASD 30(b)(6)) (Exhibit 45) at 104:11-105:11; 116:12-116:18.

**Response to SOF 106**

Disputed.  INN and ASD worked together to pitch Aranesp to medical providers, and
both entities focused on marketing for Amgen.[270]  INN and ASD both have the same corporate

---

[268] ABCQT-DMA-0000519072 (Resp. App. at 59).

[269] *See* Relator's Mem. in Opp. to Strike Portions of Hartman, Exh. 11 (Dkt 396-11).

[270] *See* RELATOR-KW-0089608 at 0089672 (App. at 425) (describing an "ASD demonstration" to
Amgen as "ASD calls customer to negotiate terms after they find out how important the customer is to
Amgen (from INN).  Can give up to additional 5.5% OID [off-invoice discount] to INN members."); *see
id.* (describing services INN "illustrated" to Amgen at an "INN training day," including "[d]iscount
prices, they compare ESP prices with a spreadsheet, can give accounts up to additional 5.5% by using
ASD, this is determined based on sales and volume, can do this because they are safe harbor"); Gremont
Tr. 57:5-58:3 (App. at 872-873).

parent, have overlapping employees, and have an imprecise and overlapping corporate structure, and their financials all roll up into the same parent entity. *See* Relator's R. 56.1 Stmt. 7-16. Indeed, INN's 30(b)(6) representative William Venus described ASD as "the distribution side" of INN's business.[271]   Selling Aranesp represented approximately 90% of ASD's business.[272] And INN even argues in its brief that INN and ASD, as sister companies, are incapable of conspiring with each other.  INN Br. at 19.

**INN SOF 107**

In January 2005, CMS began using Average Sales Price ("ASP") to calculate

reimbursement for most Medicare Part B drugs to providers. 69 Fed. Reg. 55763 (September 16,

2004); *See* AMGEN-BST0004042261 at 4042267 (Exhibit 68).

**Response to SOF 107**

Not disputed.

**INN SOF 108**

Amgen, as the manufacturer of Aranesp, is responsible for the reporting of the ASP for

Aranesp. 42 C.F.R. § 414.804.

**Response to SOF 108**

Not disputed.

**INN SOF 109**

Pursuant to 42 C.F.R. § 414.804, "[t]he manufacturer's average sales price must be

calculated by the manufacturer every calendar quarter and submitted to CMS within 30 days of

the close of the quarter."

---

[271] Venus (INN 30(b)(6)) Tr. 85:14-17 (App. at 986).

[272] Gremont Tr. 32:23-33:3 (Resp. App. at 505-506).

**Response to SOF 109**

Not disputed.

**INN SOF 110**

Neither INN nor ASD had knowledge regarding Amgen's calculation of the ASP for

Aranesp. *See* A. Corrao Deposition (Exhibit 29) at 142:5-142:7, 244:14-245:18; G. Inglese

Deposition (Exhibit 56) at 503:6-503:19; M. Mullen Deposition (Exhibit 69) at 68:16-68:22,

126:3-126:19; W. Venus Deposition (INN 30(b)(6)) (Exhibit 35) at 66:16-67:5.

**Response to SOF 110**

Disputed to the extent that INN and ASD were both aware that overfill was free product, and that free product is not included in ASP and should not be billed.

Angela Miele of INN referred to overfill as "extra," and made the observation that in order to make an "apples to [apples]" comparison of Aranesp to Procrit, one would need to account for overfill.[273]  When advising an Amgen rep about how to best market Aranesp to a medical provider based on overfill, Miele stated that the rep should remove overfill from the "original" (initial) pitch to the medical provider, "Then you can speak to the fact that Ara has 16 percent overfill afterwards."[274]  Miele understood that overfill was different in kind from the labeled volume of drug product, and that the overfill was free product not purchased by the provider.[275]

INN's "Nephrology Backgrounder" training document explained that, "[i]f you calculate it out, an office can get an extra dose for every 10 vials of Procrit but it only takes 7 vials to get the extra dose with Aranesp."[276]  If overfill constitutes an "extra" dose, then it is free drug product.

Kelly Carter of Amgen sent John Sowersby of INN an email message referring to the "overfill bonus," which made Sowersby aware that overfill was something additional or beyond the labeled volume.[277]

---

[273] Miele Tr. 147:11-150:16 (concerning Ex 25, ABCQT-DMA-00087594) (Resp. App. at 5)) (Resp. App. 564-567).

[274] *Id*. 151:24-154:15 ((concerning Ex 25, ABCQT-DMA-00087594) (Resp. App. at 5)) (Resp. App. 568-571).

[275] ABCQT-DMA-0000087594 (Resp. App. at 5).

[276] ABCQT-DMA-0000427667 at 0000427669 (Resp. App. at 14).

[277] ABCQT-DMA-0000092014 (Resp. App. at 5).

