**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* KASSIE WESTMORELAND,<br><br>               Plaintiff,<br><br>    v.<br><br>AMGEN INC.; INTERNATIONAL<br>NEPHROLOGY NETWORK renamed<br>INTEGRATED NEPHROLOGY NETWORK, a<br>d/b/a of DIALYSIS PURCHASING ALLIANCE,<br>INC.; and ASD HEALTHCARE,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 06-10972-WGY<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**AMGEN INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO STRIKE AND PRECLUDE REFERENCES TO DATA COMPILED IN CMS SPREADSHEETS AS EVIDENCE OF PROVIDER CERTIFICATION DATES**

Amgen Inc. ("Amgen") moves to strike inadmissible hearsay evidence upon which Relator relies in opposing Amgen's motion for partial summary judgment. That evidence consists of two spreadsheets of purported Medicare provider enrollment data compiled solely for this litigation by an unknown source at the Centers for Medicare and Medicaid Services ("CMS"). Relator relies upon these spreadsheets as proof of an essential element of her Count 2 claim under the False Claims Act ("FCA") – that providers certified their compliance with the Anti-Kickback Statute ("AKS") while knowing at the time that they would be accepting kickbacks in the form of Aranesp® overfill. Relator has actual signed certifications of AKS compliance for only 2% of the providers upon which her Count 2 claim rests. For the remaining providers, she merely guesses at the existence and date of such a certification, which includes relying on the data in the two CMS spreadsheets. The resolution of this evidentiary issue in Amgen's favor would eliminate for trial a significant portion of Relator's kickback-based false certification claim and streamline consideration of Amgen's motion for summary judgment.

## BACKGROUND

Relator's Count 2 theory of falsity under the FCA is that providers who allegedly billed Medicare for Aranesp® overfill made knowingly false certifications in Medicare enrollment forms of their compliance with the AKS. *See U.S. ex rel. Westmoreland v. Amgen Inc.*, 738 F. Supp. 2d 267, 275-76 (D. Mass. 2010). Relator contends that a jury can infer that those certifications are knowingly false from proof that these providers billed Medicare for Aranesp® overfill on dates both before and after the dates on which they signed certifications of compliance with the AKS. *See* Amgen's Mem. Supp. Summ. Judg. at 16-17 [Docket No. 377] ("Amgen's Mem."). Regardless of the lack of merit of this theory, it turns upon Relator proving the specific date on which providers signed the certification forms and that the signed forms did in fact contain the AKS certification – which only first appeared in late 2001.

To establish these certification dates, Relator issued a third-party subpoena to CMS for, *inter alia*:

> All Medicare enrollment forms, including but not limited to any versions of CMS Form CMS-855, submitted to CMS by any Medical Provider that sought reimbursement from any Government Healthcare Program for the use or purchase of Aranesp, Procrit, or Epogen.

Relator's Appendix Opp'n Amgen's Mot. Summ. Judg. ("Relator's App.") [Docket No. 432] at 520. In lieu of providing the actual certifications for providers who sought reimbursement for Aranesp® – which CMS could not locate for the vast majority of providers – CMS provided Relator with two spreadsheets purporting to reflect enrollment information for many, but far from all, providers and provider groups. Neither of these spreadsheets contain the actual dates on which providers may have signed their certifications or indicates whether the enrollment forms even contained the AKS certifications.

CMS expressly informed Relator that none of the dates on the spreadsheets is the actual date on which providers signed certifications. Ex. 1 [Email chain with Ms. Susan Bozinko, U.S. Department of Health & Human Services Office of the General Counsel – CMS Division dated October 2010] ("Oct. CMS Emails"). Furthermore, CMS told Relator that the spreadsheets do not even reflect the date upon which the providers submitted those certifications to Medicare. *Id*. Instead, as CMS told Relator, the spreadsheet date labeled "enrollment create date" is merely "the date of the creation [by Medicare] of the enrollment record in [Medicare's] PECOS [system]. It is not the effective date of enrollment of the provider or supplier . . . . These two dates are not always the same." *Id*. In other words, it is the date on which some administrative record was created, not the date a provider signed or filed a certification.

