# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA | ) | |
| *ex rel.* KASSIE WESTMORELAND, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 06-10972-WGY |
| AMGEN INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## RELATOR'S RESPONSE TO SUPPLEMENTAL STATEMENT OF MATERIAL FACTS IN SUPPORT OF INTERNATIONAL NEPHROLOGY NETWORK'S AND ASD HEALTHCARE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

This supplemental statement of facts was submitted by International Nephrology Network ("INN") and ASD Healthcare ("ASD") on March 22, 2011, identified as being in further support of *their* motion for partial summary judgment, which was due and filed on March 1, 2011. (Dkt 379). Relator intends to move to strike this statement as an improper late supplement of the INN and ASD motion. Relator's responses herein are made to the extent that the Court permits INN or ASD to rely on any of the statements herein for any purpose, but should not be deemed a waiver of the relief Relator has requested in her pending motion to strike this statement.[1]

---

[1] To the extent that INN and ASD have attempted to incorporate all the statements from their Rule 56.1 statement filed on March 1, 2011 into this statement (*see* INN & ASD Supplemental SOF at 1 n.1), Relator incorporates all her responses to those statements from her Response to INN's and ASD's Rule 56.1 Statement (Dkt 439) (Mar. 22, 2011). To the extent Relator refers to specific responses there in, they are noted as "Relator Response to INN SOF."

**INN SUPPLEMENTAL SOF 1**[2]

As a wholesaler, ASD purchases products from pharmaceutical manufacturers at the "wholesaler acquisition cost," also know as WAC.  Declaration of M. McClain (Exhibit 1).

## Response to SSOF 1

Undisputed that the Declaration of Mitchell McClain states that ASD is a wholesaler and purchases products from pharmaceutical manufacturers at "wholesaler acquisition cost," without defining or quantifying that term.[3]  Relator notes that Mr. McClain's declaration suggests that his knowledge of ASD comes from his role as "corporate deposition representative of ASD,"[4] without indicating the level of Mr. McClain's personal knowledge of the statement.

**INN SUPPLEMENTAL SOF 2**

ASD then sells and distributes the product to customers, including pursuant to terms set forth in GPO contracts and customers' contracts with manufacturers.  ASD retains the discretion to provide discounts to customers in addition to the terms set forth in the contracts between the customer and manufacturer.  Declaration of M. McClain (Exhibit 1).

## Response to SSOF 2

Disputed in part.  Relator disputes that Mr. McClain's declaration supports this statement as written.  Mr. McClain's declaration does not reference "GPO contracts" (or even the term "GPO") and therefore cannot support that ASD "sells and distributes the product to customers, including pursuant to GPO contracts."[5]  Relator notes that Mr. McClain's declaration suggests that his knowledge of ASD comes from his role as "corporate deposition representative of ASD,"[6] without indicating the level of Mr. McClain's personal knowledge of the statement.

---

[2] INN and ASD include several section headings in their supplemental statement of material facts.  As these headings are not part of any paragraph, no response to them is required.  To the extent that a response is required, Relator disputes the facts contained in those headings.

[3] INN/ASD Ex. 1 ¶¶ 4-5.

[4] *Id.* ¶ 2.

[5] *See id.* ¶ 6.

[6] *Id.* ¶ 2.

**INN SUPPLEMENTAL SOF 3**

ASD's invoices to customers clearly disclose the discounts and the customer's

obligations with respect to these discounts.  The invoices' Terms and Conditions state that:

> [s]ales reflected on this invoice may include price discounts or be subject to subsequent
> reductions or adjustments in price, which may be reflected on other documentation.
> Buyer will comply with all applicable federal and state laws requiring it to report or
> reflect such discounts, reductions, or adjustments on cost reports or claims submitted to
> federal or state healthcare programs or other third party payers, retain this invoice and
> related pricing documentation, and make the invoice and such documentation available
> on request to federal or state healthcare program or other third party payer
> representatives.

*See, e.g.*, NAI 000552 (Exhibit 2).

**Response to SSOF 3**

Disputed.  The cited passage does not support that "ASD's invoices to customers clearly
disclose the discounts and the customer's obligations with respect to these discounts."  First, the
cited passage specifically states, "*[s]ales reflected on this invoice may include price discounts* or
be subject to subsequent reductions or adjustments in price, *which may be reflected on other
documentation*,"[7] thus supporting that ASD's invoices did *not* specify the nature and amount of
all discounts.  Second, because the passage does not, in fact, disclose any discounts, it cannot
support the broad assertion that it sets forth "the customer's obligations with respect to these
discounts."  Third, Relator disputes that ASD has established from this example that all ASD
invoices contained the cited language.  Fourth, Relator disputes that the cited language
establishes any "customer's obligations," which may be a matter of law.

**INN SUPPLEMENTAL SOF 4**

Pursuant to most distribution agreements between manufacturers and

wholesaler/distributors, the wholesaler/distributor is *required* to provide additional discounts to

customers.  Declaration of M. McClain (Exhibit 1).

**Response to SSOF 4**

Disputed.  The "Wholesaler Distribution Agreement" between Amgen USA Inc. and
AmerisourceBergen Drug Corporation, and their affiliates, attached hereto as Exhibit A
(AMGEN-BST0002242999), and the similar agreement at Exhibit 4 to the INN/ASD
Supplemental SOF, do not support this statement.  It does *not* require ASD to "provide additional
discounts to customers."  At most, the agreement requires ASD to honor the contractual price

---

[7] INN Ex. 2 at NAI 000553 (emphases added).

negotiated between Amgen and its customers, which may include discounts below the "Wholesaler Acquisition Price," for which Amgen will compensate ASD by crediting ASD with "chargebacks."[8] Mr. McClain's declaration acknowledges that ASD "sells and distributes the product to customers pursuant to the terms set forth in each customer's contract with the manufacturer,"[9] but then incorrectly suggests that Amgen "*required*" more discounts from ASD.[10] Mr. McClain's unsubstantiated belief about "most distribution agreements," is refuted by the actual agreement between Amgen and ASD, not supported by any other information, and not relevant to this matter.

## INN SUPPLEMENTAL SOF 5

ASD reports to manufacturers the contract price and the number of product units sold and distributed by ASD. The manufacturer then provides ASD with a "chargeback," which is the difference between the wholesaler acquisition cost and the customer's contract price. Declaration of M. McClain (Exhibit 1).

### Response to SSOF 5

Undisputed to the extent the statement is supported by the terms of any actual agreement between Amgen and ASD. For example, Paragraph 13 of the agreement attached as Exhibit A states that "Amgen shall credit Wholesaler for the difference between the customer's contracted price and Wholesaler Acquisition Price, for Products sold and shipped to customers designated by Amgen to receive special contract pricing. Adjustments or credits will be made in accordance with Amgen's Chargeback Policy as set forth in Article Two attached hereto."[11] Article Two provides further information about Amgen's Chargeback Policy.[12]

## INN SUPPLEMENTAL SOF 6

In keeping with this customary business practice and industry norm, ASD operated pursuant to a Wholesaler Distribution Agreement with Amgen. Declaration of M. McClain (Exhibit 1).

---

[8] *See* AMGEN-BST0002242999 at 3002 ¶ 13 (Ex. A) ("Contracts and Chargebacks"); *see also* INN/ASD Ex. 4 at ABCQT-DMA-0000054438 ¶ 14 (Wholesaler Distribution Agreement for 2005).

[9] INN/ASD Ex. 1 ¶ 6.

[10] *See id.* ¶ 7 (emphasis in original).

[11] AMGEN-BST0002242999 at 3002 ¶ 13 (Ex. A).

[12] *Id.* at AMGEN-BST0002243008. *See also* INN/ASD Ex. 4 at ABCQT-DMA-0000054454.

