**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| *ex rel.* KASSIE WESTMORELAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-10972-WGY |
| | ) | |
| AMGEN INC.; INTERNATIONAL | ) | |
| NEPHROLOGY NETWORK renamed | ) | |
| INTEGRATED NEPHROLOGY NETWORK, a | ) | |
| d/b/a of DIALYSIS PURCHASING ALLIANCE, | ) | |
| INC.; and ASD HEALTHCARE, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE*
TO EXCLUDE UNAUTHENTICATED DATA COMPILATIONS PROVIDED BY CMS**

Acting on behalf of the United States, Relator seeks in this action billions of dollars in damages and penalties from Defendants. Relator's damages and penalty calculations derive exclusively from a set of data that was initially compiled and provided by the Centers for Medicare and Medicaid Services ("CMS") in response to an investigative request by the United States Attorney's Office for the Eastern District of New York ("EDNY") and that was later produced to Relator in this litigation (the "EDNY Claims Data"). This data is not admissible, however, because Relator has failed adequately to authenticate it, CMS has opposed Defendants' attempts to discover information relevant to the authenticity and accuracy of the data, no exception to the rule against hearsay applies, and numerous errors have been identified in the data that warrant exclusion for lack of trustworthiness.

The EDNY Claims Data is critical both to Relator's attempt to identify overfill claims and to her calculations of damages and penalties. In fact, Relator's purported damages expert, Raymond Hartman, relies exclusively on the EDNY Claims Data to identify what claims he

alleges included overfill amounts for purposes of calculating Relator's claimed damages and penalties. Despite Relator's heavy reliance on the EDNY Claims Data – which she received from CMS no later than August 2010 – Relator never once sought to authenticate it in any fashion during discovery, nor did she obtain any information regarding its accuracy or authenticity.

Instead, Relator now seeks to authenticate the EDNY Claims Data solely on the basis of a generic, boilerplate four-paragraph declaration (presumably drafted by counsel for Relator) executed by Elizabeth Richter, a CMS employee who, by all accounts, has no personal, first-hand knowledge regarding how the EDNY Claims Data was obtained, maintained, compiled, or produced. *See* Exhibit 1 (Richter Declaration). Upon learning of Relator's intent to have the EDNY Claims Data admitted on the basis of the Richter Declaration, Defendants sought information from CMS regarding the authenticity and accuracy of the EDNY Claims Data, but their requests have been repeatedly rejected. CMS expressly rejected Defendants' requests for a deposition of Ms. Richter regarding the authenticity and accuracy of the EDNY Claims Data by invoking its *Touhy* regulations in refusing to comply with the deposition subpoena issued pursuant to Fed. R. Civ. P. 45.

The Court should allow Defendants' motion and preclude Relator from seeking to introduce the EDNY Claims Data at trial for the following reasons:

- The Richter Declaration fails to provide any of the necessary foundation to establish that the declarant is sufficiently knowledgeable about the EDNY Claims Data, the underlying records, or CMS' record keeping procedures to attest to the authenticity of the EDNY Claims Data. Moreover, according to CMS' own statements and the circumstances under which the data is managed by CMS contractors, there is no reasonable basis to believe that the declarant possesses such knowledge.

- Defendants have been denied any opportunity to challenge the Richter Declaration as contemplated by Fed. R. Evid. 902. In fact, CMS, the real party-in-interest in this litigation, has invoked its *Touhy* regulations to prevent any deposition related to the

accuracy and authenticity of the EDNY Claims Data, and it is refusing to produce Ms. Richter or any other witness for trial to provide Defendants an opportunity to challenge the authenticity or accuracy of the data.

- Because the EDNY Claims Data constitutes an unexplained selection of underlying CMS data that was created in anticipation of litigation, it is not admissible as a public or business record exception to hearsay.