**INN SOF 111**

INN and ASD did not have access to Amgen's methodology for calculating ASP because it was a "proprietary calculation." *See* M. Mullen Deposition (Exhibit 69) at 68:16- 68:22 "Yeah, I—I don't know, and the reason I don't know is it's a proprietary calculation" (In response to question whether admin fees paid to various GPOs formed part of ASP); *see also* F. Manak Deposition (Amgen 30(b)(6)) (Exhibit 70) at 79:2-79:23.

**Response to SOF 111**

Not disputed in part, but disputed that INN was not aware that overfill was free product and was therefore not included in ASP and should not have been billed. INN was so aware. Relator incorporates her response to ¶110.

**INN SOF 112**

INN conducted regional and practice advisory boards sponsored by Amgen, pursuant to consulting services contracts that were separate from the GPO agreement. *See* AMGEN-BST0001342886 (Exhibit 71); ABCQT-DMA-0000432721 (Exhibit 72); ABCQTDMA-0000012390 (Exhibit 73); AMGEN-BST0000002384 (Exhibit 74).

**Response to SOF 112**

Disputed. The contracts which purport to relate to the practices and regional advisory boards do not reflect the true nature of the arrangement between the parties. For example, the Regional Advisory Boards involved unlawful activities such as the off label promotion of Aranesp under a monthly dosing regimen; the unlawful maximization of Medicare revenue; and marketing the spread on Aranesp:

| RECORDING MD0129-CAS-002 | Dan Smitley, RN, INN conference on anemia held at the St. Regis Hotel in Los Angeles, California, | 10/25/2003 |
|---|---|---|

**MONTHLY DOSING At 55.51 minutes**[278]

Smitley:        In fact what we do, if that patient used to come in every two weeks, we now make 'em go to three

---

[278] The audio recordings transcribed above were produced by INN and ASD Healthcare in discovery in this matter. The transcriptions above are true and accurate transcriptions of the contents of the audio tape. *See* Declaration of Donna Owens (Mar. 22, 2011) (Resp. App. 778). Relator will provide courtesy copies of the tapes themselves to the Court. *See* Resp. App. at 786.

weeks.  If this patient was coming every one week, we're  putting 'em out, put 'em out a week.  If they were coming every three weeks, we try and use that same dose.  It's not a "hold," but come back next week and we're going to try and make 'em now every four weeks.  So we space 'em out that way. **We have now quite a few of our patients are at every four week dosing.  We've got another, I think about, fourteen, fifteen patients that are  now out every six week dosing and I found out the other day that I've got eight patients that, since January, are holding at our eight week dosing.**

Male voice:        Is that on Aranesp?

Smitley:           On Aranesp, with Procrit we've tried, we've tried, we tried . We can't get 'em past two weeks effectively.

| RECORDING MD0129-CAS-008 | Dr. Edward Goldman, INN | 10/25/2003 |
|---|---|---|
| | INN conference on anemia held at the St. Regis Hotel in Los Angeles, California, | |

Goldman advises the audience that they should be testing every anemia patient for depression, because once diagnosed, the doctor can make an arrangement with a psychotherapist and make a profit on the bills submitted to Medicare.  Of the diagnostic test, Goldman advises:

**At 4.25**

Goldman:          One caveat, if you're giving a test, it, it needs to last for fifteen plus one minute.  'Cause if it lasts for fifteen plus one minute, you can bill an hour.

**ANEMIA IS A GOLDMINE at 14.34**

Goldman:          And then lastly what else can you, can you do in this? You can make money on, on intravenous therapies, um on hydration.  You certainly can make money on the anemia treatment, and um and that's no different than what you've been doing now, only in this case you are probably documenting functional status, you're probably documenting quality of life a little more aggressively than you would as justification for your using Aranesp.  But again, is this going to be the determinant of how you turn around your office finances? No.  But if you do it a little bit here and a little bit here and a little bit here, one of the things that you are going to find is that the, the dialysis companies are now tuning in to CKD as a lost goldmine.   And shame on you, it's your goldmine!

**ENCOURGAING DAILY HEMATOCRIT TESTING at 19.31**

Goldman:          Brian Pereira is going to be here at lunch.  Brian and I were looking at a non-puncture, non-puncture, puncture um, um hematocrit device.  It's a little ring, you stick your finger in it.

Male:              Photometry?

Goldman:          Yes, um stick your finger in it, and it gives you hematocrit level.  You can do that every day on every Medicare patient that walks through your office.  I don't mean every day, but uh, but that is a legitimate test that you can do, that has a print out, that's documented, uh that makes sense.  Now does it reimburse you a fortune of money? No, but, but day in day out, it's, it's this little meter that continues to go.  And by the way, it's good medicine 'cause then you're going to find the anemia, you're going to use the Aranesp--another source of profit and good medicine.  It's paying attention to what's going on in your office rather than just being in the office and dashing off to the hospital and then bitching and moaning that the office doesn't pay for itself.

| RECORDING MD0129-CAS-012 | Tracy Johnson Coding & Reimbursement | No date |
|---|---|---|

**TWO MONTHLY DOSING At 24.05 minutes**

Johnson:    If the patient sees the physician on that day, then you can bill the appropriate CPT code that the physician deems for that visit.