Nevertheless, Relator sought a declaration from CMS to lay the foundation for a hearsay exception that would allow her to use the spreadsheets to prove the dates by which providers certified that they would comply with the AKS. *See* Ex. 2 [Email chain with Ms. Bozinko dated March 2011] ("Mar. CMS Emails"). Upon information and belief, Relator's counsel never obtained the requested declaration from CMS. However, in correspondence concerning the requested declaration, CMS responded to a question regarding when the spreadsheets were created and for what purpose. CMS stated:

> [T]he 'spreadsheet' was compiled for purposes of responding to the subpoena requests in this litigation! We were trying to be helpful – all the information was compiled by CMS employees for the purposes of responding to the subpoenas – they found the information requested and put it in the spreadsheet. As to the certifications, our contractors have searched and we have produced all enrollment and re-enrollment certifications we have been able to find up to now.

*Id*. CMS provided no information as to the source of the spreadsheet data, where the data was "found," when or why that data had been created, or how it had been maintained. *Id*.

Relator's opposition to Amgen's motion for summary judgment on the Count 2 certification claim relies upon these CMS spreadsheets to prove the "approximate certification dates" for many of the providers who allegedly certified compliance with the AKS. Relator's Mem. Opp'n Amgen's Summ. Judg. at 16 [Docket No. 431] ("Relator's Opp'n"). Relator's theory of liability and damages depends, however, on proving an actual certification date of compliance with the AKS. To the extent the assigned date on the spreadsheets is later than the actual signature date, Relator cannot establish that the enrollment form even exists or that the version of any submitted enrollment form includes the AKS certification that was not part of the enrollment forms once used by CMS.

Moreover, there is no discernable pattern between the actual signature date on the actual enrollment forms obtained and the dates assigned to the provider on the spreadsheets, and these dates often vary by a number of years. For example, the actual signature date on an actual enrollment form for Dr. Renee Garrick is nearly *five years after* the date assigned in the spreadsheets upon which Relator relies. Ex. 3[1] (Chart of Expert F.S. Morton). Using the actual certification date for Dr. Garrick eliminates most – if not all – of the alleged damages for this provider. *See* Amgen's Mem. at 16-17.

Similarly, using the actual signature date upsets Relator's theory of a *knowingly* false certification based on proof of overfill claims both before and after that specific date. For example, Relator assigned a certification date based on the CMS spreadsheets for Dr. Jerome Rubin of May 19, 2005, and, based on this certification date, calculated damages of $3.4 million

---

[1] Due to confidentiality agreements with CMS regarding the protection of provider enrollment information, Amgen is not attaching copies of the enrollment forms or spreadsheets themselves. Instead, Amgen has provided summaries of this information as contained in the Rebuttal Expert Report of F.S. Morton. Upon request of the Court, however, Amgen will file the requested documents under seal. The full expert report reflecting redactions due to provider and patient confidentiality issues of Amgen's rebuttal expert Fiona Scott Morton is attached as Exhibit 35 to the Decl. Kirsten V. Mayer Supp. Amgen's Mot. Summ. Judg. [Docket No. 381].

4

and penalties of up to $65 million. Ex. 3 ¶ 259. The only alleged overfill claims, however, begin on January 6, 2005 and end on May 8, 2006. Ex. 4 (listing six overfill claims for Dr. J. Rubin). Thus, Relator's theory of a knowingly false certification will fail – taking damages and penalties for this provider down to zero – if the actual certification date for Dr. Rubin is either six months earlier or one year later. *See id.*; Ex. 3 ¶ 259. For both liability and damages, therefore, "approximate" dates are not enough; actual certification dates are critical.

Nor are Dr. Garrick and Dr. Rubin the only examples of providers whose actual certification date is years before or after the date on the spreadsheets, or for whom either no liability could be alleged or for whom damages could be reduced to zero, or close to zero, if Relator had used the actual date of signature.