**Response to SSOF 6**

Disputed in part.  Relator does not dispute that Amgen and ASD had a Wholesaler Distribution Agreement but disputes that Mr. McClain has established that Amgen and ASD always "operated pursuant to a Wholesaler Distribution Agreement."  Relator also disputes that Mr. McClain's declaration provides any basis for him to make statements about any "customary business practice and industry norm" and notes that his declaration is unclear as to what the language about "customary business practice and industry norm" was intended to refer to.[13]  For the reasons stated in support of Relator's Motion for Partial Summary Judgment as to INN & ASD Healthcare's Ninth Affirmative Defense, Relator disputes that INN and ASD operated pursuant to legitimate business practices.[14]

**INN SUPPLEMENTAL SOF 7**

ASD purchases Aranesp from Amgen, and then sells Aranesp to nephrology practices based on contracts between Amgen and the practices.  ASD offers, in its discretion, additional discounts to practices.  Declaration of M. McClain (Exhibit 1).

**Response to SSOF 7**

Undisputed, with clarification.  Relator does not dispute that ASD purchased Aranesp from Amgen, which was then sold to nephrology practices based on contracts between Amgen and the practices, but notes that other agreements, such as the INN GPO agreement may also be relevant.  Relator also does not dispute that ASD offered additional discounts to particular practices.  Relator does not dispute that ASD had discretion in regard to the additional discounts, but adds that the administrative fees that Amgen paid to ASD were used to fund the discounts.[15]  Relator disputes that this statement describes all of the conduct of ASD, which included, *e.g.*, marketing efforts undertaken with Amgen sales representatives, as well as "cold calling" nephrologists to encourage them to become INN members.[16]  Relator notes that Mr. McClain's declaration suggests that his knowledge of ASD comes from his role as "corporate deposition representative of ASD,"[17] without indicating the level of Mr. McClain's personal knowledge of

[13] *See* INN/ASD Ex. 1 ¶ 9.

[14] *See*, *e.g.*, Relator's Memorandum of Law in Support of Her Motion for Partial Summary Judgment as to INN & ASD Healthcare's Ninth Affirmative Defense 8-9 (Dkt 386) (Mar. 1, 2011).

[15] *See*, *e.g.*, Relator's Rule 56.1 Statement in Support of Her Motion for Partial Summary Judgment as to INN & ASD Healthcare's Ninth Affirmative Defense 7-8, ¶¶ 31, 38-39 (Dkt 390) (Mar. 1, 2011) ("Relator's SOF").

[16] *See*, *e.g.*, *id.* at 11-14, ¶¶ 50-75; Rule 30(b)(6) Deposition of Mitchell McClain 65:15-66:19 (Nov. 11, 2010) ("McClain Dep.") (excerpts attached hereto as Exhibit B); McClain Dep. Ex. 8 (attached hereto as Exhibit C).

[17] INN/ASD Ex. 1 ¶ 2.

the statement.

**INN SUPPLEMENTAL SOF 8**

ASD's accounting system maintained a record of various discounts provided to

customers who purchased Aranesp.  M. McClain Dep. (Exhibit 3) at 63:17-63:25.

**Response to SSOF 8**

Undisputed, with clarification.  Relator does not dispute that Mr. McClain testified that ASD's accounting system had fields in which customer discounts could be entered, but notes that ASD did not maintain records of how the discounts were allocated or determined.[18]  Relator notes that Mr. McClain's declaration suggests that his knowledge of ASD comes from his role as "corporate deposition representative of ASD,"[19] without indicating the level of Mr. McClain's personal knowledge of the statement.

**INN SUPPLEMENTAL SOF 9**

ASD reported to Amgen the number of units sold as well as the contract price for those

units.  Declaration of M. McClain (Exhibit 1).

**Response to SSOF 9**

Undisputed that Mr. McClain's declaration includes this statement,[20] but Mr. McClain's declaration does not support how, when, or to what extent such reporting occurred, rendering this statement incomplete.  Relator notes that Mr. McClain's declaration suggests that his knowledge of ASD comes from his role as "corporate deposition representative of ASD,"[21] without indicating the level of Mr. McClain's personal knowledge of the statement.

**INN SUPPLEMENTAL SOF 10**

Amgen then paid ASD a chargeback for the difference between the customer's contract

price and ASD's wholesaler acquisition cost. Declaration of M. McClain (Exhibit 1).

**Response to SSOF 10**

Undisputed that Mr. McClain's declaration includes this statement,[22] but Mr. McClain's

---

[18] *See, e.g.*, Relator's SOF at 7-8, ¶¶ 34-37.

[19] INN/ASD Ex. 1 ¶ 2.

[20] *See id.* ¶ 11.

[21] *Id.* ¶ 2.

[22] *See id.* ¶ 12.

declaration does not support how, when, or to what extent such reporting occurred.  Relator notes that Mr. McClain's declaration suggests that his knowledge of ASD comes from his role as "corporate deposition representative of ASD,"[23] without indicating the level of Mr. McClain's personal knowledge of the statement.

## INN SUPPLEMENTAL SOF 11

In addition to Aranesp, ASD had contracts with Amgen for the distribution of other products.  *See* ABCQT-DMA-0000054433 (Exhibit 4), ABCQT-DMA-0000054466 (Exhibit 5).

### Response to SSOF 11

Disputed in part.  Relator does not dispute that ASD distributed other Amgen products besides Aranesp, but the documents cited are not "contracts with Amgen for the distribution of other products."  INN/ASD Exhibit 4 is a Wholesaler Distribution Agreement No. 200501077 "to distribute Amgen products in the United States,"[24] without limitation on distribution of Aranesp.  INN/ASD Exhibit 5 is a Notification of Price Change to Agreement No. 200501077, which specifically references Aranesp.[25]

## INN SUPPLEMENTAL SOF 12

ASD is INN's preferred, but not only wholesaler.  *See* ABCQT-DMA0000432775 (Exhibit 6) at 432789.

### Response to SSOF 12

Undisputed, with clarification.  Relator does not dispute that INN/ASD Exhibit 6 is Amendment No. 8 to the GPO agreement between INN and Amgen and contains a list of wholesalers.[26]  However, INN and ASD have not supported that the list of "Authorized Wholesalers" therein was the same throughout all relevant time periods.

## INN SUPPLEMENTAL SOF 13

Relator's purported GPO rebuttal expert, Hal Singer, did not refute that GPOs routinely have one preferred distributor.  H. Singer Dep. (Exhibit 7) at 164:21-165:4.

---

[23] *Id.* ¶ 2.

[24] *See* INN/ASD Ex. 4.

[25] *See* INN/ASD Ex. 5.

[26] *See* INN/ASD Ex. 6.

**Response to SSOF 13**

Disputed as stated.  Hal Singer's testimony as cited was that he did not address in his report the issue of INN expert Professor Burns' "conclusions that it's common practice for GPOs to designate one wholesaler or distributor to be their preferred wholesale distributor."[27]

**INN SUPPLEMENTAL SOF 14**

ASD had internal sales representatives who were based in the office.  *See* M. McClain Dep. (Exhibit 3) at 132:24-133:9.

**Response to SSOF 14**

Undisputed with clarification that Mr. McClain did not know whether ASD "inside" sales representatives went to INN member offices[28], thus no assumption can be drawn that ASD sales representatives did not meet with customers.

**INN SUPPLEMENTAL SOF 15**

Strategic Account Managers ("SAMs") for INN worked to identify potential customers in a number of ways, including from vendors of other products in INN's portfolio and from INN SAMs' own knowledge of the nephrology practices.  A. Miele Dep. (Exhibit 8) at 57:4-57:24, 200:18-200:23.

**Response to SSOF 15**

Undisputed with clarification.  Relator does not dispute that INN SAM Angela Miele testified about how she identified potential customers, but she did not respond generally for all SAMs and also indicated that she obtained information about potential customers from Amgen.[29]

**INN SUPPLEMENTAL SOF 16**

INN SAMs directed nephrologists to ASD internal sales force members to establish new accounts and manage the logistics of ordering portfolio products, including Aranesp.  E. Gremont Dep. (Exhibit 9) at 94:15-94:23.

---

[27] *See* INN/ASD Ex. 7 at 164:21-165:4 (Singer Dep.).

[28] *See* McClain Dep. 133:10-12 (Ex. B).

[29] INN/ASD Ex. 8 at 57:19-20 (Miele Dep.).