- Finally, even without an opportunity to conduct discovery regarding the authenticity and accuracy of the EDNY Claims Data, Defendants have identified numerous errors in the EDNY Claims Data that result in substantial double-counting and overstatement of Relator's damages and penalty claims. These unexplained errors in the EDNY Claims Data render it untrustworthy and inadmissible and, because Defendants have been denied the opportunity to challenge the authenticity and accuracy of this data, provide an independent basis for exclusion.

## <u>BACKGROUND</u>

CMS produced the EDNY Claims Data in several installments on June 15, June 17, July 1, and August 2, 2010. It purports to contain and reflect millions of line-item entries submitted by thousands of medical providers to CMS contractors across the country relating to their utilization of Aranesp®. These entries are made up of hundreds of different data fields purportedly reflecting combinations of information submitted by providers and entered by CMS upon its review of the provider submissions.

Through discussions with counsel for CMS, Defendants learned that the EDNY Claims Data was originally compiled and provided in response to an investigative request from EDNY, and a copy of that data was later produced to Relator in this action. *See* Exhibit 2 (Letter from D. Whitney to D. Berwick and S. Bozniko of Sept. 6, 2011); Exhibit 3 (Letter from J. Blum to D. Whitney of Sept. 9, 2011).

On August 24, 2011, months after the close of fact discovery, Relator served on Defendants the Richter Declaration, which generically asserts that Ms. Richter is "knowledgeable about the manner in which these CMS records have been created and retained by CMS," but does not provide any explanation or detail regarding the basis of that knowledge.

Exhibit 1 (Richter Declaration) ¶ 1.  The Richter Declaration further asserts that the EDNY Claims Data is "a true and accurate representation of claims submitted by medical providers for reimbursement by Medicare," but provides no further elaboration whatsoever.  *Id*.  Counsel for CMS later informed counsel for Defendants that Ms. Richter has little familiarity with the EDNY Claims Data.  *See* Exhibit 6 (E-mail from D. Whitney to S. Bozinko of Sep. 20, 2011).

The Richter Declaration further states in boilerplate terms that underlying records "were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of these matters; were kept in the ordinary course of CMS's regularly conducted activity; and were made by the regularly conducted activity as a regular practice."  Exhibit 1 (Richter Declaration) ¶ 3.  The Richter Declaration does not describe how, when, by whom, or for what purpose the EDNY Claims Data was created or compiled from CMS' underlying records.  It does not explain how these underlying records were recorded and stored by CMS.  Nor does it explain how Ms. Richter is familiar with or knowledgeable about CMS' record-keeping procedures or the process by which the EDNY Claims Data was created and compiled.  In short, the Richter Declaration consists entirely of uninformative boilerplate language cribbed directly from Fed. R. Evid. 902(11) and conveys no meaningful information about either the EDNY Claims Data or the underlying records from which it was generated.

On August 25, 2011, Defendants sought to depose Ms. Richter by issuing a subpoena pursuant to Fed. R. Civ. P. 45, seeking her attendance at a deposition.  *See* Exhibit 4 (Subpoena to CMS dated Aug. 25, 2011).  CMS responded to that subpoena by letter on September 2, 2011, taking the position that Amgen was required to comply with the agency's *Touhy* regulations[1] to request the testimony of a CMS employee, notwithstanding that the United States is the real

---

[1] *Touhy* regulations refer to those adopted by a government agency in an attempt to control its employees' disclosure of agency information in response to subpoenas.

party-in-interest in this case.  *See* Exhibit 5 (Letter from S. Bozinko to D. Whitney of Sept. 2, 2011).  Amgen responded by letter dated September 6, 2011, explaining that it had a compelling need for Ms. Richter's testimony because the EDNY Claims Data served as the sole basis for Relator's multi-billion dollar damage and penalty calculations, and yet neither Relator nor CMS had provided any basis on which either Defendants or the Court could judge the authenticity or accuracy of the EDNY Claims Data.  *See* Exhibit 2 (Letter from D. Whitney to D. Berwick and S. Boznico of Sept. 6, 2011).