Female:    Um, usually it's not on that day all the time.

Johnson:    Well and that's one good thing with Aranesp you, you can make it on that date.  You, you can, **because they're gonna be coming in once a month, once every two months.**

The next exchange follows a presentation on some of the difficulties of obtaining reimbursement and the financial risk of starting patients on Aranesp.  The speaker advises the audience on ways to minimize financial risk and in this passages suggests billing for free samples:

**BILLING FOR FREE SAMPLES At 34.54 minutes**

Audience:    My understanding about the Reimbursement Connection is you have to put your patient through them.  They're gonna verify the insurance coverage, and then if you submitted a claim and the claim was denied saying there was no coverage when they told Reimbursement there was, that then Reimbursement Connection would do the appeal for you.  And then if you didn't get paid, then they would reimburse you the drug.  But if I did the investigation myself, they wouldn't help you at all.

Johnson:    And you might – I, I would double check that with Reimbursement Connection just to make sure, because it may vary, um.  I haven't had to have any drug replacement, because I've been able to get all my claims paid after I did my appeal.  Um, I know that we're signed up for it, but I really haven't had to use it.  So, I may be incorrect.  Um, but I would definitely contact them.  And if that's the case, all you have to do is fill out a piece of paperwork and fax it to 'em.  And they, I think they have a really good turn-around.  24 hours.  And what we are able to do was, we have accumulated some free drug, samples, or whatever, and you can give them one shot.

Audience:    Until that comes back?

Johnson:     Yeah.  And then that gives you enough time to verify that information.  And I, and it does vary you know from carrier to carrier and state to state, but the Reimbursement Connection should be able to help you with that.

| RECORDING MD0129-CAS-045 | Dan Smitley, RN<br><br>INN conference on anemia held at the St. Regis Hotel in Los Angeles, California | 10/25/2003 |
|---|---|---|

**MARKETING THE SPREAD At 33.36**

Male voice:    You're buying a million dollars worth of drug each year in your practice, is that right?

Smitley:    We bought, this year, it's about 1.3, 1.4 million.

Male voice:    Okay, so what kind of **profit** are you making off that?

Smitley:    Not charging nurse visits 'cos that's a whole separate fee and everything else on top of that-- just

based on the drug alone?

Male voice:        Right.

Smitley:           **This year our numbers were about $350,000.**

**INDUSTRIAL DOSING At 44.31**

Smitley:           Most of our patients are anywhere from 120 to 200 mics, the ones that we have on the longer
                   dosing.  I mean we're starting **some really industrial dosing. One of our physicians just had me
                   order last week a 300, or two weeks ago, the 300 mics.**  He wants to try and get 'em even
                   further out.  So we start with a much higher dose.

| RECORDING MD0129-CAS-049 | Sheila Young, RN of Mid-Atlantic Nephrology Associates on Infusion Services<br><br>International Nephrology Network/Amgen Consultant Conference, St. Regis Hotel, LA, CA | 12/9/2003 |
| --- | --- | --- |

**MONTHLY DOSING At 57.07 minutes**

Young:             One really good protocol we have -- once our patient's stabilize after six weeks on every-other-
                   week dosing, we have just started doing this, so I don't know what the, what the um outcome is,
                   we -- **we double their Aranesp dose and automatically put 'em out to every four weeks** …
                   sometimes you can't actually double it, like -- but we try and, and make it two times that and have
                   'em come back in a month.  **So it's pretty much a leap of faith** that we're doing that, but we're
                   doing that based on our outcomes with the AMPS study.  But we, we have been able to maintain
                   people on monthly Aranesp dose.

| RECORDING MD0129-CAS-063 | Dan Smitley St. Petersburg, FL | 3/6/2004 |
| --- | --- | --- |

In the next passage Dan Smitley is giving a slide presentation:

**MONTHLY DOSING at 42.29 minutes**

Smitley:           Transportation is a big issue.  Try and get this patient in here every single week -- we can't do it.
                   [Inaudible] **We switch the patient over to Aranesp, actually this patient is now on 160 mics
                   every six weeks**.  He doesn't miss appointments.  He can get a ride once a month. He can get a
                   ride once every six weeks.

**At 43.53 minutes**

Smitley:           This is another patient who is being dosed every month.  In fact, **we now have I think 26, 27 of
                   our patients are now dosed at greater than six-week dosing**… for a lot of 'em it's six to eight
                   weeks.  So we are now trying to take a lot, the rest of our patients that way.  Some of the things to
                   take from this -- develop protocols, develop [inaudible] and you, and you gotta make it,
                   [inaudible]. You need to do this, but then your fear is that you don't know my staff. Or you don't
                   know whatever's going on [inaudible]. **I'm a firm believer that whatever you do develop has
                   got to be P H D.  It's gotta be "Push here dummy!"**

**At 48.18 minutes**

Smitley:           How are y'all doing in your clinics? Are y'all, are y'all making money at this? Are you making
                   money off the drug?  Whichever one you use, Procrit, Aranesp, iron? Are y'all making money at
                   this?  How many are not really sure?....