Despite the numerous deficiencies with the spreadsheets, Relator summarily asserts that they are admissible under the public records hearsay exception of Fed. R. Evid. 803(8). Relator's Opp'n at 16. But Relator has provided no declaration, testimony, or other evidence to show that the spreadsheets could satisfy the requirements of this hearsay exception.

## ARGUMENT

"Evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Vazquez v. Lopez-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998). Relator argues the data contained in the spreadsheets satisfy the public records exception to hearsay. Relator's Opp'n at 16. But Relator has not carried her burden, through declarations or otherwise, of proving that the data compiled in these spreadsheets would satisfy any hearsay exception. Furthermore, the information CMS provided confirms that no hearsay exception could be satisfied. In addition, the data contained in the spreadsheets lacks trustworthiness and is inaccurate and insufficient proof for the truth of the matters asserted.

**I.   THE CMS SPREADSHEETS DO NOT SATISFY THE PUBLIC RECORDS EXCEPTION TO HEARSAY**

To satisfy the public records exception to hearsay, Relator must prove that the CMS spreadsheets set forth "the activities of the office or agency," "matters observed pursuant to duty imposed by law as to which matters there was a duty to report," or "factual findings resulting from an investigation made pursuant to authority granted by law." Fed. R. Evid. 803(8); *Sabel v. Mead Johnson & Co.*, 737 F. Supp. 135, 146 (D. Mass. 1990) (FDA records failed to satisfy Rule 803(8) because the notes, though made "during the course of [the declarant's] work," were not made while "performing a legally mandated duty of observation" and did not constitute "factual findings resulting from an investigation"). Relator cannot meet her burden to show that the CMS spreadsheets constitute data compilations that satisfy the criteria of Rule 803(8). *Robbins v. Whelan*, 653 F.2d 47, 50 (1st Cir. 1981) (data compilation satisfies Rule 803(8) when resulting from an inquiry made "pursuant to its statutory authority"); *Reyes v. Bd. of County Comm'rs of Sedgwick County, Kan.*, 07-cv-2193, 2008 WL 2704160, *5 n.7 (D. Kan. July 3, 2008) (report inadmissible as public record where no "statutory duty to conduct" the evaluation that led to the report); *cf. U.S. v. Reyes*, 239 F.R.D. 591, 600 (N.D. Cal. 2006) (subpoenaed materials produced from investigation not records kept "in the course of a regularly conducted business activity").

First, CMS confirmed for the parties that the information in the CMS spreadsheets was "compiled for purposes of responding to the subpoena requests in this litigation" and not as part of CMS' regular activities or observed in accordance with any legally imposed public duty. Ex. 2 (Mar. CMS Emails). Rule 803(8) allows for the admission of reports, statements, or data compilations based on the assumption that "a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." Fed. R. Evid. 803(8) adv. comm. note (citing *Wong Wing Foo v. McGrath*, 196 F.2d 120 (9th Cir. 1952)). The

hearsay exception applies only to "activities *of the office*, and on observations and investigation *made under the authority of law*." *United States v. De La Cruz*, 469 F.3d 1064, 1069 (7th Cir. 2006) (holding inadmissible a city's response to an audit). Here, the data in the CMS spreadsheets was compiled solely for use in this litigation, which is a purpose separate and apart from any legally imposed duty or activity of CMS.[2] *Cf. U.S. v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010) ("The purpose of the [business records exception] is to ensure that documents were not created . . . in anticipation of litigation . . . .") (internal citations omitted).

Second, CMS confirmed that the information contained in the spreadsheets is not a subset of any larger database maintained in the ordinary course of a public duty. CMS informed the parties that CMS employees searched for and "found" the information and created the spreadsheets solely for this litigation. Ex. 2 (Mar. CMS Emails). Neither CMS nor Relator has been able to describe how and where that information was "found." *Cf. U.S. v. Kim*, 595 F.2d 755, 764 (D.C. Cir. 1979) ("When the underlying documents are not subject to examination by the opposing parties, the summary should not be admitted into evidence.") It is not even clear whether the CMS employees who did such a search would have personal knowledge of the information contained in the spreadsheets. Fed. R. Evid. 803(8)(B); *see* Weissenberger *Federal Evidence*, § 803.43 (2010).