**Response to SSOF 16**

Disputed that the cited testimony supports the statement as written.  The cited testimony says nothing about INN SAMs, or their instructions to nephrologists, or how/whether nephrologists were "directed" to "ASD internal sales force members," or anything about the "logistics of ordering portfolio products."  All it says is:

Q:  Who is Roy Harsila?
A:  Roy was a sales support individual at ASD.
Q:  And who is Heath Dugan?
A:  The same.
Q:  And what are the job responsibilities of a sales support person?
A:  They were working with the customers, setting up new accounts, just making sure orders got there properly.[30]

**INN SUPPLEMENTAL SOF 17**

Kristen Lyons is currently the Director of Sales for ASD and has been employed by

American Medical Distributors and subsequently ASD since 1997.  In her capacity as Director of

Sales for ASD, she is responsible for managing accounts and supporting customer needs.

Declaration of K. Lyons (Exhibit 10).

**Response to SSOF 17**

Relator disputes that INN and ASD may rely on the Declaration of Kristen Lyons.  Ms. Lyons was not identified by INN or ASD as an individual likely to have discoverable information relevant to these proceedings as required by Federal Rule of Civil Procedure 26(a)(1) until March 23, 2011.[31]  Nor did information about INN and ASD's reliance on Ms. Lyons for their defense emerge "during the discovery process."[32]  The submission of Ms. Lyons's declaration weeks after the parties' March 1 deadline for summary judgment motions, as well as *after* the deadline for oppositions thereto is inexcusable.  Subject to that objection, Relator does not dispute that the Declaration of Kristen Lyons supports this statement.

---

[30] INN/ASD Ex. 9 at 94:5-94:23 (Gremont Dep.).

[31] *Compare* Supplemental Disclosure of INN and ASD Pursuant to Federal Rule of Civil Procedure 26(e)(1)(A) (Mar. 23, 2011) (attached hereto as Exhibit D) *with* Initial Disclosures of INN, ABSG, ASD, and ABC Pursuant to Federal Rule of Civil Procedure 26(a)(1) (Dec. 11, 2009) (attached hereto as Exhibit E); First Revised Initial Disclosures of INN and ASD Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A) (Apr. 19, 2010) (attached hereto as Exhibit F); Initial Disclosures of INN and ASD Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A) (July 12, 2010) (attached hereto as Exhibit G).

[32] *See* Fed. R. Civ. P. 26(e).

**INN SUPPLEMENTAL SOF 18**

In the summer of 2008, Ms. Lyons was Director of Sales for ASD. During this time,

Ms. Lyons corresponded with Shelley Huttar, an INN SAM, regarding Ms. Huttar's discussion

of potential discounts for the purchase of Aranesp through ASD available to provider

Dr. Thomas.  *See* Declaration of K. Lyons (Exhibit 10).

**Response to SSOF 18**

Disputed.  In the summer of 2008, Ms. Lyons was Director of Sales for American
Medical Distributors ("AMD"), according to the address block she used in the email she
acknowledges sending to INN SAM Shelly Huttar.[33]  Around the same time, Ms. Lyons was also
the AMD National Account Manager and the Manager of Group Purchasing for the dialysis
GPO, DPA.[34]  Relator notes that Ms. Lyons's fluctuating titles among companies in the
AmerisourceBergen corporate structure supports that INN, ASD, and other related entities did
not operate as separate businesses.[35]  *See also* Relator's Response to INN Supplemental SOF 17.

**INN SUPPLEMENTAL SOF 19**

In her capacity as Director of Sales for ASD, Ms. Lyons did not believe that emphasizing

discounts to customers was the most effective way to promote ASD's business because, in her

experience, discounts were not effective means of developing customer loyalty and satisfaction

because of the frequency of discount fluctuations.  Declaration of K. Lyons (Exhibit 10).

**Response to SSOF 19**

Disputed.  Ms. Lyons's declaration states that she once held these beliefs (in the past
tense, although Ms. Lyons is still in "[her] capacity as Director of Sales for ASD"), but Relator
disputes that her statements are supported by contemporaneous documentation regarding her
communications with INN SAM Shelly Huttar.

Ms. Huttar was an INN SAM who admitted to providing information about the
reimbursement of overfill to medical providers to sell them Aranesp.[36]  The email attached as
Exhibit A to Ms. Lyons's declaration, ABCQT-DMA-0000603399, indicates that Ms. Lyons and

---

[33] *See* INN/ASD Ex. 10, Ex. A (ABCQT-DMA-0000603399).

[34] *See* AMGEN-BST0003604409 (attached hereto as Exhibit H).

[35] *See*, *e.g.*, Relator's SOF at 3-5, ¶¶ 8-16.

[36] *See*, *e.g.*, *id.* at 12-13, ¶ 62; Relator's Response to INN's and ASD's Rule 56.1 Statement 40-
42, ¶ 84 (Dkt 439) (Mar. 22, 2011) ("Relator's Response SOF").

Ms. Huttar had an exchange the morning of July 31, 2008, in which Ms. Lyons stated the following about Ms. Huttar's sales calls with a nephrology practice:

> I don't understand why $ is being discussed in the Nephrology office practice when INN is a service and GPO company.[37]

An email that evening between Ms. Lyons and Ms. Huttar provides more context to the concern raised by Ms. Lyons. *Responding to the same email from Ms. Huttar*, Ms. Lyons wrote on the evening of July 31, 2008:

> Shelley please send Will and me a copy of the template you are using to show reimbursement vs. cost.  The one that you showed me here in NY and sent to Bob Kelly.[38]

Ms. Huttar used "reimbursement vs. cost" information with medical practices that included overfill.[39]  That Ms. Lyons would request such information supports that she was, in fact, concerned about it.

Ms. Huttar was also concerned – not only did she state to Evan Gremont that she wanted to speak with him about the "communication from Kristen,"[40] but she also wrote to William Venus that she wanted to speak with him:

> As you will see after reading the following email, Kristen and I are having a disagreement and it is affecting many aspects of my position and my ability to be successful in the field.[41]

*See also* Relator's Response to INN Supplemental SOF 17.

**INN SUPPLEMENTAL SOF 20**

Ms. Lyons does not agree that the level of coordination between ASD and INN raised

flags within ABSG, nor did Ms. Lyons have any concerns with Ms. Huttar discussing economic

issues with customers.  *See* Declaration of K. Lyons (Exhibit 10).

**Response to SSOF 20**

Disputed.  *See* Relator's Response to INN Supplemental SOF 19; *see also* Relator's

---

[37] INN/ASD Ex. 10, Ex. A (ABCQT-DMA-0000603399)

[38] ABCQT-DMA-0000096760 (attached hereto as Exhibit I).

[39] *See* Relator's Response to INN's and ASD's Rule 56.1 Statement ¶ 91 (Dkt 439) (Mar. 22, 2011).

[40] *See* INN/ASD Ex. 10, Ex. A (ABCQT-DMA-0000603399).

[41] ABCQT-DMA-0000096971 (attached hereto as Exhibit J).

Response to INN Supplemental SOF 17.

**INN SUPPLEMENTAL SOF 21**

From 2007 to 2010, ASD and INN shared the same accounting department and

consolidated their financial reports. Declaration of M. McClain (Exhibit 1).

**Response to SSOF 21**

Undisputed.

**INN SUPPLEMENTAL SOF 22**

Mr. Evan Gremont of ASD did not use spreadsheets with providers.  E. Gremont Dep.

(Exhibit 9) at 66:25-67:11.

**Response to SSOF 22**

Disputed.  The cited testimony does not support the proposition.  Rather, it supports that
Evan Gremont was very uncomfortable with spreadsheets showing a comparison of profit
between Procrit and Aranesp, even though he knew that his colleagues were using them to sell
Aranesp.[42]  Moreover, ASD's corporate designee under Rule 30(b)(6), Mr. McClain, testified
that Mr. Gremont "used spreadsheets with INN member accounts."[43]

Mr. Gremont also requested a spreadsheet containing overfill information for use as part
of an "official" strategy.[44]  He directed INN employees to send cost comparison spreadsheets to
medical providers, such as when Mr. Gremont informed Harold Wodinsky of IPN that Gina at
Renal Hypertension Physicians "needs a cost comparison on Procrit v. Aranesp" because "if it is
that much better she'll start switching everybody over to Aranesp," and he asked that Mr.
Wodinsky "email her the template" and closed the email by ordering him to "[c]all her."[45]

**INN SUPPLEMENTAL SOF 23**

ASD's policy was not to initiate any communications with respect to overfill and to refer

the practice to the manufacturer if they had questions. M. McClain Dep. (Exhibit 3) at 103:2-

103:13.