In a letter dated September 9, 2011, but not received by Defendants until September 20, 2011, CMS formally denied Amgen's request to take the deposition of Ms. Richter.  *See* Exhibit 3 (Letter from J. Blum to D. Whitney of Sept. 9, 2011).  CMS asserted that "[w]ith the declaration of authenticity of this claims data from CMS, there is simply no need, let alone a compelling need, for testimony on this issue."  *Id.* at 2.  Upon receipt of the letter on September 20, 2011, Amgen requested additional information regarding the EDNY Claims Data and the Richter Declaration, but to date, neither CMS nor Relator has provided Amgen any information about the EDNY Claims Data apart from what was offered in the four paragraphs of the Richter Declaration.  *See* Exhibit 6 (E-mail from D. Whitney to S. Bozinko of Sep. 20, 2011).[2]

## ARGUMENT

## I.      RELATOR HAS FAILED TO AUTHENTICATE THE EDNY CLAIMS DATA

The Richter Declaration purports to authenticate the EDNY Claims Data as certified domestic records of regularly conducted activity under Fed. R. Evid. 902(11) and certified copies

---

[2] Relator also served on Defendants a declaration of Frank Cipolloni that may also relate to the EDNY Claims Data. That one-paragraph declaration purports to state that "the attached documents constitute a true and correct copy of materials relating to the captioned case" but fails to attach any documents.  *See* Exhibit 7 (Declaration of F. Cipolloni of Sept. 2, 2011); Exhibit 8 (E-mail from M. Wallenstein to D. Whitney of Sept. 8, 2011); Exhibit 9 (Forward of E-mail from S. Bozinko to M. Wallenstein of Sept. 8, 2011).  Defendants have also sought discovery regarding this declaration, but CMS again asserted its *Touhy* regulations.  *See* Exhibit 10 (Subpoena to CMS dated Sept. 14, 2011); Exhibit 11 (*Touhy* response from CMS to D. Whitney of Sept. 20, 2011).

of public records under Fed. R. Evid. 902(4).  In the declaration, however, Ms. Richter fails to lay any foundation for her assertion that she is sufficiently knowledgeable about the EDNY Claims Data, the underlying records, or CMS' record keeping procedures to attest to the authenticity of the EDNY Claims Data.   Nor have Defendants been given a sufficient opportunity to challenge the Richter Declaration as contemplated by Rule 902.  On the contrary, Defendants' efforts to test the authenticity and accuracy of the EDNY Claims Data have been expressly rejected by CMS, the real party-in-interest, through its invocation of its *Touhy* regulations.  *See* Exhibit 3 (Letter from J. Blum to D. Whitney of Sept. 9, 2011); Exhibit 5 (Letter from S. Bozinko to D. Whitney of Sept. 2, 2011).

## A.    There is No Basis to Believe that Ms. Richter Is A "Custodian Or Other Qualified Person" within the Meaning of Fed. R. Evid. 803(6) and 902(11)

Rule 902(11) provides that a record of a regularly conducted activity that would be admissible as a business record under Rule 803(6) can be authenticated by a "written declaration of its custodian or other qualified person."  Fed. R. Evid. 902(11).  However, in her boilerplate declaration, Ms. Richter does not even claim to be the custodian of the EDNY Claims Data, and the generic statements in the Richter declaration are insufficient to demonstrate that she is an otherwise "qualified person" under the Rule.  *See* Exhibit 1 (Richter Declaration).

Courts have held that a "custodian or other qualified person" must "'have enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business.'"  *United States v. Lauersen*, 348 F.3d 329, 342 (2d Cir. 2003) (quoting 5 *Weinstein's Federal Evidence* § 803.08[8][a], at 803-77 (2d ed. 2003)), *vacated on other grounds and remanded by* 543 U.S. 1097 (2005).[3]   And courts

---

[3] This language in Rule 902(11) has been interpreted to have the same meaning as the nearly identical language in Rule 803(6) ("custodian or other qualified witness").  *See Lauersen*, 348 F.3d at 342.