70

Following a discussion of the "incident to care" Medicare rule that services billed "incident to care" require the "presence" of a physician.

**At 57.06 minutes**

Smitley:      The physician must be in the office.  Now some of the commercials do not require it. But my staff, it can get too confusing.  I just tell 'em for everybody, we've gotta do that.

Male:        It's a big issue for non-compliance in small offices, because we're not in the office most of the time.  And, we're not in for example, any morning, so patients can't come by in the morning and get a shot.  They have to come by in the afternoon.  So it's really only four days, four afternoons a week that they can come in and get a shot…

Smitley      **Can you turn the tape off for a minute?**

| RECORDING MD0129-CAS-082 | Sheila Young, RN

International Nephrology Network/Amgen consultant conference in Carmel, California | 3/27/2004 |
|---|---|---|

**MONTHLY DOSING at 9.41 minutes**

Young:      I think what we need to do in the office setting is do what they've done in the dialysis unit -- take it away from the physicians.  Make it nurse-driven, have protocols in place.  And this is pretty much the basis of the anemia talk you heard earlier.  So we put that in play and we were able to hire a nurse who is, she's held accountable for outcomes, she's held accountable for people that -- getting 'em to target**. She's held accountable for putting more people on drug** and I think right now is, we have 580 people on….[inaudible]

**MONTHLY DOSING at 10.22 minutes**

Young:      About two months ago we were 50/50 Procrit/Aranesp. Since we've been with INN and we've got the Group Purchase Organization fee, Amgen's been very aggressive. Right now the doctors made the financial decision that any new starts will be on Aranesp…. Our protocol is pretty simple, and I'd like to ask you guys what you do.  We start everybody on 60 micrograms every other week.  If they weigh over 180[279] lbs we'll put 'em on 100 mics every other week.  What we do traditionally, what we've done is, using the 90 day rolling average we never hold, we never hold drug.  We do it 90 day rolling average and extend the dosing interval, so if they're every, if they're every two weeks, what we'll do is we'll give 'em the dose and have them come back every three weeks.  **Now what we're doing because we've done a couple clinical trials and we've seen some data from Amgen, what we're gonna do is, we're gonna try and get everybody to once a month.**  So essentially once they've hit target, every two weeks we're gonna double their dose and have them come back once a month.  So that was a real leap of faith on the doctors' part, they were like, "oh, I don't know about that," but there is some data and there have been some studies done that shows that's, that's effective, that's a good way of doing it.

**TWO MONTHLY DOSING at 14.12 minutes**

Young:      I've talked to a lot of nurses across the country **and a lot of people were even going Q6, Q8 weeks** but the doctors are not comfortable letting their patients go that long.  They really want to

---

[279] According to the National Center for Health Statistics, the average weight for an adult male in the United States is: 189.8 pounds.

> keep a tighter rein.  It was, it was a leap to let 'em go once a month, but so far it's been proven the patients, they're coming back.  Before, as their anemia has been treated, they feel better, and they come, they are committed to coming back once a month

Practice Advisory Boards were also known as practice assessments[280] and were ostensibly a service to the practice.[281]  However, in effect, this form of advisory board was simply a means by which INN could provide Amgen with "an intimate look inside a practice" "where 'pharma' cannot go."[282]  Thus, the practice assessments "[p]rovide[] [the] opportunity to drive decisions and to influence changes in current behaviors"[283] for example the dissemination of information regarding overfill.

INN, with knowledge by Amgen senior management, was presenting economic analyses that included overfill revenues to medical providers.  By way of example, an overview and analysis of the Southwest Kidney Institute ("SKI"), with multiple locations in Phoenix, Arizona, maintained in the files of Vice President of Sales, Leslie Mirani, and prepared by a member of the Amgen sales force stated:

> INN has aggressively targeted this hospital.  They have presented a contract to contract numbers comparison, *overfill analysis*, Aranesp in dialysis, and the potential of ordering through different tax identification numbers to maximize both Ortho's and Amgen's contracts.  SKI is aware that top Amgen accounts get an additional 4% rebate in their P3 [purchase agreement] – and they do not.[284]

**INN SOF 113**

Amgen had identified the need to further understand the regional and practice level treatment differences and patient access issues related to chronic kidney disease, and INN was providing Amgen with a service by assisting them in addressing their business and information needs for the nephrology market by performing practice and regional advisory boards. *See* S. Carmer Deposition (Exhibit 31) at 131:17-134:6.

---

[280] Steve Reichenbach testified that practice advisory boards and practice assessments were "the same thing," and that the terms were "interchangeable."  Reichenbach Tr. 65:12-20 (Resp. App. at 611).