Third, what is known regarding the data used to compile the spreadsheets is that it did not come from information contained in the actual enrollment forms themselves. CMS stated that it has produced all enrollment and re-enrollment forms it could locate. Ex. 2 (Mar. CMS Emails).

---

[2] Any argument that the data contained in the CMS spreadsheets satisfies the business records exception fails for this same reason. To be admissible under Rule 803(6), the record must be "made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the court of a regularly conducted business activity." Fed. R. Evid. 803(6). CMS explicitly acknowledged that the CMS spreadsheet "was compiled for purposes of responding to the subpoena requests in this litigation" and all information in the spreadsheet "was compiled by CMS employees for the purposes of responding to the subpoenas." CMS employees merely "found the information requested and put it in the spreadsheet." Ex. 2 (Mar. CMS Emails).

By Relator's own accounts, she has obtained signed certifications for approximately 40 providers from all third-party discovery. Relator's Opp'n at 16. Furthermore, as discussed below, there is no correlation between the actual certification dates on the actual enrollment forms and the information in the spreadsheets. *See* Ex. 3 (Chart of Expert F.S. Morton). Instead, the actual signature dates are, in many instances, *years before or after* the dates contained in the spreadsheets. *See id.*

## II. THE DATA IN THE CMS SPREADSHEETS LACK TRUSTWORTHINESS AND ARE INACCURATE FOR THE TRUTH OF THE MATTERS ASSERTED

Relator cannot rely on the data in the CMS spreadsheets for the independent reason that it lacks trustworthiness. Fed. R. Evid. 803(8) (hearsay exception does not apply where "the source of information or method or circumstances of preparation indicate a lack of trustworthiness"); *Bennett v. Saint-Gobain Corp.*, 453 F. Supp. 2d 314, 325 (D. Mass. 2006) (refusing to consider on summary judgment factual findings from an administrative hearing where the procedures "undermin[ed] the trustworthiness of the findings"). Trustworthiness in this context turns on whether "the evidence is self-authenticating or contemporaneously compiled by a person of adequate skill and experience." *In re Stanton*, No. 02-cv-10408, 2005 WL 2035586, *3 (D. Mass. Aug. 18, 2005) (citing *Blake v. Pellegrino*, 329 F.3d 43, 48 (1st Cir. 2003); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 n. 11 (1988)). Here, the information CMS compiled is objectively and demonstrably wrong and CMS' method and intention for creating the spreadsheets lacks the necessary trustworthiness to admit the CMS spreadsheets at trial or to consider on summary judgment. *See Sage v. Rockwell Int'l Corp.*, 477 F. Supp. 1205, 1207 (D. N.H. 1979) ("The exclusionary mechanism [under Rule 803(8)] provides a sufficient safeguard against the admission of unreliable evidence.")

CMS did not compile this information contemporaneously with any observation pursuant to a legal duty. CMS made clear that in response to the subpoena, it had to search for, find, and record the data in order to create the spreadsheets.[3] Ex. 2 (Mar. CMS Emails); *cf. Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 205 (4th Cir. 2000) ("The absence of trustworthiness is clear, however, when a report is prepared in the anticipation of litigation because the document is not for the systematic conduct and operations of the enterprise but for the primary purpose of litigating.")

Moreover, the information contained within the spreadsheets is inaccurate and unreliable for purposes of establishing the actual certification dates of providers. CMS has explained that no date contained in the spreadsheets reflects the actual date that a provider signed or submitted any certification. Ex. 1 (Oct. CMS Emails). The inaccuracy of this data can be independently verified by comparing the dates listed in the spreadsheets against the actual certification dates on the few produced enrollment forms. Ex. 3 (Chart of Expert F.S. Morton) (indicting that not one date in the CMS spreadsheets matches the date of an actual provider enrollment form). Relator cannot identify a single instance where the information contained in the spreadsheet matches the date a provider signed an AKS certification. *See id.*; *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1272-73 (7th Cir. 1988) (affirming exclusion of purported public record due to its untrustworthiness).