---

[42] INN/ASD Ex. 9 at 67:4-11 (Gremont Dep.).

[43] McClain Dep. 97:20-24 (Ex. B).

[44] McClain Dep. Ex. 15 (Relator's SOF, App. at 523).

[45] ABCQT-DMA-0000650275 (Relator's Response SOF, Resp. App. at 76).

**Response to SSOF 23**

Disputed.  Mr. McClain testified based on his communications with current employees of AmerisourceBergen Corporation affiliates, Kim Soskolne, Liz Feldman, Taylor Hoss, Roy Harsila, and Leo Loybowich, in preparation for his November 11, 2010 deposition, that:

> [t]hey spoke to how they've been directed to address overfill when talking to practices. They specifically said that they've been directed not to initiate any communications with practices with respect to overfill.  In the event that a practice initiated a communication with them with respect to overfill, they were to refer the practice to the manufacturer.[46]

Mr. McClain's statement involved discussions about current practices at ASD, not any policy that was in place at ASD at any specific time.  Moreover, Mr. McClain was unsure who had provided the current employees with information on addressing overfill.[47]  In light of evidence that ASD employees did discuss overfill with medical practices, which Mr. McClain acknowledged,[48] there is no support for this statement.

**INN SUPPLEMENTAL SOF 24**

GPOs are permitted to and do enter into partnerships with vendors for products and services, pursuant to which they receive administrative fees.  The provision of administrative fees from vendors to GPOs is common in the industry and specifically sanctioned by the GPO Safe Harbor. H. Singer Dep. (Exhibit 7) at 111:10-111:23, 122:19-128:2.

**Response to SSOF 24**

Disputed in part.  Dr. Singer did not testify about GPOs "enter[ing] into *partnerships*" with vendors – indeed, the word "partnership" does not appear in Dr. Singer's deposition.[49]  Nor does the word "sanction."[50]  Relator disputes that Dr. Singer's testimony involved interpretation of any legal issues.  Relator does not dispute that Dr. Singer testified that GPOs commonly charge administrative fees and that a 3% administrative fee was the "limitation" under the GPO safe harbor.[51]

---

[46] McClain Dep. at 101:24-103:25 (Ex. B).

[47] *Id.* at 103:22-25.

[48] *See id.* at 104:1-105:7.

[49] *See* Deposition of Hal Singer, Word Index (Mar. 14, 2011) ("Singer Dep.") (excerpts attached hereto as Exhibit K).

[50] *Id.*

[51] INN/ASD Ex. 7 at 122:19-124:1 (Singer Dep.).

**INN SUPPLEMENTAL SOF 25**

Relator's GPO expert testified:

Q. And is it also fair to say, however, that one of the other reasons why a vendor   will pay an administrative fee to a GPO is for its ability to sell through the GPO to the GPO's members?

A. Correct . . . .

H. Singer Dep. (Exhibit 7) at 125:17-125:22.

**Response to SSOF 25**

Undisputed.

**INN SUPPLEMENTAL SOF 26**

The administrative fee arrangement outlined in the GPO Safe Harbor creates a

commonality of economic interests between a GPO and a vendor to sell more of the vendor's

GPO-contracted products to the GPO's members.  H. Singer Dep. (Exhibit 7) at 121:20-128:2.

**Response to SSOF 26**

Disputed as written, because Dr. Singer did not use the term "commonality of economic interests," which is a conclusion reached by INN's GPO expert, Lawton Burns.[52]  The testimony of Dr. Singer should not be reinterpreted based on the language of INN's GPO expert.  Relator does not dispute that Dr. Singer provided the testimony as stated in the transcript portion cited by INN and ASD.

**INN SUPPLEMENTAL SOF 27**

Relator's GPO expert testified:

Q. And the fact is that the existing compensation structure under the safe harbor provides certain incentives to GPOs, correct?
A. Correct.
Q. And one of those incentives is to have their members buy more of those products that are within the GPO portfolio, correct? MR. HALL:  Object to the form.
A. That is – that is one incentive, yes.
Q. Because the way these fees are structured, if they do that, they will earn more money, correct?
A. Correct.

---

[52] *See* Singer Dep. 165:6-16 (Ex. K).

Q. So that's an economically rational thing for them to do, correct?
A. Correct.

H. Singer Dep. (Exhibit 7) at 121:20:122:12.

**Response to SSOF 27**

Undisputed.

**INN SUPPLEMENTAL SOF 28**

It is standard industry practice of GPOs to use a portion of the GPO fees they receive

from vendors to provide more favorable pricing to members.  As Relator's expert Hal Singer

testified that, "depend[ing] on the GPO. . . GPOs pass through a certain portion of those fees, net

of certain expenses, to their members" and agreed with the conclusion of INN's and ASD's

expert Dr. Lawton Burns that "the mere fact of a pass-through is not uncommon."  H. Singer

Dep. (Exhibit 7) at 135:11-136:20; 139:4-140:8.

**Response to SSOF 28**

Disputed as stated.  Dr. Singer actually testified as follows:

Q.   Now, am I correct that it's not uncommon for a GPO to pass along to its members
some portion of the administrative fees that it receives from its vendors?
MR. HALL:  Object to the form.
THE WITNESS:  It's correct, that there are – it depends on the GPO.  But based on my
reading of the literature on GPOs, GPOs pass through a certain portion of those fees, net
of certain expenses, to their members in accordance to the equity holdings that those
members have.[53]

Dr. Singer further testified that such passing through of administrative fees is
"effectuated with a check at the end of the year.  It's a lump sum check that represents that
member's pro-rate equity holding in the distributions by the GPO."[54]  This is not the type of
passthrough that INN made of Amgen's administrative fees to ASD.[55]

---

[53] INN/ASD Ex. 7 at 135:11-23 (Singer Dep.).

[54] *Id.* 135:25-136:7.

[55] *See*, *e.g.*, Relator's SOF at 6, ¶¶ 23-26.

**INN SUPPLEMENTAL SOF 29**

As purchasing agents for their members, GPOs discuss the economic consequences of

their member practices' purchase of products.  Relator's expert Hal Singer testified that "it

would be typical for a GPO to lay out the relative expenses or costs of the various options under

the GPO contract." H. Singer Dep. (Exhibit 7) at 152:1-153:16.

**Response to SSOF 29**

Undisputed.

**INN SUPPLEMENTAL SOF 30**

Relator's GPO expert further testified:

Q. And let's focus on the purchasing agent aspect of it.  It's fair to say in a general
fashion that one thing that a purchasing agent does for those that it's acting on
behalf of is talk to its members about the economic aspects of the products that
they are considering purchasing; is that right?
A. So long as the economic aspect means which one is going to be less
expensive for you.
Q. So, in other words, a role of a purchasing agent is to say that if you buy product X, it
will cost you this much, but if you buy product Y, it will cost you that much to allow the
member to compare the economics of the purchase of those two products; is that right?
MR. HALL:  Object to form.
THE WITNESS: Correct. I think that goes on.
BY MR. SITARCHUK: Q.  And to the extent that a GPO acts as a purchasing agent for
its membership, that is something that a GPO does, correct?
MR. HALL:  Object to the form.
THE WITNESS:  Yes.
BY MR. SITARCHUK: Q.  And that's not uncommon, correct?
A. Correct."

H. Singer Dep. (Exhibit 7) at 152:1-153:5.

**Response to SSOF 30**

Undisputed.

**INN SUPPLEMENTAL SOF 31**

Relator's GPO expert testified: "Q. And so the acquisition cost per unit could be lowered

by the use and billing for overfill under my scenario; is that right?  A. I think that's fair." H.

Singer Dep. (Exhibit 7) at 73:24-76:13.