consistently refuse to admit business records where the foundation is laid by a witness who lacks sufficient familiarity with the record-keeping system of the business in question. *See, e.g.*, *United States v. Brown*, 553 F.3d 768, 793 (5th Cir. 2008) (holding that the "district court did not err in ruling that [the witness] was not qualified to lay the foundation" where the witness "knew about the pharmacy computer system, how to operate the system, and how to extract information from it" but was not familiar with the pharmacy's record-keeping procedures).[4]

The Richter Declaration is far too vague to demonstrate familiarity with the procedures used to maintain and compile the EDNY Claims Data.  It states only that Richter is "knowledgeable about the manner in which these CMS records have been created and retained." Exhibit 1 (Richter Declaration) ¶ 1.  Critically, however, it does "not tell the court *how [she] knows* the procedure by which records were created and maintained." *DirecTV, Inc. v. Reyes*, No. 03 C 8056, 2006 WL 533364, at *11 (N.D. Ill. Mar. 1, 2006) (emphasis added) (finding declaration insufficient under Rule 902(11) on this ground).  As a result, the Richter Declaration is a far cry from what courts have deemed sufficient under Rule 902(11).  *Cf. Fed. Trade Comm'n v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 16 n.14 (1st Cir. 2010) (affirming admission where a declaration explained "(A) that from June 2000 to July 2005, the declarant entered Triad's financial data into spreadsheets, maintained Triad's accounting records, and oversaw all

---

[4] *See also United States v. Petrie*, 302 F.3d 1280, 1288 (11th Cir. 2002) (affirming exclusion of records offered through secretary who was "able to testify as to how the documents are maintained, filed and retrieved" but "simply is not able to testify concerning the origination and compilation of the documents," *i.e.*, "the initial link in the chain producing the record"); *United States v. Pelullo*, 964 F.2d 193, 201-02 (3d Cir. 1992) (holding that "the Government failed to lay a proper foundation as required by the business records exception" for the admission of bank records because the government agent through whom records were introduced "did not purport to have familiarity with the record-keeping system of the banks"); *United States v. Porter*, 821 F.2d 968, 977 (4th Cir. 1987) (holding that records were improperly admitted through security officer because "[h]e was not the custodian of records," "[h]e did not work in the personnel department where such records were made, and he did not know the record keeping requirements of the company"); *DirecTV, Inc. v. Reyes*, No. 03 C 8056, 2006 WL 533364, at *11 (N.D. Ill. Mar. 1, 2006) (declaration offered under Rule 902(11) was insufficient to show that declarant was a qualified custodian because "[s]imply saying that he was at some unspecified time a 'custodian' of the database does not tell the court how he knows the procedure by which records were created and maintained in that database").

of Triad's employees who did any accounting work; (B) that the declarant and Triad kept and regularly relied on these spreadsheets and the data they contained; and (C) that the data were entered into the spreadsheets almost daily").

Not only does the Richter Declaration fail to explain her familiarity with record-keeping procedures used to maintain and compile the EDNY Claims Data, but Amgen has reason to believe that Richter is not, in fact, familiar with those procedures at all.    Counsel for CMS recently informed counsel for Defendants that Ms. Richter in fact has little familiarity with the EDNY Claims Data she was purporting to authenticate, and although Defendants have requested from CMS information that may shed light on Ms. Richter's knowledge and qualifications, CMS declined to respond.  *See* Exhibit 6 (E-mail from D. Whitney to S. Bozinko of Sept. 20, 2011).

Because there is no basis to conclude or believe that Ms. Richter has the requisite familiarity with the procedures used to create and maintain the claims data, she is not a "qualified person" under Rule 902(11) and her declaration is insufficient to authenticate the EDNY claims data.[5]

---

[5] For the same reasons, the Richter Declaration is insufficient under Rule 902(4), which requires a certificate from "the custodian or other person authorized to make the certification." Fed. R. Evid. 902(4).  Ms. Richter does not claim to be the custodian of the EDNY Claims Data, nor does her declaration – which merely identifies her as "Deputy Center Director" – demonstrate that she is authorized to certify the data.  *See* Exhibit 1 (Richter Declaration) ¶ 1; 31 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 7138 (3d ed. 1998) (explaining that "[p]ersons other than the custodian authorized to make a certification commonly are the deputy custodian or other officials with duties in the custodian's office" and that "the authority to make the certification cannot be inferred from an official's title where that title is so vague as to leave unclear [her] official duties").