[281] Practice Advisory Boards "[e]levate[] the network from being a seller of goods to a more advisory and consultative role, allowing for a more integrated relationship between the practice and the [INN] network.'"  AMGEN-BST0001376382 (Resp. App. at 167).

[282] AMGEN-BST0001376381 (Resp. App. at 171).

[283] AMGEN-BST0001376382 (Resp. App. at 172)

[284] AMGNY-MIL00175114 at 00175116 (emphasis added) (Resp. App. at 182).

**Response to SOF 113**

Disputed.  The true purposes behind the Practice and Regional Advisory Boards had little to do with their official justification.  *See* Relator's Response to INN SOF 112.  Relator further disputes this assertion as containing improper argument and/or opinion.

**INN SOF 114**

Mr. Carmer testified that "[Amgen] didn't have the skills, the competencies, the insights of experience to do th[e] kind of work" to put on regional and practice advisory boards. *See* S. Carmer Deposition (Exhibit 31) at 275:16-275:21.

**Response to SOF 114**

Not disputed.

**INN SOF 115**

INN and Amgen negotiated the contract terms of the consulting services agreements for the practice and regional advisory boards for over a five month period of time. *See* V. DeStasio Deposition (Exhibit 75) at 171:14-174:18, 178:1-179:25; AMGENBST0002651928 (Exhibit 76); AMGEN-BST0002651474 (Exhibit 77);   AMGENBST0002651623 (Exhibit 78); AMGEN-BST0002262157 (Exhibit 79).

**Response to SOF 115**

Not disputed to the extent that the time period in question was approximately five months.

**INN SOF 116**

The practice advisory boards sponsored by Amgen were proposed "to discuss the clinical and practice management issues related to supportive care and the use of erthyropoietic stimulating proteins in the practice setting . . . " The objective of the project was "[t]o discuss the treatment algorithm for the anemia of chronic kidney disease from the perspective of physicians, nurses and the office manager." The practice advisory boards would "help identify the clinical

and practice issues related to the use of ESPs which would be addressed by Amgen." *See*

ABCQT-DMA-0000012390 (Exhibit 73).

**Response to SOF 116**

Disputed.  *See* Relator's Response to INN SOF 112 in so far as it relates to Practice
Advisory Boards.  Relator further disputes this assertion to the extent that it relies upon
inadmissible evidence.

**INN SOF 117**

Pursuant to the practice advisory board consulting services agreement, INN completed

twenty-four practice advisory boards in 2003 and provided to Amgen the discussion guides, data

collected from surveys and summaries of the practice advisory boards. *See* ABCQT-DMA-

0000012390 (Exhibit 73); ABCQT-DMA-0000671078 (Exhibit 80); ABCQTDMA-0000070460

(Exhibit 81); ABCQT-DMA-0000654845 (Exhibit 82); AMGEN- BST0001352060 (Exhibit 83)

**Response to SOF 117**

Disputed to the extent that the contracts which purport to relate to the practices advisory
boards do not reflect the true nature of the arrangement between the parties.  *See* Response to
¶ 112 to the extent that it relates to Practice Advisory Boards.

**INN SOF 118**

The consulting services agreements informed practices that information received at

practice advisory boards would be shared with Amgen. Pursuant to the consulting services

agreements signed by the providers for the practice advisory boards, the providers also "agree[d]

that Amgen has the royalty-free right to use any information, ideas, and reports provided by

Consultant to Amgen in connection with the performance of Services hereunder." *See, e.g.,*

AMGEN-BST0002650919 (Exhibit 84).

**Response to SOF 118**

Not disputed that INN conducted practice assessments / practice advisory boards of
specific medical providers, that those practice assessments / practice advisory boards were paid
for by Amgen, and that INN then provided the information that it gained from the practice

assessment about that medical provider to Amgen.  Otherwise disputed.

Steve Reichenbach testified that practice advisory boards and practice assessments were "the same thing," and that the terms were "interchangeable."[285]  Reichenbach testified that Amgen employees never attended practice advisory boards / practice assessments, and it would have "absolutely" been inappropriate if they had.  Reichenbach testified that the practice advisory boards were "a function of INN.  It wasn't a function of Amgen."  When asked how Amgen was involved in practice assessments generally, Reichenbach testified that "they weren't involved."[286]  Reichenbach testified that he did not provide any information from a practice assessment / practice advisory board to Amgen.[287]

Angela Miele also testified that INN advised doctors that the content of the practice assessments would be absolutely confidential:

> Q. Okay. Did you share practice assessments at Amgen?
> A. No.
> Q. Okay. Did you tell the doctors that their practice assessment would be shared with Amgen?
> A. We expressly told them that would not be shared with any third party.[288]

Amgen participated in the joint marketing efforts of INN and ASD, by providing "target lists" to INN of health care providers that it wanted to "capture."[289]  Reichenbach testified that he did not know whether medical providers who were the targets of practice assessments were aware that Amgen was the one who had chosen them, that he personally did not make any providers aware that Amgen had targeted them, and that he was not aware of anybody else who ever told medical providers that Amgen had targeted them.[290]  He further testified that he had "no idea" whether medical providers knew that Amgen was involved in practice assessments / practice advisory boards.[291]  The language in the sample agreement cited by INN above notwithstanding, there is a genuine issue of fact as to whether medical providers were aware that Amgen paid for practice assessments of their specific medical practice, and that the information about their practices was then shared with Amgen without their knowledge.