There is also no discernable pattern between the dates contained in the spreadsheets and the actual signature dates on the few obtained actual enrollment forms. Relator characterizes the

---

[3] This is further shown by Relator's argument in opposition to summary judgment. Relator states that "It is undisputed that *all* providers *must* sign an AKS certification as a condition of enrollment (or re-enrollment) in the Medicare program. . . . Therefore signed AKS certifications exist for each of the tens of thousands of providers that have received Medicare reimbursement for Aranesp." Relator's Opp'n at 16. If the government had an obligation to track the enrollment dates for "tens of thousands of providers" who, according to Relator, must have signed an AKS certification, then the fact that CMS's efforts to find information yielded information only for approximately 3,500 providers in the spreadsheets further demonstrates that the information was not properly maintained to support a public records exception.

data as providing the "approximate certification dates." Relator's Opp'n at 16. The assigned dates in the spreadsheets, however, frequently vary by a number of years from the actual signature dates on the certifications themselves.[4] Ex. 3 (Chart of Expert F.S. Morton). Critically, while Relator relies on the spreadsheets to provide a date by which a certification had been signed, the date in the spreadsheets that CMS compiled is not even consistently later than the actual signature date. *See id*. Instead, the actual signature date on the certification forms can be nearly *five years after* the date assigned in the spreadsheets, which would eliminate most, if not all, of the alleged damages and potentially preclude any theory of falsity. *See id*.

Finally, CMS created these spreadsheets for litigation in which the government has acknowledged it is the "primary real party in interest" and for which CMS, if the litigation succeeds, could be entitled to a substantial portion of any damages award. *See* U.S. Stat. of Interest at 1 n.1 [Docket No. 421]. Trustworthiness cannot be presumed in situations where "possible motivation problems" exist. Fed. R. Evid. 803(8) adv. comm. note; *see Beech Aircraft Corp.*, 488 U.S. at 167 n. 11 ("[A] trial judge has the discretion, indeed the obligation, to exclude an entire report or portions thereof . . . that she determines to be untrustworthy" and courts should consider "possible bias when reports are prepared with a view to possible litigation.").

## CONCLUSION

For these reasons, Relator's reliance on the data compiled in the CMS spreadsheets should be stricken from her opposition to Amgen's Motion for Partial Summary Judgment and Relator should be precluded from further reliance on these documents and information.

---

[4] *See, e.g.*, Ex. 3 (Chart of Expert F.S. Morton) (Dr. Geraldo Chica: actual signature date of Dec. 2, 2009; assigned spreadsheet dates of June 14, 2004 and Aug. 20, 2010) (Dr. Michael Klein: actual signature date of Sep. 29, 2008; assigned spreadsheet dates of Jan. 5, 2005 and Aug. 20, 2010). Relator's purported damages expert, Raymond Hartman, chose to calculate damages for these two providers by counting as fraudulent every Aranesp® claim (regardless of whether it included overfill) subsequent to the 2004 and 2005 dates, respectively. *See id*.

DATED:  March 28, 2011                              Respectfully submitted,

  /s/ Kirsten V. Mayer
Brien O'Connor (BBO # 546767)
Kirsten V. Mayer (BBO # 641567)
William J. Dunn (BBO #666465)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Tel:  617.951.7000
Fax:  617.951.7050
brien.o'connor@ropesgray.com

David S. Rosenbloom, *pro hac vice*
Douglas E. Whitney, *pro hac vice*
MCDERMOTT, WILL & EMERY LLP
227 West Monroe Street, Suite 4400
Chicago, IL 60606-5096
Tel:  312-372-2000
Drosenbloom@mwe.com

Michael Kendall (BBO # 544866)
Daniel A. Curto (BBO # 639883)
MCDERMOTT, WILL & EMERY LLP
28 State Street
Boston, MA  02109-1775
Tel:  617.535.4000
Fax:  617.535.3800
mkendall@mwe.com

*Counsel to Amgen Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and a copy will be sent by electronic mail to those indicated as non registered participants on March 28, 2011.

/s/ Kirsten V. Mayer
Kirsten V. Mayer