**Response to SSOF 31**

Disputed as presented.  Relator does not dispute that Dr. Singer testified as stated at
INN/ASD Ex. 7 at 76:10-13, but objects that this statement does not explain the "scenario" that
was being presented to Dr. Singer.

**INN SUPPLEMENTAL SOF 32**

Relator's GPO expert testified with respect to the report of Professor Burns (INN and

ASD's GPO expert):

Q. Where in your report do you address Professor Burns' conclusions that it is common
practice for GPOs to discuss with practices the margin associated with  the use of a
particular product and the impact that that can have on the  profitability of the practice?
MR. HALL:  Object to the form.
A: I don't think that I would disagree with that proposition in the abstract, and I don't
think that's an issue of contention between me and Professor Burns.

H. Singer Dep. (Exhibit 7) at 161:15-162:1.

**Response to SSOF 32**

Undisputed.

**INN SUPPLEMENTAL SOF 33**

Relator's GPO expert Hal Singer agrees that "GPOs are a highly efficient channel for the

distribution of medical devices and other products."  H. Singer Dep. (Exhibit 7) at 155:15-156:2,

160:2-160:19.

**Response to SSOF 33**

Undisputed.

**INN SUPPLEMENTAL SOF 34**

INN did not perform any services for Amgen before the execution of the GPO or

advisory board contracts.  V. DeStasio Dep. (Exhibit 11) at 28:13-29:1.

**Response to SSOF 34**

Disputed.  Although Vince DeStasio's testimony included a statement that "[a]bsolutely not," no work was performed by INN by Amgen before the GPO agreement was signed (and that he believed it would have been improper for INN to have done work before then), his testimony also makes clear that he does not know if that was the case.[56]  He described what he knew as follows:  "I do not know specifically when the GPO agreement was signed relative to our actually beginning the advisory board programs in '03, but they were somewhat aligned in terms of the GPO agreement.  I'm not sure exactly whether that predated the advisory boards or not."[57] There also is evidence that significant work was done on advisory boards before the INN GPO agreement was signed on September 15, 2003.[58]  And, as set forth in the Rule 56.1 Statement of Facts in support of Relator's Motion for Partial Summary Judgment, various AmerisourceBergen corporate entities operated together, including in providing services to Amgen.[59]

**INN SUPPLEMENTAL SOF 35**

INN used a third party company, Bulk Mailing and Addressing, Inc. ("BMA") to send its

annual administrative fee disclosure letters to INN members for purchases in years 2003 to 2006.

*See* W. Venus Dep. at 77:18-77:24 (Relator's App. at 992 (Dkt. 390-8)); ABCQTDMA-

0000697669 (Exhibit 12); ABCQT-DMA-0001111640 (Exhibit 13); ABCQT-DMA0001111653

(Exhibit 14).

**Response to SSOF 35**

Disputed.  INN has not submitted any credible evidence that the required annual administrative fee disclosure letters were sent to all INN members, as required by the GPO safe harbor, in any year.[60]  Until the late submission of this "supplemental" statement of facts,

---

[56] *See* Deposition of Vincent DeStasio 28:4-29:6 (Sept. 7, 2010) (attached hereto as Exhibit L).

[57] *Id.*

[58] *See* ABCQT-DMA-0000574527 (attached hereto as Exhibit M) (July 22, 2003 email with the "final invitation for the LA ad board," which INN was "sending . . . to the printer this afternoon," entitled "International Nephrology Network/Amgen Consultant Conference" to be held September 5-6, 2003).

[59] *See* Relator's SOF ¶¶ 1-78

[60] *See* Relator's SOF at 18-19, ¶¶ 93-101.

accompanied by Mr. Ort's declaration and production of other materials, no witness had testified that "Bulk Mailing and Addressing, Inc." had sent such letters for any period.  Mr. Venus thought that letters had been sent through some unnamed service, but he was not even at INN until 2008.[61]  The documents cited are not such letters – they are incomplete, have corrections, lack signatures, and do not show that anything was actually sent by Bulk Mailing and Addressing, Inc.[62]

For example, INN/ASD Exhibit 12 includes an email from an IPN contract manager to "Vince" at a bma-inc.com email address, purporting to attach 29 letters dated December 10, 2004, referring to 1,000 members in INN, and purporting to set forth total 2003 fees paid to Amgen.[63]  That these non-final materials constitute proof that all INN members received fee disclosure is unsupported, particularly given that INN had 532 members as of December 31, 2003.[64]  INN/ASD Exhibit 13 supports that the letters in Exhibit 12 were not sent, as it is an email explaining problems that prevented the letters from being sent as of December 28, 2004.[65]  INN/ASD Exhibit 14 confirms that information to complete the letters was lacking as of December 21, 2004, and when read in conjunction with Exhibit 13 supports that INN did not provide the information to Vince at BMA in any usable form.[66]

Moreover, despite clear representation by INN's counsel that document production was complete as of December 15, 2010,[67] Exhibits 13 and 14 were not produced until March 18, 2011.[68]  Relator therefore disputes that INN and ASD should be permitted to rely on Exhibits 13

---

[61] 30(b)(6) Deposition of William Venus 46:4-8, 77:25-78:3, 93:13-94:23 (excerpts attached hereto as Exhibit N).

[62] *See* INN/ASD Ex. 12 at ABCQT-DMA-0000697846-47.

[63] *See id.*

[64] *See* ABCQT-DMA-0000909093.xls (INN Roster listing 532 members with "EFFECTIVEDATE" on or before December 29, 2003) (Relator's Response SOF, Resp. App. at 785).

[65] *See* INN/ASD Ex. 13 (December 28, 2004 email from Vince Buscemi to Brett Howery stating that the letters lacked signatures and address information provided was incomplete).

[66] *See* INN/ASD Ex. 14 (December 21, 2004 email from Brett Howery to Juliane Boley requesting that Vince Buscemi at BMA be provided "lists so they can print up the mailing envelops for each IDN, IUN, and INN [sic]"); INN/ASD Ex. 13 (December 28, 2004 email from Vince Buscemi to Brett Howery regarding "no address line or city for us to use in the Ink Jet files for the envelope").

[67] *See* Email from D. Kessler to S. Strikis (Feb. 26, 2011) (stating "My letter to Bryan of December 15, details quite precisely what the INN Defendants produced and that the INN Defendants have complied with Judge Young's November 15 Order.  The INN Defendants have not uncovered any additional documents that should be produced under the Order and our reasonable search for such materials is complete.") (attached hereto as Exhibit O).

[68] *See* Letter from D. Kessler to B. Carey (Mar. 17, 2011) (enclosing a document production bates labeled ABCQT-DMA-0001111639 – ABCQT-DMA-0001111659) (attached hereto as Exhibit P).

and 14 in any manner.

**INN SUPPLEMENTAL SOF 36**

BMA was a vendor based out of Hanover, Maryland, in the business of mailing and

distributing large volumes of direct mail pieces.  Declaration of P. Ort (Exhibit 15).

**Response to SSOF 36**

Relator disputes that INN and ASD may rely on the Declaration of Paul Ort.  Mr. Ort was
not identified by INN or ASD as an individual likely to have discoverable information relevant
to these proceedings as required by Federal Rule of Civil Procedure 26(a)(1) until March 23,
2011.[69]  Nor did information about INN and ASD's reliance on Mr. Ort for their defense emerge
"during the discovery process."[70]  INN and ASD indisputably had access to the information,
however, and knew of its relevance to this case, as supported by (among other things) Relator's
Notice of Deposition under Federal Rule 30(b)(6) to Defendant International Nephrology
Network (served October 6, 2010).[71]  The submission of Mr. Ort's declaration weeks after the
parties' March 1 deadline for summary judgment motions, as well as *after* the deadline for
oppositions thereto is inexcusable.  Moreover, INN and ASD have not obtained any statement
from the only BMA representative included on any of the material cited by INN and ASD, Vince
Buscemi (nor have they asserted that Mr. Buscemi is not available).  Subject to those objections,
Relator does not dispute that the Declaration of Paul Ort describes BMA as such a business, but
lacks knowledge to comment on what work BMA may have performed.