Even if Richter were an authorized person under Rule 902(4), her declaration cannot authenticate the EDNY Claims Data under that rule because it was not made under seal or accompanied by a second certification made under seal. *See* Fed. R. Evid. 902(4) (to certify public records, a certificate must be self-authenticating under Fed. R. Evid. 902(1), (2), or (3)); Fed. R. Evid. 902(2) (a record not under seal can be authenticated by a certificate made under seal); *see also* 31 Wright & Miller, *Federal Practice and Procedure* § 7138 (explaining that, for a Rule 902(4) certificate to be authenticated under Rule 902(2), "there must be a second certificate in which another public officer, with duties in the same district or political subdivision as the signer of the first certificate, certifies under seal that the signer of the first certificate had the official capacity to sign and that his signature is genuine").  Although CMS later produced an under-seal declaration from Frank Cipolloni stating that "the attached documents constitute a true and correct copy of materials relating to the captioned case," no documents were attached.  *See* Exhibit 7

**B.     Relator and CMS Have Refused to Allow Defendants Any Meaningful Opportunity To Challenge The Richter Declaration**

Relator's attempt at authentication also fails because Defendants have not been given any opportunity to challenge the Richter Declaration.  Rule 902(11) provides that "[a] party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence *to provide the adverse party with a fair opportunity to challenge them*."   Fed. R. Evid. 902(11) (emphasis added).   The Advisory Committee's note explains that "[t]he notice requirement … is intended to give the opponent of the evidence a full opportunity to test the adequacy of the foundation set forth in the declaration."  *Id.* advisory committee's note to the 2000 amendments; *see also Stang v. Comm'r*, 89 T.C.M. (CCH) 1490, 2005 WL 1503682, at *8 (T.C. 2005) (notice was sufficient because opponent could have employed the "straightforward expedient of calling [the declarant] as a witness" at trial); *Spurlock v. Comm'r*, 85 T.C.M. (CCH) 1236, 2003 WL 1987156, at *6 (T.C. 2003) (same).

All Defendants have been provided with is a copy of the Richter Declaration.  Defendants have been given no meaningful opportunity to challenge the conclusory assertions it contains. Rule 902(11) plainly requires that the opposing party be given a "full" and "fair" opportunity to challenge "the foundation set forth in the declaration."   Yet, CMS refuses to produce Ms. Richter for a deposition because it maintains that her declaration alone is sufficient, and it has suggested that it will similarly refuse to produce Richter as a witness at trial, declaring that "[t]here is no need for additional CMS testimony on authentication."   Exhibit 3 (Letter from J. Blum of Sept.

(Declaration of F. Cipolloni of Sept. 2, 2011).  Accordingly, that declaration is plainly insufficient to certify the authenticity of the Richter Declaration or the EDNY Claims Data.

9, 2011); *cf. Stang*, 2005 WL 1503682, at *8 (notice was sufficient only because declarant could have been called to testify); *Spurlock*, 2003 WL 1987156, at *6 (same).

CMS' refusal to allow Defendants to test the authenticity and accuracy of the EDNY Claims Data and challenge the unsupported, boilerplate assertions contained in the Richter Declaration  is entirely inconsistent with the purpose behind Rule 902(11)'s notice requirement. Because Amgen has not been given a "full" and "fair" opportunity to challenge the Richter Declaration as required, the EDNY Claims Data has not been sufficiently authenticated under Rule 902(11) and should be excluded from evidence.