---

[285] Reichenbach Tr. 65:12-20 (Resp. App. at 611).

[286] *Id.* at 77:16-20 (Resp. App. at 612).

[287] *Id.* at 77:9-10 (Resp. App. at 612).

[288] Miele Tr. 83:18:25 (Resp. App. at 562).

[289] Venus (INN 30(b)(6)) Tr. 173:3-15 (App. at 999)

[290] Reichenbach Tr. 78:13-79:7 (Resp. App. at 613-614).

[291] *Id.* at 79:15-19 (Resp. App. at 614).

**INN SOF 119**

Separate and distinct from the Amgen-sponsored practice advisory boards were practice

assessments for which INN was not paid. As INN developed its capabilities, a few practices did

pay INN for this service. G. Inglese Deposition (Exhibit 56) at 293:7-294:10.

**Response to SOF 119**

Disputed.  Steve Reichenbach testified that practice advisory boards and practice
assessments were "the same thing," and that the terms were "interchangeable."[292]  Relator also
disputes this assertion to the extent that it includes improper opinion and/or argument.

A.    **INN Conducted Seven Regional Advisory Boards That Concluded in 2004.**

**INN SOF 120**

The regional advisory boards were proposed to "examine regional differences in

nephrology practices and discuss protocols and standards for treatment and utilization of

supportive care in the treatment of anemia associated with chronic kidney disease." *See*

AMGEN-BST0001342886 (Exhibit 71). The objectives of the programs were to "a) [d]etermine

the regional differences in practice patterns related to the treatment of anemia of chronic kidney

disease, b) [l]earn about the regional differences in how nephrologists utilize erythropoietic

stimulating proteins (ESPs), c) [e]valuate how office managed care policies and policies [sic]

impact on patient care at the office level, [and] d) [r]eview protocols and standards for treatment

and utilization of supportive care in the treatment of anemia of chronic kidney disease." *See*

AMGEN-BST0001342886 (Exhibit 71).

**Response to SOF 120**

Disputed.  The contracts which purport to relate to the regional advisory boards do not
reflect the true nature of the arrangement between the parties.  *See* Response to ¶ 112 to the
extent that it relates to Regional Advisory Boards.  Relator also disputes this assertion to the
extent that it includes improper opinion and/or argument.

---

[292] Reichenbach Tr. 65:12-20 (Resp. App. at 611).

**INN SOF 121**

Pursuant to additional Consulting Services Agreements with Amgen, INN conducted seven regional advisory boards in 2003 and 2004. *See* AMGEN-BST0001342886 (Exhibit 71); ABCQT-DMA-0000432721 (Exhibit 72).

**Response to SOF 121**

Disputed.  The contracts which purport to relate to the regional advisory boards do not reflect the true nature of the arrangement between the parties.  *See* Response to ¶ 112 to the extent that it relates to Regional Advisory Boards.

**INN SOF 122**

The regional advisory boards were held in Washington, D.C. on October 4, 2003; Dallas, Texas on October 24-25, 2003; Miami, Florida on November 21-22, 2003; Los Angeles, California on December 12-13, 2003; New Orleans, Louisiana on February 20-21, 2004; St. Petersburg, Florida on March 5-6, 2004; and Carmel, California on March 26-27, 2004. *See* ABCQT-DMA-0000070530 (Exhibit 85) at 70531; ABCQT-DMA-0000441590 (Exhibit 86); AMGEN-BST0004100641 (Exhibit 87); ABCQT-DMA-0000440608 (Exhibit 88); ABCQT-DMA-0000702736 (Exhibit 89); ABCQT-DMA-0000023660 (Exhibit 90); ABCQT-DMA-0000092724 (Exhibit 91).

**Response to SOF 122**

Not disputed.

**INN SOF 123**

The regional advisory boards involved seminars and break-out sessions led by clinicians, including physicians from different practices, regarding topics relevant to nephrology practices, such as Interventional Nephrology, Anemia CKD Discussion, End of Life Programs for Nephrology Offices. *See* ABCQT-DMA-0000092724 (Exhibit 91).

**Response to SOF 123**

Disputed to the extent that while some of the content of the Regional Advisory Boards may have included legitimate presentations, a significant portion involved unlawful marketing practives.  *See* Response to ¶ 112 to the extent that it relates to Regional Advisory Boards.