**INN SUPPLEMENTAL SOF 37**

INN would prepare the template for each annual administrative fee disclosure letter.  *See*

ABCQT-DMA-0000719480 and ABCQT-DMA-0000719478 (2003 administrative fee

disclosure template) (Exhibits 16 and 17); ABCQT-DMA-0001111643 (2004 administrative fee

disclosure template) (Exhibit 18); ABCQT-DMA-0000760018 (2005 administrative fee

disclosure template) (Exhibit 19); ABCQT-DMA-0000760016 (2006 administrative fee

---

[69] *Compare* Supplemental Disclosure of INN and ASD Pursuant to Federal Rule of Civil
Procedure 26(e)(1)(A) (Mar. 23, 2011) (Ex. D) *with* Initial Disclosures of INN, ABSG, ASD,
and ABC Pursuant to Federal Rule of Civil Procedure 26(a)(1) (Dec. 11, 2009) (Ex. E); First
Revised Initial Disclosures of INN and ASD Pursuant to Federal Rule of Civil Procedure
26(a)(1)(A) (Apr. 19, 2010) (Ex. F); Initial Disclosures of INN and ASD Pursuant to Federal
Rule of Civil Procedure 26(a)(1)(A) (July 12, 2010) (Ex. G).

[70] *See* Fed. R. Civ. P. 26(e).

[71] *See, e.g.*, Notice of Deposition at 12 (Topic 28: "Any efforts made by you to ensure that INN

disclosure template) (Exhibit 20); ABCQT-DMA-0000787290 and ABCQT-DMA-0000787287

(2007 administrative fee disclosure template) (Exhibits 21 and 22).

**Response to SSOF 37**

Disputed.  INN has submitted no evidence that the cited exhibits were prepared as "templates" for each annual fee disclosure letter – the information wholly lacking includes such basic information as who prepared the letters, how or when.  Moreover, the purported 2004 template, INN/ASD Exhibit 18, was not produced until March 17, 2011,[72] despite clear representations from counsel for INN and ASD that their document production was complete months before then.[73]  That alone supports that INN and ASD should not be allowed to rely on Exhibit 18.

The alleged 2004 "template," Exhibit 18, has another interesting feature.  It purports to relate to "INN Member 2004 Fee Disclosure," but could not have been written in 2004 or even 2005, because there is a paragraph that states: "You will receive a subsequent disclosure regarding administrative fees based on your 2005 purchases," suggesting that the document was not even drafted until 2006.  Indeed, the metadata produced with this document shows that it was last modified on January 3, 2006.[74]

The alleged 2005 "template," INN/ASD Exhibit 19, contains significant *blanks*:

With your help our network has grown to over _____ members . . . with the backing of _____% of all practicing _____ in the U.S. . . .

And the metadata produced indicates that Vinu Pillai (an in-house attorney for INN) worked on the letter, modifying it on March 22, 2007.[75]  That information is supported, as well, by entries in the privilege log of INN and ASD, of documentation withheld from production on the ground of attorney-client privilege:

---

has complied with federal regulations governing GPOs.") (attached hereto as Exhibit Q).

[72] *See* Letter from D. Kessler to B. Carey (Mar. 17, 2011) (enclosing a document production bates labeled ABCQT-DMA-0001111639 – ABCQT-DMA-0001111659) (Ex. P).

[73] *See* Email from D. Kessler to S. Strikis (Feb. 26, 2011) (stating "My letter to Bryan of December 15, details quite precisely what the INN Defendants produced and that the INN Defendants have complied with Judge Young's November 15 Order.  The INN Defendants have not uncovered any additional documents that should be produced under the Order and our reasonable search for such materials is complete.") (Ex. O).

[74] *See* Exhibit R at 1 (metadata for ABCQT-DMA-0001111643).

[75] *See id.* at 3 (metadata for ABCQT-DMA-0000760018).

| Ref. No. | Document No. | BegBates No. | Doc / Att | Author / From | To | CC | Date | Custodian | Withheld/ Redacted | Priv. Type | Privilege Log Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 868 | ABCQT0000259062 | | Doc | Pillai, Vinu* | Rozencwaig, Jorie | Lee, Michelle | 3/22/2007 | Contracts & Member Services | Withheld | AC | Email between attorney and non-attorneys regarding attorney draft of disclosure letter. |
| 869 | ABCQT0000259066 | | Att | Pillai, Vinu* | | | 3/22/2007 | Contracts & Member Services | Withheld | AC | Attorney draft of disclosure letter. |

The metadata produced with the alleged 2006 "template," INN/ASD Exhibit 20, indicates the letter was worked on by "ION LEGAL," with a modification date of January 30, 2008.[76]

INN and ASD agree that the safe harbor plainly requires that "the GPO must disclose to the member in writing, *at least annually*, the amount the GPO receives from each vendor in administrative fees for purchase by that member."[77]  Yet, even if the "facts" as stated by INN and ASD are accepted for purposes of summary judgment, the *only* inferences that could be drawn are that INN:

- Transmitted letters for 29 out of 532 (or 5.45%) of INN members relating to their 2003 INN administrative fees to BMA in December 2004, with BMA sending those letters out around December 28, 2004.

- Was drafting the letter regarding 2004 INN administrative fees in January 2006 (*more than one year* after the 2003 letter was sent to some members).

- Was drafting – *through in-house counsel* – the letter regarding 2005 INN administrative fees in March 2007 (*more than one year* after the 2004 letter was drafted).

- Was drafting – *again through in-house counsel* – the letter regarding 2006 INN administrative fees in January 2008.

In sum, even under its own "facts," INN *did not* comply with the GPO Safe Harbor by advising *each* member in writing *at least annually* of the administrative fees received with respect to their purchases.  Given the involvement of in-house counsel with the "templates," their attorneys likely know that is the case.

**INN SUPPLEMENTAL SOF 38**

INN would send the "raw data around the purchases" to the outside vendor who "would

then fulfill, do a mail merge and mail the actual letters out."  *See* W. Venus Dep. at 77:18-77:24

(Relator's App. at 992 (Dkt. 390-8)).

---

[76] *See id.* at 5 (metadata for ABCQT-DMA-0000760016).

[77] INN/ASD Opp. at 8 (emphasis added).

**Response to SSOF 38**

Disputed.  What Mr. Venus testified regarding the purported "annual fee disclosure letter" that he states "was sent out" is:

Q:  Who prepared the annual fee disclosure letters?
A:  My understanding was is [sic] that the raw data around the purchases were sent to an outside firm that would then fulfill [sic], do a mail merge and mail the actual letters out.[78]

It is clear, however, that Mr. Venus actually did not know this was the case, as he further testified that he had only seen one sample letter the details of which he could not recall:

Q:  Did INN send those reports by regular mail to the members?
A:  That's my understanding, yes.
Q:  Have the reports that were provided to members been produced?
A:  I'm not sure.
Q:  Did you review any of those reports in preparation for your deposition?
A:  I believe there was an example of one which was a standard form letter.
Q:  Was the example that you reviewed completed for any particular practice.
A:  I believe it was.
Q:  Do you recall what practice it was related to?
A:  No, I don't.
Q:  Do you know what year the standard letter was for?
A:  I don't recall, no.
Q:  Do you know where those letters are kept at INN?
A:  Physically?  No, I'm not sure.
Q:  Do you know if there is any filing system for those letters?
A:  I'm sure there is, but I don't know.[79]

Relator further disputes that INN and ASD can rely on only part of Mr. Venus's testimony as INN's corporate designee.  If Mr. Venus's testimony is accepted for purposes of summary judgment, two of his points are fundamentally inconsistent with INN and ASD's proposed facts.  First, the process for sending the letter involved submitting "raw data around purchases" – not fees – to an outside vendor for the vendor to create the letter, in *every* year.  Moreover, INN and ASD would have retained such letters (if sent) in some manner of filing system, meaning that either INN and ASD have not produced the letters or they do not exist.

**INN SUPPLEMENTAL SOF 39**

Paul Ort served as President of BMA from 1983 to 2010.  In the ordinary course of

BMA's business, Mr. Ort's duties as President included performing mail merges, producing and

---

[78] Venus Dep. 77:18-24 (Ex. N).