## II.   THE EDNY CLAIMS DATA IS INADMISSIBLE HEARSAY NOT SUBJECT TO THE BUSINESS RECORDS OR PUBLIC RECORDS EXCEPTIONS

In addition to being unauthenticated, an insufficient foundation has been laid for admissibility of the EDNY Claims Data under any exception to the hearsay rules.  The Richter Declaration suggests that Relator will seek to admit the EDNY Claims Data as business records under Rule 803(6) or public records under Rule 803(8).  Relator and CMS have failed, however, to show that the EDNY Claims Data is admissible under either exception.

It is well-established that the business records exception does not apply to records created in anticipation of litigation.  *Palmer v. Hoffman*, 318 U.S. 109, 114 (1943) (reports "calculated for use essentially in the court, not in the business" are not business records); *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994) ("Data prepared or complied for use in litigation are not admissible as business records."); *House of Clean, Inc. v. St. Paul Fire & Marine Ins. Co.*, No. 07-10839-NMG, 2011 WL 2118633, at *11 (D. Mass. May 27, 2011) (affidavits prepared in anticipation of litigation not admissible under Rule 803(6)).  Nor are public records prepared solely for use in litigation generally admissible under Rule 803(8)(a). *See, e.g.*, *United States v. Stone*, 604 F.2d 922, 925 (5th Cir. 1979) ("This hearsay exception is

designed to allow admission of official records and reports prepared by an agency or government office for purposes *independent of specific litigation*.") (emphasis added).

The Richter Declaration asserts that the records reflected in the EDNY Claims Data were created and maintained "in the ordinary course of [CMS's] business" and created "at or near the time of the occurrence of the matters set forth."  Exhibit 1 (Richter Declaration) ¶¶ 2, 3.  But neither Relator nor CMS has produced a single claim for payment submitted by a provider to CMS, or one of its contractors.  The EDNY Claims Data do not contain the underlying records themselves, or the full universe of claims submitted by the providers at issue in this litigation.  Rather, the EDNY Claims Data reflects the output of some unknown process through which a small subset of the underlying data stored by CMS was selected, extracted, compiled, and produced.

Although computer generated printouts of electronically stored data, created for the purpose of litigation, can qualify as business records where the underlying data is prepared and kept pursuant to regular business practices, *see, e.g.*, *United States v. Goodchild*, 25 F.3d 55, 61– 62 (1st Cir. 1994), such documents are inadmissible where their creation involves more than simply retrieving and printing the stored data.  The Second Circuit, for example, has held that documents were inadmissible under the business records exception where they were created by programming a "computer system to scan the history tapes, extract the pertinent information concerning the transactions between the parties, and create a printout."  *Potamkin*, 38 F.3d at 630 (internal quotation marks omitted).  The records were inadmissible in part because they contained "inaccuracies" that "suggest[ed] that the [computer] History required *significant selection and interpretation of data*, not simply a downloading of information previously computerized in the regular course of business."  *Id.* at 633 (emphasis added); *see also United*

*States v. Blackburn*, 992 F.2d 666, 670 (7th Cir. 1993) (computer printout inadmissible where it was "specially prepared at the behest of the FBI and with the knowledge that any information it supplied would be used in an ongoing criminal investigation").  The Fifth Circuit has likewise held computer printouts created for litigation are admissible business records "when the program that calls forth the data only orders it out *rather than sorting, compiling or summarizing the information*."  *United States v. Sanders*, 749 F.2d 195, 198 (5th Cir. 1984) (emphasis added).

Moreover, where courts have admitted such evidence, the proponent has provided substantial information describing the process by which the underlying data was retrieved and used to generate computer printouts.  *See, e.g.*, *id.* at 198 n.4 (noting that "the custodian of the claims records … testified extensively about the manner of preparation of the printouts" and that his testimony made clear that they were not "selective compilations of information"); *Hardison v. Balboa Ins. Co.*, 4 F. App'x 663, 670 (10th Cir. Feb. 16, 2001) (unpublished) (affidavit "explained how data was entered and retrieved from the computer system").