**INN SOF 124**

Dr. Edward Goldman, for example, was a presenter at the Dallas, Texas regional advisory board. He "gave a lecture on the current medical environment showing what [his] research had showed [sic] in terms of patient care in nephrology offices and the treatment of chronic kidney disease." E. Goldman Deposition (Exhibit 10) at 68:15-68:24.

**Response to SOF 124**

Disputed to the extent that the example given of one of Dr. Goldman's presentations is not representative of the content of the sort of instruction provided by the doctor.  At the same regional Advisory Board in Texas, Goldman advised the audience that they should be testing every anemia patient for depression, because once diagnosed, the doctor can make an arrangement with a psychotherapist and make a profit on the bills submitted to Medicare.  Of the diagnostic test, Goldman warns: "*One caveat, if you're giving a test, it needs to last for fifteen plus one minute because if it lasts for fifteen plus one minute, you can bill an hour.*"  Relator's Response to INN SOF 112, *supra* (emphasis added) (At 4.25 minutes [MD0129-CAS-008] (Resp. App. at 786)).

**INN SOF 125**

There was no entertainment provided at the regional advisory boards; for example, there was no golfing, meals were only provided in connection with the program and attendance by spouses was not paid for. *See* V. DeStasio Deposition (Exhibit 75) at 212:22- 213:18.

**Response to SOF 125**

Disputed.  The nature of the locations themselves are sufficient for a jury to infer that the provision of free accommodation at the itself constitutes a "kickback", for example the Wyndham Valley Golf Resort & Spa describes itself thus *"The Ranch's metamorphosis from a golf and tennis resort to something more magical included revitalizing the existing structures, adding new ones such as a 10,500-square-foot spa, and creating the ideal environment for play to be incorporated into every aspect of life, so that guests go home utterly relaxed and invigorated – and brimming with inspiration and great stories. The Ranch is rich with activities*

*ranging from hiking and yoga to apiculture and wine tasting.*"[293]

Indeed, as Jeremy Jaggi put it in an email to Alex Roubanis of April 4, 2004, "Venue was a hit to customers regardless of the content."[294]  Further adding, "Overall, everyone had a great time (In Carmel, it happens no matter what)."[295]  These Regional Advisory Boards were principally a means by which to promote Amgen's products.

Jaggi also recalled a comment from Gary Inglese made at the Carmel Regional Advisory Board that he is "dedicated to flipping difficult accounts, but wouldn't mind picking up some easy ones along the way."[296]  When Deponent number 2 was asked about sales and practice advisory boards at his deposition he declined to answer instead invoking his rights against self incrimination.[297]

When Deponent number 1, the former national sales director for Aranesp, was asked about regional and practice advisory boards at his deposition he declined to answer instead invoking his rights against self incrimination.[298]

In addition doctors were paid $500 to attend, practice managers and nurses were paid $250.  Dorothy Schneider of Nephrology Associates of Syracuse ("NAS") recalls attending a weekend seminar advisory board where the flights and hotel accommodation were paid for by Amgen.  Ms. Schneider recalls that three other staff members also attended such an advisory board.  However, despite being styled an advisory board, she does not recall filling out any questionnaires or speaking at any presentation.  Instead, Ms. Schneider was a passive recipient of information in lectures she felt obliged to attend having received an honorarium of $1000 in her capacity as practice manager for NAS.[299]

## INN SOF 126

Pursuant to the terms of the regional advisory board consulting services agreements, INN

delivered to Amgen the data it collected from surveys, summaries of the advisory boards, and

analyses of the responses from the various advisory board meetings to Amgen. *See* ABCQT-

DMA-0000069890 (Exhibit 92); ABCQT-DMA-0000070530 (Exhibit 85); AMGEN-

BST0001342886 at 1342897 (Exhibit 71); ABCQT-DMA-0000432721 at 432734 (Exhibit 72).

---

[293] http://www.carmelvalleyranch.com

[294] AMGEN-BST 000391105 (Resp. App. at 129).

[295] *Id.*

[296] *Id*.

[297] Deponent No. 2 Tr. 48:9-23, 56:6-15 (Resp. App. at 451, 452).

[298] Deponent No. 1 Tr. 51:20-52:20 (Resp. App. at 447-448).

**Response to SOF 126**

Disputed to the extent that the contracts which purport to relate to the practices and regional advisory boards do not reflect the true nature of the arrangement between the parties which involved.  See Response to 112 to the extent it relates to regional Advisory Boards. Otherwise some data may have been collected but Relator does not concede that this means that the Regional Advisory Boards were conducted in good faith.

**INN SOF 127**

INN prepared survey reports that were the quantitative deliverable submitted to Amgen concerning the breakout sessions that focused for example on CKD disease management, interventional nephrology, infusion management, and anemia in CKD. *See* V. DeStasio Deposition (Exhibit 75) at 222:17-223:1, 225:2-225:8; ABCQT-DMA-0000069890 (Exhibit 92).

**Response to SOF 127**

Disputed.  *See* Response to INN SOF 126.