[79] *Id.* at 93:20-94:23.

distributing direct mail pieces on behalf of BMA's clients, and managing client accounts. *See*

Declaration of Paul W. Ort (Exhibit 15).

**Response to SSOF 39**

Relator does not dispute that Mr. Ort's declaration contains such a description of his work, but lacks knowledge to comment on what work Mr. Ort may have performed. *See also* Relator's Response to INN Supplemental SOF 36.

**INN SUPPLEMENTAL SOF 40**

INN was a client of BMA from approximately 2003 through 2007. *See* Declaration of P.

Ort (Exhibit 15).

**Response to SSOF 40**

Disputed. Mr. Ort's declaration states that INN was a client of BMA from approximately 2003 through 2007, but Relator disputes that statement on the ground that INN has cited no evidence besides Mr. Ort's declaration of any such relationship between BMA and INN during the specified time period. *See also* Relator's Response to INN Supplemental SOF 36.

**INN SUPPLEMENTAL SOF 41**

Mr. Ort personally corresponded with employees of INN and arranged the distribution of

letters on behalf of INN. Employees under Mr. Ort's direction performed mail merges and

created various types of direct mail pieces for INN on a regular basis from 2003 to 2007. *See*

Declaration of P. Ort (Exhibit 15).

**Response to SSOF 41**

Disputed. Mr. Ort's declaration states that he supervised the preparation of direct mail pieces from INN from 2003 to 2007, but Relator disputes that statement on the ground that INN has produced no evidence of such work with Mr. Ort at any time from 2003 to 2007. As set forth in Relator's Response to INN Supplemental SOF 35, the only evidence contemporaneous to any point from 2003 to 2007 submitted by INN is a few emails relating to a handful of redlined and incomplete letters regarding 2003 administrative fees that were sent to another person – not Mr. Ort – in December 2004. *See also* Relator's Response to INN Supplemental SOF 36.

**INN SUPPLEMENTAL SOF 42**

Mr. Ort identified a draft annual administrative fee letter as an example of the type of

direct mail piece that BMA would mail on behalf of INN on a regular basis. These direct mail

pieces were delivered to the United States Post Office, who confirmed their receipt and mailing,

in the regular course of BMA's business.  *See* Declaration of P. Ort and Exhibit A thereto

(Exhibit 15).

**Response to SSOF 42**

Disputed.  Mr. Ort's declaration states that a redlined unsigned version of a letter
purporting to refer to 2003 INN administrative fees is "[a]n example of the type of direct mail
pieces BMA would send on behalf of INN."[80]  He further asserts that "BMA would mail
correspondence in the form of Exhibit A for INN on a regular basis."[81]  Relator disputes these
statements on the ground that INN has produced no evidence of such work with Mr. Ort at any
time from 2003 to 2007.  As set forth in Relator's Response to INN Supplemental SOF 35, the
only evidence contemporaneous to any point from 2003 to 2007 submitted by INN is a few
emails relating to a handful of redlined and incomplete letters regarding 2003 administrative fees
that were sent to another person – not Mr. Ort – in December 2004.  Moreover, Mr. Ort's
declaration supports that INN used BMA to distribute other materials.

Relator further disputes that the U.S. Post Office "confirmed the[] receipt and mailing" of
any letters regarding INN administrative fees as there is no evidence of any such mailing, or
Postal Service confirmation, receipt, or other acknowledgement of any such thing.  Moreover,
Mr. Ort's declaration provides nothing but a bald assertion to that effect.  He does not describe
any details of how or where or when letters were transmitted to the Postal Service other than to
assert it was "in the regular course of BMA's business."[82]  *See also* Relator's Response to INN
Supplemental SOF 36.

**INN SUPPLEMENTAL SOF 43**

For fiscal years 2007, 2008 and 2009, Jennifer Russell, INN's Manager of Member

Services, was responsible for the preparation of and sending the administrative fee disclosure

letters to INN members.  *See* Declaration of J. Russell (Exhibit 23).

**Response to SSOF 43**

Relator disputes that INN and ASD may rely on the Declaration of Jennifer Russell.
Ms. Russell was not identified by INN or ASD as an individual likely to have discoverable
information relevant to these proceedings as required by Federal Rule of Civil Procedure
26(a)(1) until March 23, 2011.[83]  Nor did information about INN and ASD's reliance on

---

[80] INN/ASD Ex. 15 ¶ 7.

[81] *Id.*

[82] INN/ASD Ex. 15 ¶ 8.

[83] *Compare* Supplemental Disclosure of INN and ASD Pursuant to Federal Rule of Civil

Ms. Russell for their defense emerge "during the discovery process."[84]  INN and ASD indisputably had the information, however, and knew of its relevance to this case, as supported by (among other things) Relator's Notice of Deposition under Federal Rule 30(b)(6) to Defendant International Nephrology Network (served October 6, 2010).[85]  The submission of Ms. Russell's declaration weeks after the parties' March 1 deadline for summary judgment motions, as well as *after* the deadline for oppositions thereto is inexcusable.  Subject to that objection, Relator does not dispute that the Declaration of Jennifer Russell claims to support this statement, but Relator lacks information to ascertain its truth.

**INN SUPPLEMENTAL SOF 44**

For the fiscal years of 2007 and 2008, INN sent the administrative fee disclosure letters to

INN members via facsimile.  *See* Declaration of J. Russell (Exhibit 23); *see, e.g.*, ABCQT-

DMA-0001112042 (Exhibit 24); ABCQT-DMA-000111661 (Exhibit 25).  For fiscal year 2009,

INN employees sent the administrate fee disclosure letters to INN members via United States

Postal Service. Declaration of J. Russell (Exhibit 23).

**Response to SSOF 44**

Disputed.  Ms. Russell's declaration makes that assertion, but Relator notes that INN has not produced any proof of the submission of the letters than Ms. Russell's unsupported declaration and, as stated in Relator's Response to INN Supplemental SOF 38, her declaration conflicts with the testimony of INN's Rule 30(b)(6) witness, who claimed to know that an outside mailing company had sent the INN administrative fee letters based on raw data about member purchases.  *See also* Relator's Response to INN Supplemental SOF 43.

**INN SUPPLEMENTAL SOF 45**

Patrick Corcoran, a process server with Superior Process Service, LLC, in Glen Burnie,

Maryland, received a request from counsel for INN and ASD on September 19, 2010, to serve a

---

Procedure 26(e)(1)(A) (Mar. 23, 2011) (Ex. D) *with* Initial Disclosures of INN, ABSG, ASD, and ABC Pursuant to Federal Rule of Civil Procedure 26(a)(1) (Dec. 11, 2009) (Ex. E); First Revised Initial Disclosures of INN and ASD Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A) (Apr. 19, 2010) (Ex. F); Initial Disclosures of INN and ASD Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A) (July 12, 2010) (Ex. G).

[84] *See* Fed. R. Civ. P. 26(e).

[85] *See, e.g.*, Notice of Deposition at 12 (Topic 28: "Any efforts made by you to ensure that INN has complied with federal regulations governing GPOs . . .") (Ex. Q).

subpoena to produce documents on the custodian of records at BMA, 1328 Charwood Rd., Suite

100, Hanover, Maryland 21076.  Declaration of P. Corcoran (Exhibit 26).

**Response to SSOF 45**

Relator disputes that INN and ASD may rely on the Declaration of Patrick Corcoran. Mr. Corcoran was not identified by INN or ASD as an individual likely to have discoverable information relevant to these proceedings as required by Federal Rule of Civil Procedure 26(a)(1) until March 23, 2011.[86]  Nor did information about INN and ASD's reliance on Mr. Corcoran for their defense emerge "during the discovery process."[87]  INN and ASD indisputably had the information, however, and knew of its relevance to this case, as supported by (among other things) Relator's Notice of Deposition under Federal Rule 30(b)(6) to Defendant International Nephrology Network (served October 6, 2010).[88]  The submission of Mr. Corcoran's declaration weeks after the parties' March 1 deadline for summary judgment motions, as well as *after* the deadline for oppositions thereto is inexcusable.  Subject to that objection, Relator does not dispute that the Declaration of Patrick Corcoran so states, but Relator is without information to verify the truth of the statement.