Here, Relator and CMS have provided none of the required information to establish and admit the EDNY Claims Data as a business or public record.  The Richter Declaration merely recites the language of Rule 803(6) and asserts – with no explanation – that the EDNY Claims Data complies with its requirements.  *See* Exhibit 1 (Richter Declaration) ¶ 3 ("[T]he CMS records were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of these matters; were kept in the ordinary course of CMS's regularly conducted activity; and were made by the regularly conducted activity as a regular practice.").  In discussing the "CMS records," moreover, the Richter Declaration fails even to distinguish between what was compiled and produced to EDNY from the underlying data compiled by CMS and its contractors.

Neither Relator nor CMS has explained how, when, or by whom, the EDNY Claims Data was sorted or compiled or what type of selection or interpretation was involved in that process. Nor have they explained how the underlying data itself is recorded or maintained.  Consequently, there is no way for Defendants, or the Court, to determine whether the process for creating the EDNY Claims Data involved "simply a downloading of information previously computerized in the regular course of business," *see Potamkin*, 38 F.3d at 633, or the "sorting, compiling or summarizing" of information, *see Sanders*, 749 F.2d at 198.   Indeed, as in *Potamkin*, the numerous "inaccuracies" in the EDNY Claims Data (discussed below) suggest that their creation "required significant selection and interpretation of data," which would render them inadmissible.  *See* 38 F.3d at 633.

In sum, the complete absence of essential information about how the EDNY Claims Data were retrieved, compiled, and prepared renders them inadmissible as business records or public records.

## III.   RELATOR AND CMS HAVE FAILED TO ESTABLISH THE TRUSTWORTHINESS OF THE EDNY CLAIMS DATA

Even where a proper foundation for the admission of business or public records has been laid, such documents may still be excluded if there are indicia of lack of trustworthiness.  Fed. R. Evid. 803(6) (business records exception applies "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness"); Fed. R. Evid. 803(8) (public records exception applies "unless the sources of information or other circumstances indicate lack of trustworthiness").

The EDNY Claims Data contains numerous unexplained irregularities and errors.  For example, many claims appear twice in the EDNY Claims Data.  The duplicate entries appear to reflect an original claim and an adjusted claim.  But CMS has not offered any explanation for

why such duplicate entries exist or which of the two claims is accurate. As set forth in the attached declaration of a medical provider, the EDNY Claims Data *does not accurately reflect the claims submitted by that practice*, but instead double counts numerous claims submitted. *See* Exhibit 12 (Declaration of M. Harms dated Jan. 20, 2011) ¶ 14. CMS has not explained why certain provider claims are inaccurately included more than once in the dataset, or even provided a means to identify such errors. These are exactly the sort of data irregularities that courts have cited in holding data compilations to be inadmissible. *See, e.g., Potamkin*, 38 F.3d at 633 (upholding lower court's conclusion that computer generated records were unreliable because they "contained numerous uncorrected errors").

These irregularities in the EDNY Claims Data are particularly problematic given that this data serves as the exclusive source for Relator's multi-billion dollar damage and penalty analysis. *Cf. United States v. Cincotta*, 689 F.2d 238, 243 (1st Cir. 1982) (upholding admission of notebook as a business record despite some errors because it was corroborated in many instances by other evidence). Moreover, the errors identified are only those that could be determined from the face of the EDNY Claims Data. Further errors might well come to light if CMS explained adequately what each field and value in the EDNY Claims Data represents or how the EDNY Claims Data was selected, processed, and compiled.