**INN SOF 128**

INN also prepared narrative summaries for Amgen that were qualitative reports of each of the breakout sessions "in terms of the general tone of the discussion, some of the trends, [and] some of the issues that the presenter learned as a result of conducting the breakout session." *See* V. DeStasio Deposition (Exhibit 75) at 224:1-224:20, 225:22-225:24.

**Response to SOF 128**

Disputed.  *See* Response to INN SOF 126.

**INN SOF 129**

INN delivered these items to Amgen.  *See* V. DeStasio Deposition (Exhibit 75) at 224:21-225:21.

**Response to SOF 129**

Not disputed.

---

[299] Schneider Tr. 90:3-93:13 (Resp. App. at 625-628).

**INN SOF 130**

Pursuant to the consulting services agreements signed by the providers for the regional advisory boards, the providers also "agree[d] that Amgen has the royalty-free right to use any information, ideas, and reports provided by Consultant to Amgen in connection with the performance of Services."  *See, e.g.,* AMGEN-BST0004099066 (Exhibit 93).

**Response to SOF 130**

Disputed.  Reichenbach testified that he did not provide any information from a practice assessment / practice advisory board to Amgen.  (Reichenbach Tr. 77:9-10.)

Angela Miele also testified that INN advised doctors that the content of the practice assessments would be absolutely confidential:

> Q. Okay. Did you share practice assessments at Amgen?
> A. No.
> Q. Okay. Did you tell the doctors that their practice assessment would be shared with Amgen?
> A. We expressly told them that would not be shared with any third party.[300]

Amgen participated in the joint marketing efforts of INN and ASD, by providing "target lists" to INN of health care providers that it wanted to "capture."[301]  Reichenbach testified that he did not know whether medical providers who were the targets of practice assessments were aware that Amgen was the one who had chosen them, that he personally did not make any providers aware that Amgen had targeted them, and that he was not aware of anybody else who ever told medical providers that Amgen had targeted them.[302]  He further testified that he had "no idea" whether medical providers knew that Amgen was involved in practice assessments / practice advisory boards.[303]  The language in the sample agreement cited by INN above notwithstanding, there is a genuine issue of fact as to whether medical providers were aware that Amgen paid for practice assessments of their specific medical practice, and that the information about their practices was then shared with Amgen without their knowledge.

---

[300] Miele Tr. at 83:18-25 (Resp. App. at 562).

[301] Venus (INN 30(b)(6)) Tr. 173:3-15 (App. at 999).

[302] Reichenbach Tr. 78:13-79:7 (Resp. App. at 613-614).

[303] *Id.* at 79:15-19 (Resp. App. at 614).

March 22, 2011                                          Respectfully submitted,

                                                        RELATOR KASSIE WESTMORELAND

                                                        By: /s/ Joseph S. Hall
                                                        Mark C. Hansen (BBO # 541753)
                                                        Silvija A. Strikis (pro hac vice)
                                                        Joseph S. Hall (pro hac vice)
                                                        Derek T. Ho (BBO # 652627)
                                                        Wan J. Kim (pro hac vice)
                                                        Andrew C. Shen (pro hac vice)
                                                        Marc A. Wallenstein (pro hac vice)
                                                        KELLOGG, HUBER, HANSEN, TODD
                                                          EVANS & FIGEL, P.L.L.C.
                                                        1615 M Street, N.W., Suite 400
                                                        Washington, D.C. 20036
                                                        (202) 326-7900
                                                        (202) 326-7999 (facsimile)

                                                        Suzanne E. Durrell (BBO #139280)
                                                        DURRELL LAW OFFICE
                                                        180 Williams Avenue
                                                        Milton, Massachusetts 02186
                                                        (617) 333-9681
                                                        Fax: (617) 333-0014
                                                        Email: Suzanne.durrell@verizon.net

                                                        Robert M. Thomas, Jr. (BBO #645600)
                                                        THOMAS & ASSOCIATES
                                                        280 Summer Street, 5th Floor
                                                        Boston, MA 02210-1131
                                                        (617) 371-1072
                                                        Fax: (888) 676-7420
                                                        Email: rmt@thomasandassoc.net

                                                        Rory Delaney, Esq. LLC (BBO #655666)
                                                        Seven Liberty Square, 2nd Floor
                                                        Boston, MA 02109
                                                        (857) 498-0384
                                                        Email: rory@rorydelaney.com

                                                        Charles F. Kester (pro hac vice)
                                                        Lawrence M. Isenberg (pro hac vice)
                                                        KESTER & ISENBERG
                                                        Encino Financial Center

16133 Ventura Boulevard, Suite 260
Encino, California 91436
(818) 728-3300
Fax: (818) 728-3311
Emails ckester@kesterisenberg.com
lisenberg@kesterisenberg.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to
the registered participants as identified on the Notice of Electronic Filing (NEF) and paper
copies will be sent to those indicated as non registered participants on March 22, 2011.

_/s/ Joseph S. Hall_