**INN SUPPLEMENTAL SOF 46**

The subpoena requested: (1) Any and all documents sent by [BMA] to any person or

entity on behalf of INN; (2) Any and all documents relating to any documents or letters sent by

[BMA] on behalf of INN; and (3) Any and all lists of recipients of letters and/or documents that

were sent by You on behalf of INN. *See* September 17, 2010 Subpoena to Produce Documents

issued to Custodian of Records, BMA (Exhibit 27).

**Response to SSOF 46**

Undisputed that a subpoena issued by INN contains the information above, but Relator is without information to verify the truth of Mr. Corcoran's statements.  *See also* Relator's Response to INN Supplemental SOF 45.

---

[86] *Compare* Supplemental Disclosure of INN and ASD Pursuant to Federal Rule of Civil Procedure 26(e)(1)(A) (Mar. 23, 2011) (Ex. D) *with* Initial Disclosures of INN, ABSG, ASD, and ABC Pursuant to Federal Rule of Civil Procedure 26(a)(1) (Dec. 11, 2009) (Ex. E); First Revised Initial Disclosures of INN and ASD Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A) (Apr. 19, 2010) (Ex. F); Initial Disclosures of INN and ASD Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A) (July 12, 2010) (Ex. G).

[87] *See* Fed. R. Civ. P. 26(e).

[88] *See, e.g.*, Notice of Deposition at 12 (Topic 28: "Any efforts made by you to ensure that INN has complied with federal regulations governing GPOs . . .") (Ex. Q).

**INN SUPPLEMENTAL SOF 47**

Mr. Corcoran made three attempts to serve the subpoena at the location on September 20, 2010 at 11:30 AM and again at 3:05 PM, and on September 21, 2010 at 11:10 AM. Declaration of P. Corcoran (Exhibit 26).

**Response to SSOF 47**

Undisputed that Mr. Corcoran's declaration so states, but Relator is without information to verify the truth of the statement. *See also* Relator's Response to INN Supplemental SOF 45.

**INN SUPPLEMENTAL SOF 48**

When Mr. Corcoran attempted to serve the subpoena, there were no cars in the parking lot of that location, there did not appear to be any people inside or outside the building, and the interior rooms contained only debris. Mr. Corcoran declared that "[t]o the best of my knowledge, it did not appear that any business was operating at that location." Declaration of P. Corcoran (Exhibit 26).

**Response to SSOF 48**

Undisputed that Mr. Corcoran's declaration so states, but Relator is without information to verify the truth of the statements. *See also* Relator's Response to INN Supplemental SOF 45.

**INN SUPPLEMENTAL SOF 49**

Mr. Corcoran completed the proof of service noting that he was returning the subpoena unexecuted. *See* Proof of Service (Exhibit 28).

**Response to SSOF 49**

Undisputed that a Proof of Service was completed to show that the subpoena was not executed but Relator is without information to verify the truth of the remainder of the statement. Relator notes that the failed proof of service *was never* produced to the other parties in the litigation by INN during discovery and that, given INN's late production (after Relator's motion for summary judgment was filed) of various records and this declaration, INN has deliberately engaged in a *failure* to produce evidence supporting its compliance with the mandatory requirement that GPOs provide an annual disclosure of fees to their members. *See also* Relator's Response to INN Supplemental SOF 45.

**INN SUPPLEMENTAL SOF 50**

Michael Mullen was employed by AmerisourceBergen Specialty Group from 2003 to

2010. Mr. Mullen is a former employee of AmerisourceBergen Specialty Group.  Declaration of

M. DiCandilo (Exhibit 29).

**Response to SSOF 50**

Undisputed.

**INN SUPPLEMENTAL SOF 51**

On or about April 23, 2010, Mr. Mullen was terminated by ABSG for reasons unrelated

to "pass-through payments," any issues in this or any other litigation or related to any specialty

GPO.  Declaration of M. DiCandilo (Exhibit 29).

**Response to SSOF 51**

Disputed.  As Mr. Mullen testified, his termination came after he raised concerns with
ABSG management regarding issues, including relating to GPOs and passthrough payments.[89]
Mr. Mullen raised these concerns in a meeting with David Yost, the CEO of AmerisourceBergen
Corp., on March 23, 2010.  Mr. Yost told Mr. Mullen "Good thoughts, . . . let me sleep on it."[90]

Two weeks later, on April 8, 2010, Mr. Mullen was summoned to a meeting with
Mr. Yost and John Chou, General Counsel to AmerisourceBergen Corporation.  At that meeting
Mr. Mullen's employment was terminated.[91]  Counsel for INN and ASD objected to Mr. Mullen
testifying to the content of that meeting and Mr. Mullen's counsel acquiesced to that objection.[92]
Accordingly, due to the objection of INN and ASD's counsel, Mr. Mullen was not permitted to
testify about what was said to him regarding his termination.

Mr. Mullen had started with ABSG as CFO in 2003.[93]  At the time of his termination,
Mr. Mullen was the COO of ABSG's business units as well as all of its corporate functions,[94] yet
within two weeks of raising his concerns regarding the pass-through arrangements within ABSG,

---

[89] *See* Relator's SOF at 10, ¶ 49.

[90] Deposition of Mike Mullen 51:16- 55:12, 61:2-61:25 (Oct. 19, 2010) (excerpts attached hereto
as Exhibit S).

[91] *Id.* at 62:17-63:4, 63:25-64:4.

[92] *Id.* at 63:5-63:24.

[93] *Id.* at 7:15-22.

[94] *Id.* at 17:23-18:2.

he was summarily terminated.

**INN SUPPLEMENTAL SOF 52**

Mr. Mullen has an attorney-client relationship with counsel for Relator.  M. Mullen Dep.

at 80:7-82:24 (Exhibit 30).

**Response to SSOF 52**

Undisputed that Mr. Mullen's deposition transcript includes colloquy by counsel at the cited pages regarding assertion of privilege at Mr. Mullen's deposition.


April 1, 2011                                    Respectfully submitted,

                                                 RELATOR KASSIE WESTMORELAND

                                                 By: /s/ Joseph S. Hall
                                                 Mark C. Hansen (BBO # 541753)
                                                 Silvija A. Strikis (pro hac vice)
                                                 Joseph S. Hall (pro hac vice)
                                                 Derek T. Ho (BBO # 652627)
                                                 Wan J. Kim (pro hac vice)
                                                 Andrew C. Shen (pro hac vice)
                                                 Marc A. Wallenstein (pro hac vice)
                                                 KELLOGG, HUBER, HANSEN, TODD
                                                   EVANS & FIGEL, P.L.L.C.
                                                 1615 M Street, N.W., Suite 400
                                                 Washington, D.C. 20036
                                                 (202) 326-7900
                                                 (202) 326-7999 (facsimile)

                                                 Suzanne E. Durrell (BBO #139280)
                                                 DURRELL LAW OFFICE
                                                 180 Williams Avenue
                                                 Milton, Massachusetts 02186
                                                 (617) 333-9681
                                                 Fax: (617) 333-0014
                                                 Email: Suzanne.durrell@verizon.net

                                                 Robert M. Thomas, Jr. (BBO #645600)
                                                 THOMAS & ASSOCIATES
                                                 280 Summer Street, 5th Floor
                                                 Boston, MA 02210-1131
                                                 (617) 371-1072

Fax: (888) 676-7420
Email: rmt@thomasandassoc.net

Rory Delaney, Esq. LLC (BBO #655666)
Seven Liberty Square, 2nd Floor
Boston, MA 02109
(857) 498-0384
Email: rory@rorydelaney.com

Charles F. Kester (pro hac vice)
Lawrence M. Isenberg (pro hac vice)
KESTER & ISENBERG
Encino Financial Center
16133 Ventura Boulevard, Suite 260
Encino, California 91436
(818) 728-3300
Fax: (818) 728-3311
Emails ckester@kesterisenberg.com
lisenberg@kesterisenberg.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to
the registered participants as identified on the Notice of Electronic Filing (NEF) and paper
copies will be sent to those indicated as non registered participants on April 1, 2011.

_/s/ Joseph S. Hall_