The EDNY Claims Data also lacks trustworthiness because CMS has provided no meaningful information about the source of the data reflected therein. The First Circuit has repeatedly emphasized that business records are not reliable where the source of information is not identified. *See Ricciardi v. Children's Hosp. Med. Ctr.*, 811 F.2d 18, 23 (1st Cir. 1987) ("An unknown source is hardly trustworthy."); *Petrocelli v. Gallison,* 679 F.2d 286, 289 (1st Cir. 1982) (upholding the exclusion of evidence under Rule 803(6) "primarily because of the

complete absence of any indication as to where this information … came from").  Although the ultimate source of much of what is reflected in the EDNY Claims Data is presumably the providers who submitted claims for reimbursement, CMS has not explained how that information is recorded or maintained.  CMS has not even revealed whether the underlying data was stored electronically or stored in paper form and transcribed into spreadsheets by CMS employees or other individuals acting at CMS' direction.  If the data was stored electronically, CMS has not explained how and by whom it was originally recorded, the computer system used to maintain it, and how it was retrieved and used to populate spreadsheets.  Without knowing where the EDNY Claims Data came from, there is simply no way to conclude that it is sufficiently reliable to be admitted.

Moreover, because CMS has refused to submit to a deposition on this subject or to produce a witness at trial, Amgen will have no way of meaningfully questioning the trustworthiness of the data at trial, if it is admitted.  *See Wilco Kuwait (Trading) S.A.K. v. deSavaray*, 843 F.2d 618, 628 (1st Cir. 1988) (holding that telex was untrustworthy and inadmissible under Rule 803(6) in part because the declarant "did not testify at trial and apparently was never deposed"); *see also United States v. Briscoe*, 896 F.2d 1476, 1494 (7th Cir. 1990) (holding that computer generated telephone records were admissible under Rule 803(6) in part because "defense counsel were given an opportunity to, and did in fact, cross-examine [the keeper of records] on all of the information concerning the telephone records presented at trial").  Thus, even if Relator and CMS had laid a proper foundation for the admission of the EDNY Claims Data – which they have not – it would still be inadmissible hearsay because its trustworthiness has not been sufficiently established and cannot be meaningfully challenged at trial.

-15-

## CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court allow their

Motion *In Limine* to Exclude Unauthenticated Data Compilations Provided by CMS.


DATED:  September 26, 2011                          Respectfully submitted,


BY:  /s/ Kirsten V. Mayer                          BY:  /s/ Thomas J. Sullivan
Brien O'Connor (BBO # 546767)                      Peter E. Ball
Kirsten V. Mayer (BBO # 641567)                    SALLY & FITCH LLP
William J. Dunn (BBO # 666465)                     One Beacon Street
ROPES & GRAY LLP                                   Boston, MA 02108
Prudential Tower                                   peb@sally-fitch.com
800 Boylston Street                                (617) 830-1221
Boston, MA  02199-3600
Tel:  617.951.7000                                 James M. Becker (admitted *pro hac vice*)
Fax:  617.951.7050                                 BUCHANAN INGERSOLL & ROONEY, PC
brien.o'connor@ropesgray.com                       Two Liberty Place
                                                   50 S. 16th St., Suite 3200
David S. Rosenbloom, pro hac vice                  Philadelphia, PA  19102
Douglas E. Whitney, pro hac vice                   james.becker@bipc.com
MCDERMOTT, WILL & EMERY LLP                         (215) 665-5366
227 West Monroe Street, Suite 4400
Chicago, IL 60606-5096                             Eric W. Sitarchuk (admitted *pro hac vice*)
Tel:  312-372-2000                                 Meredith S. Auten (admitted *pro hac vice*)
Drosenbloom@mwe.com                                Thomas J. Sullivan (admitted *pro hac vice*)
                                                   MORGAN, LEWIS & BOCKIUS LLP
Michael Kendall (BBO # 544866)                     1701 Market St.
Daniel A. Curto (BBO # 639883)                     Philadelphia, PA 19103
MCDERMOTT, WILL & EMERY LLP                         (215) 963-5000
28 State Street
Boston, MA  02109-1775                             *Counsel for International Nephrology*
Tel:  617.535.4000                                 *Network and ASD Healthcare*
Fax:  617.535.3800
mkendall@mwe.com


*Counsel to Amgen Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and a copy will be sent by electronic mail to those indicated as non registered participants on September 26, 2011.

<u>/s/ Kirsten V. Mayer</u>
Kirsten V. Mayer